**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

EMPIRE LEASEHOLDER LLC,

    and

EMPIRE OFFSHORE WIND LLC,

              *Plaintiffs*,

v.

DOUGLAS J. BURGUM, in his official capacity
as Secretary of the U.S. Department of the Interior,

U.S. DEPARTMENT OF THE INTERIOR,

MATTHEW GIACONA, in his official capacity as
Acting Director of the Bureau of Ocean
Management,

and

BUREAU OF OCEAN ENERGY
MANAGEMENT.

              *Defendants*.

Case No. _____

## COMPLAINT

Plaintiffs Empire Leaseholder LLC and Empire Offshore Wind LLC (together, "Empire Wind") allege as follows:

## INTRODUCTION

1.      This case challenges an action by the United States that unlawfully suspends the development of the Empire Wind Project, a fully permitted, multi-billion-dollar commercial wind project that would provide 810 megawatts ("MW") of renewable energy to the State of New York, capable of powering more than 500,000 homes, by 2027. The order ("Suspension Order") offers

no plausible justification for such an extraordinary action, was issued with no notice whatsoever to Empire Wind, finds no authority in the Outer Continental Shelf Lands Act, and violates the Due Process clause of the Fifth Amendment. The Suspension Order is just the latest unlawful action by the Trump Administration against the development of offshore wind, including against offshore wind projects actively under construction. The Suspension Order should be set aside for its clear and significant legal deficiencies.

2.    The Empire Wind Project (the "Project") and associated construction at an onshore port facility in Brooklyn, New York have put more than 4,000 people to work across a range of positions, from tradespeople to mariners to regulatory compliance personnel. Empire Wind has completed a substantial amount of offshore and onshore construction relating to the first phase of the Project, Empire Wind 1 ("EW 1"), since the Project was authorized more than *22 months ago* in February 2024, expending billions of dollars. After nearly 10 years of planning, review, and construction, Empire Wind expects to provide first power to the grid by 2027 in fulfillment of its contract to sell power to the New York State Energy Research and Development Authority.

3.    But those efforts were thrown into disarray when Defendant Bureau of Ocean Energy Management ("BOEM"), a Bureau within the United States Department of the Interior ("Interior"), issued the Suspension Order. **Exhibit A**, Suspension Order by Acting BOEM Director Matthew Giacona to Empire Offshore Wind LLC (Dec. 22, 2025). Despite the detailed review of national security implications that BOEM completed in consultation with the Department of Defense, now called the Department of War ("DoW"), over the course of the Project's seven-year permitting process, the Suspension Order asserts that a November 2025 DoW "assessment" provided Interior with new and classified information that led BOEM to conclude that approved lease activities must be suspended while the agency considers whether potential

-2-

harms can be mitigated.[1]  On the same day, BOEM suspended activity for all offshore wind projects under construction off the east coast of the United States.

4.    The United States' conjuring of generalized and unsupported justifications to thwart the Project's progress are nothing new.  This is the second such attempt by the United States to halt construction of the Project illegally.  On April 16, 2025, Interior and BOEM issued a similarly unlawful "Stop Work Order" requiring Empire Wind to halt construction.  After having been pushed to the brink of cancelling the Project, Empire Wind resumed construction after BOEM rescinded the Stop Work Order, installing the Project's 54 monopile foundations into the seafloor, and proceeding with numerous other construction tasks only for the United States to halt construction again by issuing the December 22, 2025, Suspension Order.  Empire Wind cannot wait for the United States to change its mind, as the Suspension Order is preventing Empire Wind from accessing its construction loan, delaying the Project's construction schedule, and threatening termination of the Project.  The delay contemplated by the Suspension Order — at least 90 days with a potential extension — will likely result in cancellation of the Project given the complex construction schedule that is dependent upon highly choreographed specialized vessels and necessary sequencing of certain construction activities.  In the meantime, Empire Wind cannot draw down on construction financing used to pay employees and contractors and is prohibited from performing any offshore construction activities other than those necessary to respond to an emergency or prevent impacts to health, safety, and the environment.

---

[1] On September 5, 2025, President Trump signed an Executive Order authorizing the Secretary of Defense to refer to the U.S. Department of Defense by use of an additional secondary title, the Department of War.  During the review of the Empire Wind Project, the agency acted as the Department of Defense.  This filing refers to the Department of Defense as the Department of War or "DoW" for clarity.

5.    The Empire Wind Project was approved by the United States government through a roughly seven-year, multi-agency, multi-million-dollar, no-stone-unturned administrative process to ensure that the Project meets or exceeds every applicable environmental, marine, and safety statute and regulation.  As part of that federal review process, Empire Wind commissioned scores of studies at the agencies' request, at a cost of hundreds of millions of dollars; BOEM led (in consultation with numerous agencies) a comprehensive review under National Environmental Policy Act ("NEPA"); and Empire Wind agreed to hundreds of conditions imposed by the agencies, to include the DoW, to ensure that the Project appropriately mitigated all environmental, marine, national security, and safety issues.  On February 21, 2024, BOEM issued the "green light" approval for the offshore construction and operation of the Empire Wind Project, which will provide energy for half a million homes in the State of New York.  In short, the United States government exhaustively studied, considered, and then decided that the Empire Wind Project was not only safe and appropriate, but also beneficial to the Nation's interests.

6.    In reliance on authorizations committing the United States to allowing the construction and operation of the Empire Wind Project and having already invested hundreds of millions of dollars to complete the review process, Empire Wind began onshore construction in April 2024 and offshore site preparation in July 2024.  Empire Wind has invested over $4 billion to develop, construct, and operate the Project, with $1.5 billion expended since BOEM rescinded the April Stop Work Order.  This investment includes costs associated with permitting, engineering, surveys, construction, site preparation, and other procurement and development activities.  Indeed, in close coordination with Interior after the rescission of the April Stop Work Order, Empire Wind has installed all 54 monopile foundations and transition pieces, the foundation of the offshore substation, a significant portion of the Project's inter-array cables connecting

components within the Lease area, and a significant portion of the Project's two 46-mile submarine export cables that will connect the Project to shore, resulting in the Project being approximately 60% percent complete. Empire Wind is now well along in offshore construction and in the middle of a number of critical steps required to be completed to avoid safety and environmental risks and to deliver power to the electrical grid by 2027.

