## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EMPIRE LEASEHOLDER LLC, *et al.*, ) | |
| ) | |
| *Plaintiffs*, ) | Case No. 1:26-cv-00004 |
| ) | |
| v. ) | Judge Carl J. Nichols |
| ) | |
| DOUGLAS J. BURGUM, in his official ) | **EXPEDITED HEARING REQUESTED** |
| capacity as Secretary of the Interior, *et al.*, ) | |
| ) | |
| *Defendants*. ) | |

## EMPIRE WIND'S MOTION FOR
## PRELIMINARY INJUNCTION AND STAY PENDING REVIEW

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Local Rule 65.1, and Section 705 of the Administrative Procedure Act, Plaintiffs Empire Leaseholder LLC and Empire Offshore Wind LLC (together, "Empire Wind") respectfully request that the Court issue a stay pending review pursuant to 5 U.S.C. § 705 and a preliminary injunction enjoining the December 22, 2025, order issued by Defendants the United States Department of the Interior and the Bureau of Ocean Energy Management requiring Empire Wind to "suspend all ongoing activities related to the Empire Wind 1 Project on the Outer Continental Shelf" ("Suspension Order") and enjoining Defendants from enforcing the Suspension Order.

Empire Wind respectfully requests expedited consideration by this Court given the immediate and irreparable harm caused by the Suspension Order. As explained in the accompanying Memorandum in Support and attached Declarations, without the ability to continue Project construction by January 16, 2026, the Project faces likely termination due to disruption of a tightly choreographed construction schedule dependent on vessels with constrained availability, delay costs, and the existential threat to the Project financing caused by the Suspension Order. As further explained in the Memorandum in Support, the threat of Project termination became even

more acute on January 5, 2026, when the government took the position that certain ongoing construction activities that Empire Wind views as necessary for safety are prohibited by the Suspension Order, even though the Suspension Order allows activities necessary to prevent impacts to health, safety, or the environment. This development turned a dire situation for Empire Wind into a near terminal one, making immediate relief necessary.

For the reasons set forth in the accompanying Memorandum in Support, the Suspension Order violates the Administrative Procedure Act, 5 U.S.C. §§ 701-706, 558; the Outer Continental Shelf Lands Act, 43 U.S.C. § 1341; and the Due Process Clause of the Fifth Amendment to the United States Constitution. If allowed to stand, it is very likely that the Suspension Order will strike a fatal blow to an ongoing offshore wind project that is fully and duly permitted under the law and has been in active construction for over a year at a cost of billions of dollars. A stay and preliminary injunction will preserve the status quo (*i.e.*, allowing construction of the Empire Wind 1 Project to continue) pending the ultimate resolution on the merits of this action.

As required by Local Civil Rule 7(m), on January 5, 2026, counsel for Empire Wind conferred with counsel for the United States regarding Empire Wind's Motion. On January 6, 2026, counsel for the United States responded that the United States does not oppose Empire Wind's request for an expedited hearing on this Motion.[1] However, counsel for the United States represented that the United States would only be available for a hearing only on January 14 or 20, 2026, or thereafter.

Given that Empire Wind must resume construction by January 16, 2026, Empire Wind respectfully requests that a hearing be scheduled as expeditiously as possible and is available on

---

[1] Counsel for the government also stated that the Defendants can file their Opposition to this Motion on January 13, 2025, the time period provided for in the rules.

January 14, 2026, or any other expedited date at the Court's convenience.  While Empire Wind

respects that counsel for the United States may have a significant workload, the irreparable harm

being suffered by Empire Wind due to the United States' actions outweighs any inconvenience to

the government.

A proposed order is attached hereto.


Date:  January 6, 2026                                 Respectfully submitted,


                                                        /s/ Ann D. Navaro
Tyler S. Johnson (DC Bar #1003009)              Ann D. Navaro (DC Bar #1643328)
(*pro hac vice pending*)                        David A. Super (DC Bar #429359)
**BRACEWELL LLP**                               Taylor M. Stuart (DC Bar #429359)
701 Fifth Avenue                                **BRACEWELL LLP**
Suite 3420                                       2001 M Street NW, Suite 900
Seattle, Washington 98104                        Washington, DC 20036
Telephone:  (206) 204-6211                       Telephone:  (202) 828-5800
Facsimile:  (800) 404-3970                       Facsimile:  (800) 404-3970
Email:  ty.johnson@bracewell.com                 Email:  ann.navaro@bracewell.com
                                                         david.super@bracewell.com
                                                         taylor.stuart@bracewell.com

                                                *Counsel for Plaintiffs*
                                                *Empire Leaseholder LLC and Empire Offshore*
                                                *Wind LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of January 2026, a true and complete copy of the foregoing *Empire Wind's Motion for Preliminary Injunction and Stay Pending Review, Statement of Points and Authorities in support thereof, and proposed Order* was filed with the Clerk of the Court pursuant to the Court's electronic filing procedures, and served via first-class mail, postage prepaid, on the following:

Douglas J. Burgum, Secretary
U.S. DEPARTMENT OF THE
INTERIOR
1849 C Street NW
Washington, DC 20240

U.S. DEPARTMENT OF THE INTERIOR
Office of the Solicitor
1849 C Street NW
Washington, DC 20240

Matthew Giacona, Acting Director
BUREAU OF OCEAN ENERGY
MANAGEMENT
U.S. Department of the Interior
1849 C Street NW
Washington, DC 20240

BUREAU OF OCEAN ENERGY
MANAGEMENT
Office of the Solicitor
U.S. Department of the Interior
1849 C Street NW
Washington, DC 20240

Civil Process Clerk
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
601 D Street NW
Washington, DC 20004

Environment and Natural Resources Division
U.S. DEPARTMENT OF JUSTICE
P.O. Box 23986
Washington, DC 20026-3986

Attorney General of the United States
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
Washington, DC 20530

Assistant Attorney General for Administration
U.S. DEPARTMENT OF JUSTICE
Justice Management Division
950 Pennsylvania Avenue NW
Washington, DC 20530

with courtesy copies sent via email to:

USADC.ServiceCivil@usdoj.gov
peter.pfaffenroth@usdoj.gov
Civil Process Clerk
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
601 D Street NW
Washington, DC 20004

kristofor.swanson@usdoj.gov
Kristofor Swanson
Environment and Natural Resources Division
U.S. DEPARTMENT OF JUSTICE
P.O. Box 23986
Washington, DC 20026-3986

   */s/ Ann D. Navaro*
Ann D. Navaro

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EMPIRE LEASEHOLDER LLC, *et al.*,    ) | |
|         ) | |
|      *Plaintiffs*,    ) | |
|         ) | Case No. 1:26-cv-00004 |
|  v.    ) | |
|         ) | Judge Carl J. Nichols |
| DOUGLAS J. BURGUM, in his official    ) | |
| capacity as Secretary of the Interior, *et al.*,    ) | **EXPEDITED HEARING REQUESTED** |
|         ) | |
|      *Defendants*.    ) | |

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF EMPIRE WIND'S MOTION FOR PRELIMINARY INJUNCTION <u>AND STAY PENDING REVIEW</u>

Tyler S. Johnson (DC Bar #1003009)
(*pro hac vice pending*)
**BRACEWELL LLP**
701 Fifth Avenue
Suite 6850
Seattle, Washington 98104
Telephone:  (206) 204-6211
Facsimile:  (800) 404-3970
Email:  ty.johnson@bracewell.com

Ann D. Navaro (DC Bar #1643328)
David A. Super (DC Bar #429359)
Taylor M. Stuart (DC Bar #429359)
**BRACEWELL LLP**
2001 M Street NW, Suite 900
Washington, DC 20036
Telephone:  (202) 828-5800
Facsimile:  (800) 404-3970
Email:  ann.navaro@bracewell.com
      david.super@bracewell.com
      taylor.stuart@bracewell.com

Date:  January 6, 2026

*Counsel for Plaintiffs*
*Empire Leaseholder LLC and Empire Offshore*
*Wind LLC*

### TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

LIST OF EXHIBITS ........................................................................................ x

INTRODUCTION ............................................................................................ 1

BACKGROUND .............................................................................................. 4

      I.       The Empire Wind Project. ................................................................. 4

      II.     Status Of Project Construction ........................................................... 4

      III.    The Project's Benefits And Empire Wind's Massive Investment. ......... 8

      IV.   The Government's Decade-Plus Review Of The Project. ..................... 9

      V.     DoW's Review Of The Project. ......................................................... 10

      VI.   BOEM's Approval Of The Project. ................................................... 13

      VII.   Status Of DoW And Navy Mitigation. ............................................. 15

      VIII.  Interior's Prior Attempt to Halt Construction. .................................. 16

ARGUMENT .................................................................................................. 18

      I.       Interior Has Not Justified Withholding The Information On Which The Suspension Order Is Based. ................................................ 18

      II.     Empire Wind Is Likely To Succeed On The Merits. ......................... 20

           A.    Empire Wind's Claims Are Justiciable. ................................. 20

           B.    BOEM's Suspension Order Is Arbitrary And Capricious ......... 21

                1.    BOEM's Suspension Order Lacks Reasonable Explanation. ........ 22

                2.    The Suspension Order Is Overly Broad. ........................ 27

                3.    The Suspension Order Violates The Change-In-Position Doctrine ................................................................. 28

           C.    The Suspension Order Violates Section 558 Of The APA. ....... 29

           D.    The Order Is Contrary To Law In Violation Of OCSLA And The APA ................................................................... 30

       1.     OCSLA Provides Interior With Limited Authority To Suspend Lease Operations For National Security Reasons. ..........30

       2.     Empire Wind's Lease Reflects This Statutory Structure. ..............34

    E.     The Suspension Order Violates Empire Wind's Due Process Rights. ......................................................................................35

III.    Absent Preliminary Relief, Empire Wind Will Continue To Suffer Irreparable Harm. ...............................................................................37

IV.    The Balance Of Equities And Public Interest Strongly Support Preliminary Injunctive Relief.........................................................................................43

CONCLUSION..................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3883 Connecticut LLC v. District of Columbia*,
  336 F.3d 1068 (D.C. Cir. 2003) .................................................................................35, 36

*Aera Energy LLC v. Salazar*,
  691 F. Supp. 2d 25 (D.D.C. 2010), *aff'd*, 642 F.3d 212 (D.C. Cir. 2011) ...........................27

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
  526 U.S. 40 (1999) ................................................................................................................35

*Am. Pub. Gas Assoc. v. Dep't of Energy*,
  72 F.4th 1324 (D.C. Cir. 2023) ............................................................................................19

*Barnhart v. Sigmon Coal Co., Inc.*,
  534 U.S. 438 (2002) ..............................................................................................................33

*Bd. of Regents of State Colleges v. Roth*,
  408 U.S. 564 (1972) ..............................................................................................................35

*Beach TV Props., Inc. v. Solomon*,
  No. CV 15-1823, 2016 WL 6068806 (D.D.C. 2016) ...........................................................30

*Bennett v. Spear*,
  520 U.S. 154 (1997) ..............................................................................................................21

*Chekkouri v. Obama*,
  158 F. Supp. 3d 4 (D.D.C. 2016) ..........................................................................................19

*Cnty. of San Francisco v. EPA*,
  604 U.S. 334 (2025) ..............................................................................................................33

*Cobell v. Kempthorne*,
  455 F.3d 301 (D.C. Cir. 2006) ..............................................................................................18

*Connecticut v. Doehr*,
  501 U.S. 1 (1991) ..................................................................................................................36

*CSX Transp., Inc. v. Williams*,
  406 F.3d 667 (D.C. Cir. 2005) ..............................................................................................41

*D.C. Fed'n of Civic Ass'ns v. Volpe*,
  459 F.2d 1231 (D.C. Cir. 1972) .......................................................................................26, 27

*Darby v. Cisneros*,
   509 U.S. 137 (1993)............................................................................................21

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019)............................................................................................26

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
   591 U.S. 1 (2020)........................................................................................21, 29

*Dist. Hosp. Partners, L.P. v. Burwell*,
   786 F.3d 46 (D.C. Cir. 2015)..............................................................................23

*Dist. of Columbia v. U.S. Dep't of Agric.*,
   444 F. Supp. 3d 1 (D.D.C. 2020)........................................................................18

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016)............................................................................................28

*Energy Action Educ. Found. v. Andrus*,
   631 F.2d 751 (D.C. Cir. 1979)............................................................................30

*Ensco Offshore Co. v. Salazar*,
   781 F. Supp. 2d 332 (2011) ..........................................................................41, 42

*Everglades Harvesting & Hauling, Inc. v. Scalia*,
   427 F. Supp. 3d 101 (D.D.C. 2019)....................................................................42

*Fares v. Smith*,
   901 F.3d 315 (D.C. Cir. 2018)............................................................................19

*FBME Bank Ltd. v. Lew*,
   125 F. Supp. 3d 109 (D.D.C. 2015)....................................................................23

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009)......................................................................................22, 28

*FDA v. All. For Hippocratic Med.*,
   602 U.S. 367 (2024)................................................................................20, 24, 27

*FDA v. Wages & White Lion Investments., L.L.C.*,
   604 U.S. 542 (2025)............................................................................................28

*Hikvision USA, Inc. v. FCC*,
   97 F.4th 938 (D.C. Cir. 2024)............................................................................27

