# **<u>EXHIBIT C</u>**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EMPIRE LEASEHOLDER LLC, *et al.*, | ) |
| *Plaintiffs*, | ) ) ) |
| v. | ) Case No. 1:26-cv-00004-CJN ) ) Judge Carl J. Nichols |
| DOUGLAS J. BURGUM, in his official capacity as Secretary of the Interior, *et al.*, | ) ) ) |
| *Defendants*. | ) ) |

**DECLARATION OF ELISABETH TRESEDER**

Pursuant to 28 U.S.C. § 1746(2), I, ELISABETH TRESEDER, hereby declare:

1.  I am the Vice President for Communications and External Affairs for Equinor Wind Services, LLC, an affiliate of Equinor Wind US LLC ("Equinor Wind'). I have held this position since September 2024. My present duties and responsibilities include providing strategic support and managing a team of subject matter experts responsible for securing government authorizations to develop, build, and operate offshore wind assets through comprehensive environmental impact assessment and stakeholder engagement. I previously held the following positions with Equinor Wind and its affiliates: (1) Vice President – Business Development; (2) Head of Area Development; and (3) New England Market Lead.

A.  **Construction of the Empire Wind Project**

2.  On December 15-16, 2016, BOEM held a competitive auction for the sale of a commercial renewable energy lease on the Outer Continental Shelf ("OCS"). This auction and the resulting lease issuance occurred after a multi-year stakeholder engagement process and extensive environmental review. Over the course of three years, BOEM developed the geographic boundaries of the lease area through coordination with stakeholders to address concerns surrounding overlapping military and security uses. The U.S. Department of Defense ("DoD"),

also referred to as the U.S. Department of War ("DoW") was involved in the siting process that preceded the auction and regularly attended the intergovernmental taskforce meetings organized by BOEM. DoW also presented on its assessment of the suitability of waters offshore New York for wind energy.

3. Statoil Wind US LLC, renamed as Equinor Wind US LLC, won the December 2016 auction and was subsequently awarded Renewable Energy Lease OCS-A 0512 ("Lease"). Equinor Wind's Lease became effective April 1, 2017. Equinor Wind assigned the Lease to Empire Offshore Wind LLC on January 27, 2021, and Empire Offshore Wind LLC later assigned the Lease to Empire Leaseholder LLC on December 20, 2024. The area defined by the Lease is located offshore Brooklyn, New York on the OCS and covers 79,350 acres.

4. Equinor Wind is providing project development services for its indirectly, wholly owned subsidiaries Empire Offshore Wind LLC and Empire Leaseholder LLC (collectively, "Empire Wind"). Empire Wind is developing the utility-scale Empire Wind project (the "Project") offshore New York and within the Lease area and associated easements. The Project is being developed in two phases: Empire Wind 1 ("EW 1") and Empire Wind 2 ("EW 2"). EW 1 will be located in the western portion of the Lease area and will generate approximately 810 megawatts ("MW"). EW 1 will be interconnected to the transmission grid through a substation in Brooklyn, New York. EW 1 is under active construction.

5. Empire Wind is redeveloping the South Brooklyn Marine Terminal ("SBMT"), a long inactive port facility in Brooklyn, New York, as a construction and staging port and operations port for the Project. Construction at SBMT began in April 2024. This marine terminal is being substantially upgraded to support the Project's near-term construction and staging activities as well as the long-term operations and maintenance activities.

6. In my role as Vice President for Communications and External Affairs, I am familiar with the federal, state, and local permitting efforts; consultation with federal and state agencies to avoid impacts to the environment and historic and cultural resources; stakeholder engagement; surveying and other site investigations; and layout and design of the Project. These efforts include the federal review and permitting process that resulted in the Construction and Operations Plan ("COP") Approval issued by the Bureau of Ocean Energy Management ("BOEM"). The COP Approval is one of many state and federal authorizations needed for the construction and operation of the Project. Empire Leaseholder LLC holds the Lease and COP Approval for EW 1 and EW 2. Empire Offshore Wind LLC is the designated operator for the EW 1 portion of the Lease area pursuant to BOEM's regulations and holds several authorizations for EW 1, including the Clean Water Act Section 404 permit issued by the U.S. Army Corps of Engineers.

**B.     The Permitting Process**

7. Between 2017 and 2024, Empire Wind sought and obtained dozens of federal, state, and local permits and approvals to construct, operate, and maintain the Project. Between 2017 and 2020, Empire Wind completed initial site assessment work and prepared applications to obtain these permits and approvals.

