# **EXHIBIT E**



# United States Department of the Interior

## BUREAU OF OCEAN ENERGY MANAGEMENT
### WASHINGTON, DC 20240-0001

**Information Memorandum**

**To:**      Elizabeth Klein
           Director

**From:**    Karen Baker          KAREN BAKER    Digitally signed by KAREN BAKER
                                                  Date: 2023.11.21 17:06:17 -05'00'
           Chief, Office of Renewable Energy Programs

**Subject**:  Compliance Review of the Construction and Operations Plan for the Empire
           Wind Offshore Commercial Wind Farm and Empire Wind Offshore Commercial
           Export Cable Projects for Commercial Lease OCS-A 0512

## 1    SUMMARY

Subsection 8(p)(4) of the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1337(p)(4), requires the Secretary of the Interior (Secretary) to approve activities in a manner that provides for 12 enumerated factors under subsection 8(p) of OCSLA. This memorandum documents the Bureau of Ocean Energy Management's (BOEM) compliance review of the Construction and Operations Plan (COP)[1] for the Empire Wind Offshore Wind Farm (Empire Wind) and Empire Wind Offshore Export Cable (E) Project (hereinafter "Projects")[2] on Commercial Lease OCS-A 0512, and BOEM's consideration of the 12 factors enumerated in subsection 8(p)(4) of OCSLA (hereinafter "8(p)(4) factors").[3]

BOEM has determined that the Projects will comply with the Bureau's regulations and that the proposed activities will be carried in a manner that provides for safety, protection of the environment, prevention of waste, and the other factors listed in subsection 8(p)(4) of OCSLA.

## 2    BACKGROUND AND PROJECT OVERVIEW

Subsection 8(p)(7) of OCSLA, as amended by the Energy Policy Act of 2005 (EPAct), directs DOI, through BOEM, to provide for coordination and consultation with the Governor of any state or the executive of any local government that may be affected by a lease, easement, or

---

[1] Empire Wind Construction and Operations Plan (May 2022). https://www.boem.gov/renewable-energy/state-activities/empire-wind-construction-and-operations-plan

[2] This memo considers the Project as modified by the preferred alternative in the FEIS, Alternative C-1, D, G, and H. Bureau of Ocean Energy Mgmt., BOEM 2023-049, Empire Wind Farm Export Cable Project Final Environmental Impact Statement, (2023) [hereinafter FEIS].

[3] See M-Opinion 37067, entitled, "*Secretary's Duties under Subsection 8(p)(4) of the Outer Continental Shelf Lands Act When Authorizing Activities on the Outer Continental Shelf,*" which provides that 8(p)(4) of OCSLA "does not require the Secretary to ensure that the goals are achieved to a particular degree, and she retains wide discretion to determine the appropriate balance between two or more goals that conflict or are otherwise in tension." Solicitors' M-Opinions are legal interpretations that are binding on DOI as a whole. Dep't of the Interior, Departmental Manual, 209 DM 3.1, 3.2A(11) (2020).

right-of-way authorizing renewable energy activities on the OCS. BOEM formed the BOEM New York Renewable Energy Task Force (Task Force) in 2009 to help fulfill this obligation in its consideration of potential leasing activities on the Outer Continental Shelf (OCS) offshore New York. The Task Force allowed for coordination among affected federal agencies and tribal, state, and local governments throughout the leasing process. The first Task Force meeting was held on November 18, 2010; subsequent meetings were held on April 3, 2012; September 26, 2013; and April 28, 2016.

## 2.1 Planning, Analysis, and Leasing

On September 8, 2011, BOEM received an unsolicited request from the New York Power Authority (NYPA), Long Island Power Authority (LIPA), and Consolidated Edison (ConEd) for a commercial lease for NYPA. The proposal included the installation of up to 194, 3.6-megawatt (MW) wind turbines, yielding a potential 700 MW of wind energy generation.[4]

On January 4, 2013, BOEM issued a Request for Interest (RFI) in the Federal Register to assess whether there were other parties interested in developing commercial wind facilities in the same area proposed by NYPA.[5] In addition to inquiring about competitive interest, BOEM sought public comment on the NYPA proposal, its potential environmental consequences, and the use of the proposed Project Area.[6] Based on the responses received to the RFI, BOEM determined there to be competitive interest in the location identified by NYPA and continued with the competitive leasing process.

On May 28, 2014, BOEM published a Call for Information and Nominations (Call) to seek additional nominations from companies interested in commercial wind energy leases within the Call Area offshore New York.[7] BOEM also sought public input on the potential for wind development in the Call Area, including comments on site conditions, resources, and existing uses of the area that would be relevant to BOEM's wind energy development authorization process.

BOEM also published a Notice of Intent (NOI) to prepare an Environmental Assessment (EA) on May 28, 2014.[8] The EA's purpose was to determine whether significant impacts would be associated with issuing a lease, conducting site characterization surveys, and conducting site assessment activities (e.g., the installation of a meteorological tower and/or buoys) within the proposed area. Through the NOI, BOEM sought public input on the environmental and socioeconomic issues to be considered, as well as alternatives and mitigation measures.

---

[4] https://www.boem.gov/renewable-energy/state-activities/empire-wind
[5] https://www.govinfo.gov/content/pkg/FR-2013-01-04/pdf/2012-31654.pdf
[6] 18 30 C.F.R. § 585.113 defines "Project Area" as "the geographic surface leased, or granted, for the purpose of a specific project. If OCS acreage is granted for a project under some form of agreement other than a lease (i.e., a Right-of-Way or Right-of-Use and Easement), the federal acreage granted would be considered the Project Area. To avoid distortions in the calculation of the geometric center of the Project Area, project easements issued under this part are not considered part of the qualified Project Area." Note that the Project Area covers the entirety of the Lease Area Lease OCS-A 0512, which consists of approximately 79,350 acres (124 sqm).
[7] https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/NY/NY-NOI-FR-Notice.pdf
[8] *id*

On March 16, 2016, BOEM designated a Wind Energy Area (WEA), consisting of 5 OCS blocks and 148 sub-blocks. The WEA began approximately 11 nautical miles (nmi) south of Long Beach, New York, and extended approximately 26 nmi southeast along its longest portion.[9] BOEM received several comments as a result of the WEA designation, specifically regarding environmental concerns of sensitive habitat on Cholera Bank.

BOEM held a competitive lease sale in October 2016, pursuant to 30 CFR § 585.211, for certain lease areas within the WEA. On June 6, 2016, BOEM published a Proposed Sale Notice (PSN) for the area located offshore New York and New Jersey.[10] In response to comments from the National Marine Fisheries Service (NMFS), BOEM removed five aliquots, or 1,780 acres from the western tip of the identified WEA to avoid conflicts with Cholera Bank.

On October 27, 2016, BOEM announced the publication of the Final Sale Notice (FSN) for a lease sale offshore New York and the availability of a revised EA for site assessment and site characterization activities in the area.[11]   The Lease Area covers approximately 79,350 acres (ac) (32,112 hectares (ha)) and is located approximately 14 statute miles (mi) (12 nautical miles (nm), 22 kilometers (km)) south of Long Island, New York and 19.5 mi (16.9 nm, 31.4 km) east of Long Branch, New Jersey.

## 2.2 Lease Sale

The lease sale was held on December 15 and 16, 2016. The auction lasted 33 rounds and was won by Statoil Wind US LLC, with a winning bid of just under $42.5 million, the highest amount bid in the program's history at that time. Lease OCS-A 0512 was issued to Statoil Wind US LLC effective as of April 1, 2017.[12]

As of May 16, 2018, Statoil Wind US LLC changed its name to Equinor Wind US LLC. On January 27, 2021, Equinor Wind US LLC assigned 100 percent of the lease to Empire Offshore Wind LLC, (Empire Wind) to facilitate an agreement in which BP Wind Energy North America, Inc. ("BP") would obtain an indirect 50 percent share in the Projects.

Lease OCS-A 0512 does not authorize Empire Wind to conduct construction activities within the leased area. Under Lease OCS-A 0512[13] and 30 C.F.R. part 585, Empire Wind must first submit and receive approval of a COP before any construction activities may take place on the OCS.[14] Submittal and processing of the COP is governed by the provisions set forth in 30 C.F.R. §§ 585.620 through 585.629.

## 2.3 Site Assessment

---

9 https://www.boem.gov/renewable-energy/state-activities/empire-wind
10 https://www.boem.gov/sites/default/files/regulations/Federal-Register-Notices/2016/81-FR-36336.pdf
11 https://www.doi.gov/pressreleases/interior-department-auction-over-79000-acres-offshore-new-york-wind-energy-development
12 https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/Bid-Summary-ATLW-6.pdf
13 https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/NY/OCS-A-0512-Lease.pdf
14 *See* 30 C.F.R. § 585.600(b)

In June of 2018, Empire Wind submitted a Site Assessment Plan (SAP) for review. The plan was subsequently revised per BOEM comments in July, August, and October 2018. BOEM determined the SAP was complete on August 22, 2018, and approved the SAP on November 21, 2018.  The plan details the methods and procedures Empire Wind will use to collect and analyze data and information on the meteorological and oceanographic conditions of the Lease Area. The SAP approval allowed for the deployment of two RPS Floating Light Detection and Ranging buoys, one RPS™ Meteorological and Wave buoy, and one subsea Current Meter mooring.[15]

## 2.4 Construction and Operations

Empire Wind submitted a COP to BOEM on January 10, 2020, with subsequent revisions, including the most recent revision submitted on November 6, 2023.[16] The COP proposes the construction and operation of two wind farms, known as Empire Wind 1 (EW 1) and Empire Wind 2 (EW 2). Each wind farm will connect via offshore substations to separate Points of Interconnection (POIs) at onshore locations by way of export cable routes and onshore substations. The Project Overview is shown in Figure 1. The offshore components of the Projects will consist of up to 147 wind turbines and supporting tower structures and two offshore substations, using up to 149 foundations at any of up to 176 locations. In addition, there will be associated support and access structures (for aforementioned wind turbines and offshore substations) and up to 260 nm (481 km) of interarray cable (up to 116 nm (214 km) for EW 1 and up to 144 nm (267 km) for EW 2), all of which will be located on the OCS within the Lease Area.