7.      Nevertheless, the United States government declared that the Project may not proceed, with no meaningful explanation or attempt to first engage Empire Wind in addressing new concerns that it alleges have arisen, despite having possession of the classified information on which they now rely since November 2025. The United States' non-explanation for its about-face is as hollow as it is pretextual. The Suspension Order provides no justification warranting the shutdown of a multi-billion-dollar infrastructure project that is actively under construction. Indeed, the Project's impacts—or lack thereof—on national security were extensively studied by BOEM and the DoW, which concluded that the studied impacts either posed no concern or were acceptably mitigated. The capriciousness of the Suspension Order is underscored by the fact that the United States recently and *successfully* defended one of the Project's key permits before this Court and the U.S. District Court for the District of New Jersey. *See Save Long Beach Island v. U.S. Dep't of Com.,* No. 1:25-cv-2214 (CJN), Dkt. 21, at 32 (D.D.C. Sept. 5, 2025) ("*SLBI*") (BOEM stating just three months ago that a halt of the Project's construction "would harm the public interest by unnecessarily disrupting years of work and analysis that Federal Defendants conducted in connection with issuing the challenged [Empire Wind] Project approvals."); *Save Long Beach Island v. U.S. Dep't of Com.*, No. 3:23-cv-1886 (RK) (JBD), 794 F. Supp. 3d 273 (D.N.J. July 2, 2025) (holding that Empire Wind's permit was valid based on United States actively defending Project and arguing it did not pose risks to endangered whales). This Court agreed with

BOEM's argument that continued construction of the Project is in the public interest: "The government's—and thereby the public's—interest would also be negatively affected by the loss of thousands of jobs and a new source of clean energy that would result from the derailment of construction . . . the relevant government actors have already determined that the benefits of the project outweigh the downsides . . ." *SLBI*, No. 1:25-cv-2214 (CJN), 2025 WL 2996157, at *6 (D.D.C. Oct. 24, 2025). The United States is also actively defending BOEM's rescission of the first Stop Work Order.[2]

8.    The Suspension Order is arbitrary and capricious, unlawful, and cannot stand. Due to the Suspension Order, Empire Wind's financing is immediately threatened, and Empire Wind is unable to draw down on its construction loan used to fund construction efforts and pay employees and contractors. If the Suspension Order is not rescinded, it may jeopardize the Project's existing funding. Empire Wind's tight construction time frame also necessitates rescission of the Suspension Order.

9.    The Suspension Order violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 and the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331 *et seq*. First, the APA requires Interior and BOEM to articulate the reasons for their decisions within the boundaries provided by the law and to refrain from engaging in an arbitrary and capricious departure from their prior determinations and past policies without adequate explanation.

10.    Here, the United States has arbitrarily and capriciously violated that fundamental requirement by offering only cursory and generic reasons for their decision to halt construction of

---

[2] *See Protect Our Coast NJ, et al. v. United States of America*, No. 3:25-cv-6890-(GC)-(TJB) (D.N.J. filed June 3, 2025).

a Project they gave final approval for 22 months ago, after a seven-year administrative review and approval process. The final Project approval issued by BOEM determined that given the mitigation measures required, the Project did not pose a threat to national security. The Suspension Order fails to provide a reasoned explanation for BOEM's decision that all lease activities must now be suspended for "reasons of national security." *See* Ex. A at 1. The Suspension Order also constitutes an arbitrary and capricious change in position without adequate explanation or acknowledgement of Empire Wind's significant reliance interests. These reliance interests are particularly significant considering the losses Empire Wind incurred during the pendency of the April 2025 Stop Work Order, during which time Empire Wind incurred an estimated $200 million in delay costs.

11.  The Suspension Order is also arbitrary and capricious because it is overly broad. Interior's press release suggests that the Suspension Order aims to address concerns related to air defense radar interference caused by the spinning of wind turbine blades.[3] But Empire Wind's towers and blades have not yet been installed, and the Suspension Order halts all construction activities not necessary for safety or protection of the environment, including activities like cable installation that would have no impact on air defense radar. It also remains unclear why the Project would be treated differently from other commercial activities offshore. Moreover, a press release cannot justify the suspension or cure plain deficiencies in the agency's action. The Suspension

---

[3] "As for the national security risks inherent to large-scale offshore wind projects, unclassified reports from the U.S. Government have long found that the movement of massive turbine blades and the highly reflective towers create radar interference called 'clutter.' The clutter caused by offshore wind projects obscures legitimate moving targets and generates false targets in the vicinity of the wind projects." U.S. Dept. of the Interior, *Press Release: The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases* (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases.

Order itself provides no facts at all to support Interior's action.  The Suspension Order is an overly broad remedy that is not narrowly tailored to address the risk purportedly identified by BOEM and the DoW, which BOEM has otherwise failed to reasonably explain.

12.     The government's pretextual statements regarding the justification for the Suspension Order further demonstrate that the Order is arbitrary and capricious.  Statements by the Secretary of Interior and the White House regarding BOEM's issuance of the Suspension Order suggest the true motivation for the Suspension Order relates to the Administration's opposition to offshore wind energy.  These statements focus on the cost of offshore wind energy and the disadvantages of offshore wind energy in comparison to natural gas fired power, characterizing offshore wind as a "scam."[4]  These explanations are completely unrelated to the "reasons of national security" cited in the Suspension Order.  These pretextual statements also suggest the Suspension Order was issued based on undue political influence, constituting a violation of the APA.

---

[4] "Offshore wind is the MOST EXPENSIVE form of electricity in our country. This is a self inflicted pricing issue for residents in New England when we have abundant natural gas nearby in Pennsylvania!" Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 22, 2025, at 12:59 p.m.), https://x.com/SecretaryBurgum/status/2003163435320926688;  "Due to national security concerns, by the [Department of War], [Interior] is PAUSING leases for 5 expensive, unreliable, heavily subsidized offshore wind farms! ONE natural gas pipeline supplies as much energy as these 5 projects COMBINED. [President Trump] is bringing common sense back to energy policy & putting security FIRST!" Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 22, 2025, at 8:35 a.m.), https://x.com/SecretaryBurgum/status/200309466604787213; "The White House was more explicit that Trump simply doesn't want wind. 'President Trump has been clear: wind energy is the scam of the century,' said Taylor Rogers, a White House spokesperson, repeating a favorite administration talking point. 'For years, Americans have been forced to pay billions more for the least reliable sources of energy.'"  Benjamin Storrow and Kelsey Tamborrino, *'Incredibly reckless': Trump's wind halt stuns even some allies*, POLITICO (Dec. 22, 2025), https://www.politico.com/news/2025/12/22/trump-leaves-wind-industry-reeling-at-a-perilous-moment-for-his-party-00704170.

13.     Second, OCSLA and the implementing regulations constrain the United States' ability to suspend activities on the lease for national security and defense purposes after project approval.  BOEM's actions plainly ignore these clear constraints in violation of the law.  A suspension for national security reasons is authorized only under Section 12(c) of OCSLA.  That provision directs the Interior Secretary to include in all leases "a provision whereby authority is vested in the Secretary, upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, after August 7, 1953, to *suspend operations* under any lease . . . . "  43 U.S.C. § 1341(c) (emphasis added). Section 12(c) also provides for payment of compensation.  Authority for the Secretary to suspend operations for national security reasons appears nowhere else in OCSLA and none of the circumstances allowing suspension were invoked by Interior with respect to the Empire Wind lease.