*Jacksonville Port Auth. v. Adams*,
   556 F.2d 52 (D.C. Cir. 1977)..............................................................................44

*Jifry v. FAA,*
370 F.3d 1174 (D.C. Cir. 2004)..................................................................................19, 20

*League of Women Voters of United States v. Newby,*
838 F.3d 1 (D.C. Cir. 2016)...................................................................................37, 41, 44

*Louisiana v. Biden,*
622 F. Supp. 3d 267 (W.D. La. 2022), *rev'd on other grounds*, 64 F.4th 674
(5th Cir. 2023).........................................................................................................21, 42

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992)..........................................................................................................20

*Mathews v. Eldridge,*
424 U.S. 319 (1976)....................................................................................................35, 36

*Mo. Edison Co. v. Fed. Power Comm'n,*
479 F.2d 1185 (D.C. Cir. 1973).......................................................................................45

*Moncrief v. Interior,*
339 F. Supp. 3d 1 (D.D.C. 2018).....................................................................................25

*Morgan Stanley DW Inc. v. Rothe,*
150 F. Supp. 2d 67 (D.D.C. 2001)...................................................................................18

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.,*
463 U.S. 29 (1983)..............................................................................20, 22, 23, 25

*Music Choice v. Copyright Royalty Bd.,*
970 F.3d 418 (D.C. Cir. 2020)....................................................................................28, 29

*Nat'l Mining Ass'n v. Babbitt,*
172 F.3d 906 (D.C. Cir. 1999).........................................................................................27

*New York v. Trump,*
No. 25-CV-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025) ..................................20

*Nken v. Holder,*
556 U.S. 418 (2009)..........................................................................................................18

*Propert v. District of Columbia,*
948 F.2d 1327 (D.C. Cir. 1991).......................................................................................36

*Revolution Wind, LLC v. Burgum,*
No. 1:25-cv-02999 (RCL) (D.D.C. Sept. 22, 2025), Dkt. No. 36.........................17, 20, 24, 43

*RFE/RL, Inc. v. Lake,*
772 F.Supp.3d 79 (D.D.C. Mar. 25, 2025) ......................................................................25

*Russello v. U.S.*,
    464 U.S. 16 (1983).................................................................................32, 33

*Save Long Beach Island, et al., v. Dep't of Com. et al.*,
    No. 1:25-cv-2214, Dkt. 21 (D.D.C. Sept. 5, 2025)...............................4, 42, 43, 44

*Schindler Elevator Corp. v. Wash. Metro. Area Transit Auth.*,
    2021 WL 663191 (D.D.C. Feb. 19, 2021) ......................................................43, 44

*Seeger v. U.S. Dep't of Def.*,
    306 F. Supp. 3d 265 (D.D.C. 2018) .................................................................21

*Shawnee Tribe v. Mnuchin*,
    984 F.3d 94 (D.C. Cir. 2021) ...........................................................................18

*Shell Petroleum Inc. v. United States*,
    2008 WL 2714252 (S.D. Tex. 2008) ...............................................................35

*Sierra Club v. EPA*,
    292 F.3d 895 (D.C. Cir. 2002) .........................................................................20

*Solenex, LLC v. Haaland*,
    626 F. Supp. 3d 110 (D.D.C. 2022) .................................................................23

*UDC Chairs Chapter v. Bd. of Trs. of Univ. of D.C.*,
    56 F.3d 1469 (D.C. Cir. 1995) .........................................................................35

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981)..........................................................................................18

*Va. Elec. and Power Co. v. U.S. Dep't of the Interior*,
    No. 2:25-cv-00830 (E.D. Va. Dec. 31, 2025), Dkt. No. 30 .............................19

*Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health and Hum. Servs.*,
    485 F. Supp. 3d 1 (D.D.C. 2020) ...........................................................37, 41, 42

*Widakuswara v. Lake*,
    779 F. Supp. 3d 10 (D.D.C. 2025) ...................................................................21

*Winter v. Nat. Res. Defense Council*,
    555 U.S. 7 (2008)..............................................................................................18

*Wis. Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) .........................................................................42

*World Shipping Council v. Fed. Maritime Comm'n*,
    152 F4th 215 (D.C. Cir. 2025) .........................................................................22

*Zevallos v. Obama,*
    793 F.3d 106 (D.C. Cir. 2015) ...............................................................................19

**Statutes**

5 U.S.C. § 704 .................................................................................................................21

5 U.S.C. § 705 ..............................................................................................................2, 18

5 U.S.C. § 706(2)(A) .......................................................................................................22

5 U.S.C. § 706(2)(C) .......................................................................................................22

5 U.S.C. § 706(2)(D) .......................................................................................................29

5 U.S.C. § 706(2)(E) .......................................................................................................22

43 U.S.C. § 1332(3) .........................................................................................................42

43 U.S.C. § 1334 ...............................................................................................31, 32, 33

43 U.S.C. § 1334 (a)(1) .............................................................................................32, 33

43 U.S.C. § 1334(a)(2) ...............................................................................................33, 34

43 U.S.C. § 1334(a)(2)(A) ...............................................................................................32

43 U.S.C. § 1334(a)(2)(B) ...............................................................................................32

43 U.S.C. § 1337(p)(4) ...............................................................................................14, 33, 34

43 U.S.C. § 1337(p)(4)(F) ...............................................................................................33

43 U.S.C. § 1341(c) .........................................................................31, 32, 33, 34, 35

43 U.S.C. § 1341(d) .....................................................................................................31, 33

43 U.S.C. § 1349(a)(3) .....................................................................................................21

43 U.S.C. § 1802(2)(C) ...................................................................................................31

43 U.S.C. § 1802(2)(D) ...................................................................................................31

Administrative Procedure Act,
    5 U.S.C. §§ 701-706, 558 ...............................2, 18, 19, 21, 25, 26, 27, 29, 30

Outer Continental Shelf Lands Act,
    43 U.S.C. § 1341 ............................................................................................. *passim*

**Regulations**

30 C.F.R. pt. 585 ...................................................................................................................14

30 C.F.R. § 585.417(b) .........................................................................................................30

86 Fed. Reg. 33351 ...............................................................................................................10

88 Fed. Reg. 63615 ...............................................................................................................10

88 Fed. Reg. 83146 ...............................................................................................................13

**Constitutional Provisions**

U.S. Const. Amendment V .............................................................................................2, 35, 36

**Other Authorities**

Benjamin Storrow and Kelsey Tamborrino, *'Incredibly reckless': Trump's wind
     halt stuns even some allies*, POLITICO, Dec. 22, 2025,
     https://www.politico.com/news/2025/12/22/trump-leaves-wind-industry-
     reeling-at-a-perilous-moment-for-his-party-00704170............................................26

Conditions 4.2 and 4.3 of South Fork Wind COP Approval (Jan. 18, 2022),
     *available online* at https://www.boem.gov/renewable-energy/state-
     activities/sfwf-cop-terms-and-conditions .................................................................24

DoW Military Aviation and Installation Assurance Siting Clearinghouse Fact
     Sheet, *available at*
     https://www.DoDclearinghouse.osd.mil/Portals/134/Clearinghouse101_Factsh
     eet_v11.pdf.................................................................................................................11

Ella Nilsen, *Trump suspends all large offshore wind farms under construction,
     threatening thousands of jobs and cheaper energy*, CNN (Dec. 22, 2025),
     https://www.cnn.com/2025/12/22/climate/trump-offshore-wind-suspension-
     virginia ........................................................................................................................1

Energy Policy Act of 2005,
     Public Law 109-58, 119 Stat. 594..............................................................................31

Jennifer McDermott, *An offshore wind project for New York may be abandoned
     over Trump administration delays*, AP (May 9, 2025)............................................17

New York State Climate Leadership and Community Project Act,
     2019 N.Y. Sess. Laws ch. 106 (McKinney 2019) ......................................................9

Rapid Response 47 (@RapidResponse47), X (Dec. 22, 2025, at 9:15 a.m.),
     https://x.com/RapidResponse47/status/2003125425879629936 ..............................26

Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 22, 2025, at 3:23 p.m.),
    https://x.com/SecretaryBurgum/status/2003199861953560652 ..............................................26

Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 22, 2025, at 8:35 a.m.),
    https://x.com/SecretaryBurgum/status/2003094666040787213 ..............................................26

South Fork Wind, Table 3.1-3 of South Fork Wind Farm Construction &
    Operations Plan: Volume I (May 7, 2021), *available online* at
    https://www.boem.gov/sites/default/files/documents/renewable-energy/South-
    Fork-Construction-Operations-Plan.pdf ..............................................................................25

U.S. Dep't of Energy, *Update on Effort of the Wind Turbine Radar Interference
    Mitigation Working Group: Report to Congress*, at ii (Feb. 2024), *available
    online* at https://www.energy.gov/sites/default/files/2024-02/EXEC-2022-
    004484%20-
    %20Report%20to%20Congress%20as%20of%20December%2014%202023%
    20%282%29.pdf.............................................................................................................12

U.S. Dep't of the Interior, *Press Release: The Trump Administration Protects U.S.
    National Security by Pausing Offshore Wind Leases,* USDOI (Dec. 22, 2025),
    https://www.doi.gov/pressreleases/trump-administration-protects-us-national-
    security-pausing-offshore-wind-leases ........................................................................25, 27

## LIST OF EXHIBITS

| | |
|---|---|
| **Exhibit A** | BOEM Suspension Order (Dec. 22, 2025) |
| **Exhibit B** | Declaration of Theodore Muhlfelder (Jan. 6, 2026) |
| **Exhibit C** | Declaration of Elisabeth Treseder (Jan. 5, 2026) |
| **Exhibit D** | COP Approval (Issued Feb. 21, 2024, Revised Dec. 20, 2024) |
| **Exhibit E** | Memorandum from Karen Baker to Elizabeth Klein (Nov. 21, 2023) |
| **Exhibit F** | Excerpts of Empire Wind's FEIS at 3.17-16 (Sept. 2023) |
| **Exhibit G** | BOEM issued Stop Work Order (Apr. 16, 2025) |
| **Exhibit H** | BOEM lifted Stop Work Order (May 19, 2025) |
| **Exhibit I** | McSweeney Email to Giacona (Dec. 30, 2025) |
| **Exhibit J** | Notice of Intent to Sue (Jan. 2, 2026) |
| **Exhibit K** | OCS-A 0512 Amended and Restated Lease (Dec. 30, 2024) |
| **Exhibit L** | BSEE Email RE Empire Wind Continued Activities (Jan. 5, 2026) |
| **Exhibit M** | Letter from Stephen J. Sample, Deputy Director of the DoW Clearinghouse (July 29, 2020) |

**INTRODUCTION**

This action challenges the Department of the Interior's ("Interior") second unlawful attempt in the past eight months to halt construction of the Empire Wind project, an offshore wind project that will bring much needed power to half a million homes in the State of New York (the "Project"). On December 22, 2025, Interior issued an order directing Empire Wind to "suspend all ongoing activities related to the Empire Wind 1 Project on the Outer Continental Shelf." December 22, 2025, Order from BOEM Director Matthew Giacona to Empire Offshore Wind LLC ("Suspension Order") (Exhibit A). The one-page Suspension Order relies upon unexplained national security concerns based on an undisclosed November 2025 "assessment" by the Department of War ("DoW"). The Suspension Order has halted the Project's construction, including critical construction activities that are scheduled to take place in the coming days. If allowed to stand, the Suspension Order substantially threatens cancellation of a Project that is fully and duly permitted under the law and has been in active construction for over a year and a half at a cost of billions of dollars.

Interior authorized the Project less than two years ago, based on a seven-year, no-stone-unturned review, which included a thorough assessment of national security impacts and the implementation of mitigation measures, including agreements with DoW to address national security concerns. Indeed, DoW was extensively consulted prior to and during the Project's seven-year permitting process to ensure that the Project does not pose a risk to national security.[1]

---

[1] BOEM reportedly sent nearly identical suspension orders other offshore wind projects under construction along the East Coast. They span more than 500 miles from New England to Virginia. Ella Nilsen, *Trump suspends all large offshore wind farms under construction, threatening thousands of jobs and cheaper energy*, CNN (Dec. 22, 2025), https://www.cnn.com/2025/12/22/climate/trump-offshore-wind-suspension-virginia.

Plaintiffs Empire Leaseholder LLC and Empire Offshore Wind LLC ("Empire Wind") secured the necessary approvals for the Project from Interior in 2024 and have spent upwards of $4 billion to develop the Project, which is now 60% complete. Of this $4 billion, Empire Wind has spent $1.5 billion since May 2025, after Interior rescinded its first order unlawfully halting construction of the Project without notice or explanation. Interior issued the current Suspension Order without warning and without any engagement with Empire Wind regarding DoW's new conclusions about national security or how those concerns might be mitigated.

Empire Wind requests that the Court enter a stay pending review pursuant to 5 U.S.C. § 705 and a preliminary injunction preventing enforcement of the Suspension Order and preserving the status quo (*i.e.*, allowing Project construction to continue) pending the ultimate resolution on the merits. Empire Wind respectfully requests that the Court set a hearing and rule on this Motion as expeditiously as possible given the irreparable harm to Empire Wind and the public.