8. On January 10, 2020, Empire Offshore Wind LLC submitted its COP, the application to construct and operate an offshore wind project on the OCS, to BOEM. The COP was updated on five occasions to provide additional technical, survey, and other information to inform the scope of the Project and BOEM's review. The final version of the COP spans thousands of pages and includes 32 appendices containing voluminous information on potential impacts to national security and defense, radar systems, navigation and safety, aviation, electromagnetic

fields, air emissions, air and underwater acoustics, marine mammals, avian and bat species, benthic resources, essential fish habitat, marine archaeological resources, terrestrial archaeological resources, historic properties, among many other analyses and data.

9. In the COP, Empire Wind proposed nearly 300 voluntary mitigation and monitoring measures aimed at protecting and minimizing impacts to the various resources that could be impacted by the Project. This included proposed mitigation measures addressing national security, safety, and navigation risks.

10. Following Empire Wind's submission of its COP, BOEM undertook an environmental review process pursuant to the National Environmental Policy Act ("NEPA") that culminated in a final Environmental Impact Statement ("EIS"). BOEM issued a notice of intent ("NOI") in the Federal Register on June 24, 2021, announcing its intention to prepare an EIS for the Project and soliciting public input on the scope of this environmental review, significant resources that may be affected, impact-producing factors, reasonable alternatives, and potential mitigation measures. 86 Fed. Reg. 33351. The NOI marked the commencement of the environmental review of the Project under NEPA, which ultimately lasted approximately 29 months.

11. On November 18, 2022, BOEM published a notice in the Federal Register announcing the availability of a draft EIS ("DEIS"). Publication of the DEIS was followed by a 60-day comment period from November 18, 2022, to January 17, 2023. On September 15, 2023, BOEM published a notice in the Federal Register announcing the availability of a final EIS ("FEIS"). 88 Fed. Reg. 63615. The FEIS considered the 180 comments received on the DEIS, in part, through a detailed, 348-page appendix (Appendix P) to the FEIS. The FEIS covered an array

of topics, including analysis of impacts to military and national defense operations, radar, and navigation and safety.

12. As part of its NEPA review, BOEM coordinated with various federal agencies that have permitting authority over activities related to constructing and operating offshore wind projects, including the DoW, the Federal Aviation Administration, the U.S. Coast Guard, the National Oceanic and Atmospheric Administration's ("NOAA") National Marine Fisheries Service, the U.S. Environmental Protection Agency, the U.S. Army Corps of Engineers, and several others.

13. Empire Wind and BOEM consulted with DoW's Military Aviation and Installation Assurance Siting Clearinghouse ("DoW Clearinghouse"), which oversees the military mission compatibility evaluation process for all energy projects or energy-related projects in the United States. BOEM coordinates with the DoW Clearinghouse to review each proposed offshore wind project on a project-by-project basis and resolves any conflicts identified by the DoW Clearinghouse through conditions to its approval of the COP. As part of this process, project developers also consult directly with the DoW Clearinghouse and other branches and offices of the military to mitigate potential impacts on military and security operations.

14. DoW did not comment on the NOI or DEIS. However, DoW served as a cooperating agency with BOEM during the environmental review process. Between 2020 and 2024, Empire Wind consulted with the DoW Clearinghouse, U.S. Fleet Forces, U.S. Coast Guard, and U.S. Navy Office of Cable Protection, and the North American Aerospace Defense Command ("NORAD") regarding the Project's potential impacts on national security and military operations.

15. As a result of consultation, in 2020, the DoW Clearinghouse determined that in the absence of mitigation, the Project had the potential to adversely affect NORAD's operation of the

Riverhead, New York Air Route Surveillance Radar-4 ("ARSR-4"). NORAD uses radar systems to conduct aerospace warning and control in the defense of North America. The presence of wind energy installations can in some instances cause radar "clutter" or "interference" where radar signals are generated by objects other than the intended target. Depending on a wind farm's proximity to certain radar systems, the "blade flash" of spinning wind turbine blades can cause radar clutter. On July 29, 2020, Steven J. Stample, Deputy Director of the DoW Clearinghouse, informed Empire Wind that "[t]his impact, however, can be overcome by conducting radar optimization to the affected radar systems." Radar Adverse Impact Management ("RAM") is the technical process used by DoD to minimize adverse impacts of interference on a radar system.

16.     As a result of Empire Wind and BOEM's consultation with the DoW Clearinghouse, DoW proposed several mitigation measures to address potential radar impacts, each of which was eventually incorporated into Empire Wind's permits. DoW and NORAD requested that Empire Wind notify NORAD 30 to 60 days prior to the completion of commissioning of the last wind turbine generator (i.e., that date by which every wind turbine generator in the Project is installed with potential for blade rotation) for RAM scheduling. DoW and NORAD also requested that Empire contribute $80,000 toward the execution of RAM and enter into a radar mitigation agreement with DoW and NORAD to implement these mitigation measures. DoW also requested that it be permitted to curtail (shutdown or limit) the Project's operation for national security and defense purposes.