The preferred alternative, which falls within the PDE, is a combination of Alternative C-1 (Gravesend Anchorage Area), Alternative D (Empire Wind 2 [EW 2] Submarine Export Cable Route Options to Minimize Impacts to the Sand Borrow Area), Alternative F (Wind Resource Optimization with Modifications for Environmental and Technical Considerations), Alternative G (Cable Bridge Crossing of Barnums Channel Adjacent to Long Island Railroad Bridge) and Alternative H (Dredging for Empire Wind 1 [EW 1] Export Cable Landfall). Specifically, the Preferred Alternative would entail the construction, operation, maintenance, and eventual decommissioning of an approximately 816-megawatt (MW) EW 1 Project and 1,260-MW EW 2 Project on the OCS offshore New York within Lease Area OCS-A 0512, with export cables making landfall at South Brooklyn Marine Terminal in Kings County, New York for EW 1 and on Long Beach in Nassau County, New York for EW 2. The Preferred Alternative would route the EW 1 export cable through an anchorage area at Gravesend Bay rather than through the Ambrose Navigation Channel; provide for a minimum 500-meter buffer between the EW 2 submarine export cable and a sand borrow area offshore Long Beach; optimize the EW 1 and EW 2 WTG layouts to maximize annual energy production and minimize wake loss while addressing geotechnical considerations; utilize an above-water cable bridge to construct the EW 2 onshore export cable crossing at Barnums Channel; and use a method of dredge or fill activities for construction of the EW 1 export cable landfall that would reduce the discharge of dredged material. BOEM does not have authority under Outer Continental Shelf Lands Act (OCSLA) to

[15] https://www.boem.gov/renewable-energy/state-activities/empire-wind
[16] https://www.boem.gov/renewable-energy/state-activities/empire-wind-construction-and-operations-plan

approve proposed facilities that would be located within the state of New York, and BOEM would coordinate with cooperating agencies regarding this aspect of the Preferred Alternative.

The regulations at 30 C.F.R. § 585.200(b) entitle a lessee to one or more project easements, without further competition, for the purpose of installing transmission and distribution cables and appurtenances on the OCS as necessary for the full enjoyment of the lease. In accordance with 30 C.F.R. § 585.622(b), Empire Wind requested project easements as part of its COP. As proposed in the COP, the Projects will include up to 66 nm (122 km) of submarine export cables, consisting of up to two routes to New York. The COP further proposes that the EW 1 export cable will interconnect in Gowanus, NY and the EW 2 export cable will interconnect in Oceanside, NY.  The export cable route for Empire Wind 1 contains two High Voltage Alternating Current (HVAC) export cables, ranges from a maximum width of 1010 ft (307.8 m) to a minimum width of 500 ft (152.4 m). The proposed Empire Wind 2 project easement contains two HVAC export cables, ranges from a maximum width of 900 ft (274.3 m) to a minimum width of 500 ft (152.4 m).  Empire Wind requested an easement width greater than 200 ft to allow for safe cable maintenance operations and installation of repair and construction jointing and omega bights, which may require an installation width up to five times water depth. Water depths range from approximately 40 ft (12m) to 121 ft (37 m) within the proposed project easements.  Empire Wind also requested that the project easement include inter-array cables in select locations outside of their lease area necessary to facilitate their layout as proposed in the COP.



*Figure 1: Project Overview – Lease Area and Submarine Export Cable Routes*

## 3     SECTION 585.628 REVIEW

As noted in Section 2, the regulations at 30 C.F.R. §§ 585.620 through 585.629 govern BOEM's review and processing of COPs. The regulations at 30 C.F.R § 585.628 require BOEM to review the COP and all information provided therein pursuant to 30 C.F.R. §§ 585.626 and 585.627, to determine whether the COP contains all the information necessary to be considered complete and sufficient for BOEM to conduct technical and environmental reviews.[17] Once BOEM determines that the COP is complete and sufficient, BOEM and the Bureau of Safety and Environmental Enforcement (BSEE) conduct a technical review, and BOEM conducts an environmental review. As described below, BOEM's Office of Renewable Energy Programs (OREP) has completed the sufficiency, technical, and environmental reviews of the Empire Wind COP.

### 3.1     Completeness and Sufficiency Review

30 C.F.R. § 585.620 provides the general requirements of what must be described in a COP, 585.627, the Lessee must submit information and certifications necessary for BOEM to comply with the National Environmental Policy Act of 1969 (NEPA) and other relevant laws.

In a letter submitted on January 10, 2020, Empire Wind requested a regulatory departure from 30 C.F.R. § 585.626(a)(4)(ii), which requires that detailed in situ geotechnical data at each proposed foundation location be provided at the time of COP submittal. Instead of submitting the in situ geotechnical data with the COP, Empire proposed to provide the data no later than with its submittal of the Facility Design Report and the Fabrication and Installation Report (FDR/FIR), when the Project design and associated Project design envelope was more mature. OREP's Projects and Coordination Branch (PCB) evaluated the departure request and coordinated BOEM's review. On November 3, 2020, BOEM approved the departure request after determining that the geotechnical information submitted by Empire Wind at that point was sufficient to allow for review of the COP. Therefore, BOEM approved the departure request, allowing Empire Wind to submit geotechnical investigations at final foundation locations with or prior to the FDR along with results of geotechnical analyses and foundation design parameters.

In a separate letter submitted on January 10, 2020, Empire Wind requested a regulatory departure from 30 C.F.R. § 585.626(a)(2), (4)(i), (5) and (6), which requires a full data package for geophysical and geotechnical data in support of the COP be provided to BOEM at the time of COP submission. BOEM determined that a formal departure approval was not required as Empire Wind proposed a schedule of supplemental filings to submit during COP review the information identified in 30 C.F.R. § 585.626(a)(2), (4)(i), (5) and (6). BOEM determined that the schedule would provide BOEM with sufficient time to conduct its reviews, initiate federal agency consultations, and begin the NEPA process. BOEM approved the proposed approach.

On January 10, 2020, Empire Wind submitted a COP to BOEM for review and approval. On January 21, 2020, PCB in coordination with OREP's Engineering and Technical Review Branch (ETRB) and Environment Branch for Renewable Energy (EBRE) verified that the COP included an adequate level of information required in 30 C.F.R. §§ 585.626 and 585.627 for BOEM to

---

[17] See 30 C.F.R. §§ 585.620 through 585. 629.

begin reviewing the sufficiency of that information. PCB coordinated BOEM's sufficiency review of the Empire Wind COP. Throughout the review process, BOEM evaluated the information provided in response to its requests for additional information, as well as the updated COPs Empire Wind submitted, and determined that the information provided was sufficient in accordance with the regulations.

BOEM has determined that the COP includes all the information required in 30 C.F.R. §§ 585.626 and 585.627, except the information described in 30 CFR § 585.626(a)(4)(ii), for which BOEM approved a regulatory departure.  Following COP approval Empire Wind must submit the following information no later than when it submits its Facility Design Report (FDR):

- Updated information required in 30 CFR § 585.626(a)(4)(2); the results of deep borings within the Project Area, as needed.

## 3.2  Technical Review

ETRB reviewed the proposed facilities, project design, project activities, shallow hazards, geological conditions, physical and oceanographic conditions, cables, and fabrication and installation details in the COP, and coordinated with the following agencies:

- BSEE, for safety (Safety Management System (SMS) and Oil Spill Response Plan);

- National Oceanic and Atmospheric Administration (NOAA), for aviation and radar interference; and

- Federal Aviation Administration (FAA), for aviation and radar interference; and

- United States Coast Guard (USCG), for vessel navigation.

Furthermore, ETRB and BSEE reviewed the statement of work and qualifications submitted in the COP for the Certified Verification Agent (CVA) nomination. On June 24, 2020, BOEM approved the nomination of DNV GL Denmark A/S (now DNV) to be the CVA for the Projects. DNV will review Empire Wind's submitted FDR and FIR and must certify that the project facilities are designed, fabricated, and installed in conformance with accepted engineering practices.

As a result of these reviews, ETRB has determined both the technical information and supporting data provided with the COP meet the requirements of 30 C.F.R. § 585.626 and are sufficient to allow the safe installation of the Projects on the OCS. ETRB has also concluded that the COP proposes the use of properly trained personnel and the best available and safest technology, pursuant to 30 C.F.R. § 585.621. ETRB provided a memorandum (ETRB Review Memo; Appendix B.1 to the Record of Decision (ROD)), which recommends the approval of the COP subject to ETRB's proposed conditions (Anticipated Conditions of COP Approval; Appendix A to the ROD).

8

### 3.3  Environmental Review

OREP's EBRE conducted an environmental review of the COP. On June 24, 2021, BOEM published the NOI to prepare an environmental impact statement (EIS) for Empire Wind's COP[18], which started BOEM's formal scoping process pursuant to NEPA. The Notice of Availability (NOA) of the Draft EIS for the Projects was published on November 18, 2022.[19] The U.S. Army Corps of Engineers (USACE), NMFS, BSEE, U.S. Department of Defense (DoD), USCG, U.S. Fish and Wildlife Service (USFWS), the U.S. Environmental Protection Agency (USEPA), National Park Service (NPS), and U.S. Maritime Administration (MARAD) were cooperating federal agencies during the development and review of the Final EIS. Cooperating state agencies included New York State Department of State (NYSDOS), New York State Energy Research and Development Authority (NYSERDA), New York State Department of Environmental Conservation (NYSDEC), and City of New York Economic Development Commission.

BOEM initiated consultation under Section 106 of the National Historic Preservation Act (NHPA) prior to the NOI. BOEM elected to use the NEPA substitution procedures allowed under 36 C.F.R. 800.8(c).  BOEM included a draft Finding of Adverse Effect and draft agreement to resolve effects with the Draft EIS, and BOEM included updated versions of those documents in the Final EIS.  On November 20, 2023, the final Memorandum of Agreement resolving adverse effects on historic properties was executed.[20]

Moreover, BOEM consulted with federally recognized tribes regarding renewable energy leasing and development on the OCS. The following federally recognized tribes were invited to consult: Eastern Shawnee Tribe of Oklahoma; Shawnee Tribe; Absentee-Shawnee Tribe of Indians of Oklahoma; Stockbridge-Munsee Community, Wisconsin/Band of Mohican Indians; The Delaware Nation; Delaware Tribe of Indians; The Shinnecock Indian Nation; The Narragansett Indian Tribe; Wampanoag Tribe of Gay Head (Aquinnah); Mashpee Wampanoag Tribe, Mashantucket Pequot Tribal Nation; and Mohegan Tribe of Connecticut. Of the federally recognized tribes only the Stockbridge-Munsee Community, Wisconsin/Band of Mohican Indians; The Delaware Nation; Delaware Tribe of Indians; The Shinnecock Indian Nation; Wampanoag Tribe of Gay Head (Aquinnah); Mashantucket Pequot Tribal Nation; and Mashpee Wampanoag Tribe participated in government-to-government consultation meetings. BOEM held four government-to-government meetings with federally recognized Tribes in July 2021, and on August 3, 2021, April 28, 2023, and September 7, 2023.