14.     Finally, the United States' conduct here is contrary to the Fifth Amendment of the United States Constitution.  The law provides only narrow circumstances in which the United States may take actions adverse to the Project now that it has been approved and is underway.  In issuing the Suspension Order, the United States deprived Empire Wind of its Fifth Amendment right to due process by directing a halt to these lawful activities without affording Empire Wind notice or an opportunity to be heard.  The Defendants' failure to provide any notice is particularly egregious considering that Empire Wind participates in biweekly calls led by BOEM to discuss the status of construction, the last of which occurred on December 17, 2025 — just six days before BOEM issued the Suspension Order.  No national security concerns were mentioned in this meeting.

15.    Empire Wind respectfully requests that this Court issue a declaratory order finding that the Suspension Order is unlawful, arbitrary and capricious, an abuse of discretion, and otherwise in violation of the APA and OCSLA.  Empire Wind further requests that this Court vacate the Suspension Order and enjoin its implementation and enforcement on the grounds that it violates the Due Process clause of the Fifth Amendment to the United States Constitution and OCSLA, and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under the APA, 5 U.S.C. § 706.

## JURISDICTION AND VENUE

16.    The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, specifically OCSLA, 43 U.S.C. §§ 1331-1356c and APA, 5 U.S.C. §§ 701-706, and the United States Constitution.  The Court also has jurisdiction under OCSLA's citizen suit provision, 43 U.S.C. § 1349(b).

17.    The relief requested herein is proper under the APA, 5 U.S.C. §§ 701-706, Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and OCSLA, 43 U.S.C. § 1349(a)(1).

18.    The Suspension Order is final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, and 706.  The Suspension Order is immediately effective, marks the consummation of Defendants' decision-making, and results in immediate, irreparable legal consequences to Empire Wind.

19.    Empire Wind has directly suffered and will continue to suffer ongoing actual and imminent concrete injuries as result of the Suspension Order.  Empire Wind is the direct target of the Suspension Order.  Except for certain activities to protect safety and the environment, the Suspension Order prohibits Empire Wind from continuing its offshore Project construction activities, which Empire Wind was actively undertaking when the Suspension Order was issued.

The Suspension Order has and will continue to impose substantial financial harm on Empire Wind, harm to the public interest, and harm to employees working on the Project and associated facilities. The Suspension Order also is causing existential harm to Empire Wind by preventing Empire Wind from completing the Project. These injuries suffered by Empire Wind are concrete and particularized and traceable to the Suspension Order, providing the requisite stake in the outcome of this controversy necessary for this Court's jurisdiction.

20.    There is no mandatory statutory or regulatory requirement that Empire Wind exhaust administrative remedies. To the extent required, Empire Wind provided notice to the Defendants of the alleged violations in compliance with 43 U.S.C. § 1349(a)(1). *See* **Exhibit B**, OCSLA Notice of Empire Wind's Intent to Sue. Because the Defendants' alleged violations "immediately affect a legal interest of the plaintiff," Empire Wind is authorized to file suit immediately after such notification. 43 U.S.C. § 1349(a)(3).

21.    Venue is proper in this district under 28 U.S.C. § 1391(e) and 43 U.S.C. § 1349(b)(1) because Defendants reside in this district and a substantial part of the events or omissions took place here.

## PARTIES

22.    Plaintiff Empire Leaseholder LLC is a Delaware limited liability company with its principal place of business in Stamford, Connecticut. Empire Leaseholder LLC is the lessee to Lease OCS-A 0512 ("Lease") issued by BOEM, which defines an area located on the Outer Continental Shelf ("OCS") offshore Brooklyn, New York for the lessee to develop renewable energy. Empire Leaseholder LLC is the holder of several federal permits issued by the United States, including the Construction and Operations Plan ("COP") approval issued by BOEM for the Project. Empire Leaseholder LLC's sole corporate function is the development, financing,

construction, and operation of the Empire Wind Project. Empire Leaseholder LLC is an affiliate of Equinor ASA, a global offshore energy company with interests in offshore oil and gas operations, including in the Gulf of America, and offshore wind projects.

23.     Plaintiff Empire Offshore Wind LLC is a Delaware limited liability company with its principal place of business in Stamford, Connecticut. Empire Offshore Wind LLC is the Designated Operator approved by BOEM and is authorized under BOEM's regulations to develop the Project on behalf of Empire Leaseholder LLC. Empire Offshore Wind LLC is also the holder of several federal permits and approvals issued by the United States for the Project. Empire Offshore Wind LLC's sole corporate function is the development, financing, construction, and operation of the Empire Wind Project. Empire Offshore Wind LLC is an affiliate of Empire Leaseholder LLC and Equinor ASA.

24.     Defendant Interior is an agency of the United States charged with the responsibility over leasing, permitting, construction, and operation of offshore wind projects on the OCS pursuant to OCSLA and its implementing regulations.

25.     Defendant Douglas J. Burgum is sued in his official capacity as the Secretary of the Interior. Secretary Burgum is the federal official ultimately responsible for the management and oversight of leasing, permitting, construction, and operation of offshore wind projects on the OCS pursuant to OCSLA, and for all official actions or inactions of Interior and BOEM challenged in this Complaint.

26.     Defendant BOEM is a federal agency within Interior that is responsible for the administration of leasing and permitting of offshore energy projects on the OCS pursuant to OCSLA.

27.    Defendant Matthew Giacona is the Acting Director of BOEM.  Acting Director Giacona is sued in his official capacity as Acting Director of BOEM.

## GENERAL ALLEGATIONS

**A.    The Empire Wind Project.**

28.    The Empire Wind Project involves the construction of a 2,070 MW commercial-scale offshore wind farm located on the OCS approximately 14 miles offshore New York, in addition to substantial onshore facilities to support the offshore power generation facilities. Consistent with various approvals issued by the United States, including by Interior, Empire Wind is developing the Project in two phases: Empire Wind 1 and Empire Wind 2.  Empire Wind 1 is currently under construction in the western portion of the Lease area and will generate approximately 810 MW of energy that has been committed to the State of New York.  The energy will be delivered to a substation in Brooklyn.  Empire Wind 1 will consist of 54 offshore wind turbines, one onshore substation, and one offshore substation.  When fully constructed, Empire Wind 1 will be capable of powering more than 500,000 homes.  **Figure 1** shows Empire Wind's location in relation to shore.

**Figure 1: Empire Wind Project**



29.     The Project is being built in the Lease area designated in the Lease issued by BOEM

pursuant to OCSLA.  OCSLA requires that the OCS "be made available for expeditious and orderly

development, subject to environmental safeguards, in a manner which is consistent with the

maintenance of competition and other national needs . . . ."  43 U.S.C. § 1332(3).  Renewable

energy leasing is authorized by specific provisions of OCSLA, contained in 43 U.S.C. § 1337(p).