Empire Wind readily satisfies the standard for a stay pending review and a preliminary injunction. Empire Wind is likely to succeed on the merits of its claims that the Suspension Order violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, 558; the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1341; and the Due Process Clause of the Fifth Amendment to the United States Constitution. The Suspension Order states only that "new classified information, including the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects," necessitates suspension of all activities on Empire Wind's lease not necessary to prevent harm to health, safety, or the environment. Ex. A at 1. But the Suspension Order (i) offers no reasonable justification for halting construction, given the extensive, multiyear national security review that preceded its issuance; (ii) is an arbitrary and capricious change in agency position, lacking any reasonable explanation

or agency awareness of the change or Empire Wind's reasonable reliance interests; (iii) is unlawfully overbroad; (iv) violates OCSLA, which delimits Interior's authority to suspend leases; and (v) was abruptly issued without any notice or opportunity for Empire Wind to respond.

Absent a preliminary injunction, Empire Wind will continue to suffer irreparable harm; indeed, the Suspension Order constitutes an existential threat to the Project with an extremely short fuse. Due to the Suspension Order, nearly all construction activities have been halted by Interior, even those that Empire Wind maintains are necessary to prevent harm to health, safety, or the environment, which the Suspension Order states would be allowed. The construction delays caused by the Suspension Order threaten to terminate the Project due to limited vessel availability and the complex, sequential nature of the Project's construction schedule. To complete the Project, critical construction activities suspended by the Order must be commenced by January 16, 2026. Multi-million-dollar delay and termination fees resulting from the Suspension Order also threaten the Project's economic viability. Moreover, Empire Wind is currently unable to draw on its construction loan intended to fund construction costs and pay employees and contractors. Even worse, the Project's lenders may decide to seek accelerated repayment of the $2.7 billion Empire Wind has borrowed under the terms of a credit agreement, which the lenders have the basis to seek upon occurrence of an event of default that remains unremedied after a period of 60 days. Events of default under the credit agreement include impairments to government approvals. Thus, without immediate judicial relief, Empire Wind's construction schedule and financing will be materially and adversely compromised. Each of these harms substantially threatens to terminate the Project; together, they are likely insurmountable.

Finally, the public interest supports the requested relief. Just three months ago, the government represented to this Court that halting the Project's construction "would harm the

public interest by unnecessarily disrupting years of work and analysis that [the government] conducted in connection with issuing the challenged Project approvals." *Save Long Beach Island, et al., v. Dep't of Com. et al.* ("*SLBI*"), No. 1:25-cv-2214, Dkt. 21 at 25 (D.D.C. Sept. 5, 2025). This Court agreed, finding that "[t]he government's—and thereby the public's—interest would . . . be negatively affected by the loss of thousands of jobs and a new source of clean energy that would result from the derailment of construction" and "the relevant government actors have already determined that the benefits of the project outweigh the downsides." *SLBI*, 2025 WL 2996157, at *6 (D.D.C. Oct. 24, 2025). Those interests are even more acute today given the extensive work performed on the Project since then.

For all these reasons, a stay pending review and a preliminary injunction are warranted.

## BACKGROUND

### I.    The Empire Wind Project.

The Project is a 2,070-megawatt ("MW") commercial-scale offshore wind farm located on the Outer Continental Shelf ("OCS") approximately 14 miles offshore New York. Declaration of Theodore Muhlfelder ("Muhlfelder Decl.") ¶ 3 (Exhibit B). The Project is being constructed in Lease OCS-A 0512 ("Lease") issued by BOEM in 2017. *Id*. ¶ 2. Consistent with approvals issued by the United States, Empire Wind is developing the Project in two phases: Empire Wind 1 and Empire Wind 2. *Id*. ¶ 3. Empire Wind 1 is currently under construction in the western portion of the Lease area and when completed, will consist of 54 offshore wind turbines, one offshore substation, and one onshore substation in Brooklyn, New York. *Id*.

### II.    Status Of Project Construction.

In April 2024, Empire Wind began constructing the onshore portion of Empire Wind 1, which involves constructing the onshore substation at the South Brooklyn Marine Terminal ("SBMT") and converting it into a construction, operations and maintenance port for the Project.

*Id*. ¶¶ 4, 7.  Work to upgrade SBMT—which is roughly 90% complete—is not subject to regulation by BOEM, but that work is necessary and critical to interconnect the Project to the grid and to Empire Wind's construction, operations, and maintenance of the Project.  *Id*. ¶ 7.

In June 2024, Empire Wind began in-water construction work.  *Id*.  ¶ 8.  Since then, Empire Wind has installed (i) all 54 of the monopile foundations that will support the Project's wind turbine generators; (ii) the jacket foundation that will support the Project's offshore substation; (iii) 75% of the inter-array cables that will connect the wind turbine generators to Empire Wind 1's offshore substation; and (iv) nearly all of the Project's two export cables that will run 46 miles between the Lease area and SBMT to connect the Project to the onshore substation.  *Id*. ¶¶ 8-13. "First power" from the Project (*i.e*., power from the first wind turbine generator) is expected to be delivered in late 2026.  *Id*. ¶ 15.  Empire Wind is scheduled to complete construction of Empire Wind 1 by summer 2027, with all turbines generating power and the Project being fully operational by the end of 2027 in fulfillment of Empire Wind's contract to sell power to the State of New York and its interconnection agreement with the New York State Independent System Operator ("NYISO").  *Id*. ¶¶ 15, 35.

Several key stages of construction are scheduled for 2026 (including in January) to reach first power by the end of the year.  *Id*. ¶ 14.  These activities include (i) installation of inter-array cables and scour protection rock to prevent erosion at the base of the offshore substation jacket foundation in early January 2026 in preparation for lifting the "topside" to the Project's offshore substation (*i.e.*, the structure that contains the electrical equipment necessary to deliver power to shore) onto its jacket foundation; (ii) the actual lifting the topside onto its jacket foundation by the end of January 2026; and (iii) commissioning and hook-up of the offshore substation between February and June 2026.  *Id*. ¶¶ 14, 45.  After that work, the schedule contemplates (i) energizing

the offshore substation and cables and testing the Project's electrical connection to the onshore substation beginning July 2026, (ii) transporting the wind turbine generator components to the onshore work site and the Lease area between April 2026 and October 2026, and (iii) installing the wind turbine generator towers, nacelles, and blades beginning in October 2026.  *Id*. ¶ 14.

When the Suspension Order was issued, Empire Wind's contractors and chartered vessels were actively engaged in offshore and onshore construction, installing cables in the Lease area and along the cable route to shore in preparation for lifting the topside, one of the most complex aspects of the Project's entire construction schedule.  *Id*. ¶¶ 21-23.  Empire Wind was also in the process of transporting scour rock to the Lease area to secure existing structures.  *Id*. ¶ 21.  In addition, the topside to the Project's offshore substation was in the middle of the Atlantic Ocean on a specialized heavy transport vessel in transit to the Lease area.  *Id*. ¶ 22.  A specialized heavy lift vessel, Heerema's *Sleipnir*, was also in transit to the Lease area to perform the specialized lift of the topside off of the transport vessel and onto its jacket foundation.  *Id.*  The *Sleipnir*'s lift of the topside, which weighs more than 3,000 tons and was commissioned at a cost of $224 million, must begin on or before January 26, 2026, because the *Sleipnir* must depart the Lease area by February 1, 2026, to fulfill its contractual commitments to other clients.  *Id.* ¶¶ 10, 22, 31.

Consistent with the Suspension Order, on December 23, 2025, Empire Wind informed the Bureau of Safety and Environmental Enforcement ("BSEE"), a bureau within Interior, that it planned to continue certain construction activities "necessary to respond to emergency situations and/or prevent impacts to health, safety, and the environment" as allowed under the Order.  *Id*. ¶ 26; Ex. A at 1.  Empire Wind also discussed these activities during a meeting with BOEM that occurred on January 2, 2025.  *Id*. ¶ 24.  These "safety" activities include (i) installing and protecting the remaining inter-array cable segments to ensure offshore structures, including the monopile

foundations and the jacket foundation already placed in the seabed, are properly lit and marked to prevent allision risk (*i.e.*, collision of a vessel with a stationary offshore structure); (ii) repairing and recovering a 650-meter segment of the export cable that was recently damaged by a storm; (iii) placing scour rock around the monopile foundations for the wind turbines and jacket for the offshore substation already placed in the seabed to avoid erosion and ensure integrity of the structures; (iv) installing the offshore substation with interim commissioning and preserving actions that ensure that critical lighting and navigational features are available for safety; and (iv) routine monitoring of the offshore infrastructure. *Id.* ¶ 26. Installation and limited commissioning of the offshore substation topside is necessary to ensure safety because the structure will be equipped with an Aircraft Detection Lighting System ("ADLS") that will adequately protect the offshore substation from allision by vessels or aircrafts, a navigational system that will provide U.S. mariners manning the Project's Marine Coordination Center ("MCC") with stronger communication capabilities, and provide permanent lighting to the already installed monopile foundations through the Project's inter-array cables. *Id.* ¶ 11. Failing to install the offshore leave temporary lighting on all offshore structures, the guard boat employed to protect the offshore substation's jacket foundation from allision would be unable to do so during severe weather, and the Project's MCC will be able to maintain limited communication and navigational capabilities through use of a service vessel. *Id.*

On January 5, 2026—nearly two weeks after Empire Wind informed BSEE of activities it would perform to prevent impacts to safety—BSEE informed Empire Wind that it must halt all these activities, except for limited trenching (burying) of inter-array cables already installed on the seabed and routine monitoring of the offshore infrastructure. *See* Ex. L, Email Communication from BSEE dated January 5, 2025. Regarding the precluded activities, BSEE stated that it "cannot

allow those actions to occur at this time as these are neither identified as an emergency situation, nor is it a matter that impacts health, safety, and the environment." *Id*. at 1. Empire Wind has complied with BSEE's directive and halted all other construction activities. Muhlfelder Decl. ¶ 29.

The construction activities that were scheduled to occur within the 90-day suspension period ending on March 22, 2026, are absolutely critical to ensure safety and Project viability. *Id*. ¶¶ 11, 32-34, 44. Installation and limited commissioning of the offshore substation topside and its lighting and navigational systems will ensure safety of operations, personnel, and vessels in and around the Lease area. *Id*. ¶ 11. Moreover, Empire Wind must begin the lift of the offshore substation topside no later than January 26, 2026, and failure to do so will result in the loss of the *Sleipnir* for at least a year. Further, the specialized vessel needed to perform the offshore substation commissioning work—Macro Offshore's *Crossway Eagle*—is only chartered through the end of June 2026, after which the vessel will not be available for another *five years* due to its other contractual commitments. *Id*. ¶ 33. Empire Wind needs 10 days to complete preparatory work (*i.e.*, installation of inter-array cables and scour surrounding the offshore substation foundation) prior to lifting the topside and four to six days to complete the lift. Thus, to ensure the necessary work is completed before the *Sleipnir* departs the Lease area, Empire Wind must resume all suspended construction activities by January 16, 2026. *Id*. ¶¶ 30, 47. Failure to do so will result in a series of cascading delays from which there is a vanishingly small chance the Project could recover. *Id*. ¶¶ 33, 48.

## III.    The Project's Benefits And Empire Wind's Massive Investment.

Once operational, Empire Wind 1 will fulfill Empire Wind's contractual obligations to deliver 810 MW of renewable energy to New York pursuant to a 2024 Purchase and Sale Agreement and provide significant environmental and economic benefits to the region. *Id*. ¶ 35. Empire Wind 1 will deliver nearly $5 billion in economic benefits to New York and contribute to

the State's goal of procuring 9,000 MW of offshore wind generating capacity by 2035. *See* New York State Climate Leadership and Community Project Act, 2019 N.Y. Sess. Laws ch. 106 (McKinney 2019). Empire Wind is also party to an interconnection agreement with the NYISO facilitating the Project's interconnection to the electric grid. Muhlfelder Decl. ¶ 35. The Project's offshore construction and onshore construction of SBMT have created 4,000 jobs across a range of positions, from tradespeople to mariners to regulatory compliance personnel. *Id*. ¶ 36.

Empire Wind has spent roughly $4 billion to develop and construct the Project. *Id*. ¶ 38. Empire Wind has entered into numerous contracts—with a collective value of roughly $3.85 billion—to fabricate, transport, and install the Project components to facilitate onshore and offshore construction. *Id*. ¶ 43. Empire Wind's payments to date under these contracts are included in the roughly $4 billion in development costs incurred thus far. *Id.* To construct the Project, in December 2024, Empire Wind obtained more than $3 billion in financing from a consortium of lenders and has since drawn $2.7 billion of those funds. *Id*. ¶ 39.

## IV.    The Government's Decade-Plus Review Of The Project.

Before issuing Empire Wind's Lease in 2017, BOEM spent three years, with DoW's participation, conducting a comprehensive analysis of the suitability of portions of the OCS offshore New York for offshore wind projects. Declaration of Elisabeth Treseder ("Treseder Decl.") at ¶ 2 (Exhibit C). As part of this analysis, BOEM developed the geographic boundaries of the Lease area through coordination with stakeholders and other federal agencies, including DoW, to address concerns surrounding the siting of offshore wind leases. *Id.* After receiving the Lease, Empire Wind spent nearly seven years developing the Project, undertaking federal, state, and local and municipal reviews, securing the necessary permits, authorizations, and approvals for the Project, and conducting extensive surveys of the Lease area and cable routes. *Id*. ¶¶ 7-8.