17.     Empire Wind also consulted with the U.S. Department of Navy ("Navy") regarding the Project's potential to impact the Navy's operations. The Navy requested that Empire Wind provide the DoD and the Navy with the opportunity to assess risks related to foreign investment and foreign material vendors to protect defense capabilities from compromise and exploitation by

foreign actors. The Navy also requested that Empire Wind coordinate with the Navy on any proposal to use distributed fiber-optic sensing technology as part of the Project or associated transmission cables. The Navy also requested that Empire Wind enter into a coordination agreement with DoD and the Navy to implement the requested mitigation measures.

18. BOEM's environmental review process under NEPA concluded with its November 21, 2023 issuance of the joint Record of Decision with the National Marine Fisheries Service. As an appendix to the ROD, BOEM issued a 29-page memorandum in which the agency evaluated all the information that Empire Wind provided in its COP and assessed it in relation to the enumerated factors in Subsection 8(p)(4) of OCSLA, 43 U.S.C. § 1337(p)(4) ("OCSLA Factors Memorandum"), which require BOEM to ensure that any activity is carried out in a manner that provides for protection of national security interests of the United States. In the OCSLA Factors Memorandum, BOEM noted that when "addressed through coordination with the DoD," impacts of an offshore wind project offshore New York would be "negligible and avoidable." BOEM acknowledged DoD and the Navy's requested mitigation measures and incorporated them into the Project's proposed permit conditions. BOEM then expressly concluded that "[a]pproval of the COP . . . would be in accordance with the regulations at 30 C.F.R. part 585 and would ensure that all Project activities on the OCS are carried out in a manner that provides for the factors in Subsection 8(p)(4) of OCSLA."

19. On February 21, 2024, BOEM issued the Project's COP Approval in reliance on the ROD and its appended OCSLA Factors Memorandum. The COP Approval was issued subject to dozens of terms and conditions that span more than 100 pages. These terms and conditions include the mitigation measures requested by DOD and the Navy, which are contained in Conditions 3.2, 4.2, 4.3, and 4.4 of the COP Approval.

20. Condition 3.2 requires that Empire Wind equip all wind turbine generators rotors with control mechanisms constantly operable from its control center. If an emergency order is issued by DoW or the U.S. Coast Guard requiring Empire Wind to shut down the Project, Empire Wind must initiate braking and shut down of each wind turbine generator and may resume operations only upon notification from the entity (DoW or the U.S. Coast Guard) that initiated the shutdown. Empire Wind must conduct annual testing of its shutdown procedures and functionality and send certain reports and notifications to the U.S. Coast Guard and BOEM's sister agency, the Bureau of Safety and Environmental Enforcement ("BSEE"). While Empire Wind's wind turbine generators are not yet operational, Empire Wind was designed to comply fully with Condition 3.2

21. Condition 4.2 of the COP Approval requires that Empire Wind notify NORAD at least 30 days, but no more than 60 days, before completing commissioning of the last wind turbine generator (*i.e.*, that date by which every wind turbine generator in the Project is installed with potential for blade rotation) for RAM scheduling. Empire Wind is also required to contribute $80,000 toward the execution of RAM at least 30 days, but no more than 60 days, before completing commissioning of the last wind turbine generator (*i.e.*, that date by which every wind turbine generator in the Project is installed with potential for blade rotation). Condition 4.2 further requires Empire Wind to enter into a mitigation agreement with DoW to ensure these RAM mitigation measures are implemented.

22. Condition 4.3 of the COP Approval implements mitigation measures requested by the Navy. Condition 4.3 requires that Empire Wind provide the Navy and DoW an opportunity to assess risks related to foreign investment and foreign material vendors to protect defense capabilities from compromise and exploitation by foreign actors. Empire Wind is also required to coordinate with the Navy on any proposal to use distributed fiber-optic sensing technology as part

of the Project or associated transmission cables.  The Navy also requested that Empire Wind enter into a coordination agreement with DoW and the Navy to implement the requested mitigation measures.

23.  Condition 4.4 requires that where Empire Wind's activities necessitate entrance to any designated defense operating area, warning area, or water test area, Empire Wind is required to enter a coordination agreement with the commander of the appropriate military headquarters to address electromagnetic emissions from survey activities.  Empire Wind's activities have not yet required such an agreement.