---

[18] https://www.federalregister.gov/documents/2021/06/24/2021-13408/notice-of-intent-to-prepare-an-environmental-impact-statement-for-empire-offshore-wind-llcs-proposed
[19] https://www.federalregister.gov/documents/2022/11/18/2022-25034/notice-of-availability-of-a-draft-environmental-impact-statement-for-empire-offshore-wind-llcs
[20] *See*  https://ceq.doe.gov/docs/ceqpublications/NEPA_NHPA_Section_106_Handbook_Mar2013.pdf and https://www.achp.gov/integrating_nepa_106 for details on the NEPA/NHPA Integration or Substitution Process

9

On September 15, 2023, BOEM published the NOA of the Final EIS in the *Federal Register*.[21] Alternatives C-1, D, F, G, and H[22] were identified as the Preferred Alternatives and the Final EIS included in Appendix P BOEM's responses to comments on the Draft EIS. The Final EIS found that the Proposed Action and Preferred Alternatives C-1, D, F G, and H, would have negligible to moderate adverse impacts on most resources and only the potential for major adverse impacts on (i) marine mammals, (ii) scenic and visual resources, (iii) commercial fisheries and for-hire recreational fisheries, and (iv) scientific research. The Final EIS also found that the Projects could have, to some extent, beneficial impacts on the following resources: (i) sea turtles, (ii) benthic resources, (iii) birds, (iv) air quality, (v) land use and coastal infrastructure, (vi) recreation and tourism, (vii) demographics, (viii) employment, and (ix) economics.

Regarding impacts from future planned actions, including the Projects, the Final EIS found that the following resources could be subject to major impacts if future planned actions materialize and no further actions are taken to mitigate their impacts: marine mammals, scenic and visual resources, commercial fisheries and for-hire recreational fisheries, scientific research and surveys, navigation and vessel traffic. The Final EIS also found that future planned actions could have beneficial impacts on the following resources: sea turtles, benthic resources, birds, air quality, land use and coastal infrastructure, recreation and tourism, demographics, employment, and economics. Cumulative impacts on all resources range from negligible to major. The 30-day waiting period for the Final EIS closed on October 16, 2023.

Several consultations were conducted as part of the environmental review process. On September 8, 2023, NMFS issued a Biological Opinion (BiOp) for the Projects under Section 7 of the Endangered Species Act (ESA).[23]  The BiOp concluded that the Projects are not likely to jeopardize the continued existence of blue, fin, sei, sperm, or North Atlantic right whales (NARW), loggerhead sea turtles, Kemp's ridley or leatherback sea turtles, the North Atlantic distinct population segment (DPS) of green sea turtles, the shortnose sturgeon, or any Atlantic sturgeon. The Projects are not likely to destroy or adversely modify critical habitat designated for the NARW, Atlantic sturgeon, and the Northwest Atlantic DPS of loggerhead sea turtles. The BiOp also determined that the Projects will have no effect on the Gulf of Maine DPS of Atlantic salmon, the Northeast Atlantic DPS of loggerhead sea turtles, or critical habitat designated for the NARW, the New York Bight and Carolina DPSs of Atlantic sturgeon, or the Northwest Atlantic DPS of loggerhead sea turtles. NMFS concurs with BOEM's determination that the proposed action is not likely to adversely affect blue whales, giant manta rays, hawksbill sea turtles, or oceanic whitetip sharks, and determined that the proposed action will have no effect on Rice's whales. To be exempt from the prohibitions of Section 9 of the ESA, BOEM, BSEE, USACE, and NMFS' Office of Protected Resources must comply with the Reasonable and Prudent Measures and implementing Terms and Conditions issued as part of the BiOp.

---

[21] https://www.federalregister.gov/documents/2023/09/15/2023-19956/notice-of-availability-of-the-empire-offshore-wind-final-environmental-impact-statement

[22] EIS Alternatives C-1, D, F G, and H narrow the Project Design Envelope (PDE) proposed in Empire's COP to select export cable route options or construction methods that reduce environmental impacts or use conflicts compared the Proposed Action (which includes analysis of the full range of PDE parameters).

[23] https://www.fws.gov/law/endangered-species-act

On June 23, 2023, USFWS transmitted a BiOp and concluded consultation and conference for the Projects. The BiOP concluded the Projects are not likely to jeopardize the continued existence of the federally listed piping plover, rufa red knot, roseate tern, northern long eared and tricolored bats, the Monarch butterfly, or Seabeach amaranth.[24]

BOEM also completed an Essential Fish Habitat (EFH) consultation under the Magnuson-Stevens Fishery Conservation and Management Act (MSA)[25] and received conservation recommendations from NMFS on July 28, 2023, pursuant to Section 305(b)(4)(A) of the MSA. According to Section 304(b)(4)(B) of the MSA, BOEM is required to provide NMFS a detailed response to each EFH conservation recommendation within 30 days of receipt. BOEM issued a detailed response letter to NMFS on October 24, 2023. The detailed response to the conservation recommendations provided draft conditions of COP approval that adopt or partially adopt NMFS's conservation recommendations, which BOEM has included in Appendix A of the ROD.

BOEM also conducted a NHPA[26] Section 106 review of the Projects and, through that review, identified historic properties that may be adversely affected by COP approval, and measures to resolve those adverse effects. BOEM identified three National Historic Landmark (NHL) properties (Sandy Hook Light, Fort Hancock and Sandy Hook Proving Ground Historic District, and Navesink Light Station (Twin Lights)) that may be visually adversely affected by the Projects. BOEM followed the requirements for compliance with NHPA Section 110(f) (36 C.F.R. § 800.10) and consulted with the NPS, New York and New Jersey State Historic Preservation Officer (SHPO), and the Advisory Council on Historic Preservation (ACHP) to assess and undertake planning and actions as may be necessary to minimize harm to NHLs. BOEM addressed this process and finding in Appendix N, Section N.6, National Historic Landmarks, and the NHPA Section 106 Process of the Final EIS. Consultation under Section 106 of the NHPA concluded with the execution of the Memorandum of Agreement (MOA), which was signed by the Lessee, BOEM, the New York and New Jersey SHPOs, and the ACHP, and fully executed on November 20, 2023.

Empire Wind submitted requests for Federal Consistency Certification to the States of New York and New Jersey under the Coastal Zone Management Act (CZMA).[27] Acting under Section 307 of the Federal CZMA (Pub. L. No. 92-583), as amended, the coastal management programs for the States of New York and New Jersey concurred with Empire Wind's consistency certification, finding the Projects are consistent to the maximum extent practicable with the enforceable policies of each state's coastal management plan. Empire Wind provided BOEM with the CZMA concurrence letters issued by New York on October 16, 2023, and New Jersey on September 15, 2023.

---

[24] *See* Letter from Ian Drew, Field Supervisor, Long Island Field Office, Fish and Wildlife Serv., to Brandi Sangunett, OREP, BOEM (June 22, 2023).

[25] https://www.fisheries.noaa.gov/resource/document/magnuson-stevens-fishery-conservation-and-management-act

[26] https://www.nps.gov/subjects/archeology/national-historic-preservation-act.htm

[27] *See* 16 U.S.C. §§ 1451 *et seq*.

## 4    COMPLIANCE REVIEW[28]

The regulations at 30 C.F.R. part 585 set forth responsibilities for both BOEM and Empire Wind that are similar to those imposed by the 8(p)(4) factors.[15] The regulations at 30 C.F.R. § 585.102 require BOEM to ensure that any activities authorized under part 585 are carried out in a manner that provides for 12 enumerated goals. Similarly, 30 C.F.R. § 585.621 requires the COP to demonstrate that Empire Wind has planned and is prepared to conduct the proposed activities in a manner that conforms to its responsibilities listed in 30 C.F.R. § 585.105(a), as well as 7 other goals listed therein. BOEM and Empire Wind share some of the responsibilities (e.g., ensuring that activities are carried out in a safe manner), while others are the responsibility of either BOEM (e.g., ensuring a fair return to the United States) or Empire Wind (e.g., using properly trained personnel). The discussion in the following sections, 4.1 to 4.12, provides an overview of how BOEM has ensured the selected alternative provides for the 8(p)(4) factors and the regulations at 30 C.F.R. part 585. Because many of these goals are related to the same topic or overlap one another, some are analyzed together.

### 4.1   Conforms to All Applicable Laws, Regulations, and Lease Provisions of Empire Wind's Commercial Lease[29]

Consultations and reviews for the Projects under NEPA, ESA, CZMA, MSA, and NHPA have been completed. Further, approval of the COP would prohibit Empire Wind from commencing construction activities for which additional permits and authorizations are required, including permits and permissions requested by Empire Wind under Section 10 of the Rivers and Harbors Act of 1899 (RHA), Section 404 of the Clean Water Act, and Section 14 of the RHA from USACE, and Incidental Take Regulations and an associated Letter of Authorization under the Marine Mammal Protection Act from NMFS. Section 1.5 of the COP (Regulatory Framework) lists all expected federal, New York State, regional (county), and local-level reviews and permits for the Projects.[30]

### 4.2   Safety, Best Available and Safest Technology, Best Management Practices, and Properly Trained Personnel[31]

The Empire Wind Project COP proposed the following major offshore components:

- Up to 147 wind turbine generators (WTGs);

- Each WTG would be supported by a monopile foundation;

- Inter-array cables with an operating voltage of 66 kilovolts (kV);

---

[28] See 43 U.S.C. § 1337(p)(4) (OCSLA Subsection 8(p)(4)); 30 C.F.R. §§ 585.102, 585.621.
[29] See id. §§ 585.102(b), 585.621(a).
[30] https://www.boem.gov/sites/default/files/documents/renewable-energy/Public_EOW%20COP_v5_Volume%201_Redacted.pdfhttps://www.boem.gov/sites/default/files/documents/renewable-energy/Public_EOW COP_v5_Volume 1_Redacted.pdf
[31] See 43 U.S.C. § 1337(p)(4)(A); 30 C.F.R. §§ 585.102(a)(1), 585.621(b), 585.621(e)-(g).