Pursuant to OCSLA, BOEM is responsible for leasing portions of the OCS for renewable energy

development, considering a set of twelve enumerated factors, including protection of national

security interests of the United States, safety, protection of the environment, prevention of waste,

and prevention of interference with other reasonable uses of the OCS.  *Id*. § 1337(p)(4).

30.    In April 2024, Empire Wind commenced construction of the onshore portion of Empire Wind 1 at the supporting port—the South Brooklyn Marine Terminal ("SBMT").[5] Empire Wind is constructing the onshore substation at SBMT and converting SBMT into a construction and operations and maintenance port for the Project.  SBMT is being substantially upgraded to support the Project's activities as well as the long-term operations and maintenance activities. Work to upgrade the marine terminal is not subject to regulation by BOEM, but that work is necessary and critical to the Empire Wind Project's interconnection into the grid and to undertake operations and maintenance activities for the Project.

31.    In July 2024, Empire Wind began in-water construction work to prepare to install the two offshore export cables that will bring the Project's power from the offshore turbines to the onshore substation in Brooklyn, including clearance activities along the route where the cables have been laid, dredging near the shore, and reconstructing the piers at SBMT to accommodate the cables' landfall.  Between June and October 2025, Empire Wind installed all 54 monopile foundations that will support the wind turbine generators.  In July 2025, Empire Wind began installing the Project's two 46-mile offshore export cables that will deliver power, and this work is nearly complete.  When the Suspension Order was issued, Empire Wind's contractors were actively engaged in offshore and onshore construction efforts.  The Project is now at a critical stage in construction, and the suspension risks Project termination in light of the month-long delay resulting from the April 2025 Stop Work Order.

---

[5] *See* Equinor, "Groundbreaking at Southern Brooklyn Marine Terminal to transform port into NYC offshore wind hub" (June 10, 2024), *available at* https://www.equinor.com/news/us/groundbreaking-at-south-brooklyn-marine-terminal-to-transform-port-into-nyc-offshore-wind-hub.

32.    Empire Wind has commissioned the fabrication of several bespoke Project components, including the Project's monopile foundations and the foundation that will support the Project's offshore substation, all of which have been installed.  Empire Wind is scheduled to complete construction of the Empire Wind 1 phase by the summer of 2027, with the Project commencing commercial operations by the end of 2027.

33.    Once operational, Empire Wind 1 will fulfill Empire Wind's contractual obligations to the State of New York to deliver 810 MW of renewable energy and provide significant environmental and economic benefits to the region.  Through the construction and operation of Empire Wind 1 alone, Empire Wind is expected to deliver nearly $5 billion in economic benefits to the State of New York.  Empire Wind will contribute to the State of New York's goal of procuring 9,000 MW of offshore wind generating capacity by 2035. *See* New York State Climate Leadership and Community Project Act, 2019 N.Y. Sess. Laws ch. 106 (McKinney 2019).

34.    The Project began nearly a decade ago when BOEM first initiated the regulatory process to propose portions of the OCS offshore New York for leasing.  Following extensive stakeholder engagement and environmental review, BOEM held a competitive auction for the sale of the Lease on December 15-16, 2016, during which BOEM auctioned the 79,350-acre Lease area.  Statoil Wind US LLC, later renamed Equinor Wind US LLC, won the Lease in the December 2016 auction for roughly $42 million and was subsequently awarded the Lease.  The Lease became effective on April 1, 2017, during the first Administration of President Trump.  Equinor Wind US LLC assigned the Lease to Empire Offshore Wind LLC on January 27, 2021.  The Lease has since been assigned to Empire Leaseholder LLC as of November 1, 2024, and was amended by BOEM and Empire Leaseholder LLC on December 30, 2024.

35.    BOEM issued Empire Wind's Lease pursuant to its leasing regulations at 30 C.F.R. Part 585.  Section 8 of the Lease provides that "[a]ny cancellation or suspension ordered by [BOEM] that is predicated on a threat of serious irreparable, or immediate harm or damage, or on an imminent threat of serious or irreparable harm or damage, requires a finding by [BOEM] of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities."  The Lease further provides that "[a]ny cancellations are subject to the limitations and protections contained in subsections 5(a)(2)(B) and (C) of the Act (43 U.S.C. § 1334 (a)(2)(B) and (C))."  Section 3 of Empire Wind's Lease addresses suspensions and cancellations for national security reasons, limiting BOEM's right to suspend Empire Wind's operations "in accordance with the national security and defense provisions of Section 12 of the [OCSLA] and applicable regulations, provided that compensation must be paid to the Lessee as provided by 43 U.S.C. § 1341(c) and (d)."  Section 3 of the Lease provides that "[e]very effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations and/or evacuate."

36.    Following its receipt of the Lease, Empire Wind spent roughly seven years developing the Project, undertaking federal, state, and local/municipal reviews, and securing the necessary permits, authorizations, and/or approvals.  Empire Wind began by conducting extensive surveys of the Lease area and associated easements to characterize the seabed, ocean, and weather conditions in these areas.  The results of these surveys informed the design and layout of the Project, and much of the data was submitted to various permitting agencies, including BOEM.

37.    Pursuant to OCSLA and BOEM's regulations, on January 10, 2020, Empire Wind submitted to BOEM a Construction and Operations Plan, or COP, which spanned thousands of pages and included detailed analyses.  The COP includes thousands of pages and 32 appendices

containing voluminous information on potential impacts to national security and defense, radar systems, navigation and safety, aviation, electromagnetic fields, air emissions, air and underwater acoustics, marine mammals, avian and bat species, benthic resources, essential fish habitat, marine archaeological resources, terrestrial archaeological resources, historic properties, among many other analyses and data. In the COP, Empire Wind proposed nearly 300 voluntary mitigation and monitoring measures aimed at protecting and minimizing impacts to the various resources and activities that could be impacted by the Project, including national security.

38.      BOEM spent over a year reviewing drafts of the COP and requesting updated versions before formally beginning its environmental review of the Project under NEPA on June 24, 2021. 86 Fed. Reg. 33351. BOEM then spent more than two years closely studying the Project's impacts and soliciting input from the public and cooperating federal agencies participating in the review process, including the DoW. This review process culminated in BOEM's publication of the Project's final environmental impact statement on September 15, 2023. Following its publication of the environmental impact statement ("EIS"), BOEM published a record of decision ("ROD") pursuant to NEPA on November 21, 2023, which contained the agency's conclusions regarding the Project's environmental impacts.[6]

39.      Along with its publication of the ROD, BOEM also published a 29-page memorandum in which the agency evaluated all the information that Empire Wind provided in its COP and the final EIS and assessed it in relation to the enumerated factors in Subsection 8(p)(4) of OCSLA, 43 U.S.C. § 1337(p)(4) ("OCSLA Factors Memorandum"). The OCSLA Factors Memorandum contained BOEM's assessment of whether approval of the Project would ensure

---

[6] BOEM's ROD was issued jointly with the National Oceanic and Atmospheric Administration's National Marine Fisheries Service.