In January 2020, Empire Wind submitted the first draft of its Construction and Operations Plan ("COP") to BOEM.  *Id*. ¶ 8.  The final version of the COP spans thousands of pages and includes 32 appendices containing voluminous information on, among other things, potential impacts to national security and defense, including radar systems.  In the COP, Empire Wind proposed nearly 300 voluntary mitigation and monitoring measures aimed at protecting and minimizing impacts, including potential impacts related to national security.  *Id*. ¶ 9.

In June 2021, BOEM began its environmental review of the Project under the National Environmental Policy Act ("NEPA").  86 Fed. Reg. 33351.  As part of its NEPA review, BOEM coordinated with various federal agencies that have permitting authority over activities related to constructing and operating offshore wind projects, including the DoW, the Federal Aviation Administration, the U.S. Coast Guard, the National Oceanic and Atmospheric Administration's ("NOAA") National Marine Fisheries Service, the U.S. Environmental Protection Agency, the U.S. Army Corps of Engineers, and several others.  Treseder Decl. at ¶ 12.  On September 15, 2023, BOEM published its final environmental impact statement ("FEIS") for the Project.  88 Fed. Reg. 63615.  The FEIS contains an in-depth discussion of the Project's potential impacts on national security and defense, safety, and navigation, and BOEM's conclusions regarding effectiveness of mitigation measures.  Treseder Decl. at ¶ 11; *see* Ex. F, Excerpts of FEIS.

V.    **DoW's Review Of The Project.**

DoW actively participated in BOEM's process to identify the area defined by the Lease and BOEM's NEPA review of the proposed Project.  *Id*. ¶¶ 2, 13-15.  DoW was intimately involved in the siting process before the Lease was issued and regularly attended BOEM's intergovernmental taskforce meetings, even presenting to the taskforce on DoW's assessment of the suitability of the waters offshore New York for wind energy.  *Id*. ¶ 2.

-10-

Throughout BOEM's review of the Project's COP, both BOEM and Empire Wind consulted with DoW's Military Aviation and Installation Assurance Siting Clearinghouse ("DoW Clearinghouse"), which oversees the process for evaluating whether energy projects in the United States are compatible with DoW's military mission. *Id*. ¶¶ 13. The DoW Clearinghouse was created to provide a timely and transparent process to evaluate potential impacts and mitigation options related to alternative energy production.[2] It acts as the single point of military contact for all federal agencies, developers, and stakeholders regarding energy infrastructure development approval, and works with these entities to minimize adverse impacts to military training, testing, and operations. *Id*. BOEM coordinates with the DoW Clearinghouse to evaluate each proposed offshore wind project on a project-by-project basis, and BOEM resolves any conflicts the DoW Clearinghouse identifies through conditions to BOEM's approval of the COP. Treseder Decl. at ¶ 13. As part of this process, project developers also consult directly with the DoW Clearinghouse and, as appropriate, other branches and offices of the military, to mitigate a proposed project's potential impacts on military operations and national security. *Id*.

Between 2020 and 2024, Empire Wind consulted with the DoW Clearinghouse, the U.S. Fleet Forces, U.S. Coast Guard, the U.S. Department of Navy ("Navy") Office of Cable Protection, and other military offices and branches regarding the Project's potential impacts and any need for mitigation. *Id*. ¶ 14. Through this consultation, the DoW Clearinghouse informed Empire Wind that, without mitigation, the Project could potentially adversely affect the North American Aerospace Defense Command's ("NORAD") operation of the Riverhead, New York Air Route Surveillance Radar-4 ("ARSR-4"). *Id*. ¶ 15. NORAD uses radar systems to conduct aerospace

---

[2] DoW Military Aviation and Installation Assurance Siting Clearinghouse Fact Sheet, *available at* https://www.DoDclearinghouse.osd.mil/Portals/134/Clearinghouse101_Factsheet_v11.pdf.

warning and control in the defense of North America. *Id*. The presence of wind energy installations may, in some instances, cause radar "clutter" or "interference" where radar signals are generated by objects other than the intended target. *Id*. Depending on a wind farm's proximity to certain radar systems, the "blade flash" of spinning wind turbine blades may cause radar clutter. *Id*. However, the DoW Clearinghouse assured Empire Wind that "[t]his impact . . . can be overcome by conducting radar optimization to the affected radar systems." Exhibit M, Letter from Stephen J. Sample, Deputy Director of the DoW Clearinghouse (July 29, 2020). Radar Adverse Impact Management ("RAM") is the technical process used by DoW to minimize adverse impacts of interference on a radar system. Treseder Decl. at ¶ 15.

DoW's conclusion regarding the Project was consistent with the government's broader findings on wind turbine impacts to air defense radar. Since 2018, BOEM and DoW have been studying the potential impacts of wind turbines on defense radar through participation in the Wind Turbine Radar Interference Mitigation Working Group and reported to Congress in 2024 that wind farms and air defense radar can coexist safely through implementation of mitigation measures.[3]

As a result of Empire Wind's and BOEM's consultation with the DoW Clearinghouse, DoW proposed the following mitigation measures to address potential radar impacts, each of which was incorporated into the Project's approvals:

- Empire Wind is required to notify NORAD at least 30 days, but no more than 60 days, before completing commissioning of the last wind turbine generator (*i.e.*,

---

[3] U.S. Dep't of Energy, *Update on Effort of the Wind Turbine Radar Interference Mitigation Working Group: Report to Congress*, at ii (Feb. 2024), *available online* at https://www.energy.gov/sites/default/files/2024-02/EXEC-2022-004484%20-%20Report%20to%20Congress%20as%20of%20December%2014%202023%20%282%29.pdf (concluding that "the development and use of radar interference mitigation techniques, and collaboration both among federal agencies and between the federal government and the wind industry have enabled federal radar agencies to continue to perform their missions without significant impacts and have also enabled significant wind energy deployments throughout the United States,").

that date by which every wind turbine generator in the Project is installed with potential for blade rotation) for RAM scheduling.

- Empire Wind is required to contribute $80,000 toward the execution of RAM at least 30 days, but no more than 60 days, before completing commissioning of the last wind turbine generator .

- Empire Wind is required to enter into a mitigation agreement with DOW to ensure the RAM mitigation measures above are implemented.

- DoW is permitted to curtail (shutdown or limit) the Project's operation for national security and defense purposes.  Treseder Decl. at ¶ 21.

Empire Wind also consulted with the Navy on the Project's potential to impact Navy operations.  *Id*. ¶ 17.  The Navy requested that Empire Wind provide the Navy and DoW an opportunity to assess risks related to foreign investment and foreign material vendors to protect defense capabilities from compromise and exploitation by foreign actors.  *Id*.  The Navy also requested that Empire Wind coordinate with it on any proposal to use distributed fiber-optic sensing technology as part of the Project or associated transmission cables.  *Id*.  The Navy also requested that Empire Wind enter into a coordination agreement with DoW and the Navy to implement the requested mitigation measures.  *Id*.  All these measures are incorporated into Empire Wind's COP approval, discussed below.  *Id*. ¶ 22; *see* Ex. D, COP Approval (issued Feb. 21, 2024, revised Dec. 20, 2024).

## VI.    BOEM's Approval Of The Project.

On November 21, 2023, BOEM published a record of decision ("ROD") setting forth its conclusions regarding the Project's impacts based on BOEM's findings in the FEIS.  88 Fed. Reg. 83146.  Along with the ROD, BOEM issued a 29-page memorandum ("OCSLA Factors Memorandum") evaluating the Project under the factors in Subsection 8(p)(4) of OCSLA,

43 U.S.C. § 1337(p)(4), which, among other things, requires BOEM to ensure that any activity is carried out in a manner that provides for protection of U.S. national security interests.[4]

      In the OCSLA Factors Memorandum, BOEM concluded that, when "addressed through coordination with the [DoW]," the Project's impacts would be "negligible and avoidable." Ex. E at 16. BOEM acknowledged DoW's and the Navy's requested mitigation measures and incorporated them into the Project's proposed permit conditions. *Id.* BOEM then expressly concluded that "[a]pproval of the COP . . . would be in accordance with the regulations at 30 C.F.R. part 585 and would ensure that all Project activities on the OCS are carried out in a manner that provides for the factors in Subsection 8(p)(4) of OCSLA." *Id.* at 29. These findings were based on BOEM's detailed analysis of national security and military impacts in the FEIS, DoW's review of the Project, and the specific mitigation measures proposed. *See* Exhibit F at 3.17-22—3.17-28. In addition to RAM, BOEM noted several other mitigation measures to reduce impacts to defense radar, which could be incorporated into the mitigation agreement between DoW and Empire Wind. *Id.* at 3.17-23. BOEM expressly found that "[t]he mitigation measures for radar systems, implemented in combination, would reduce impacts to minor." *Id.* at 3.17-30. BOEM concluded that, "[i]n combination, the mitigation measures for radar systems would have the effect of reducing impacts" of the Project on ARSR-4 and NORAD radar systems," and that, if these mitigation measures are implemented, "[NORAD] and DOW could continue operations and continue to meet mission objectives." *Id.*

---

[4] *See* Exhibit E, Memorandum from Karen Baker to Elizabeth Klein, *Compliance Review of the Construction and Operations Plan for the Empire Wind Offshore Commercial Wind Farm and Empire Wind Offshore Commercial Export Cable Projects for Commercial Lease OCS-A 0512* (Nov. 21, 2023).

On February 21, 2024, BOEM approved Empire Wind's COP subject to dozens of terms and conditions that span more than one hundred pages ("COP Approval"). Ex. D. The COP Approval authorizes Empire Wind to construct the Project consistent with the required terms and conditions. The mitigation measures requested by DoW and the Navy are fully incorporated in Conditions 3.2, 4.2, 4.3, and 4.4 of the COP Approval.[5]

## VII.   Status Of DoW And Navy Mitigation.

Since BOEM issued the COP Approval more than 22 months ago, Empire Wind has frequently communicated with DoW and the Navy regarding the radar mitigation agreement required by COP Approval Condition 4.2 and the Navy coordination agreement required by COP Approval Condition 4.3. Treseder Decl. at ¶¶ 25-31. Empire Wind and its consultants have communicated with DoW and NORAD on more than a dozen occasions as to the status of the radar mitigation agreement and have been told repeatedly by DoW and NORAD officials that a draft of the mitigation agreement has been prepared and is being reviewed by DoW. *Id*. ¶ 27. As of December 12, 2025, NORAD informed Empire Wind that the draft mitigation agreement is currently with the DoW Siting Clearinghouse for internal review. *Id*. This communication contained no mention of national security concerns, even though it was made only 10 days before BOEM issued the Suspension Order and *after* DoW raised purported national security concerns in

---

[5] Condition 3.2 requires that Empire Wind equip its wind turbine generators with control mechanisms constantly operable from the Empire Wind's control center to immediately initiate the shutdown of any wind turbine generators upon emergency order from DoW or the U.S. Coast Guard. Ex. D at 30. While Empire Wind's wind turbine generators have not yet been installed, the Project was designed to comply fully with Condition 3.2. Condition 4.4 of the COP Approval requires that where Empire Wind's activities necessitate entrance to any designated defense operating area, warning area, or water test area, Empire Wind is required to enter a coordination agreement with the commander of the appropriate military headquarters to address electromagnetic emissions from survey activities. Empire Wind's activities have not yet required such an agreement. *Id*. at 33.

its November 2025 "assessment."  Despite Empire Wind's attempts to advance progress on the radar mitigation agreement, DoW and NORAD have not acted with any sense of urgency.

Empire Wind has also corresponded regularly with the Navy regarding the coordination agreement.  In July 2024, the Navy requested that in lieu of a formal coordination agreement, Empire Wind (i) inform the Navy of any changes to the Project's acoustic monitoring approach from what the Navy has already reviewed (*i.e.*, if Empire Wind uses fiber optic sensing for something other than monitoring cable); and (ii) inform the Navy if the acoustic data were to be shared outside of Empire Wind.  *Id.* ¶ 29.  The Navy stated that it viewed the email communications and the COP Approval Condition 4.3 as sufficient to encompass the Navy's requests.  *Id.*  Empire Wind's acoustic monitoring approach has not changed, and Empire Wind's acoustic data has not been shared outside of the Empire Wind organization to warrant notification to the Navy.  *Id.* ¶ 30.  Empire Wind has remained in close coordination with the Navy regarding mitigation of these impacts, and the Navy has not expressed any concerns relating to the Project's activities since construction began.  *Id.* ¶ 31.  Nor has Empire Wind received any further communications from the Navy regarding entering into a coordination agreement.  *Id.*

BOEM has continuously monitored Empire Wind's adherence to the COP Approval conditions and has not identified a single instance where Empire Wind has failed to comply.  *Id.* ¶ 37.  Empire Wind and BOEM engage in regular correspondence relating to Project construction, and Empire Wind attends biweekly meetings led by BOEM, the last of which was on December 17, 2025.  *Id.* ¶ 33.  Empire Wind has not received any notification from BOEM, DoW, or the Navy as to any alleged non-compliance with the COP Approval conditions.  *Id.* ¶ 37.