24.  The February 21, 2024 COP Approval was issued to Empire Offshore Wind LLC. BOEM amended the COP Approval on December 20, 2024, by administratively re-issuing the COP approval as two separate, nearly identical COP approvals to Empire Leaseholder LLC, one for the development of EW 1 and one for the development of EW 2.  I refer to the two COP approvals herein as the "COP Approval," given that they are nearly identical and together make up BOEM's final approval of the overall Project.

**C.    Status of Compliance with COP Approval Condition 4.2 (DoW and NORAD)**

25.  On July 29, 2020, Empire Wind received a request from the DoW Clearinghouse to enter into a partnership to initiate mitigation discussion for potential impacts resulting from the construction and installation of the Project.  In this communication, DoW informed Empire Wind that DoW had identified impacts on defense radar systems, but the impacts could be overcome by conducting radar optimization to the affected radar systems. Empire Wind responded with a confirmation letter on August 19, 2020 confirming its intent to enter into this partnership.  Empire Wind first met with DoD in November 2021 to discuss a mitigation agreement.

26. Since then, Empire Wind has communicated with DoW and NORAD regularly to discuss impacts to defense operations and execution of a mitigation agreement. Prior to BOEM's issuance of the COP Approval, Empire Wind and its contractor, Capitol Airspace Group, conducted outreach to DoW regarding the possibility of entering into a mitigation agreement. On February 23, 2024, two days after BOEM issued the Project's COP Approval, Empire Wind submitted outreach to DoW in accordance with COP Approval Condition 4.2 requesting a call to discuss compliance with the condition.

27. Since February 2024, Empire Wind has communicated with DoW and NORAD on more than a dozen occasions. Empire Wind and its consultant have been advised by NORAD and DoW that the mitigation agreement has been drafted and is under review by the DoW Clearinghouse. On December 12, 2025, Thomas Ramos, an analyst at NORAD, informed Empire Wind's consultant, Capitol Airspace Group, that the mitigation agreement remains under review by the DoW Clearinghouse.

**D.    Status of Compliance with COP Approval Condition 4.3 (Navy)**

28. Since February 2024, Empire Wind has corresponded regularly with the Navy regarding the coordination agreement required by Condition 4.3.

29. In July 2024, the Navy requested that in lieu of a formal coordination agreement, Empire Wind (i) inform the Navy of any changes to the Project's acoustic monitoring approach from what the Navy has already reviewed (i.e., if Empire Wind uses fiber optic sensing for something other than monitoring cable); and (ii) inform the Navy if the acoustic data were to be shared outside of Empire Wind. The Navy stated that it viewed the email communications and the COP Approval Condition 4.3 as sufficient to encompass the Navy's requests.

30. Since this time, Empire Wind's acoustic monitoring approach has not changed, and Empire Wind's acoustic data have not been shared outside of the Empire Wind organization to warrant notification to the Navy.

31. Empire Wind has remained in close coordination with the Navy regarding mitigation of these impacts. The Navy has not expressed any concerns relating to the Project's activities since construction began. Empire Wind has not received further communications from the Navy regarding entering into a coordination agreement.

**E.     Coordination with Interior**

32. Since the Project was approved in February 2024, Empire Wind has remained in close coordination with BOEM, BSEE, and the U.S. Coast Guard.

33. Specifically, Empire Wind participates in biweekly calls with BOEM and BSEE in which BOEM leads a discussion relating to the status of the Project's construction and its compliance with permits. The most recent biweekly call with BOEM and BSEE occurred on December 17, 2025.

34. Empire Wind also participates in monthly calls with BSEE and Empire Wind's Certified Verification Agent, the third-party expert charged with reviewing the Project's design, construction, and compliance with safety regulations. BOEM also attends these monthly calls. The most recent monthly call with BSEE, BOEM, and the Certified Verification Agent occurred on December 17, 2025.

35. Empire Wind also participates in a weekly call with the U.S. Coast Guard, BOEM, BSEE, and the National Oceanic Atmospheric Administration, which the U.S. Coast Guard leads. The most recent weekly call with these entities occurred on December 22, 2025.

36. Empire Wind has obtained all the authorizations and permits required to construct and operate the Project.

37. Since obtaining its COP Approval from BOEM, Empire Wind has not been informed of any instances where Empire Wind failed to comply with the terms and conditions of the COP Approval. Empire Wind has not received any notification from BOEM, DoW, or the Navy as to any alleged non-compliance with the COP Approval conditions.

I certify under penalty of perjury that the foregoing is true and correct.

Dated: January 5, 2026

_____
Elisabeth Treseder
Vice President for Communications and External Affairs
Equinor Wind Services, LLC