- Up to 2 offshore substations on a piled jacket foundation;

- Interconnection cables with a voltage of 138-345 kV; and

- The export cables would consist of up to (4) buried submarine high-voltage alternating-current cables.

As documented in ETRB's memo (attachment #6), BOEM expects Empire Wind to use the most current technology available for commercial production that meets or exceeds current industry standards. In some cases, this could include technologies currently in prototyping and/or working toward type certification by a recognized certification body but not yet commercially available. ETRB has determined that the information on the proposed major components provided in the COP is sufficient to determine that the Projects propose to use the best available and safest technology pursuant to 30 C.F.R. § 585.621(e) which will meet or exceed the current international industry standards. The approved CVA will confirm as much by certifying that the facility is designed, fabricated, and installed in accordance with the COP and approved industry standards. BOEM and BSEE will also confirm that the design is in accordance with the COP through review of the FDR and FIR.

The engineering design of the WTGs and their ability to sufficiently withstand weather events—which include hurricane-level events—are independently evaluated by a CVA when reviewing the FDR and FIR according to international standards. One of these standards calls for the structure to be able to withstand a 50-year return interval event. An additional standard also includes withstanding 3-second gusts of a 500-year return interval event. WTGs are designed to withstand the oceanographic and meteorological conditions expected in the Lease Area, including hurricane force winds.

Further, OREP consulted with BSEE and the USCG on safety requirements during the COP review process. BSEE's recommendations and relevant requirements have been incorporated into the proposed conditions of approval for the COP to ensure the Projects are carried out in a safe manner.[32] Additionally, oversight of the review of future submissions (e.g., FDR and FIR activities) will allow BSEE to evaluate if the "facilities are designed, fabricated, and installed in conformance with accepted engineering practices."[33]

The COP also provides a description of the Projects' proposed SMS,[34] as required by 30 C.F.R. § 585.627(d). The proposed SMS, which will be finalized following any COP approval, includes a description of the processes and procedures listed in 30 C.F.R. § 285.810(a)-(f), and Empire Wind's proposed implementation thereof. Furthermore, the finalized SMS must describe the methods that are used and maintained to control the identified risks. BOEM determined that Empire Wind's proposals are consistent with acceptable industry practices and standards. Specifically, the SMS provides that all contractors will be legally qualified to perform the roles for which they are contracted, including implemented prescribed safety standards and attending

---

[32] *See* infra. Anticipated Terms and Conditions of COP Approval, Appendix A to the ROD.
[33] *See* 30 C.F.R. § 285.705(a)(1).
[34] *See* COP vol. I, app. B.  https://www.boem.gov/renewable-energy/state-activities/empire-wind-construction-and-operations-plan

awareness training.  Empire Wind will be responsible for overseeing that contractors comply with these obligations.

### 4.3   Protection of the Environment and Prevention of Undue Harm or Damage to Natural Resources; Life (including human and wildlife); Property; the Marine, Coastal, or Human Environment; or Sites, Structures, or Objects of Historical or Archaeological Significance[35]

Minimizing environmental impacts through the assessment of environmental resources is integral to BOEM's planning and leasing phase of offshore wind development. The Final EIS (BOEM, 2023) determined that the majority of the potential adverse impacts to the environment and natural resources are negligible to moderate. The Final EIS concluded that the Projects would potentially result in major impacts only to commercial and for-hire recreational fisheries; marine mammals, such as the NARW; scientific research and surveys; and scenic and visual resources.[36] The Final EIS identified a range of adverse impacts to environmental, socioeconomic, and cultural resources, which are summarized in the ROD. In addition, as the Final EIS concluded, the Preferred Alternative could have beneficial impacts on the following resources: (i) air quality; (ii) benthic resources, (iii) birds, (v) demographics, employment, and economics; (vi) land use and costal infrastructure; (vii) recreation and tourism; and (x) sea turtles. The numerous consultations performed under various federal statutes, and the analysis in the Final EIS, indicate that approval of the Preferred Alternative would not result in undue harm to environmental resources. For all adverse impacts, mitigation measures were identified and will be incorporated in the terms and conditions of COP approval. This includes measures identified during consultations.

As described in Section 3.3 above, BOEM analyzed in the Final EIS the potential environmental effects of the proposed activities described in the COP. Appendix H of the Final EIS specifically references measures to be taken or mitigation measures recommended to protect the environment. BOEM has also engaged in consultations under the ESA, the MSA, and the NHPA. As a result of the ESA consultation, NMFS issued the BiOp for the Projects on September 8, 2023, and USFWS on June 23, 2023. BiOp conclusions are discussed above in Section 3.3.  To minimize impacts, both the FWS and NMFS BiOps include Reasonable and Prudent Measures and implementing Terms and Conditions that must be made conditions of approval. BOEM also consulted with NMFS in accordance with Section 305(b)(2) of the MSA. BOEM analyzed potential adverse impacts of the Projects on EFH in an EFH Assessment deemed complete by NMFS on April 13, 2023.[37] NMFS issued a letter on July 27, 2023, in which the agency provided 37 conservation recommendations to avoid and minimize impacts to EFH for activities within the OCS and state waters. Ten of the 37 recommendations--those that applied to activities in state waters--are under USACE's jurisdiction for implementation. BOEM provided a detailed response to NMFS via an October 23, 2023, letter regarding how each of the conservation recommendations would be applied to the Projects. BOEM fully or partially adopted 25 of the 27 conservation recommendations under BOEM's jurisdiction. Conservation recommendation #1 was not adopted because it is not feasible for the Projects to relocate any wind turbine generators proposed in the area described by NMFS as Cholera Bank.  Conservation recommendation #19

---

[35] *See* 43 U.S.C. § 1337(p)(4)(B); 30 C.F.R. §§ 585.102(a)(2), 585.621(d).
[36] https://www.boem.gov/renewable-energy/state-activities/empire-wind-final-eis
[37] *See* BOEM, OREP, Empire Wind Essential Fish Habitat Assessment (2023).

was not adopted because a time of year restriction on construction activities from April 1 through July 31 to protect longfin squid is not economically or technically feasible.

BOEM also conducted NHPA Section 106 consultation with the 44 consulting parties made up of 7 federal agencies (including the ACHP), 6 federally-recognized Tribes, 2 State agencies (including the New York and New Jersey Historic Preservation Offices), 16 local governments, 7 nongovernmental organizations and/or groups or private property owners, and Empire Wind, with a demonstrated interest in the affected historic properties and held 5 consulting party meetings.[38] Through that consultation, BOEM identified historic properties that may be adversely affected by activities resulting from COP approval, as well as measures to resolve those adverse effects. BOEM also identified 3 NHLs that may be visually adversely affected by activities resulting from COP approval and followed the requirements for compliance with NHPA Section 110(f). On November 20, 2023, an MOA was executed stipulating how the adverse effects of the Projects on historic properties will be resolved. As discussed in section 3.3, BOEM also conducted G2G consultation meetings with tribes in which potential impacts to the environment and archeological resources were discussed.

The COP proposed impact avoidance, minimization, and mitigation measures, which BOEM included as elements of the Projects in its environmental analysis and consultations. Measures proposed by Empire Wind can be found in Volume II, Section 1.1 of the COP and include measures to avoid, minimize, and mitigate impacts to resources such as air quality, birds, and bats, among others.[39] As described in the Record of Decision, BOEM will incorporate Empire Wind's proposed measures as COP conditions of approval and require Empire Wind to comply with all measures and commitments resulting from consultations.

BOEM's Preferred Alternative also includes mitigation and monitoring measures to avoid or reduce impacts on existing ocean uses and on environmental and socioeconomic resources associated with construction, operation, and maintenance activities across the various resources analyzed in the Final EIS. Appendix H of the Final EIS contains a comprehensive list of mitigation and monitoring measures, which are analyzed in the respective Chapter 3 resource section.

## 4.4   Prevention of Waste and Conservation of Natural Resources[40]

Natural resources are defined in 30 C.F.R. § 585.113 to "include, without limiting the generality thereof, renewable energy, oil, gas, and all other minerals (as defined in Section 2(q) of the OCSLA), and marine animal and marine plant life." In this Section 4.4 analysis, BOEM is focused on the prevention of waste and the conservation of natural resources only in the context of *wind energy resources, oil and gas, and marine minerals*. While reviewing this COP, BOEM considered how the Projects would prevent waste by considering the location, installation, and operation of wind energy facilities proposed in the COP. Discussion of the conservation of

---

[38] The list of those parties accepting participation and declining to participate by either written response or no response to direct invitations are listed in Attachment 2 of the Section 106 MOA.
[39] COP Vol. II, Section 1.1; Empire Wind COP (May 2022), https://www.boem.gov/renewable-energy/state-activities/empire-wind-construction-and-operations-plan
[40] *See* 43 U.S.C. §§ 1337(p)(4)(C) -(D); 30 C.F.R. §§ 585.102(a)(3)-(4), 585.105(a).

*marine animal and plant life* can be found in Sections 2.1 and 2.2 of the Ocean Wind 1 COP and the Final EIS, Chapter 3, Affected Environment and Environmental Consequences, both of which consider how BOEM addresses the Projects' impacts on the marine environment. For similar reasons, BOEM has determined that the Projects conserve natural marine animal and plant life consistent with 43 U.S.C. § 1337(p)(4)(B), 30 C.F.R. §§ 585.102(a)(2), and 585.621(d). See Section 4.3, above.

Lease OCS-A 0512 was the result of a comprehensive planning process, as discussed in Section 1.1 and Appendix A of the Final EIS. The multiple stages of the planning process evaluated natural resources in the region and removed from consideration areas that would be incompatible with renewable energy activities covered by Lease OCS-A 0512. The analysis conducted in Section 3.17 of the Final EIS concluded that the Projects would result in negligible impacts on non-energy marine minerals (primarily sand and gravel) because the Projects would avoid mineral leases, sand and gravel leases and borrow areas, and ocean disposal areas. There are no existing oil gas leases in the Atlantic at this time and the Atlantic is no longer under consideration for leasing in BOEM's ongoing process to develop the next national OCS oil and gas leasing program (per the final proposed program, announced on September 29, 2023).[41] There is no evidence that the Projects will waste oil, gas, or other mineral resources.