"protection of the national security interests of the United States," as required by 43 U.S.C. § 1337(p)(4)(F).   In the OCSLA Factors Memorandum, BOEM expressly concluded that "[a]pproval of the COP . . .would be in accordance with the regulations at 30 C.F.R. part 585 and would ensure that all Project activities on the OCS are carried out in a manner that provides for the factors in Subsection 8(p)(4) of OCSLA" — which specifically include "protection of national security interests of the United States."   Relying in part on the OCSLA Factors Memorandum, BOEM approved Empire Wind's COP ("COP Approval") on February 21, 2024, subject to dozens of terms and conditions that span more than one hundred pages.   The COP Approval authorizes Empire Wind to construct the Project consistent with the required terms and conditions.   On December 20, 2024, BOEM amended the COP Approval by administratively re-issuing the COP Approval as two separate COP approvals, one for the development of Empire Wind 1 and one for the development of Empire Wind 2.

40.    BOEM's COP Approval was preceded by the issuance of several other federal permits and approvals that took years to obtain, including a Letter of Authorization ("LOA") issued by the National Oceanic and Atmospheric Administration's National Marine Fisheries Service, a Clean Air Act permit from the U.S. Environmental Protection Agency, and a Clean Water Act permit from the U.S. Army Corps of Engineers.   Empire Wind also completed various consultations under statutes such as the Endangered Species Act and the Magnuson-Stevens Fisheries Conservation and Management Act.

41.    The review process leading up to the agency's findings under OCSLA included extensive coordination with the DoW and the United States Navy (the "Navy") before BOEM even issued the Lease and during the review of the Project.   Prior to the lease sale that resulted in the issuance of Empire Wind's Lease, BOEM developed the geographic boundaries of the lease area

through coordination with stakeholders to address concerns surrounding overlapping military and security uses. DoW was involved in the siting process that preceded the issuance of the Project's lease and regularly attended the intergovernmental taskforce meetings organized by BOEM, even presenting on DoW's assessment of the suitability of waters offshore New York for wind energy. DoW was a cooperating agency in the BOEM-led NEPA review to ensure that national security interests were accounted for during every step of the process.

42.     Both BOEM and Empire Wind consulted extensively with the DoW's Military Aviation and Installation Assurance Siting Clearinghouse ("DoW Clearinghouse"), which acts as the single point of military contact overseeing the military mission compatibility evaluation process for all energy projects or energy-related projects in the United States. BOEM coordinates with the DoW Clearinghouse to review each proposed offshore wind project on a project-by-project basis and resolves any conflicts identified by the DoW Clearinghouse through conditions to its approval of the COP. As part of this process, project developers also consult directly with the DoW Clearinghouse to mitigate potential impacts on military and security operations. Empire Wind's consultation with the DoW Clearinghouse resulted in several mitigation measures designed to address potential impacts to national security, including radar.

43.     These mitigation measures were incorporated into BOEM's COP Approval at Conditions 3.2, 4.2, 4.3, and 4.4. For example, Condition 4.2 of the COP Approval requires Empire Wind to mitigate radar impacts to the North American Aerospace Defense Command's ("NORAD") operation of the Riverhead, New York Air Route Surveillance Radar-4 ("ARSR-4"). by notifying DoW/NORAD at least 30 days prior to the commissioning of the Project's last wind turbine to schedule Radar Adverse Impact Management ("RAM"). Condition 4.2 also requires Empire Wind to pay $80,000 to fund the RAM and enter into a mitigation agreement with

DoW/NORAD to implement these mitigation measures.  Empire Wind is required to provide BOEM notification of its implementation of these mitigation measures within 45 days of completion.

44.    Empire Wind has been in regular communication with DoW, NORAD, and the Navy since 2020 to ensure the national security mitigation measures are implemented and that any national security concerns are addressed.  On December 12, 2025, Empire Wind's consultant discussed the status of the DoW radar mitigation agreement with NORAD, and the agency reported that the mitigation agreement has been drafted and is still being reviewed by the DoW Clearinghouse.  Since construction of the Project began, Empire Wind has not received notice from DoW or the Navy regarding any adverse impacts to national security caused by the Project's construction, and Empire Wind has not received a notice of non-compliance from Interior relating to non-compliance with the conditions of the COP Approval.

**B.    Empire Wind's Investment.**

45.    Since 2019, Empire Wind has expended more than $4 billion in costs associated with the Project.  This includes development and construction costs for the Project and supporting onshore facilities, including roughly $900 million in costs related to permitting and development efforts necessary to obtain key federal approvals. This value also includes $200 million in delay costs incurred during the pendency of the April Stop Work Order.  To develop the Project, Empire Wind entered into numerous contracts to fabricate, transport, and install the Project components to facilitate onshore and offshore construction of Empire Wind 1.  The collective value of the Project's eleven key construction and fabrication contracts is approximately $3.85 billion and Empire Wind's payments to date under these contracts are included in the approximately $4 billion in costs incurred thus far.  The commercial terms of Empire Wind's contracts and the availability

of vessels, coupled with various permitting conditions, necessitate strict compliance with Empire Wind's construction schedule, which contemplates concluding construction by the summer of 2027.

46.     In December 2024, Empire Wind obtained $3 billion in project financing from a consortium of banks and other lenders.  Empire Wind has since drawn $2.7 billion in financing to construct the Project.  Empire Wind is currently prevented from drawing down on additional financing to fund construction efforts while the Suspension Order is in effect.

**C.    The Suspension Order.**

47.     On December 22, 2025, BOEM issued the Suspension Order.  Ex. A.  The Suspension Order was issued pursuant to 30 C.F.R. § 585.417(b) and requires Empire Wind to "suspend all ongoing activities related to the Empire Wind 1 Project on the Outer Continental Shelf for the next 90 days for reasons of national security."  The Suspension Order provides that during the 90-day period, "BOEM will coordinate with [Empire Wind] to determine whether the national security threats posed by this project can be adequately mitigated."  The Suspension Order bases the need for the suspension on a November 2025 DoW assessment which allegedly provided Interior with "new classified information, including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects." The Suspension Order states that "[b]ased on BOEM's initial review of this classified information, the particularized harm posed by [the Empire Wind Project] can only be feasibly averted by suspension of on-lease activities.  The Suspension Order "invites" Empire With to meet and confer about whether the "national security threats relating to this project can be mitigated . . ."

48.     Empire Wind contacted BOEM one day later on December 23, 2025, requesting a meeting to discuss the Suspension Order and the potential for mitigation.  A meeting was held on

January 2, 2026, but did not result in a resolution.