## VIII.  Interior's Prior Attempt to Halt Construction.

The Suspension Order is Interior's second attempt to halt construction and, based on public statements, both were driven by the Trump Administration's animus towards wind energy.  On

April 16, 2025, BOEM issued a "Stop Work Order" (Exhibit G) instructing Empire Wind "to halt all ongoing activities related to the Empire Wind Project on the outer continental shelf" for an indefinite period of time to address "feedback" regarding environmental analysis by NOAA—yet another federal agency involved in the Project's review process that issued its own authorization and imposed mitigation measures.  Due to the Stop Work Order, Empire Wind was forced to cease work on the Project.  By May 9, 2025, Empire Wind's upstream owner made clear that "[i]f no material progress is made toward a resolution within days, [Equinor Wind US] will be forced to terminate the project."[6]  Ten days later, with the Project on the brink of termination, BOEM, without explanation, amended the Stop Work Order and allowed Empire Wind to recommence construction.  *See* Exhibit H, May 19, 2025, Letter from Former BOEM Director Walter Cruickshank.[7]

Since then, Interior worked cooperatively with Empire Wind as construction of the Project continued.  That cooperation abruptly stopped with Interior's issuance of the Suspension Order, directing a halt to the Project "for the next 90 days for reasons of national security" while BOEM "determine[s] whether the national security threats relating to this project can be mitigated."  Ex. A at 1. Ominously, the Suspension Order expressly reserves the right to extend the 90-day period if BOEM cannot reach a conclusion.  *Id*.  BOEM invited Empire Wind to "meet and confer" about possible mitigation, but deprived Empire Wind of any explanation of its national security concerns

---

[6] Jennifer McDermott, *An offshore wind project for New York may be abandoned over Trump administration delays*, AP (May 9, 2025).

[7] Interior tried again in August of this year to stop construction of a different offshore wind project, Revolution Wind, for reasons that included "national security."  *See* Order Granting Prelim. Inj., *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999 (RCL) (D.D.C. Sept. 22, 2025), Dkt. No. 36.  This court resoundingly rejected that attempt, calling it the "height of arbitrary and capricious action."  *Id.* at Dkt. No. 39 at 41 (transcript of hearing wherein Court recognized irreparability of harm posed).

by relying on "new" classified information not provided to Empire Wind.  *Id.*  Empire Wind met

with BOEM on January 2, 2026, and the meeting did not result in resolution.  Then on January 5,

2026, BSEE directed Empire Wind to halt several activities Empire Wind asserts are necessary to

prevent harm to health, safety, and the environment.  Ex. L at 1.  As a result, all construction

activities except for trenching (*i.e.*, burial) of already laid cables and monitoring of the offshore

site have ceased.  Muhlfelder Decl. ¶ 29.

## ARGUMENT

Section 705 of the APA allows the Court to "issue all necessary and appropriate process to

postpone the effective date of an agency action or to preserve status or rights" pending judicial

review.  5 U.S.C. § 705.  A stay under Section 705 is subject to the same stringent test that applies

to a motion for a preliminary injunction under Rule 65.  *See, e.g.*, *Dist. of Columbia v. U.S. Dep't

of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020) (citations omitted).  The movant must show (i) that

it is likely to succeed on the merits; (ii) that it is likely to suffer irreparable harm in the absence of

preliminary relief; (iii) that the balance of equities tips in its favor; and (iv) that an injunction is in

the public interest.  *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 72 (D.D.C. 2001);

*Winter v. Nat. Res. Defense Council*, 555 U.S. 7, 20 (2008).  When the nonmovant is the

government, the last two factors merge.  *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir.

2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  The purpose of a preliminary injunction

"is to preserve the status quo pending the outcome of litigation."  *Cobell v. Kempthorne*, 455 F.3d

301, 314 (D.C. Cir. 2006); *see Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (same).

## I.    Interior Has Not Justified Withholding The Information On Which The Suspension Order Is Based.

Interior claims that its Suspension Order is justified by classified information received from

DoW.  Ex. A at 1. To be clear, Empire Wind understands and respects the critical need to ensure

the national security of the United States.  But here, based on the years' long review of the Project, there is no reason to believe that the Project poses any national security risk and, in any event, Empire Wind is committed to continuing to work with BOEM to ensure that any such concerns are addressed.  Empire Wind requested access to the classified information underlying the Suspension Order solely for its attorneys who hold proper clearance (Exhibit I) and this request is pending with DoW.  In addition, Empire Wind requests that the Court require Interior to produce to the Court an unclassified summary of the classified assessment relied upon by Interior so that Empire Wind can more effectively engage in the adversarial process.  *See Fares v. Smith*, 901 F.3d 315, 324 (D.C. Cir. 2018); *Zevallos v. Obama*, 793 F.3d 106, 117 (D.C. Cir. 2015) (discussing provision of unclassified summaries in administrative record).

Interior will likely propose that this Court review the classified information *in camera* and *ex parte*, as the agency has proposed in a challenge pending in the U.S. District Court for the Eastern District of Virginia to a nearly identical order issued to a different offshore wind developer.[8]   According to the Suspension Order, the classified information forms a key component, and perhaps the only component, of the administrative record underlying the Suspension Order.  The Court's review of the legality of Interior's action is based on that record.[9] *See Am. Pub. Gas Assoc. v. Dep't of Energy*, 72 F.4th 1324, 1336 (D.C. Cir. 2023).

Interior's claim that its Suspension Order is based on classified information does not shield the Order from judicial scrutiny or change the standard of review under the APA.  *See Jifry v. FAA*,

---

[8] Federal Defendants' Notice of Intent on Sharing Classified Information, *Va. Elec. and Power Co. v. U.S. Dep't of the Interior*, No. 2:25-cv-00830 (E.D. Va. Dec. 31, 2025), Dkt. No. 30.
[9] This court has recognized that "[e]x parte submissions 'generally are disfavored because they conflict with the fundamental precept of our system of justice: a fair hearing requires a reasonable opportunity to know the claims of the opposing party and to meet them.'" *Chekkouri v. Obama*, 158 F. Supp. 3d 4, 5-6 (D.D.C. 2016) (citations omitted).

370 F.3d 1174, 1180-1181 (D.C. Cir. 2004). Rather, the Court reviews "classified material *ex parte, in camera* as part of its judicial review function." *Id*. at 1182. Here, Interior has not provided "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins*., 463 U.S. 29, 43 (1983) (internal citations omitted). Further, Interior's reliance on classified information should be considered in the context of its decision to stop *all* offshore wind projects under construction, without making any findings specific to each one. That reliance should also be scrutinized in light of the inexplicable timing of the Suspension Order, which came (1) without warning at least a month after the classified assessment was provided by DoW to Interior; (2) after Interior's previous efforts to stop this and another offshore project (on grounds that included national security) failed; and (3) two weeks after a district court ruled that Interior's implementation of President Trump's January 20, 2025 presidential memorandum stopping all federal permitting for offshore wind projects is unlawful. *See* Preliminary Injunction Order, *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999 (RCL) (D.D.C. Sept. 22, 2025), Dkt. No. 36; *New York v. Trump*, No. 25-CV-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025).

## II.    Empire Wind Is Likely To Succeed On The Merits.

### A.    Empire Wind's Claims Are Justiciable.

Empire Wind has standing to challenge the Suspension Order. Article III standing requires a plaintiff to plead facts sufficient to show: (1) injury-in-fact; (2) a "causal connection between the injury and the conduct complained of;" and (3) a likelihood that the alleged injury "will be 'redressed by a favorable decision.'" *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). Empire Wind has been injured by the Suspension Order because it has halted Project activities, causing financial and contractual burdens and threatening the very enterprise. *See Sierra Club v.*

*EPA*, 292 F.3d 895, 900 (D.C. Cir. 2002). Empire Wind's injury is redressable because a grant of preliminary injunctive relief will allow Empire Wind to continue Project construction.

In addition, the Suspension Order is a final agency action subject to judicial review under the APA, 5 U.S.C. § 704. The Order marks the consummation of BOEM's decision-making to suspend the Project and results in immediate and irreparable harm to Empire Wind. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). The mere "possibility" that BOEM may lift the Suspension Order "does not render [this] otherwise definitive decision nonfinal" for purposes of judicial review under the APA." *See Seeger v. U.S. Dep't of Def.*, 306 F. Supp. 3d 265, 285 (D.D.C. 2018) (internal quotations and citation omitted); *see also Widakuswara v. Lake*, 779 F. Supp. 3d 10, 32-33 (D.D.C. 2025). BOEM's characterization of its action as a temporary suspension does not make the Suspension Order any less final.[10] *Louisiana v. Biden*, 622 F. Supp. 3d 267, 291 (W.D. La. 2022), *rev'd on other grounds*, 64 F.4th 674, 684 (5th Cir. 2023) (collecting cases, finding "pause" of oil and gas leasing was final agency action reviewable under APA, as "[BOEM's] use of the label 'Pause' is not dispositive of whether the agency action is final").

### B.    BOEM's Suspension Order Is Arbitrary And Capricious.

Empire Wind's claims are subject to review under the APA, which "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (citation omitted). The APA provides that courts "shall hold unlawful and set aside agency

---

[10] The Suspension Order is subject to immediate review pursuant to OCSLA's citizen-suit provision, which provides that "[a]n action may be brought . . . immediately after notification of the alleged violation in any case in which the alleged violation constitutes an imminent threat to the public health or safety or would immediately affect a legal interest of the plaintiff." 43 U.S.C. § 1349(a)(3). Empire Wind notified Interior of its violations before bringing this action. Exhibit J, Notice of Intent to Sue. No administrative appeal is required because neither the APA, OCSLA, nor the BOEM regulations, mandates exhaustion or makes the Suspension Order inoperative pending appeal. *See Darby v. Cisneros*, 509 U.S. 137, 154 (1993).

action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law . . . ." 5 U.S.C. § 706(2)(A), (C), (E). Where an agency fails to articulate "a rational connection between the facts found and the choice made," a court "'may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citations omitted). An agency's decision may be deemed arbitrary and capricious where the agency has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or if the agency decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. The absence of reasoned explanation to support a change in position renders that action arbitrary and capricious. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

### 1.    BOEM's Suspension Order Lacks Reasonable Explanation.

The Suspension Order is arbitrary, capricious, and an abuse of discretion because BOEM has provided no reasonable explanation for why suspension of all Lease activities is necessary. "To satisfy arbitrary and capricious review, an agency must at least reasonably explain its decision[.]" *World Shipping Council v. Fed. Maritime Comm'n*, 152 F4th 215, 221 (D.C. Cir. 2025). Prior to issuing the Project's Lease and COP Approval, BOEM consulted with DoW and issued the Project's FEIS, the ROD, and the OCSLA Factors Memorandum, and concluded that the Project's implementation of certain mitigation measures would ensure that the Project will not adversely affect national security or defense operations, including radar. Treseder Decl. ¶¶ 18-19. Empire Wind has complied with the national security and radar related terms and conditions of its COP Approval. *Id.* at ¶¶ 25-31. Despite regular correspondence with DoW, Empire Wind has not

received any notice from DoW regarding national security or radar concerns. The Suspension Order fails to provide any meaningful explanation for Interior's sudden reversal.[11]

Moreover, merely referencing "new classified information" does not constitute a reasonable explanation for why a suspension of all Lease activities is necessary. Ex. A at 1. While judicial review is deferential in cases involving the intersection of national security and administrative law, "the deference owed to the agency is not unlimited." *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 123-24 (D.D.C. 2015) (citing *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56-57 (D.C. Cir. 2015) and granting plaintiff's preliminary injunction where *in camera* inspection of classified information showed plaintiff did not pose threat to national security justifying government's action). Even where classified information and issues of national security are involved, a "reviewing court must consider whether the agency provided a satisfactory explanation for its action including a rational connection between the facts found and the choice made" and "[a]mong other things, the agency's explanation must reflect its consideration of significant and viable and obvious alternatives." *Id.* (internal citations and quotations omitted).

The Suspension Order's cursory reference to "new classified information" does not explain why the mitigation measures imposed by the government after years of review and consultation with DoW are now insufficient, which components of the Project now pose a sudden and previously unknown risk to national security when the Project is not yet operational, or why Interior waited until December 22 to act on the information provided by DoW in November 2025 if that information posed such a significant risk to national security that *immediate suspension* of

---

[11] This Court rejected a similar attempt by Interior to cancel a lawfully issued permit based on a limited explanation that ran counter to the record. *See Solenex, LLC v. Haaland*, 626 F. Supp. 3d 110, 119, 127 (D.D.C. 2022). There, the Court found that Interior could not rescind an "already-approved" permit on the basis that it would result in adverse impacts to tribal resources, because the agency's explanation contradicted the record. *Id.* at 127 (citing *State Farm*, 463 U.S. at 43).

all lease activities without prior notice was necessary.  While the Suspension Order claims a finding of "particularized harm" that can only be "feasibly averted by suspension of on-lease activities," it discusses only alleged harm stemming from offshore wind projects generally, not the Project specifically.  *Cf. FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("Particularized" harm is "personal and individual," not "general").  The "explanation" in the Suspension Order is devoid of substance, and a similar cursory explanation provided to another offshore wind Project was rejected by Judge Lamberth.[12]  Nor can it be reconciled with the fact that BOEM and DoW studied the potential impacts of wind turbines on defense radar since 2018 through participation in the Wind Turbine Radar Interference Mitigation Working Group and concluded that wind farms and air defense radar can coexist safely.  *See supra* note 3.