The proposed COP reflects current industry practices (e.g., equipment, design, and orientation) for the Project Area. The mitigation measures to be adopted with the Preferred Alternative's selection strike a rational balance between deconflicting OCS uses and maximizing wind energy harvesting in the proposed Project Area.

## 4.5  Coordination with Relevant Federal Agencies[42]

Throughout BOEM's regulatory process, BOEM engaged with relevant federal agencies to obtain expert advice, comply with regulatory requirements, and ensure proper coordination. Documentation of this coordination with federal agencies through BOEM's Intergovernmental Renewable Energy Task Force meetings, and public meetings from the early pre-lease planning stages to the Area Identification process (which resulted in the WEAs before modification at the Proposed Sale Notice stage) can be found in Section 1.6 of the New York EA[43] and on BOEM's website.[44] Throughout the environmental and technical review of the COP, BOEM met with various federal agencies, including BSEE, DoD, EPA, USACE, USFWS, NOAA-NMFS, NPS, and USCG. Through the NOI to prepare the EIS, BOEM invited federal agencies with jurisdiction and/or special expertise to become Cooperating or Participating Agencies. BOEM provided Cooperating Agencies with the preliminary Draft EIS on February 14, 2022, for review and comment. BOEM considered and addressed agency comments received, and provided a

---

[41] *See* https://www.doi.gov/pressreleases/interior-department-invites-public-comment-proposed-five-year-program-offshore-oil-0

[42] Throughout the COP review and approval process, DOI engaged in meaningful consultation with federally-recognized Tribes. For more detail see Final EIS Appendix A, Section A.2.2.3 and Appendix N. See also 43 U.S.C. § 1337(p)(4)(E); 30 C.F.R. § 585.102(a)(5).

[43] BOEM, OCS EIS/EA BOEM 2016-042, Commercial Wind Lease Issuance and Site Assessment Activities on the Atlantic Outer Continental Shelf Offshore New York (2016). https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/NY/NY-Public-EA-June-2016.pdf

[44] https://www.boem.gov/renewable-energy/state-activities/new-york-activities

revised preliminary Draft EIS with a request that Cooperating and Participating agencies confirm that their comments were adequately addressed. On November 18, 2022, BOEM published the Draft EIS. The Cooperating Agencies also supported preparation of the Final EIS. BOEM provided Cooperating Agencies with the preliminary Final EIS on May 24, 2023, for review and comment. Before publishing the Final EIS, BOEM considered and addressed comments received, and provided a revised preliminary Final EIS with a request that Cooperating Agencies confirm that their comments were adequately addressed. During the EIS process, BOEM met with all the Cooperating and Participating agencies eight times (November 18, 2020, May 13, 2021, May 21, 2021, June 7, 2021, August 19, 2021, November 3, 2021, May 16, 2022, and April 12, 2023), met with agencies individually on multiple occasions, and hosted two sets of three public meetings (scoping and Draft EIS). NOAA has indicated its intention to adopt the Final EIS and sign a joint ROD with BOEM, and USACE has indicated its intention to adopt the Final EIS and sign a separate ROD concurrent with the issuance of its permit.

## 4.6   Protection of National Security Interests of the United States[45]

At each stage of the regulatory process involving Lease OCS-A 0512, BOEM has consulted with DoD for the purposes of assessing national security considerations in its decision-making processes. The Call Area was identified through consultation with BOEM's New York Renewable Energy Task Force, which include federal, state, and tribal government partners, including DoD, USCG, and the State of New York. Furthermore, BOEM consulted with DoD on the EA,[46] which examined the potential environmental effects of issuing commercial wind energy leases and approving site assessment activities, as well as potential impacts to military activities in the New York WEA. Following BOEM's consultation with DoD on the proposed action to issue leases in the entire WEA, DoD concluded that site-specific stipulations, designed in consultation with DoD, could mitigate the impact of site characterization surveys and the installation, operation, and decommissioning of meteorological towers and buoys on DoD testing, training, and operations in the WEA. When addressed through coordination with the DoD, impacts would be negligible and avoidable.

While reviewing the COP, BOEM coordinated with DoD to develop measures necessary to safeguard against potential liabilities and impacts on DoD activities. BOEM requested that the Military Aviation and Installation Assurance Siting Clearinghouse (DoD Clearinghouse) coordinate within the DoD a review of the COP. As a result of this review, DoD identified potential impacts on the North American Aerospace Defense Command (NORAD) and the Department of the Navy (DON).

DoD provided the following measures to mitigate potential impacts to NORAD:

- The Project owner will notify NORAD 30-60 days prior to Project completion and again when the Projects are complete and operational for Radar Adverse Impact Management (RAM) scheduling.

---

[45] *See* 43 U.S.C. § 1337(p)(4)(F); 30 C.F.R. §§ 585.102(a)(6), 585.621(c).
[46] https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/NY/NY-Public-EA-June-2016.pdf

- The Project owner will contribute funds ($80,000 per impacted radar) toward the execution of the RAM.

- Curtailment for National Security or Defense Purposes as described in the leasing agreement.

The DON also requested the ability to coordinate material vendor and foreign visitor reviews to protect defense capabilities from compromise and exploitation by foreign actors. DON also requested to be included in coordination on any proposal to utilize distributed acoustic sensing as part of the wind energy project or associated transmission cables.

To protect the security interests of the United States, BOEM has included the measures identified in communications with DoD as conditions of approval in Appendix A of the ROD.

The Lessee's lease also includes a provision allowing for BOEM to suspend operations in accordance with Suspension of Operations for National Security or Defense Purposes as described in Section 3c of Lease OCS-A 0512.[47]

## 4.7   Protection of the Rights of Other Authorized Users of the OCS[48]

BOEM must ensure that activities described in the COP provide for protection of the rights of other authorized users of the OCS. "Authorized users of the OCS" means other users authorized by BOEM to conduct OCS activities pursuant to any OCS lease, easement, or grant, including those authorized for renewable energy, oil and gas, and marine minerals.[49] BOEM's regulatory authority allows the agency to protect the rights of other authorized users by virtue of its right to determine the location of leases, easements, and grants issued and, thereafter, to approve, disapprove, or require modification of plans to conduct activities on such leases, easements, and grants. Approval of the Preferred Alternative, including the project easement, will not result in adverse impacts to rights granted by BOEM pursuant to any other OCS lease or grant, including leases or grants for renewable energy, oil and gas, or marine minerals. The activities that would be authorized by the COP do not restrict equitable access and sharing of the seabed in a manner that significantly interferes with those parties' authorized uses.

Specifically, there are no nearby oil and gas leases or grants or deposits of sand, gravel, and shell resources subject to 43 U.S.C. § 1337(k)(2) (OCSLA) that would be affected by the activities proposed in the COP. On May 1, 2022, commercial renewable energy Lease OCS-A 0544 bordering the Empire Wind Lease Area along the southeast border became effective. Section 8 of Addendum C of Lease-A 0544 states that the:

> "Lessee's (OCS-A 0544) proposed project design… must endeavor to design a surface structure layout that contains two common lines of orientation between OCS-A 0512 and OCS-A 0544 (as described in Navigation and Vessel Inspection Circular 01-19). If the

---

[47] Commercial Wind Lease OCS-A 0512, https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/NY/OCS-A-0512-Lease.pdf
[48] See 43 U.S.C. § 1337(p)(4)(G); 30 C.F.R. § 585.102(a)(7).
[49] BOEM's Marine Minerals Program manages Outer Continental Shelf mineral leasing (primarily sand and gravel) for coastal restoration, and commercial leasing of gold, manganese, and other hard minerals.

*Lessee and the neighboring BOEM lessee (i.e., the lessee for OCS-A 0512) cannot agree on such a surface structure layout, the OCS-A 0544 Lessee must incorporate a 2-nmi setback from the boundary of the neighboring lease, within which the OCS-A 0544 Lessee must not construct any surface structures."[50]*

The Proposed Action in the COP includes several turbine locations located on the border of the lease that would result in portions of the rotor swept area that results in blade overhang outside of the Lease Area. In addition, the proximity of the turbines to the boundary of the lease area could necessitate temporary placement of equipment outside the lease area for construction or maintenance of the turbines or permanent installation of an interarray cable.  In a joint communication, Empire Wind and the holder of the adjoining lease (OCS-A 0544) informed BOEM that the holder of the adjoining lease does not plan to locate WTGs in proximity to the Empire Wind WTGs overhanging its lease. Still, BOEM recognizes that the overhang of Empire Wind's WTGs on another lessee's lease could impact the full enjoyment of the neighboring lease, by possibly creating the need to temporarily locate repair and maintenance equipment in such other lease due to safety considerations. Therefore, to mitigate that potential issue, BOEM has included a condition of COP approval that requires a Repair and Maintenance Agreement between Empire Wind and the neighboring Lessee (OCS-A 0544) prior to the date that activities which would be located on the adjoining lease are scheduled to commence.[51] Inclusion of this condition of COP approval also prevents unreasonable interference with the use of the OCS by the adjoining lessee.[52]  Moreover, BOEM has included a condition of approval that requires Empire Wind to specifically notify BSEE and BOEM of the temporary placement of any equipment outside the lease and provides that BSEE will review such activity in coordination with BOEM.  That condition also provides that the any placement of equipment outside the lease must be within the area that was analyzed in BOEM's review of the COP.

## 4.8 A Fair Return to the United States[53]

BOEM has determined that the high bid resulting from the lease auction and terms of the lease provide a fair return to the United States. As described in Section 2.2, BOEM auctioned the New York WEA on November 15 and 16, 2016. The Lease Area, referred to as OCS-A 0512, consists of 79,350 acres located 11.5 nautical miles (nm) from Jones Beach, NY.

Prior to holding the lease sale, BOEM determined that the minimum bid for these Lease Areas constituted a fair return to the United States. As published in the *Federal Register* notice[54] for this lease sale, the minimum bid for the New York Lease Area was $2 per acre, or $158,700.00.[55] Statoil Wind US LLC's winning monetary bid vastly exceeded these minimum bids at $535.22 per acre and thereby exceeded fair return for the United States on that basis alone.