49.     As a result of the Suspension Order, Empire Wind has continued only those "activities that are necessary to respond to emergency situations and/or to prevent impacts to health, safety, and the environment," as contemplated by the Order.  Approximately 4,000 people have been put to work by Empire Wind and its contractors during the Project's construction phase. That work has now been derailed by the United States' unlawful Suspension Order.

**D.     The Outer Continental Shelf Lands Act.**

50.     The text of OCSLA declares it to be the policy of the United States that the OCS "should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs."  43 U.S.C. § 1332(3).  Following a 2005 amendment, OCSLA's central mandate—to develop the OCS expeditiously and competitively—encompasses federal leasing for offshore renewable energy development.  *See* Energy Policy Act of 2005, Public Law 109-58, 119 Stat. 594.

51.     Pursuant to OCSLA, BOEM is responsible for leasing portions of the OCS for renewable energy development, considering the twelve factors enumerated by OCSLA Section 8(p)(4), including protection of national security interests of the United States, safety, protection of the environment, prevention of waste, national security, and prevention of interference with other reasonable uses of the OCS.  43 U.S.C. § 1337(p)(4).  BOEM's renewable energy regulations under OCSLA, contained in 30 C.F.R. Part 585, outline the process for leasing and obtaining approval of a COP to construct an offshore wind project after a lease has been issued. BOEM serves as the federal agency for permitting offshore wind projects pursuant to the authority granted by OCSLA.  43 U.S.C. § 1337(p)(4); *see* 30 C.F.R. § 585.102.  At the time the Project

received its final approvals from BOEM, Section 585.102(a) of BOEM's regulations required BOEM to "ensure that any activities authorized in this part are carried out in a manner that provides for" the twelve factors enumerated by OCSLA.  30 C.F.R. § 585.102(a).[7]

52.    OCSLA addresses "national security" and "defense" in several places, defining when the interests of "national security" and "defense" may warrant suspension of operations on the lease.   Section 12 of OCSLA, 43 U.S.C. § 1341(c), reserves authority to Interior to suspend "operations under any lease," for reasons of national security if two conditions are satisfied: the DoW must make a "recommendation" and the country must be in a "state of war or national emergency declared by the Congress or the President of the United States…." The same section allows the DoW, with approval from the President, to designate OCS areas necessary for national defense as restricted from development.  43 U.S.C. § 1341(d).

53.    Section 5 of OCSLA addresses lease suspensions for other reasons. The Secretary may prescribe regulations for suspension or temporary prohibition of "any operation or activity," "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits … or to the marine, coastal, or human environment . . . ."  43 U.S.C. § 1334(a)(1).  Section 5 also directs Interior to issue regulations governing lease cancellation, after a hearing, if "continued activity pursuant to such lease or permit would probably cause serious harm or damage to . . . the national security or defense. . . ."

---

[7] After the issuance of Empire Wind's COP Approval on February 21, 2024, Section 585.102(a) of BOEM's regulations was amended effective July 15, 2024 to require that BOEM "ensure that any activities authorized in this part are carried out in a manner that provides for and reaches a rational balance among the following goals to the extent they conflict or are otherwise in tension, none of which inherently outweighs or supplants any other . . ."  *See Renewable Energy Modernization Rule*, 89 Fed. Reg. 42644, 42721-22 (May 15, 2024).

43 U.S.C. § 1334(a)(2)(A)(i).  Such cancellation must be preceded by suspension of operations under the lease.

54.     These provisions are reflected in the applicable regulations and the Lease terms— all of which must be strictly followed to justify an action adverse to the lessee.

**E.     The Administrative Procedure Act.**

55.     The APA authorizes courts reviewing an agency action to "hold unlawful and set aside final agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Here, the Suspension Order is subject to review under these provisions for failure to comply with the APA, OCSLA, and its implementing regulations.

<u>**CLAIMS FOR RELIEF**</u>

<u>**FIRST CLAIM FOR RELIEF:**</u>
<u>**THE SUSPENSION ORDER IS ARBITRARY AND CAPRICIOUS IN VIOLATION**</u>
<u>**OF THE APA, 5 U.S.C. § 706**</u>

56.     Empire Wind incorporates by reference all paragraphs 1-55 of this Complaint as if fully stated herein.

57.     Courts are authorized to "hold unlawful and set aside agency actions, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion . . . ."  5 U.S.C. § 706(2)(A).

58.     An agency action is arbitrary and capricious where the agency fails to engage in "reasoned decisionmaking."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 31 (1983).  The agency must examine the relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made."  *Id*. at 43.

59.     The Suspension Order is arbitrary, capricious, and an abuse of discretion because BOEM fails to offer a satisfactory explanation for suspending activities on the lease. BOEM issued the Project's COP Approval roughly 22 months ago after seven years of study, analysis, public review, and interagency consultations, including with DoW. The COP Approval was preceded by BOEM's Final EIS, the ROD, and the OCSLA Factors Memorandum, wherein BOEM provided detailed descriptions of its coordination with DoW throughout the seven-year permitting process. This no-stone-unturned analysis culminated in BOEM's conclusion that the Project's implementation of certain mitigation measures would ensure the Project will not adversely affect national security or defense operations, including radar.

60.     In light of these mitigation measures, BOEM explicitly found that "[a]pproval of the COP . . . would be in accordance with the regulations at 30 C.F.R. part 585 and would ensure that all Project activities on the OCS are carried out in a manner that provides for the factors in Subsection 8(p)(4) of OCSLA," including "protection of national security interests of the United States." OCSLA Factors Memorandum at 16, 29; 43 U.S.C. § 1337(p)(4).

61.     Condition 4.2 of Empire Wind's COP approval requires Empire Wind to notify NORAD when all WTGs are installed and capable of rotation, enter a mitigation agreement with the DoW to address impacts to Riverhead, NY air surveillance radar and pay $80,000 for such mitigation. Between February 2024 and December 2025, Empire Wind contacted DoW/NORAD on several occasions requesting execution of the required mitigation agreement with DoW. DoW and NORAD have continued to tell Empire Wind that the mitigation agreement has been drafted and is under review within DoW, with the most recent communication coming only 10 days before the Suspension Order was issued and *after* Interior had possession of the "new classified information" upon which the Suspension Order is apparently based. Condition 4.2 of the COP

Approval requires Empire Wind to enter into a coordination agreement with the Navy to mitigate certain impacts related to foreign vendors and distributed fiber optic sensing technology. Empire Wind has remained in close coordination with the Navy regarding mitigation of these impacts, and the Navy has not expressed any concerns relating to the Project's activities since construction began. Finally, Condition 4.4 of the COP Approval requires that where Empire Wind's activities necessitate entrance to any designated defense operating area, warning area, or water test area, Empire Wind is required to enter a coordination agreement with the commander of the appropriate military headquarters to address electromagnetic emissions from survey activities. Empire Wind's activities have not yet required such an agreement.