Defendants also fail to explain how the Project threatens national security when its towers and blades have not even been installed, Muhlfelder Decl. at ¶ 9, and it is not even operational, while other *operating* wind projects in the same region as the Project and subject to nearly identical DoW mitigation measures presumably do not pose the same threat.  Indeed, those other projects continue to operate and deliver power to the grid.[13]

Empire Wind is left only with BOEM's contemporaneous public statements that "the movement of massive turbine blades and the highly reflective towers create radar interference

---

[12] *See* Order Granting Prelim. Inj. and Transcript of Prelim. Inj. Hearing, *Revolution Wind, LLC v. Burgum*, No. 1:25-cv-02999 (RCL) (D.D.C. Sept. 22, 2025), Dkt. Nos. 36, 39 at 40 (enjoining similar suspension order on basis that "[t]he only, quote, concerns, unquote, [BOEM] cites are the mere potential for national security concerns or, quote, interference with reasonable uses of the exclusive economic zone, the high seas, and the territorial seas, unquote. [BOEM] does not actually point to any factual findings that lead them to believe that Revolution Wind has implicated either of these concerns or that those concerns rise to such a level that work must cease immediately.").
[13] *See* Conditions 4.2 and 4.3 of South Fork Wind COP Approval (Jan. 18, 2022), *available online* at https://www.boem.gov/renewable-energy/state-activities/sfwf-cop-terms-and-conditions.

called 'clutter.'"[14]  But those statements only confirm that the Suspension Order has no rational

basis.   BOEM, in consultation with DoW, already considered the risk of radar "clutter" and

determined that the required mitigation measures were sufficient to address these impacts if they

occur.    Treseder Decl. ¶¶ 15-19.    BOEM also created a mechanism—the radar mitigation

agreement—for continued evaluation of this issue, as necessary.  *Id.* ¶ 21.  Moreover, the Project's

monopile foundations currently installed in the Lease area reach a height of only *72* feet above sea

level (whereas the other offshore wind project operating nearby the Project reaches up to

840 feet)[15], and will not exceed this height until towers, nacelles, and blades are installed in

October 2026. Muhlfelder Decl. ¶ 9.  Thus, Empire Wind's activities in the Lease area do not pose

any risk to radar and there is no particularized harm warranting immediate suspension of all Lease

activities.  BOEM has entirely failed to establish a "rational connection between the facts found

and the choice made."  *State Farm*, 463 U.S. at 43; *see Moncrief v. Interior*, 339 F. Supp. 3d 1, 10

(D.D.C. 2018) (rejecting Interior's decision to cancel onshore oil and gas lease on basis that

environmental analysis performed prior to lease's issuance years earlier was allegedly inadequate);

*RFE/RL, Inc. v. Lake*, 772 F.Supp.3d 79, 84 (D.D.C. Mar. 25, 2025) (agency's one-page letter

terminating news organization's right to receive congressionally appropriated funds was arbitrary

and capricious under APA as it amounted to "one line in the termination letter").

Finally, while the Suspension Order itself provides no meaningful explanation, public

explanations provided by the government show that the Suspension Order is purely pretextual and

---

[14] Interior, *Press Release: The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases,* USDOI (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases.
[15] South Fork Wind, Table 3.1-3 of South Fork Wind Farm Construction & Operations Plan: Volume    I    (May    7,    2021),    *available    online*    at https://www.boem.gov/sites/default/files/documents/renewable-energy/South-Fork-Construction-Operations-Plan.pdf.

driven by political pressure.  *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019) (finding agency action arbitrary and capricious when court was presented with "explanation for agency action that is incongruent with what the record reveals about the agency's priorities").  Statements by Secretary Burgum and the White House focus on the cost of offshore wind energy and the Trump Administration's general opposition to offshore wind energy.[16]  Those statements raise no specific concerns about national security and suggest only political motivations for suspending Project activities.  Such statements also demonstrate that the Suspension Order is based on "considerations not made relevant by Congress," *D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1972), specifically President Trump and Secretary Burgum's animus towards offshore wind.[17]  They demonstrate that political considerations drove Interior's issuance of the Suspension Order.  Thus, the Suspension Order should be set aside under the APA as it was

---

[16] On the social media platform X, Secretary Burgum posted the following only minutes after issuance of the Suspension Order: "Due to national security concerns identified by [DoW], [Interior] is PAUSING leases for 5 expensive, unreliable, heavily subsidized offshore wind farms! ONE natural gas pipeline supplies as much energy as these 5 projects COMBINED. [President Trump] is bringing common sense back to energy policy & putting security FIRST!" Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 22, 2025, at 8:35 a.m.), https://x.com/SecretaryBurgum/status/2003094666040787213.  The White House's statements to the press were "more explicit that Trump simply doesn't want wind. 'President Trump has been clear: wind energy is the scam of the century,' said Taylor Rogers, a White House spokesperson, repeating a favorite administration talking point. 'For years, Americans have been forced to pay billions more for the least reliable sources of energy.'"  Benjamin Storrow and Kelsey Tamborrino, *'Incredibly reckless': Trump's wind halt stuns even some allies*, POLITICO, Dec. 22, 2025, https://www.politico.com/news/2025/12/22/trump-leaves-wind-industry-reeling-at-a-perilous-moment-for-his-party-00704170.

[17] *See, e.g.*, "At the core of the Green New Scam: high cost, fake emissions reductions, foreign supply chains and BILLIONS in taxpayer subsidies. America deserves energy that is affordable, reliable and secure—not this." Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 22, 2025, at 3:23 p.m.), https://x.com/SecretaryBurgum/status/2003199861953560652; "[SecretaryBurgum] says [Interior] is suspending the leases for five expensive, unreliable offshore wind farm projects due to national security concerns — including radar interference. (FACT: Just one natural gas pipeline can supply as much energy as these five projects combined)" Rapid Response 47 (@RapidResponse47), X (Dec. 22, 2025, at 9:15 a.m.), https://x.com/RapidResponse47/status/2003125425879629936.

"motivated in whole or in part by political pressures." *Aera Energy LLC v. Salazar*, 691 F. Supp.

2d 25, 33 (D.D.C. 2010), *aff'd*, 642 F.3d 212 (D.C. Cir. 2011) (citing *D.C. Fed'n of Civic Ass'ns*

*v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1972)).

## 2.    The Suspension Order Is Overly Broad.

The Suspension Order is also arbitrary and capricious because it is overly broad, stopping

*all* construction activities, even those that cannot impact air defense radar.  Courts have "no

difficulty" concluding that an agency action is arbitrary and capricious where it is "irrationally

overbroad." *Nat'l Mining Ass'n v. Babbitt*, 172 F.3d 906, 913 (D.C. Cir. 1999).  Where an agency

adopts an overbroad action and fails to explain itself, the agency's action is arbitrary and capricious

in violation of the APA, even where the agency's determination relates to national security.

*Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 948 (D.C. Cir. 2024) (vacating in part order issued by

the FCC on grounds that it contained overly broad definition of equipment used for surveillance

of "critical infrastructure" that poses threat to U.S. national security).

Interior's press release suggests that the Suspension Order aims to address concerns related

to air defense radar interference caused by the spinning of wind turbine blades.[18]   But the

Suspension Order halts effectively *all* construction activities (except for those that BSEE deems

necessary for safety or protection of the environment), including activities like subsea cable

installation, that cannot even theoretically have an impact on air defense radar.  Interior has also

provided no explanation why similar suspension orders were not issued to already operating

offshore wind facilities.  Interior has not shown a rational connection between allegations of

interference with air defense radar and the need for a blanket suspension of all construction

---

[18] U.S. Dept. of the Interior, *Press Release: The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases,* (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases.

activities on the Lease, even those completely unrelated to radar. Thus, the Suspension Order is arbitrary and capricious as an overly broad directive that is not narrowly tailored to address the alleged national security risk relied upon by the government.

### 3.    The Suspension Order Violates The Change-In-Position Doctrine.

As the U.S. Supreme Court recently articulated in *FDA v. Wages & White Lion Investments., L.L.C.*, the "change-in-position" doctrine dictates that an agency's action is arbitrary and capricious where it fails to display awareness that it is changing its position, provide a reasoned explanation for the change, and consider serious reliance interests impacted by the change. 604 U.S. 542, 568 (2025) (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–222 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). "Agencies are free to change their existing policies, but in explaining its changed position, an agency must be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino Motorcars*, 579 U.S. at 212 (citing *Fox Television*, 556 U.S. at 515). Importantly, an agency may not "depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Fox Television*, 556 U.S. at 515 (citations omitted). The change-in-position doctrine prescribes that an agency's "scant explanation and casual disregard for its former position do not satisfy the APA's requirements for rational decisionmaking." *Music Choice v. Copyright Royalty Bd.*, 970 F.3d 418, 429–30 (D.C. Cir. 2020).

Here, the Suspension Order violates every aspect of the change-in-position doctrine. Interior fails to display any awareness of its change in position. When it approved the Project, Interior, with DoW's involvement, concluded that the Project's construction and operation would not harm national security interests, including due to the efficacy of the COP Approval's mitigation measures. *See* Ex. E, OCSLA Factors Memorandum at 16-17; Ex. F, FEIS at 3.17-3.30. The Suspension Order reaches an entirely different conclusion—that the Project risks national security

interests, even with the existing mitigation measures.  Besides failing to acknowledge the change in position, the Suspension Order fails to provide any meaningful explanation for the change.

Further, BOEM fails to acknowledge that its prior approval of the Project—including allowing Empire Wind to recommence construction in May 2025 after issuing the Stop Work Order—"engendered serious reliance interests" on the part of Empire Wind.  *Dep't of Homeland Sec. v. Regents*, 591 U.S. 1, 30 (2020) (internal citations omitted).  Since BOEM approved the COP, Empire Wind drew roughly $2.7 billion in financing to construct the Project and installed all 54 of the Project's monopile foundations.  Muhlfelder Decl. at ¶ 9, 39.  And just since BOEM withdrew the Stop Work Order on May 19, 2025, Empire Wind has spent $1.5 billion in construction costs.  *Id*. ¶ 38.  The Suspension Order utterly fails to reflect any cognizance by BOEM of these serious reliance interests.  The Suspension Order constitutes a clear violation of the change-in-position doctrine.  *See Music Choice*, 970 F.3d at 428-430 (agency failed to acknowledge or justify its change in position, as "*ipse dixit* cannot substitute for reasoned decisionmaking") (emphasis added).

### C.    The Suspension Order Violates Section 558 Of The APA.

BOEM violated the APA because it acted "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).  Section 558 of the APA makes it unlawful for an agency to issue a "withdrawal, suspension, revocation, or annulment of a license" if it does not give the licensee "notice" and "opportunity to demonstrate or achieve compliance with all lawful requirements" "before" the agency acts.  *Id*. § 558(c).  The APA defines a license as "the whole or a part of an agency permit, certificate, approval, registration, charter, membership, statutory exemption or other form of permission." *Id*. § 551(8).  An OCSLA lease and COP Approval is a "form of permission" to use the OCS for energy development.

Interior issued the Suspension Order with no notice whatsoever and no opportunity for Empire Wind to engage in discussions that could lead to resolution of Interior's new concerns. Interior's assertion of authority to take this draconian action under OCSLA and Interior's own regulations does not relieve it of the responsibility to fulfill its obligations under the APA before doing so. *Beach TV Props., Inc. v. Solomon*, No. CV 15-1823, 2016 WL 6068806, at *11 (D.D.C. 2016) (holding that Section 558(c) requires that any procedures required by law, including the APA, be implemented within a reasonable time and in a reasonable manner).

### D.    The Order Is Contrary To Law In Violation Of OCSLA And The APA.

Interior asserts that it issued the Suspension Order pursuant to 30 C.F.R. § 585.417(b), which allows suspensions "[w]hen the suspension is necessary for reasons of national security or defense." Section 585.417(b) does not support Interior's action. OCSLA does not provide Interior unfettered authority to suspend lease activities simply by declaring a threat to "national security." Rather, OCSLA carefully structures Interior's ability to suspend lease operations due to potential national security concerns and imposes specific requirements—incorporated in the Empire Wind Lease—that have not been satisfied here. The Suspension Order should be set aside because it is contrary to law in violation of the APA.

### 1.    OCSLA Provides Interior With Limited Authority To Suspend Lease Operations For National Security Reasons.

OCSLA and its implementing regulations preclude Interior from suspending activities on an offshore lease except in circumstances that are not present here. This constrained suspension authority is reflective of OCSLA's intent to encourage responsible development of the OCS, which requires substantial, long term, and predictable investment. An unconstrained authority to suspend leases for reasons outside the lessee's control (like national security) would undermine OCSLA's purpose. *See Energy Action Educ. Found. v. Andrus*, 631 F.2d 751, 761 (D.C. Cir. 1979)

(recognizing "the national interest, to expedite exploration under [offshore] leases" and finding that disruption of OCS development would "disserve priorities set by Congress" and waste "enormous outlays" of invested capital); *see also* 43 U.S.C. § 1802(2)(C), (D) (purpose of OCSLA is "to insure the public a fair and equitable return on the resources of the [OCS], and . . . to preserve and maintain free enterprise competition").  While that original intent applied to ensuring oil and gas development, Congress added renewable energy development to that mission when amending OCSLA in 2005.  *See* Energy Policy Act of 2005, Public Law 109-58, 119 Stat. 594.