---

[50] Commercial Wind Lease OCS-A 0544. https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Lease%20OCS-A%200544.pdf
[51] See Proposed Condition 1.10, Appendix A to the ROD.
[52] For a complete discussion on preventing unreasonable interference with other OCS uses, see section 4.9.
[53] *See* 43 U.S.C. § 1337(p)(4)(H); 30 C.F.R. § 585.102(a)(8).
[54]  81 FR 75429, October 31, 2016. https://www.federalregister.gov/documents/2016/10/31/2016-26240/atlantic-wind-lease-sale-6-atlw-6-for-commercial-leasing-for-wind-power-on-the-outer-continental
[55] https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/Bid-Summary-ATLW-6.pdf

Lease payments are enumerated in Lease OCS-A 0512, Addendum B and describe annual rent payment requirements that are calculated per acre or fraction thereof. Rental payments compensate the public for lease development rights and serve as an incentive to timely develop the lease during the period before operations. According to the assignment and segregation letter, this annual rent after assignment is $238,050.00. Once a project begins commercial generation of electricity, a lessee must pay an operating fee, calculated in accordance with the formula found in Addendum B of Lease OCS-A-0512 and BOEM's regulations.[56] The operating fee compensates the public for offshore wind development on OCS submerged lands and the associated electricity generated and sold. Upon COP approval, and annually thereafter, Empire Wind would be required to submit its first project easement rent payment, calculated based on the acreage of the easement and the formula provided at 30 C.F.R. § 585.500(c)(5) and Addendum D of Commercial Lease OCS-A 0512.

## 4.9    Prevention of Interference with Reasonable Uses of the OCS, the Exclusive Economic Zone, the High Seas, and the Territorial Seas; Does Not Unreasonably Interfere with Other Uses of the OCS, Including National Security and Defense[57]

Under OCSLA and its implementing regulations, the Secretary ensures that any authorized activities are carried out in a manner that provides for the prevention of interference with reasonable uses (as determined by the Secretary) of the Exclusive Economic Zone, the high seas, and the territorial seas;[58] and that activities authorized by the Secretary will "not unreasonably interfere with other uses of the OCS."[59]

Throughout the planning and leasing process for Lease OCS-A 0512, as well as the NEPA process for the COP review, BOEM considered numerous other OCS uses in order to minimize or eliminate interference. To develop the New York WEA, BOEM worked closely with the New York Intergovernmental Task Force, federal agencies, federally recognized Tribes, the public, and other stakeholders between 2010 and December 2016.

As described in Section 2.0, BOEM initiated the planning process for the area in question in response to an unsolicited lease application from the NYPA. BOEM solicited input regarding the Project Area throughout the leasing process and removed an area overlapping Cholera Bank in direct response to comments from NMFS concerning habitat use conflicts. Before lease issuance, BOEM removed areas to strike a rational balance between identifying an area suitable for wind energy development and preventing interference with other reasonable uses of the OCS.

During the NEPA process for the COP, BOEM assessed alternatives and mitigation measures that could further avoid, minimize, or mitigate impacts to other OCS uses, including sealanes and navigation, aviation, fishing activities, and NOAA scientific research and surveys. The

---

[56] See 30 C.F.R. § 585.506.
[57] See 43 U.S.C. § 1337(p)(4)(I); 30 C.F.R. §§ 585.102(a)(9), 585.621(c). It is worth noting that approval of a COP would not restrict the legal rights of others to conduct reasonable uses of the Exclusive Economic Zone, the high seas, and the territorial sea (e.g., innocent passage, fishing).
[58] See 43 U.S.C. § 1337(p)(4)(I); 30 C.F.R. § 585.102(a)(9).
[59] See 30 C.F.R. § 585.621(c).

discussion below summarizes how BOEM considered these other OCS uses in the Lease Area[60] and the actions taken to ensure that the proposed activities, if approved, would be carried out in a manner that provides for the prevention of unreasonable interference with those uses.

- **Navigation and Vessel Traffic**[61]

    The Lease Area is just outside the largest port on the East Coast (in terms of containerized cargo volume) (Port Authority of New York and New Jersey). Vessel traffic within the area consists of vessels making the transition between the Ambrose or Sandy Hook channels into and out of the Port of New York and New Jersey. The regional setting is dominated by this commerce hub that consists of the Port of New York and New Jersey with facilities along Staten Island, Brooklyn, Manhattan, Hudson, and Newark. The Hudson River gives access to and from the New York Bight from the Port of Albany, Port of Coeymans (Ravena), Kingston, and Yonkers, New York, among numerous other commercial and small craft facilities. The coastal New York Bight waters are also used for commercial fisheries and recreational uses. The Lease Area is bordered by two of the six traffic lanes (Ambrose to Nantucket and Hudson Canyon to Ambrose) guiding large vessel traffic into and from the Port of New York and New Jersey area. On January 3, 2022, the USCG published the final Northern New York Bight Port Access Route Study (NNYBPARS) on the Federal Registry. Recommendations from the NNYBPARS included extending the two traffic lanes Ambrose to Nantucket and Hudson Canyon to Ambrose.

    The Navigation Safety Risk Assessment for the Projects show they are technically feasible to navigate through. The Projects will maintain a minimum spacing of 0.65nm (nautical mile), with a line of turbines oriented north – south, as well as perimeter rows on the northern and southern boundaries of the Lease Area that parallel the existing Traffic Separation Scheme (TSS). The rows will also be oriented southeast to northwest to accommodate the predominant trawling direction of commercial fishing industry; however, these rows contain several instances of deviation due to the irregular shape of the Lease Area. Empire Offshore Wind, LLC, consulted with USCG to ensure the layout will meet the requirement for navigation safety, and search and rescue (SAR) operation for the Project Area.

    While there are no restrictions on navigation in the Project area, vessels would need to navigate with greater caution. Navigation within the Lease Area would be aided by marked and lit WTGs and Offshore Substations. Empire Wind would ensure proper marking, lighting, and signaling of Private Aids to Navigation (PATON) pursuant to USCG requirements and BOEM[62] guidelines.

---

[60] Here, BOEM intends the "Lease Area" to encompass both the existing lease boundaries and the requested project easement. As discussed above in section 4.7, the COP includes several turbine locations located on the border of the lease that would result in portions of the rotor swept area that results in blade overhang outside of the Lease Area. BOEM considered this in the analysis described in this section, and in particular, BOEM examined how the overhang may impact other uses, particularly navigation, and concluded that the air gap between the bottom of the rotor swept zone and average sea surface height allows safe vessel transit.

[61] *See* Final EIS. https://www.boem.gov/renewable-energy/state-activities/empire-wind-final-eis

[62] BOEM, OREP, Guidelines for Lighting and Marking of Structures Supporting Renewable Energy Dev. (2021), https://www.boem.gov/sites/default/files/documents/renewable-energy/2021-Lighting-and-Marking-Guidelines.pdf.

As described in the FEIS, Empire Wind committed to continuing stakeholder engagement and public outreach with, but not limited to, federal, state, tribal, and local officials; non-governmental organizations; fishermen; shipping organizations; and other stakeholders. Empire Wind will communicate project updates to minimize impacts to mariners.[63] As indicated in anticipated conditions of approval, Empire Wind must: (1) obtain USCG approval for PATON to be installed; and (2) coordinate with USCG District 1 so, that to the extent possible, the FDR is consistent with the recommendations provided in the marking and lighting guidelines published by USCG District 1.[64]

As part of the FEIS, BOEM examined the existing port facilities in the region. There are no ports covered by the Deepwater Ports Act that are under consideration for the Projects. In addition to the consideration of navigation and vessel traffic, BOEM also examined potential project impacts on aviation and air traffic and determined that air traffic is expected to continue at current levels in and around the Projects.

- **Commercial Fisheries and For-Hire Recreational Fishing**[65]

   Federally permitted fishing occurs in the Lease Area. NMFS has issued permits for approximately 4,300 vessels that are currently engaged in various commercial and for-hire recreational fisheries in the Northeast Region (Maine to Virginia). Of these federally permitted vessels, an average of 345 vessels per year over 14 years (approximately 8.0 percent of the total number of vessels in the region) have reported fishing in the Lease Area.[66] Of these 345 vessels, NMFS data from 2008 to 2021 show that most permits source less than 0.25 percent of their annual revenue from the Lease Area.[67] Although a few outlier vessels derived a higher proportion of their annual revenue from the Lease Area in comparison to other vessels fishing in the Lease Area, the revenue for most of these outliers was below 5 percent of their annual revenue. The Final EIS found that the alternative selected in the ROD would result in moderate to major adverse impacts to commercial fisheries and minor to moderate adverse impacts on for-hire recreational fishing, depending on the fishery or fishing operation. Minor beneficial impacts for some for-hire recreational fishing operations could also occur. The Final EIS states that future planned actions, including future offshore wind approvals, could result in moderate to major adverse impacts to commercial fisheries and for-hire recreational fishing, depending on the fishery or fishing operation. The offshore wind-related factors that contributed to these impact determinations were primarily the presence of structures and the resulting navigational hazards and space-use conflicts.

   It is important to clarify that approval of the Projects would not limit the right to navigate or fish within the Project Area. That said, some Project activities and components (e.g., foundations, cable protection measures) are expected to impact some types of fishing within

---

[63] *See* COP Navigation Safety Risk Assessment, Appendix DD.
https://www.boem.gov/sites/default/files/documents/renewable-energy/Public_EOW_COP_App%20DD.pdf
[64] https://www.navcen.uscg.gov/sites/default/files/pdf/lnms/LNM01312023.pdf
[65] *See* Final EIS. https://www.boem.gov/renewable-energy/state-activities/empire-wind-final-eis
[66] *Id.*
[67] *Id.*

the Project Area.[68] For example, temporary safety zones may be established in coordination with the USCG around active construction. During this time, all fishing and transit would need to avoid the safety zone. During the operational period, fishing and transit would be permitted; however, some larger vessel size classes and/or vessels towing fishing gear may choose to avoid the Project Area due to operational concerns. It is anticipated that vessel operators that choose to avoid the area will fish or transit in other locations. Static gear fishing including hook and line, lobster and crab traps, and gillnets are not anticipated to have the same operational constraints as mobile gear fishing, although fishing methodology (e.g., direction of setting the gear and/or length of set gear) may need to be adjusted for fishing within the Project Area.