62.     In direct contravention of this multi-year process under which the government concluded that the Empire Wind posed no threat to national security, BOEM now claims just the opposite, alleging that DoW has provided an assessment containing classified information that demonstrates that the Project poses a risk to national security. BOEM's Suspension Order contains only conclusory statements that fail to explain the complete reversal from BOEM's prior determination that the Project would not impact national security, fails to explain why the required mitigation agreement is not sufficient to address any alleged new threats, and fails to explain why the mitigation measures previously required by BOEM are now insufficient to address the "particularized harm" BOEM alleges is suddenly posed by the Project, which BOEM argues "can only be feasibly averted by suspension of on-lease activities." Because the Suspension Order fails to offer *any*, much less a satisfactory, explanation for BOEM's finding that the Project poses a risk to national security sufficient to warrant a halt of all offshore construction activities, the Suspension Order is arbitrary and capricious in violation of the APA.

63.    Empire Wind is left only with BOEM's public statements that "the movement of massive turbine blades and the highly reflective towers create radar interference called 'clutter,'"[8] but these statements only confirm that BOEM had no rational basis to issue the Suspension Order. BOEM already considered the risk of radar "clutter," in consultation with DoW, and determined that the required mitigation measures at Condition 4.2 were sufficient to address these impacts if they occur. The monopile foundations currently installed in the lease area, which reach a maximum height of only 72 feet, do not pose any risk to radar and there is no particularized harm warranting immediate suspension of all lease activities. BOEM has entirely failed to establish a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

64.    The Suspension Order is also arbitrary and capricious because it is overly broad, halting all construction activities — even those that cannot impact air defense radar. Interior's press release suggests that the Suspension Order aims to address concerns related to air defense radar interference caused by the spinning of wind turbine blades. But the Suspension Order halts all construction activities not necessary for safety or protection of the environment, including activities like cable installation that would have no impact on air defense radar. Interior and BOEM have not shown a rational connection between the allegations of air defense radar interference and a blanket suspension of all construction activities on the lease, even those completely unrelated to radar. The Suspension Order is an overly broad remedy that is not narrowly tailored to address the risk purportedly identified by BOEM and DoW, which BOEM has otherwise failed to reasonably explain. Courts have "no difficulty" concluding that an agency

---

[8] U.S. Dept. of the Interior, *Press Release: The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases,* (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases.

action is arbitrary and capricious where it is "irrationally overbroad." *Nat'l Mining Ass'n v. Babbitt*, 172 F.3d 906, 913 (D.C. Cir. 1999).

65.     The pretextual nature of BOEM's "explanation" for the Suspension Order is made clear when read alongside other public statements by Secretary Burgum and the White House regarding the Suspension Order. These statements focus on the cost of offshore wind energy and the Trump Administration's opposition to offshore wind.[9] They have nothing to do with national security concerns and demonstrate BOEM's purely political or personal motivations for suspending activities on the lease.

66.     The Suspension Order is also arbitrary and capricious in violation of the APA because it violates the "change-in-position doctrine," which holds that an agency may not change its policy position without providing a reasoned explanation for the change, displaying awareness that it is changing position, and considering serious reliance interests impacted by its change in position. *FDA v. Wages and White Lion Investments, LLC*, 604 U.S. 542, 568 (2025) (internal citations and quotations omitted).

---

[9] On the social media platform X, formerly known as Twitter, Secretary Burgum posted the following only minutes after Director Giacona issued the Suspension Order: "Due to national security concerns, by the [Department of War], [Interior] is PAUSING leases for 5 expensive, unreliable, heavily subsidized offshore wind farms! ONE natural gas pipeline supplies as much energy as these 5 projects COMBINED. [President Trump] is bringing common sense back to energy policy & putting security FIRST!" Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 22, 2025, at 8:35 a.m.), https://x.com/SecretaryBurgum/status/200309466040787213. The White House's statements to the press were "more explicit that Trump simply doesn't want wind. 'President Trump has been clear: wind energy is the scam of the century,' said Taylor Rogers, a White House spokesperson, repeating a favorite administration talking point. 'For years, Americans have been forced to pay billions more for the least reliable sources of energy.'" Benjamin Storrow and Kelsey Tamborrino, *'Incredibly reckless': Trump's wind halt stuns even some allies*, POLITICO (Dec. 22, 2025), https://www.politico.com/news/2025/12/22/trump-leaves-wind-industry-reeling-at-a-perilous-moment-for-his-party-00704170.

67.     As explained above, BOEM conducted a comprehensive review of the Project's potential impacts on national security and defense and determined in consultation with DoW that the Project's activities on the OCS would be carried out in a manner that provides for the protection of national security interests of the United States.  43 U.S.C. § 1337(p)(4).

68.     The Suspension Order constitutes a 180-degree reversal of this determination that is accompanied with no meaningful explanation whatsoever, and certainly not the level of "reasoned explanation" required by law.  The Suspension Order fails to explain BOEM's change in position and fails to consider Empire Wind's substantial reliance interests, which include but are not limited to more than $4 billion invested in the Project's permitting, development, and construction.  The Suspension Order violates the change-in-position doctrine and is therefore arbitrary and capricious in violation of the APA.

69.     The Suspension Order is also arbitrary and capricious because it is the result of undue political pressure.  Political pressure invalidates an agency action "when it shapes, in whole or in part, the judgment of the ultimate agency decisionmaker."  *Aera Energy LLC v. Salazar*, 642 F.3d 212, 220 (D.C. Cir. 2011).  Where an agency suddenly reverses course, this "creates the plausible inference that political pressure may have caused the agency to take action it was not otherwise planning to take."  *Connecticut v. U.S. Dep't of the Interior*, 363 F. Supp. 3d 45, 64-65 (D.D.C. 2019).  Statements made by federal officials and the White House regarding BOEM's issuance of the Suspension Order plainly demonstrate that political pressure drove BOEM's decision to issue the Suspension Order, making it arbitrary and capricious in violation of the APA.

70.     For the reasons explained above, the Suspension Order is an arbitrary and capricious reversal of the Defendants' prior decisions and should be held unlawful and set aside consistent with the APA.  5 U.S.C. § 706(2)(A).

**SECOND CLAIM FOR RELIEF:**
**THE SUSPENSION ORDER VIOLATES SECTION 558 OF THE APA, 5 U.S.C. § 558(c)**

71.    Empire Wind incorporates by reference all paragraphs 1-70 of this Complaint as if fully stated herein.

72.    BOEM violated the APA because it acted "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  APA Section 558 makes it unlawful for an agency to issue a "withdrawal, suspension, revocation, or annulment of a license" if it does not give the licensee "notice" and "opportunity to demonstrate or achieve compliance with all lawful requirements" "before" the agency acts.  *Id.* § 558(c).  The APA defines a license as "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission."  *Id.* § 551(8).  An OCSLA lease and COP Approval is a "form of permission" to use the OCS for energy development.  Section 558 has limited exceptions for "cases of willfulness" and where "public health, interest, or safety requires otherwise."  *Id.* Neither applies here.