A suspension for national security reasons is authorized only under Section 1341 of OCSLA.  That provision directs the Interior Secretary to include in all leases "a provision whereby authority is vested in the Secretary, upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, after August 7, 1953, to *suspend operations* under any lease . . . ."  43 U.S.C. § 1341(c) (emphasis added).  Section 1341(c) also provides for payment of compensation.  Aside from Section 1341, OCSLA contains no authority for Interior to suspend operations for "national security" reasons, and none of the specific requirements that would allow for such suspension are present here.

Other sections of OCSLA address national security or defense, but they do not authorize Interior to issue a suspension.  First, Section 1341(d) does addresses defense, 43 U.S.C. § 1341(d), but simply reserves the Secretary of DoW the authority to designate restricted areas that are needed for national defense, removing these areas from future leasehold operations under OCSLA.  If leasehold operations are already occurring when the designation is made and operations are suspended by operation of the statute, it provides for both a lease extension and compensation.  *Id*.

Second, Section 1334 authorizes Interior to promulgate regulations on suspending operations—but not for reasons of national security.  43 U.S.C. § 1334.  Section 1334 is rooted in

the authority for creating the leasing program.  Interior may prescribe regulations for suspension of "any operation or activity," "if there is a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits . . . or to the marine, coastal, or human environment . . . ."  43 U.S.C. § 1334 (a)(1).  Notably, "national security" is not included.  Moreover, Section 1334 does not provide for compensation, which is telling because it underscores the basis for suspension under that provision—it addresses a threat from the lessee's operations, not from an external source (such as a foreign threat or war).

Third, subparagraph (a)(2) of Section 1334 directs Interior to issue regulations governing lease *cancellation*, which can only occur after a hearing, if "continued activity pursuant to such lease or permit would probably cause serious harm or damage" to (1) interests identified in Section 1334(a)(1) (*i.e.*, life, property, mineral interests, or the environment) or (2) "national security or defense."  43 U.S.C. § 1334(a)(2)(A).  Such cancellation, whether for national security reasons or for other reasons, must be preceded by suspension of lease operations, but this section does not give Interior additional authority for suspensions, beyond that found in Sections 1334(a)(1) and 1341(c).  43 U.S.C. § 1334(a)(2)(B).  Section 1334(a)(2)(A) does not create a *separate* authority, apart from Section 1341, to suspend for national security reasons; it only provides the procedures to cancel a lease if already suspended pursuant to Section 1334(a)(1) (*i.e.*, threats to life, property, mineral interests, or the environment) or Section 1341 (*i.e.*, threats to national security).

Where Congress includes particular language in one section of a statute but omits it in another section of the same statute, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.  *Russello v. U.S.*, 464 U.S. 16, 23 (1983).  Similarly, where Congress expressly addresses an issue in one part of a statute but does not do so

elsewhere in the statute, it shows that Congress knew how to address the issue when it wanted to and similar intentions should not then be read into the statute elsewhere. *Id.*; *see Cnty. of San Francisco v. EPA*, 604 U.S. 334, 344 (2025). Here, in Sections 1341(c) and 1341(d), Congress expressly addressed the circumstances under which suspensions for national security and defense are warranted. While Congress included language on national security and defense when addressing lease *cancellations* in Section 1334(a), Congress notably did not include national security or defense language in Section 1334(a)(1) in addressing suspensions generally. Under governing rules of statutory construction this indicates that suspensions of national security and defense grounds are governed solely by Sections 1341(c) and (d). *Russello*, 464 U.S. at 23; *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 439-40 (2002). This structure is perfectly consistent with Section 1334(a)(2). Suspensions for national security and defense reasons are governed by Section 1341 while suspensions on other grounds are governed by Section 1334(a)(1). Cancellations on either national security or other grounds are governed by 1334(a)(2).

Interior might assert that Section 1337(p)(4) provides a separate authority for national security suspensions. 43 U.S.C. § 1337(p)(4). But no part of this provision confers authority to suspend a lease. Rather, Section 1337(p)(4) imposes a duty on the Interior Secretary to ensure that leasehold activities "provide[] for . . . protection of national security interests of the United States." 43 U.S.C. § 1337(p)(4)(F). Here, the Interior satisfied this requirement by working closely with DoW, as explained above. Having issued the Lease and approved the Project, Interior is now subject to the rights and parameters set out in the Lease and project approval documents, including the parameters for lease suspension and cancellation. Further, finding some additional

and undefined suspension authority in Section 1337 would illogically negate the need for Section 1341, which specifically addresses suspension for national security reasons.

### 2. Empire Wind's Lease Reflects This Statutory Structure.

This above statutory structure is carefully reflected in Empire Wind's Lease, which does not contain any reservation by Interior to suspend operations for undefined reasons of "national security" under Section 1337. First, in the Lease, Interior reserved the right to suspend Empire Wind's operations in accordance with Section 1341 (43 U.S.C. § 1341) and applicable regulations. Section 3 of the Lease implements 43 U.S.C. § 1341(c) by providing that the Lease may be suspended for national security reasons but explicitly requiring such suspension to be in accordance with Section 1341. Second, Section 8 of the Lease governs suspensions (for reasons other than national security) and cancellations generally, providing that Interior may cancel the lease under 43 U.S.C. § 1334(a)(2) if it complies with the statute's procedural requirements.

Further, Addendum C of the Lease reiterates Interior's right to temporarily suspend operations in the interest of national security but imposes further obligations on Interior. Lease OCS-A 0512 at C-4—C-6 (Dec. 30, 2024) (Exhibit K). Specifically, "the appropriate military agency" must make "every effort" to provide "as much advance notice as possible of the need to suspend operations . . . ." Ex. K at C-5. Here, no military agency notified Empire Wind of any impending need to temporarily suspend operations. The Lease also provides that the duration of a suspension for national security reasons will not generally exceed 72 hours, a full 87 days shorter than the 90 days imposed by the Suspension Order. *Id*. In sum, no portion of the Lease confers an independent authority to suspend operations on the Lease under Section 1337.

Congress was attentive to national security interests in the statute as balanced against the statute's purpose—to develop OCS resources. This statutory framework is reflected in the Lease. Interior can suspend operations for national security reasons—but only if DoW recommends it and

the other circumstances set out in the statute exist.  *See* 43 U.S.C. § 1341(c).  Those circumstances

plainly do not exist here, and the Suspension Order does not suggest otherwise.

> **E.      The Suspension Order Violates Empire Wind's Due Process Rights.**

The Suspension Order violates Empire Wind's right to due process under the Fifth

Amendment to the U.S. Constitution.  The Fifth Amendment provides that "[n]o person shall . . .

be deprived of life, liberty, or property, without due process of law."  U.S. Const. Amend. V.  The

first inquiry is whether the plaintiff has been deprived of a protected interest in property.  *Am.

Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999) (citing *Mathews v. Eldridge*, 424 U.S. 319,

332 (1976)).  Courts then consider whether the government's actions comport with due process.

*Id*.  "Due process, while 'flexible' and determined by the particular circumstances of each situation

. . . requires, at a minimum, an 'opportunity to be heard at a meaningful time and in a meaningful

manner.'"  *UDC Chairs Chapter v. Bd. of Trs. of Univ. of D.C.*, 56 F.3d 1469, 1472 (D.C. Cir.

1995) (citing *Mathews*, 424 U.S. at 333).

Empire Wind has property interests in the Lease and COP Approval that entitles it to the

protections afforded by the Fifth Amendment's Due Process clause.  *Shell Petroleum Inc. v. United

States*, 2008 WL 2714252, at *6 (S.D. Tex. 2008) ("OCS leases are real property interests"); *3883

Connecticut LLC v. District of Columbia*, 336 F.3d 1068, 1072 (D.C. Cir. 2003) (holding that

certain permits constitute protected property interest).  Government authorizations, including

permits, create a property interest where the holder of the authorization has a "legitimate claim of

entitlement" to the permit.  *3883 Connecticut*, 336 F.3d at 1071 (citing *Bd. of Regents*, 408 U.S. at

577).  If the permit holder has "more than a unilateral expectation" in the permit's continued effect,

the permit creates a property interest entitling its holder to due process of law.  *Id*. at 1072.  Here,

Interior's authority to halt construction authorized by the Lease and COP Approval is limited by

OCSLA, which specifically restricts Interior's authority to suspend rights granted in the Lease and COP Approval. *See supra* at 30-34. These restrictions give Empire Wind a legally protected expectation in the continued effect of the Lease and COP Approval. *3883 Connecticut LLC*, 335 F.3d at 1072-73. This expectation constitutes a property interest that cannot be abridged without due process.

Here, Interior failed to afford Empire Wind *any* due process. Interior gave Empire Wind no notice or opportunity to be heard before suspending its property interests in the Lease and COP Approval. Notice and an opportunity to be heard are "threshold procedural requirements" afforded by the Fifth Amendment. *See Propert v. District of Columbia*, 948 F.2d 1327, 1332 (D.C. Cir. 1991). "The precise form of notice and the precise kind of hearing required depends upon a balancing of the competing public and private interests involved, as defined by the now familiar *Mathews* factors: (1) the private interest affected by the government action; (2) the risk of erroneous deprivation and the value of additional safeguards; and (3) the government's interest, including the fiscal and financial burdens that additional or substitute procedural requirements would entail." *Id.* (citing *Connecticut v. Doehr,* 501 U.S. 1 (1991); *Mathews,* 424 U.S. at 335).

Consideration of the *Mathews* factors demonstrates that Interior owed Empire Wind notice and an opportunity to be heard before issuing the Suspension Order. Empire Wind's interests in the Lease and COP Approval are significant. Empire Wind also owes contractual duties to New York to provide 810 MW of clean energy and billions in economic benefits. Muhlfelder Decl. ¶ 35. Moreover, the risk of erroneous deprivation is great in light of Interior's prior extensive review (with DoW's participation) of the Project's potential national security impacts, Interior's prior conclusion that national security would not be adversely impacted by the Project, and the mitigation measures imposed to safeguard national security. Treseder Decl. ¶¶ 7-24.

Pre-deprivation notice and an opportunity to be heard would have allowed Empire Wind the ability to understand and potentially address the government's professed concerns while protecting Empire Wind's interests in the Lease and COP Approval.  And while the government's interest in protecting national security is significant, pre-deprivation notice to Empire Wind would have cost the government nothing.  Interior acknowledges it received DoW's assessment in November 2025, giving Interior weeks to notify Empire Wind before issuing the Suspension Order in late December and allowing Empire Wind to address any purported concerns.  Ex. A at 1. Interior failure to provide Empire Wind with pre-deprivation notice or the opportunity to be heard is particularly egregious because Interior communicates with Empire Wind on a weekly, and often daily, basis regarding the Project's construction.  Treseder Decl. ¶¶ 32-37.  Interior deprived Empire Wind of its property interest in the Lease and COP Approval with no process whatsoever in violation of the Due Process clause.

### III.    Absent Preliminary Relief, Empire Wind Will Continue To Suffer Irreparable Harm.

To demonstrate irreparable harm, Empire Wind must show that its harm is (1) "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm;" and (2) beyond remediation.  *League of Women Voters*, 838 F.3d at 7-8 (internal quotations omitted).  Once a moving party presents clear, actual, and imminent harm, economic loss can qualify as irreparable when it threatens the "very existence" of the business.  *See Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health and Hum. Servs.*, 485 F. Supp. 3d 1, 58 (D.D.C. 2020) (collecting cases).

Empire Wind readily meets this standard.  If the Suspension Order remains in place, the Project is at substantial risk of cancellation, posing an existential risk to Empire Wind.  Muhlfelder Decl. at ¶ 54.  First, failure to re-commence critical construction activities by January 16, 2026, will likely result in the Project's cancellation.  *Id*. ¶¶ 44, 54.  Re-start is needed by this date to

ensure that the Project's offshore substation topside can be timely installed onto its jacket foundation by the *Sleipnir* before February 1, 2026 (when the vessel must depart the site), and that commissioning of the offshore substation can be completed by the *Crossway Eagle* by June 2026 (after which the vessel is unavailable for five years). *Id.* ¶ 45-49. After each of these respective dates, these vessels will no longer be available to the Project due to other contractual commitments. *Id.* ¶¶ 30, 33. There is a substantial risk that these vessels cannot readily be replaced due to limited availability of specialized offshore construction vessels. Moreover, if the offshore substation topside installation is delayed, this piece of equipment—which weighs more than 3,000 tons and was commissioned at a cost of $224 million—will likely need to sit offshore on its heavy transport vessel due to limited availability of onshore facilities capable of storing the topside and Jones Act limitations that prevent Empire Wind from transporting the topside in and out of U.S. ports. *Id.* ¶ 31. Empire Wind estimates that after 30 days, integrity of the topside's electrical components could be compromised. *Id.* ¶ 31.

Moreover, delays in Empire Wind's construction schedule will cause a ripple effect across the overall schedule, impacting other vessel and supply contracts that cannot be renegotiated or replaced, and creating substantial risk to the Project's viability. *Id.* ¶ 16. This ripple effect will grow more severe for every day the Project is delayed. Construction of an offshore wind project is sequential in nature, with most project components being installed one after another or from the bottom up. *Id.* Empire Wind cannot conduct simultaneous offshore operations to mitigate schedule delay, as this would create significant execution complexity and pose unacceptable operational and safety risk. *Id.* ¶ 45. For example, installation of wind turbine generator components in October 2026 cannot be safely completed until the offshore substation topside is installed and commissioned and the Project's electrical system is tested in July 2026. *Id.* ¶ 48.