While BOEM expects that, with time, many fishermen will adapt to the spacing and be able to fish successfully in the Project Area,[69] the Lessee has identified ways to reduce the level of interference that the Projects would have with commercial fisheries.[70] For instance, most WTGs would be placed in a grid-like array within the Lease Area, with minimum spacing of no less than 0.65 nm between WTGs in a north-south orientation. The rows would also be oriented southeast to northwest to accommodate the predominant trawling direction of commercial fishing. However, some rows contain several instances of deviation due to the irregular shape of the Lease Area. The USCG has determined that the layout will meet the requirement for navigation safety and SAR operation for the Project Area.

BOEM is including as conditions two fisheries mitigation programs which consist of a gear claim procedure under which requests for reimbursement related to lost and/or damaged gear would be processed and a Direct Compensation Program for reimbursement of lost revenues. The Direct Compensation Program must include losses to shoreside business and requires Empire Wind to conduct a shoreside seafood business analysis that would be used to further supplement funds available for settling claims of lost revenue as a result of the Projects. The Direct Compensation Fund includes a reserve amount to be used to pay claims brought by both commercial and for-hire fishermen according to BOEM's *Guidelines for Mitigating Impacts to Commercial and Recreational Fisheries on the Outer Continental Shelf Pursuant to 30 C.F.R. Part 585* (BOEM's Mitigation Guidance)[71] and must be based on the annual average commercial fisheries landings values and for-hire fishing revenue stated in the Final EIS (Tables 3.9-12 and 3.9-20). The reserve amount must be determined by the formula specified in the conditions of approval. The reserve amount will be augmented to pay claims in amounts determined through an analysis of impacts of the Projects to shoreside support services. Including all the measures described above would mitigate impacts that the Projects are expected to have on commercial fisheries and for-hire fisherman and will prevent unreasonable interference with said fishing interests.

---

[68] *Id.*

[69] *Id.*

[70] *See* Final EIS, App. H. https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Empire_Wind_FEIS_App_H_Mitigation%26amp%3BMonitoring_0.pdf

[71] See https://www.boem.gov/sites/default/files/documents/renewable-energy/DRAFT%20Fisheries%20Mitigation%20Guidance%2006232022_0.pdf#:~:text=As%20reflected%20in%20the%20Guidelines,prior%20to%20engaging%20in%20any June 23, 2022.

The area known as Cholera Bank has changed over time as fishery resources and fishing behavior have changed. Originally (circa 1832), Cholera Bank was just to the west of the Lease Area. However, more recently other parts of the bank have been referred to as Cholera Bank. Located on the same submarine reef are two grounds west of Cholera—Middle Ground, and Angler Bank—and one to the east, appropriately called East of Cholera. During the process leading up to lease issuance in 2016, BOEM removed the contiguous area around the 19 m depth contour sloping down to 24 m at approximately 1 percent grade consisting of gravel and coarse sand. The removal was based upon BOEM's EFH consultation with NMFS. NMFS determined that the Cholera Bank feature was a sensitive habitat to be avoided for the placement of site assessment structures. In addition to avoiding sensitive habitats, removal of the area also reduced potential conflict with recreational and commercial fishing activity.

- **Scenic and Visual**

During the lease sale process, BOEM worked to produce visual simulations of a hypothetical project within the Call Area. After Empire Wind submitted its COP, BOEM conducted a thorough analysis of the impacts of the Proposed Action on visual and scenic resources.  The geographic analysis area (GAA) for the Empire Wind Projects was established from a computer-generated terrain elevation and surface cover viewshed model and encompasses a 44-mile radius Zone of Theoretical Visibility (ZTV) around the Project Area. A quantified inventory of the physical elements and features and the aesthetic, perceptual, and experiential aspects of the visual and scenic resources was conducted and analyzed for impacts to the ocean, seascape, and landscape character areas within the ZTV along the Fire Island, Manhattan Island, and southern Long Island coastlines in the State of New York and Northern New Jersey coastlines.

Fifteen key observation points (KOP) in New York and New Jersey were selected from the affected areas defined in the computer-generated viewshed model. Ten photo simulations and 5 video simulations were produced showing the views from the KOPs and depicting the potential changes to the existing visual setting by the Projects' proposed components. The distance from the KOPs to the closest wind turbine ranges from 14 miles to 34 miles. The level of impact ranges from major at 14 miles away to minor at 32 miles away when viewing at the ground level. The impact level increases when viewing from elevated KOPs to moderate when viewing at a distance of 34 miles (Empire State Building), and major when at a distance of approximately 22 miles (Fire Island Lighthouse).

Aviation warning lighting affixed to the wind turbines would be potentially visible as far as 40 miles from beaches and coastlines within the GAA with impacts on scenic and visual resources. Nighttime impacts would be reduced by implementing an aviation detection lighting system (ADLS) on WTGs and offshore substations. The aviation warning lights would remain off until low flying aircraft enter the obstruction zone and are detected by surveillance radar, at which time the warning lights would activate. A report by Capitol Airspace Group estimated that with an ADLS system in place, the aviation warning lights would activate for a total of 357 hours, 46 minutes, and 45 seconds over a one-year period, or activated 7.5 percent of the time that traditional obstruction lights would be active.

24

A 4-mi (6.4-km) Visual Onshore Study Area was used to review potential visibility from 15 onshore KOPs of each of the 5 potential onshore substations, onshore export and interconnection cables, and Operations and Maintenance Base. The onshore components would be sited in highly developed and previously disturbed areas where it is feasible to introduce less visual contrast relative to the surroundings. Impacts range from minor at 10 KOPs to moderate at 3 KOPs, and major at 4 KOPs when considering the location of the sites relative to scenic resources and public viewpoints, context of the sites and surrounding land uses, visual contrast and prominence between the onshore substations, and the surrounding landscape. Some impacts will be mitigated with vegetative screening at the onshore substation sites to screen views from nearby residents.

Populations affected by the offshore and onshore actions include tourists visiting and residents living in coastal communities, including low income and minority neighborhoods; recreational users of the seascape, including those using ocean beaches and tidal areas; recreational users of the open ocean, including those involved in yachting, fishing, boating, and passage on ships; recreational users of the landscape, including those using landward beaches, golf courses, cycle routes, and footpaths; tourists, workers, visitors, or local people using transport routes; people working in the countryside, commerce, or dwellings; and people working in the marine environment, such as those on fishing vessels and crews of ships.

In coordination with BOEM, the lessee must prepare and implement a scenic and visual resource monitoring plan that monitors and compares the visual effects of the wind farm during construction and O&M (daytime and nighttime) to the findings in the COP Visual Impact Assessment and verifies the accuracy of the visual simulations (photo and video). The monitoring plan shall include monitoring and documenting the meteorological influences on actual WTG visibility over a duration of time from selected onshore key observation points, as determined by BOEM and the Lessee.  In addition, the Lessee must include monitoring of the ADLS operation in the monitoring plan. The Lessee shall monitor the frequency that the ADLS is operative, documenting when (dates and time) the aviation warning lights are in the on position and the duration of each event. Details for monitoring and reporting procedures must be included in the plan (see ROD Appendix A 7.2)

- **NOAA Scientific Research and Surveys**[72]

As described in Section 3.17.1 of the Final EIS, the Lease Area overlaps with current fisheries management, protected species, and ecosystem monitoring surveys conducted by or in coordination with NOAA's Northeast Fisheries Science Center. NOAA Fisheries and BOEM have developed the *NOAA Fisheries and BOEM Federal Survey Mitigation Implementation Strategy - Northeast US Region* (Hare et al. 2022)[73] to address these adverse

---

[72] *See* Final EIS, Section 3.17. https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Empire_Wind_FEIS_Vol1_0.pdf
[73] *See* Hare, J.A., Blythe, B.J., Ford, K.H., Godfrey-McKee, S., Hooker, B.R., Jensen, B.M., Lipsky, A., Nachman, C., Pfeiffer, L., Rasser, M. and Renshaw, K., 2022. NOAA Fisheries and BOEM Federal Survey Mitigation Implementation Strategy - Northeast US Region. NOAA Technical Memorandum 292. Woods Hole, MA. 33 pp.

impacts. As described in Section 13.17.5, the Projects will have major adverse impacts on NMFS scientific surveys.

There are 14 NMFS scientific surveys that overlap with wind energy development in the northeast region. Nine of these surveys overlap with the Projects. BOEM is including Term and Condition 6.4 in ROD Appendix A to address this issue. Consistent with NMFS and BOEM Survey Mitigation strategy actions 1.3.1, 1.3.2, 2.1.1, and 2.1.2 in the *NOAA Fisheries and BOEM Federal Survey Mitigation Implementation Strategy - Northeast US Region*, the Lessee must submit to BOEM a survey mitigation agreement between NMFS and the Lessee. The survey mitigation agreement must describe how the Lessee will mitigate the Projects' impacts on the 9 NMFS surveys. The Lessee must conduct activities in accordance with such agreement. If the Lessee and NMFS fail to reach a survey mitigation agreement, then the Lessee must submit a survey mitigation plan to BOEM.

- **National Security and Defense**

   As explained in Section 4.6, BOEM has consulted extensively with the DoD. BOEM will include any mitigation measures identified during the consultations as part of the COP approval.

**4.10   Consideration of (i) the Location of, and any Schedule Relating to, a Lease or Grant under this Part for an Area of the OCS, and (ii) any Other Use of the Sea or Seabed, Including Use for a Fishery, a Sealane, a Potential Site of a Deepwater Port, Navigation[74]**
For a discussion on how BOEM selected the Lease Area, see Section 2.1. For a discussion on how BOEM considered potential conflicts with fisheries, sealanes, deepwater ports, navigation, and aviation, see Section 4.9.

**4.11   Public Notice and Comment on any Proposal Submitted for a Lease or Easement[75]**

For a detailed discussion on public notice and comment opportunities associated with the issuance of the lease, please see Section 1 and Appendix A of the Final EIS[76] and Section 5.1 of the New York EA.[77]

Before preparing the Draft EIS, BOEM held three virtual public scoping meetings (on June 30, July 8, and July 13, 2021) to solicit feedback and to identify issues and potential alternatives for consideration. The topics most referenced in the scoping comments included birds, commercial fisheries and for-hire recreational fishing, NEPA/public involvement, planned activities scenario/cumulative impacts, and mitigation and monitoring.[78] The Scoping Summary Report was made available to the public on BOEM's website, and all public scoping submissions

---

[74] *See* 43 U.S.C. § 1337(p)(4)(J); 30 C.F.R. § 585.102(a)(10).