**THIRD CLAIM FOR RELIEF:**
**THE SUSPENSION ORDER IS CONTRARY TO LAW IN VIOLATION OF OCSLA,**
**43 U.S.C. § 1341, 5 U.S.C. § 706(2)(A)**

73.    Empire Wind incorporates by reference all paragraphs 1-72 of this Complaint as if fully stated herein.

74.    Courts are authorized to hold unlawful and set aside final agency actions contrary to law.  5 U.S.C. § 706(2)(A).

75.    The Suspension Order issued by the Defendants is contrary to law, as the Defendants lack authority to take this action under OCSLA.  43 U.S.C. § 1341(c).

76.    The Suspension Order relies on Section 585.417(b) of BOEM's regulations, which authorize BOEM to suspend a lease "[w]hen the suspension is necessary for reasons of national security or defense."  30 C.F.R. § 585.417(b).

77.    However, OCSLA provides the circumstances under which suspension can occur. Section 12 of OCSLA, 43 U.S.C. § 1341(c), provides Interior authority to suspend "operations under any lease" for national security reasons if two conditions are satisfied: the DoW must make a "recommendation" and the country must be in a "state of war or national emergency declared by the Congress or the President of the United States. . . ."  Section 12 also allows the DoW, with the President's approval, to designate OCS areas necessary for national defense as restricted from development.  43 U.S.C. § 1341(d).

78.    BOEM has not established that the Secretary of Defense has recommended that BOEM suspend operations under Empire Wind's lease, or that a state of war or national emergency exists warranting the Suspension Order.  43 U.S.C. § 1341(c).

79.    BOEM's issuance of the Suspension Order on national security grounds is contrary to law and should be set aside.  5 U.S.C. § 706(2)(A).

## FOURTH CLAIM FOR RELIEF:
## THE SUSPENSION ORDER VIOLATES EMPIRE WIND'S FIFTH AMENDMENT RIGHT TO DUE PROCESS

80.    Empire Wind incorporates by reference all paragraphs 1-79 of this Complaint as if fully stated herein.

81.    The Fifth Amendment to the United States Constitution provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. Amend. V.

82.    Empire Wind has a protected property interest in its Lease and COP Approval. Where an agency's ability to revoke or suspend an authorization is limited or restricted by the law, the holder of the authorization has a property interest in the authorization. *See 3883 Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1072 (D.C. Cir. 2003) (citing *The Bd. of Regents of State Colls v. Roth*, 408 U.S. 564, 577 (1972) and holding that certain permits constitute a protected property interest).  OCSLA and Interior's regulations implementing OCSLA restrict the ability of the Defendants to stop activities on a lease occurring under a duly issued approval and restrict the ability of the Defendants to revoke or suspend Empire Wind's COP Approval or suspend or cancel Empire Wind's Lease.  *See* 43 U.S.C. § 1341; 30 C.F.R. Parts 285, 585.

83.    BOEM's failure to provide process before suspending the lease and failure to provide information allowing Empire Wind to respond violates the Due Process clause of the Fifth Amendment.  Notice and an opportunity to be heard are "threshold procedural requirements" afforded by the Fifth Amendment.  *See Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991).  Empire Wind's substantial private interest in the Lease and COP Approval, the likelihood that the deprivation of Empire Wind's interest in the Lease and COP Approval is erroneous, and the ease by which the government could have notified Empire Wind prior to issuance of the Suspension Order dictate that Empire Wind was owed notice and an opportunity to be heard prior to being deprived of its property interests.  *Mathews v. Eldridge,* 424 U.S. 319, 335, 348-49 (1976).

84.    The Suspension Order also deprives Empire Wind of the process owed pursuant to OCSLA and the terms of the Lease.  Defendants do not have unfettered discretion to halt work on an offshore lease.  Instead, Section 3 of Empire Wind's Lease permits suspension for national security reasons, as limited by 43 U.S.C. § 1341(c), but ensures that "[e]very effort will be made

by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations and/or evacuate. Advance notice will normally be given before requiring a suspension or evacuation." These limitations endow Empire Wind with an expectation that its lawful activities may continue and that the COP Approval and Lease will continue to remain effective in the absence of the government's exercise of this limited authority.

85.    To the extent the Defendants argue that 43 U.S.C. § 1341(c) authorizes them to suspend a lease without notice or without the requisite recommendation of the Secretary of Defense and either a declaration of war or state of emergency, the Suspension Order constitutes a new and uncommunicated interpretation of OCSLA and the Lease.

86.    Moreover, the Defendants have failed to provide any explanation as to how the Project, and ongoing construction, poses a risk to national security, claiming only that a classified report supports this determination. Withholding information necessary for Empire Wind to respond violates the Due Process Clause of the Fifth Amendment.

87.    The Suspension Order did not provide Empire Wind with fair notice, depriving Empire Wind of its Fifth Amendment right to due process.

## REQUEST FOR RELIEF

88.    For the reasons set forth above, Empire Wind respectfully requests that this Court grant the following relief:

a.    A judicial declaration that the Defendants have violated and continue to violate the Due Process Clause of the Fifth Amendment to the United States Constitution, the APA, OCSLA, and OCSLA's implementing regulations through their issuance and implementation of the Suspension Order, and that the Suspension Order is arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law;

b.    An order vacating the Suspension Order;

c.    An order preliminary and permanently enjoining Defendants from implementing or enforcing the Suspension Order or otherwise relying on it to halt or delay Empire Wind's lawful construction activities;

d.    An order preliminarily and permanently enjoining Defendants from withholding any approvals, concurrences or reviews requested by Empire Wind in reliance on the Suspension Order.

e.    Attorney's fees and costs; and

f.    An order granting any other relief the Court deems just and proper.


Date:  January 2, 2026                              Respectfully submitted,


                                                     _/s/ Ann D. Navaro_____
Tyler S. Johnson (DC Bar #1003009)          Ann D. Navaro (DC Bar #1643328)
**BRACEWELL LLP**                            David A. Super (DC Bar #429359)
701 Fifth Avenue                             Taylor M. Stuart (DC Bar # 1671892)
Suite 6850                                   **BRACEWELL LLP**
Seattle, Washington 98104                    2001 M Street NW, Suite 900
Telephone:  (206) 204-6211                   Washington, DC 20036
Facsimile:  (800) 404-3970                   Telephone:  (202) 828-5800
Email:  ty.johnson@bracewell.com             Facsimile:  (800) 404-3970
                                             Email:  ann.navaro@bracewell.com
                                                     david.super@bracewell.com
                                                     taylor.stuart@bracewell.com

                                             *Counsel for Plaintiffs*
                                             *Empire Offshore Wind LLC and Empire*
                                             *Leaseholder LLC*