After already losing over a month of construction time due to BOEM's prior unlawful Stop Work Order last April, Empire Wind's construction schedule cannot absorb any additional delay. *Id.* ¶ 50. If Empire Wind is not able to begin the offshore substation commissioning work halted by the Suspension Order by January 16, 2026, there is a substantial risk that Empire Wind will not be able to complete the Project at all. *Id.*

Second, Empire Wind estimates that within a matter of weeks, the costs associated with delaying and terminating contracts and postponing the delivery of bespoke project components will make the Project economically unviable. *Id.* ¶ 51. Several of the Project's construction vessels—including the *Sleipnir*, the *Crossway Eagle*, wind turbine installation vessels, cable installation vessels, scour rock installation vessels, and construction support vessels—have been secured for specific windows of time at an astronomically high cost. *Id.* Just the costs associated with offshore construction activities scheduled to take place between December 22, 2025, and March 22, 2026, including the offshore substation topside lift, are valued at approximately $200 million. *Id.* Due to the delay caused by the Suspension Order, Empire Wind must pay fees associated with delaying or terminating its current contracts and either attempt to renegotiate with the vessel contractors for new construction windows, if any such windows are available, or identify and engage other vessels that might be available during the necessary construction windows. *Id.* As a result of the month-long delay due to Interior's Stop Work Order last April, Empire Wind incurred more than $200 million in delay costs and lost critical construction time. *Id.* Now, the Project simply will not survive the prospect of a 90-day (or longer) suspension of activity and the resultant multi-million-dollar costs. *Id.*

Third, due to the Suspension Order, Empire Wind is prevented from drawing further on its financing for the construction of the Project, which is intended by Empire Wind to fund

construction efforts and pay employees and contractors.  Muhlfelder Decl. at ¶ 52.  By halting access to credit, the Suspension Order has created an immediate financial emergency.

Finally, the Project's lenders may decide to seek accelerated repayment of the $2.7 billion Empire Wind has borrowed under the terms of a credit agreement.  Under the credit agreement, the lenders have the basis to seek repayment upon occurrence of an event of default that remains unremedied after a period of 60 days.  *Id*. ¶¶ 41, 53.  Such events of default include impairments to government approvals.  *Id*. ¶ 41.  As a result, without judicial relief, Empire Wind's financing ability is materially and adversely compromised, causing substantial risk to the Project's viability. *Id*. ¶ 44.

Each of these harms—(i) the cascading construction delays leaving Empire Wind without necessary vessels or time to complete the work, (ii) the massive delay and termination fees, (iii) Empire Wind's inability to draw down on its construction loan, and (iv) the potential for the lenders' to call the loan making it due and payable—threatens Project cancellation, posing an existential risk to Empire Wind.  In a total-Project-loss scenario, Empire Wind's monetary losses could total approximately $5.3 billion, consisting of costs including Empire Wind's $4 billion investment in the Project, $850 million in termination fees associated with the termination of Empire Wind's eleven key construction contracts, and $355 million to dismantle and scrap bespoke Project components and mothball facilities.  *Id*. ¶ 56-59.  This amount does not factor in loss of profits Empire Wind expected to derive from the Purchase and Sale Agreement.  *Id*. ¶ 54.

Due to the Project's termination, thousands of people working on the Project's construction, including union workers, would be put out of work, and the many contractors and subcontractors involved in the Project would suffer adverse consequences as well.  *Id*.  ¶ 55.  At the very least, workers currently involved in the construction phase of the Project would likely be

terminated, and subcontractors of Empire Wind's primary contractors may also terminate employees that were expected to be involved in long-term contracts. *Id.*

The "death by delay" scenario presented here would also prevent Empire Wind from performing its sole corporate function of developing, constructing, and operating the Project. If Empire Wind is prevented from constructing the Project, the losses incurred by Empire Wind would be catastrophic and threaten Empire Wind's very existence. At bottom, Empire Wind will be unable to fulfill its sole corporate function of developing, constructing, and operating the Project. *Id.* ¶¶ 2, 54; s*ee League of Women Voters*, 838 F.3d at 9 ("obstacles [that] unquestionably make it more difficult for [plaintiff] to accomplish [its] primary mission . . . provide injury for purposes [of] irreparable harm."); *see also Whitman-Walker*, 485 F. Supp. 3d at 56 (irreparable harm established where agency action would likely "perceptibly impair" health-providers' ability to provide services). The harm caused by stopping work on the Project is quintessentially irreparable, as the Suspension Order "perceptibly impair[s]" the one, and only, Empire Wind Project and "directly conflict[s] with" the only reason Empire Wind exists. 485 F. Supp. 3d at 19, 56; *see CSX Transp., Inc. v. Williams*, 406 F.3d 667, 673-74 (D.C. Cir. 2005) (finding irreparable harm where enforcement of law would cause losses to owner of complex national rail system by requiring owner to operate on much smaller, constrained network).

Courts have recognized the irreparable harm caused by BOEM actions impacting offshore infrastructure. In *Ensco Offshore Co. v. Salazar*, the court issued a preliminary injunction ordering BOEM to act on a company's offshore drilling permit applications where BOEM's failure to act caused the company to incur significant standby costs on its offshore rigs, forced the company to move some of its rigs to other locations, and BOEM was unclear on when drilling would resume. 781 F. Supp. 2d 332, 335, 340 (2011). The court found this harm was "more than economic: the

plaintiff's operations in the Gulf of Mexico are threatened with endless disability." *Id.* at 340. The court also found that BOEM's decision to curtail OCS operations "unpredictably or indefinitely" was "contrary to OCSLA's command" that development of the OCS be "expeditious." *Id.* at 336-37 (citing 43 U.S.C. § 1332(3)).

This Court has also held that economic loss is considered irreparable if it "threatens the very existence of the movant's business" or where it's unclear whether the economic loss could be recovered against a government defendant. *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health & Hum. Servs.,* 485 F. Supp. 3d at 58 (citing *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)); *see also Louisiana v. Biden,* 622 F. Supp. 3d at 297 (enjoining Biden Administration's decision to halt all oil and gas activities on OCS and finding plaintiffs established irreparable harm by showing they would suffer substantial damages, which would be difficult, if not impossible, to recover due to sovereign immunity). In *Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 108, 115 (D.D.C. 2019), the Court granted a preliminary injunction to plaintiffs after a federal agency rejected their applications for labor certifications for agricultural workers by applying a more stringent standard to the applications than it had in the past. The Court found the plaintiffs' alleged economic harm—$86,000 in losses per week—was irreparable because the losses included harm to their reputations and threatened the very existence of their business. *Id.*

This Court recognized the grave nature of these harms in denying a request by challengers to the Project to halt its construction. *SLBI*, 2025 WL 2996157, at *6 (D.D.C. Oct. 24, 2025):

> In particular, construction of Empire Wind 1 is proceeding on a sequential schedule such that a delay in one phase 'will cause a ripple effect across the overall schedule that will likely lead to Project cancellation.' . . . Empire Wind has entered numerous time-sensitive contracts for future stages of construction, so there is a substantial risk that a stay or injunction would cause it to both lose any benefit from the $3 billion it has already invested in the project and face $850 million in termination fees for violating deadlines in the contracts. . . . Furthermore, Empire Wind would likely have to forfeit an $87 million security it paid to the New York State Energy Research and

Development Authority, and it would likely have to spend up to $250 million to dismantle and safely dispose of components that were custom-made for the project.

*Id*.  The stakes are more grave today as Empire Wind's investment in the Project has increased.

Judge Lamberth reached a similar conclusion in granting the Revolution Wind Project's motion to enjoin a stop work order issued last August under the guise of "national security" concerns.  The Court found irreparable harm because the delays due to the suspension were expected to result in the project's termination and a loss of Revolution Wind's $5 billion investment in the project.  *Revolution Wind v. Burgum, et al.*, No. 1:25-cv-2999, Dkt. No. 36 at 1-2 (Sept. 22, 2025); Dkt. No. 39 at 16-18 (transcript of hearing).  The same analysis applies here.

## IV.    The Balance Of Equities And Public Interest Strongly Support Preliminary Injunctive Relief.

Finally, the balance of harms weighs in favor of granting preliminary injunctive relief to maintain the status quo and protect the public interest.  Empire Wind has outlined the irreparable harm it faces due to the Suspension Order, which is beyond remediation and threatens the very existence of Empire Wind's business.  *See, supra* at 35-43.   Empire Wind has also outlined the benefits the Project will provide to the public and the State of New York.  *See, supra* at 5, 9. Without the requested relief, the government's actions will prevent Empire Wind from delivering under its contract with the State of New York to provide clean, reliable energy to further the State's renewable energy goals.   Muhlfelder Decl. at ¶ 56.   Courts have recognized that preventing construction of projects providing such public benefits harms the public interest.  *See Schindler Elevator Corp. v. Wash. Metro. Area Transit Auth.*, 2021 WL 663191, at *2 (D.D.C. Feb. 19, 2021) (finding it is in the public interest for construction to move forward).   Further, while BSEE summarily dismissed Empire Wind's explanation of the need to undertake additional activities to prevent safety risk, that work is essential to ensure safety.  *See, supra* at 7-8.  By precluding Empire

Wind from performing that critical work, Interior is creating safety risks, plainly against the public interest.

Just three months ago, Interior admitted that the public interest favors allowing the Project's construction to continue, and this Court agreed. *SLBI*, No. 1:35-cv-2214 (D.D.C. filed June 12, 2025). Interior argued that the plaintiffs' request to enjoin the Project's construction should be denied "as the public interest would be harmed by Plaintiffs' unwarranted disruption of government-issued permits and approvals" and "allowing such an outcome would harm the public interest by unnecessarily disrupting years of work and analysis [the government] conducted in connection with issuing the challenged Project approvals." *Id*. Dkt. 21 at 2, 25. This Court agreed, finding that "[t]he government's—and thereby the public's—interest would . . . be negatively affected by the loss of thousands of jobs and a new source of clean energy that would result from the derailment of construction" and "the relevant government actors have already determined that the benefits of the project outweigh the downsides." *SLBI*, 2025 WL 2996157, at *6 (D.D.C. Oct. 24, 2025). Here, the public interest favors enjoining Interior's Suspension Order.

There is also a "substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *League of Women Voters*, 838 F.3d at 12 (internal quotations omitted); *see also Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977) ("[T]here is an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate."). As discussed above (*see, supra* at 4), it violates the public interest for Interior to unlawfully suspend years-old approvals to take another look at purported issues that were already exhaustively addressed over many years at the cost of millions of dollars to U.S. taxpayers.

Besides wasting time and money and imperiling livelihoods, the Suspension Order fundamentally undermines the public interest in a predictable government permitting process that the private sector can rely on in making large investments in the U.S. economy, including potentially undermining the willingness of large banks to provide necessary financing for complex infrastructure projects, not just for renewable energy projects, but for oil and gas developments and other infrastructure too.   Further, the Suspension Order threatens the livelihood of the thousands of people who were actively working on the Project's construction phase and jeopardizes a multi-million-dollar port upgrade project that will revitalize a community. *Id.* ¶¶ 58, 60; *see Mo. Edison Co. v. Fed. Power Comm'n,* 479 F.2d 1185, 1189 (D.C. Cir. 1973) (public interest would be harmed by effects on local economy and job losses if end-user of natural gas were forced out of business due to high energy costs).

In addition, if the Project does not proceed at the SBMT, the future of this facility remains uncertain, which will negatively impact the public interest.  Without the substantial upgrades and investments planned by Empire Wind, SBMT will struggle to find an alternative use that would bring comparable economic and infrastructural benefits to the area, resulting in lost jobs, reduced economic activity for the local community, and a setback for New York City's ambitions to become a leader in renewable energy infrastructure.  *Id*.  A preliminary injunction is clearly in the public interest.

## **CONCLUSION**

For the foregoing reasons, Empire Wind respectfully requests that the Court grant the requested stay pending review and preliminary injunction.

Date:  January 6, 2026                                          Respectfully submitted,


                                                                 _/s/ Ann D. Navaro_____
Tyler S. Johnson (DC Bar #1003009)                               Ann D. Navaro (DC Bar #1643328)
(*pro hac vice pending*)                                         David A. Super (DC Bar #429359)
**BRACEWELL LLP**                                                Taylor M. Stuart (DC Bar #429359)
701 Fifth Avenue                                                 **BRACEWELL LLP**
Suite 6850                                                       2001 M Street NW, Suite 900
Seattle, Washington 98104                                        Washington, DC 20036
Telephone:  (206) 204-6211                                       Telephone:  (202) 828-5800
Facsimile:  (800) 404-3970                                       Facsimile:  (800) 404-3970
Email:  ty.johnson@bracewell.com                                 Email:  ann.navaro@bracewell.com
                                                                         david.super@bracewell.com
                                                                         taylor.stuart@bracewell.com

                                                                 *Counsel for Plaintiffs*
                                                                 *Empire Leaseholder LLC and Empire Offshore*
                                                                 *Wind LLC*