[75] *See* 43 U.S.C. § 1337(p)(4)(K); 30 C.F.R. § 585.102(a)(11).

[76] *See* Final EIS.  https://www.boem.gov/renewable-energy/state-activities/empire-wind-final-eis

[77] BOEM, OCS EIS/EA BOEM 2016-070, Com. Wind Lease Issuance and Site Assessment Activities on the Atl. Outer Continental Shelf Offshore New York. (2016), https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/NY/NY_Revised_EA_FONSI.pdf

[78] https://www.boem.gov/renewable-energy/state-activities/scopingreportempire-wind-farm-project

received can be viewed online at http://www.regulations.gov under Docket Number BOEM-2022-0038.

On November 18, 2022, BOEM published an NOA for the Draft EIS in the *Federal Register* consistent with the regulations implementing NEPA to assess the potential impacts of the Proposed Action and alternatives.[79] The Draft EIS was made available to the public on BOEM's website. The NOA commenced the public review and comment period of the Draft EIS. BOEM held three virtual public hearings (on December 7, 13, and 15, 2022) to solicit feedback and identify issues for consideration in preparing the Final EIS. Throughout the public review and comment period, federal agencies; tribal, state, and local governments; and the general public had the opportunity to provide comments on the Draft EIS. The topics most referenced during the Draft EIS comment period included air quality, climate change, commercial fisheries and for-hire recreational fishing, demographics, employment and economics, marine mammals, and scenic and visual resources. All Draft EIS comment submissions received can be viewed online at http://www.regulations.gov under Docket Number BOEM-2022-0053.

On September 15, 2023, BOEM published an NOA for the Final EIS in the *Federal Register*.[80] The Final EIS was also made available in electronic form at https://www.boem.gov/renewable-energy/state-activities/empire-wind.  BOEM's 30-day waiting period for the Final EIS closed on October 16, 2023. BOEM's responses to comments on the Draft EIS are included in Appendix P of the Final EIS.

### 4.12   Oversight, Inspection, Research, Monitoring, and Enforcement Relating to a Lease, Easement, or Right-of-Way[81]

Secretarial Order 3299, which established BOEM and BSEE, assigned safety and environmental oversight for the OCS renewable energy program to BOEM until such time as the Assistant Secretary - Land and Minerals Management (ASLM) determined that an increase in activity justified the transfer of those functions to BSEE. In December 2020, the Principal Deputy Assistant Secretary - Land and Minerals Management, acting with the authority of the ASLM, directed the transfer of safety and environmental oversight for the OCS renewable energy program from BOEM to BSEE due to increased wind energy activity.[82] On September 14, 2022, DOI delegated relevant authorities to BSEE and BOEM in Departmental Manual Part 219, Chapter 1, and Part 218, Chapter 1, respectively.

On January 31, 2023, DOI published a final rule in the *Federal Register*[83] that moved portions of the existing OCS renewable energy regulations, consistent with the Secretary's order and the Departmental Manual. Following approval of the COP, BSEE maintains the authority to perform

---

[79] https://www.federalregister.gov/documents/2022/11/18/2022-25034/notice-of-availability-of-a-draft-environmental-impact-statement-for-empire-offshore-wind-llcs

[80] https://www.federalregister.gov/documents/2023/09/15/2023-19956/notice-of-availability-of-the-empire-offshore-wind-final-environmental-impact-statement

[81] See 43 U.S.C. § 1337(p)(4)(L); 30 C.F.R. § 585.102(a)(12).

[82] *See* "Memorandum from Principal Deputy Assistant Secretary - Land and Minerals Management on the Department of the Interior's Offshore Renewable Energy Program Roles and Responsibilities," December 22, 2020.

[83] *See* 88 Fed. Reg. 6376 (Jan. 31, 2023).  https://www.federalregister.gov/documents/2023/01/31/2023-00871/reorganization-of-title-30-renewable-energy-and-alternate-uses-of-existing-facilities-on-the-outer

oversight, inspection, research, monitoring, and enforcement relating to Lease OCS-A 0512, as authorized under the lease, OCSLA, and its implementing regulations. BOEM still retains its authority for enforcing compliance, including safety and environmental compliance, with all applicable laws, regulations, leases, grants, and approved plans through notices of noncompliance, cessation orders, civil penalties, and other appropriate means.

Under this authority BSEE and BOEM will ensure that offshore renewable energy development in Lease OCS-A 0512 is conducted safely and maintains regulatory compliance. BSEE has reviewed the proposed COP and recommended technical conditions for the design, construction, operation, maintenance, and monitoring of the Projects, and for periodic review and reporting. These proposed technical conditions are included in Appendix A of the ROD and are anticipated conditions of COP approval.

## 5    STATUS OF THE LEASE

Empire Wind is currently in compliance with the terms of Lease OCS-A 0512. Empire Wind maintains the lease in full force and effect by virtue of annual rent payments, all of which have been timely paid.

## 6    FINANCIAL ASSURANCE

As required by 30 C.F.R. § 585.625(b)(19), Section 1.10 of the COP[84] contains Empire Wind's statement attesting that the activities and facilities proposed in the COP are or will be covered by an appropriate bond or security as required by 30 C.F.R. §§ 585.515 and 585.516. Empire Wind has provided and currently maintains Surety Bond No. SU1116511 in the amount of $100,000 and Surety Bond No. ROG0001791 in the amount of $398,550 to meet the initial lease-specific and SAP supplemental financial assurance requirements on lease OCS-A 0512 to guarantee compliance with all terms and obligations of the lease. BOEM's regulations at 30 C.F.R. § 585.516(a)(3) provide that, before BOEM will approve a COP, the lessee must provide a supplemental bond or other financial assurance in an amount determined by BOEM based on the complexity, number, and location of all facilities in the lessee's planned activities and commercial operation. Empire Wind must provide supplemental financial assurance to cover the additional annual rental amount for the project easement where transmission lines to shore will be located. In addition, BOEM may increase the amount of supplemental financial assurance at any time if BOEM determines it is necessary to guarantee compliance with the terms and conditions of the lease.[85]

## 7    CONCLUSION

Minimizing environmental impacts and interference with other uses of the OCS is integral to OCS wind energy planning, leasing, and development. Over many years, the United States Government, on behalf of the American people has, through the DOI, BOEM, and other agencies, devoted significant time and resources to identifying, analyzing, and developing

---

[84] https://www.boem.gov/sites/default/files/documents/renewable-energy/Public_EOW%20COP_v5_Volume%201_Redacted.pdf
[85] *See* 30 C.F.R. § 585.517.

strategies to mitigate potential environmental impacts and interference with other OCS uses. In 2010, OREP established and began meeting with the New York Intergovernmental Renewable Energy Task Force, and with other stakeholders and ocean users, to introduce BOEM and offshore wind. An unsolicited lease request was submitted to BOEM in September of 2011 in support of a 700 MW project. Subsequently, BOEM initiated its planning and analysis process to determine competitive interest in the area and eventually identify a Wind Energy Area and conduct an EA. The EA, and the associated FONSI concluded that reasonably foreseeable environmental effects associated with lease issuance, including those resulting from site characterization surveys in the WEA and the deployment of meteorological towers and/or buoys, would not significantly impact the environment.

In December of 2016, BOEM held a lease sale which led to the issuance of lease OCS-A 0512 to Statoil Wind US LLC, now Empire Offshore Wind LLC. Empire Wind submitted its COP in January of 2020, and BOEM conducted a project-specific NEPA analysis and other environmental consultations required by the ESA, MSA, and NHPA. Throughout its environmental and technical review of the COP, BOEM also coordinated with several federal agencies, including BSEE, DoD, DON, USEPA, USACE, USFWS, NOAA, EPA, NPS, and USCG. All of those reviews, consultations, and coordination efforts enabled BOEM to assess whether approval of the Preferred Alternative conforms with the 8(p)(4) factors and implementing regulations.

As reflected in the Record of Decision for the Projects, the Preferred Alternative, i.e.,  the combination of Alternative C-1 (Gravesend Anchorage Area), Alternative D (Empire Wind 2 [EW 2] Submarine Export Cable Route Options to Minimize Impacts to the Sand Borrow Area), Alternative F (Wind Resource Optimization with Modifications for Environmental and Technical Considerations), Alternative G (Cable Bridge Crossing of Barnums Channel Adjacent to Long Island Railroad Bridge) and Alternative H (Dredging for Empire Wind 1 [EW 1] Export Cable Landfall)), plus the measures required in the NFMS and Lessee mitigation survey, balance the need to prevent interference with OCS uses with BOEM's duty to further the U.S. policy to make OCS energy resources available for expeditious and orderly development, subject to environmental safeguards, including the consideration of natural resources and existing ocean uses.  The FEIS demonstrates that approving the Projects as modified by the Preferred Alternative will have negligible to moderate adverse impacts on most resources and only the potential for major adverse impacts on (i) marine mammals, (ii) scenic and visual resources, (iii) commercial fisheries and for-hire recreational fisheries, and (iv) scientific research. However, the Preferred Alternative could also have beneficial impacts on the following resources: (i) air quality; (ii) benthic resources; (iii) birds; (iv) demographics, employment and economics; (v) land use and costal infrastructure; (vi) recreation and tourism; and (vii) sea turtles.

The numerous consultations performed under various federal statutes, and the analysis in the Final EIS, indicate that approval of the Preferred Alternative would not result in undue harm to environmental resources or in unreasonable interference with other OCS uses.[86]

---

[86] *See* Final EIS Secs. 4.3 and 4.9.  https://www.boem.gov/renewable-energy/state-activities/empire-wind-final-eis

Moreover, approval of the Preferred Alternative would further goals stated in Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, by increasing renewable energy production on the OCS, "with the goal of doubling offshore wind by 2030 while ensuring robust protection for our lands, waters, and biodiversity and creating good jobs."[87]

In conclusion, OREP has evaluated all the information that Empire Wind provided in its COP and has assessed it in relation to the enumerated factors in OCSLA Subsection 8(p)(4) and BOEM's implementing regulations at 30 C.F.R. part 585. Approval of the COP—as modified by the Preferred Alternative and the proposed Terms and Conditions included with the ROD—would be in accordance with the regulations at 30 C.F.R. part 585 and would ensure that all Project activities on the OCS are carried out in a manner that provides for the factors in Subsection 8(p)(4) of OCSLA.

---

[87] https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/27/executive-order-on-tackling-the-climate-crisis-at-home-and-abroad/