# EXHIBIT K

RECEIVED

DEC 30 2024

Office of Renewable
Energy Programs

# AMENDMENT AND RESTATEMENT

## of

## Renewable Energy Lease OCS-A 0512

This Amendment and Restatement of Renewable Energy Lease OCS-A 0512 (the "Lease") is made and entered into by and between the United States of America, ("Lessor"), acting through the Bureau of Ocean Energy Management ("BOEM"), its authorized officer, and Empire Leaseholder LLC (the "Lessee").

<u>WITNESSETH:</u>

THAT WHEREAS the Lease, containing approximately 79,350 acres, was entered into by and between the Lessor and Statoil Wind US LLC, effective as of April 1, 2017; and

WHEREAS Statoil Wind US LCC updated its recorded name to Equinor Wind US LLC, effective as of May 16, 2018; and

WHEREAS Equinor Wind US LLC assigned 100% record title interest in the Lease to Empire Offshore Wind LLC, effective as of January 27, 2021; and

WHEREAS the Lease was amended on January 17, 2024, to update Addendum "D" language; and

WHEREAS, BOEM approved the Lessee's Construction and Operations Plan (COP), granted a Project Easement, and amended Addenda A and D, effective February 21, 2024; and

WHEREAS Empire Offshore Wind LLC assigned 100% record title interest in the Lease to Empire Leaseholder LLC, effective as of November 1, 2024;

NOW, THEREFORE, in consideration of the premises, the Lessor and Lessee hereby agree that Lease OCS-A 0512 is amended and restated in its entirety to read as follows:

| UNITED STATES DEPARTMENT OF THE INTERIOR BUREAU OF OCEAN ENERGY MANAGEMENT<br><br>**COMMERCIAL LEASE OF SUBMERGED LANDS FOR RENEWABLE ENERGY DEVELOPMENT ON THE OUTER CONTINENTAL SHELF**<br><br>***Paperwork Reduction Act of 1995 statement:** This form does not constitute an information collection as defined by 44 U.S.C. § 3501 et seq. and therefore does not require approval by the Office of Management and Budget.* | | |
|---|---|---|
| | Office<br><br>Sterling, VA | Renewable Energy Lease Number<br><br>OCS-A 0512 |
| | Cash Bonus and/or Acquisition Fee<br>$42,469,725.00 | Resource Type<br><br>Wind |
| | Effective Date<br><br>April 1, 2017<br>Type text here | Block Number(s)<br><br>See Addendum A |

This lease, which includes any addenda hereto, is hereby entered into by and between the United States of America, ("Lessor"), acting through the Bureau of Ocean Energy Management ("BOEM"), its authorized officer, and

| Lessee | Interest Held |
|---|---|
| Empire Leaseholder LLC | 100% |

("Lessee").  This lease is effective on the date written above ("Effective Date") and will continue in effect until the lease terminates as set forth in Addendum "B."  In consideration of any cash payment heretofore made by the Lessee to the Lessor and in consideration of the promises, terms, conditions, covenants, and stipulations contained herein and attached hereto, the Lessee and the Lessor agree as follows:

**Section 1:  Statutes and Regulations.**

This lease is issued pursuant to subsection 8(p) of the Outer Continental Shelf Lands Act ("the Act"), 43 U.S.C. §§ 1331 *et seq.*  This lease is subject to the Act and regulations promulgated pursuant to the Act, including but not limited to, offshore renewable energy regulations at 30 CFR Part 285 30 CFR Part 585 as well as other applicable statutes and regulations in existence on the Effective Date of this lease.  This lease is also subject to those statutes enacted (including amendments to the Act or other statutes) and regulations promulgated thereafter, except to the extent that they explicitly conflict with an express provision of this lease.  It is expressly understood that amendments to existing statutes, including but not limited to the Act, and regulations may be made, and/or new statutes may be enacted or new regulations promulgated, which do not explicitly conflict with an express provision of this lease, and that the Lessee bears the risk that such amendments, regulations, and statutes may increase or decrease the Lessee's obligations under the lease.

**Section 2:  Rights of the Lessee.**

(a) The Lessor hereby grants and leases to the Lessee the exclusive right and privilege, subject to the terms and conditions of this lease and applicable regulations, to:

(1) submit to the Lessor for approval a Site Assessment Plan (SAP) and Construction and Operations Plan (COP) for the lease activities identified in Addendum "A" of this lease; and

(2) conduct activities in the area identified in Addendum "A" of this lease ("leased area") and/or Addendum "D" of this lease ("project easement(s)"), that are described in a SAP or COP that has been approved by the Lessor.  This lease does not, by itself, authorize any activity within the leased area and/or project easement(s).

(b) The rights granted to the Lessee herein are limited to those activities described in any SAP or COP approved by the Lessor.  The rights granted to the Lessee are limited by the lease-specific terms, conditions, and stipulations required by the Lessor in Addendum "C."

(c) This lease does not authorize the Lessee to conduct activities on the Outer Continental Shelf (OCS) relating to or associated with the exploration for, or development or production of, oil, gas, other seabed minerals, or renewable energy resources other than the renewable energy resources identified in Addendum "A."

(d) The Lessee may request a suspension of this lease from Lessor under 30 CFR § 585.416 for up to two years per request. The suspension will be in effect for the period specified by Lessor in the suspension order, unless the Lessee requests an earlier termination of the suspension. If the Lessee so requests, the Lessor may end the suspension on the date requested by the Lessee, or at any time before the specified end date. Nothing in this provision should be read to limit BSEE's authority.

**Section 3:  Reservations to the Lessor.**

(a) All rights in the leased area and project easement(s) not expressly granted to the Lessee by the Act, applicable regulations, this lease, or any approved SAP or COP, are hereby reserved to the Lessor.

(b) The Lessor will decide whether to approve or disapprove a SAP or COP in accordance with the applicable regulations in 30 CFR Part 585, including 30 CFR § 585.102(a). Disapproval of plans will not subject the Lessor to liability under the lease.  The Lessor also retains the right to approve a SAP or COP with conditions, as provided in applicable regulations.

(c) The Lessor reserves the right to suspend the Lessee's operations in accordance with the national security and defense provisions of Section 12 of the Act and applicable

regulations, ,provided that compensation must be paid to the Lessee as provided by 43 U.S.C. § 1341(c) and (d).

(d) The Lessor reserves the right to authorize other uses within the leased area and project easements(s) that will not unreasonably interfere with activities described in a SAP and/or COP, approved pursuant to this lease.

## Section 4:  Payments.

(a) The Lessee must make all rent payments to the Lessor in accordance with applicable regulations in 30 CFR Part 585, unless otherwise specified in Addendum "B."

(b) The Lessee must make all operating fee payments to the Lessor in accordance with applicable regulations in 30 CFR Part 585, as specified in Addendum "B."

## Section 5:  Plans.

The Lessee may conduct those activities described in Addendum "A" only in accordance with a SAP or COP approved by the Lessor.  The Lessee may not deviate from an approved SAP or COP except as provided in applicable regulations in 30 CFR Part 585.

## Section 6:  Associated Project Easement(s).

Pursuant to 30 CFR § 585.200(b), the Lessee has the right to one or more project easement(s), without further competition, for the purpose of installing, maintaining, repairing and replacing: gathering, transmission, distribution, and inter-array cables; power and pumping stations; facility anchors; pipelines; and associated facilities and other appurtenances on the OCS as necessary for the full enjoyment of the lease, and under applicable regulations in 30 CFR Part 285 and 30 CFR Part 585.  As part of submitting a COP for approval, the Lessee may request that one or more easement(s) be granted by the Lessor. If the Lessee requests that one or more easement(s) be granted when submitting a COP for approval, such project easements will be granted by the Lessor in accordance with the Act and applicable regulations in 30 CFR Part 585 upon approval of the COP in which the Lessee has demonstrated a need for such easements.  Such easements must be in a location acceptable to the Lessor, and will be subject to such conditions as the Lessor may require. The project easement(s) issued in conjunction with an approved COP under this lease will be described in Addendum "D" to this lease, which will be updated as necessary.

## Section 7:  Conduct of Activities.

The Lessee must conduct, and agrees to conduct, all activities in the leased area and project easement(s) in accordance with an approved SAP or COP, all applicable laws and regulations, and the lease-specific terms, conditions and stipulations in Addendum "C.

The Lessee further agrees that no activities authorized by this lease will be carried out in a manner that:

(a) could unreasonably interfere with or endanger activities or operations carried out under any lease or grant issued or maintained pursuant to the Act, or under any other license or approval from any Federal agency;

(b) could cause any undue harm or damage to the environment;

(c) could create hazardous or unsafe conditions; or

(d) could adversely affect sites, structures, or objects of historical, cultural, or archaeological significance, without notice to and direction from the Lessor on how to proceed.

**Section 8:  Violations, Suspensions, Cancellations, and Remedies.**

If the Lessee fails to comply with (1) any of the applicable provisions of the Act or regulations, (2) the approved SAP or COP, or (3) the terms of this lease, including associated Addenda, the Lessor may exercise any of the remedies that are provided under the Act and applicable regulations, including, without limitation, issuance of cessation of operations orders, suspension or cancellation of the lease, and/or the imposition of penalties, in accordance with the Act and applicable regulations.

The Lessor may also cancel this lease for reasons set forth in subsection 5(a)(2) of the Act (43 U.S.C. § 1334(a)(2)), and for reasons provided by the Lessor pursuant to 30 CFR § 585.422. Any cancellations are subject to the limitations and protections contained in subsections 5(a)(2)(B) and (C) of the Act (43 U.S.C. § 1334 (a)(2)(B) and (C)).

Any cancellation or suspension ordered by the Lessor that is predicated on a threat of serious irreparable, or immediate harm or damage, or on an imminent threat of serious or irreparable harm or damage, requires a finding by the Lessor of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities.

Non-enforcement by the Lessor of a remedy for any particular violation of the applicable provisions of the Act or regulations, or the terms of this lease, will not prevent the Lessor from exercising any remedy, including cancellation of this lease, for any other violation or for the same violation occurring at any other time.

**Section 9:  Indemnification.**

The Lessee hereby agrees to indemnify the Lessor for, and hold the Lessor harmless from, any claim caused by or resulting from any of the Lessee's operations or activities on the leased area or project easement(s) or arising out of any activities conducted by or on behalf of the Lessee or its employees, contractors (including Operator, if applicable), subcontractors, or their employees, under this lease, including claims for:

      a. loss or damage to natural resources,

b.  the release of any petroleum or any Hazardous Materials,

c.  other environmental injury of any kind,

d.  damage to property,

e.  injury to persons, and/or

f.  costs or expenses incurred by the Lessor.

Except as provided in any addenda to this lease, the Lessee will not be liable for any losses or damages proximately caused by the activities of the Lessor or the Lessor's employees, contractors, subcontractors, or their employees.  The Lessee must pay the Lessor for damage, cost, or expense due and pursuant to this Section within 90 days after written demand by the Lessor.  Nothing in this lease will be construed to waive any liability or relieve the Lessee from any penalties, sanctions, or claims that would otherwise apply by statute, regulation, operation of law, or could be imposed by the Lessor or other government agency acting under such laws.

"Hazardous Material" means

1.  Any substance or material defined as hazardous, a pollutant, or a contaminant under the *Comprehensive Environmental Response, Compensation, and Liability Act* at 42 U.S.C. §§ 9601(14) and (33);

2.  Any regulated substance as defined by the Resource Conservation and Recovery Act ("RCRA") at 42 U.S.C. § 6991 (7), whether or not contained in or released from underground storage tanks, and any hazardous waste regulated under RCRA pursuant to 42 U.S.C. §§ 6921 *et seq.*;

3.  Oil, as defined by the Clean Water Act at 33 U.S.C. § 1321(a)(1) and the Oil Pollution Act at 33 U.S.C. § 2701(23); or

4.  Other substances that applicable Federal, state, tribal, or local laws define and regulate as "hazardous."

## Section 10:  Financial Assurance.

The Lessee must at all times maintain the financial assurance required prior to issuance of this lease, as provided in 30 CFR Part 585.  The Lessee must also provide and maintain a surety bond(s) or other authorized financial assurance if the Lessor determines that additional financial assurance is necessary to ensure compliance with 30 CFR Part 585, applicable plan approvals, and the terms and conditions of this lease.

## Section 11:  Assignment or Transfer of Lease.

This lease may not be assigned or transferred in whole or in part without written approval of the Lessor.  The Lessor reserves the right, in its sole discretion, to deny approval of the

Lessee's application to transfer or assign all or part of this lease, in accordance with applicable regulations in 30 CFR Part 585. Any assignment or transfer made in contravention of this section is void.

## Section 12:  Relinquishment of Lease.

The Lessee may relinquish this entire lease or any officially designated subdivision thereof by filing with the appropriate office of the Lessor a written relinquishment application, in accordance with applicable regulations in 30 CFR Part 585.  No relinquishment of this lease or any portion thereof will relieve the Lessee or its surety of the obligations accrued hereunder, including but not limited to, the responsibility to remove property and restore the leased area and project easement(s) pursuant to section 13 of this lease and applicable regulations.

## Section 13:   Removal of Property and Restoration of the Leased Area and Project Easement(s) on Termination of Lease.

Unless otherwise authorized by the Lessor, pursuant to the applicable regulations in 30 CFR Part 285 and 30 CFR Part 585, the Lessee must remove or decommission all facilities, projects, cables, pipelines, and obstructions and clear the seafloor of all obstructions created by activities on the leased area and project easement(s) within two years following lease termination, whether by expiration, cancellation, contraction, or relinquishment, in accordance with any approved SAP, COP, or approved decommissioning application, and applicable regulations in 30 CFR Parts 285, 585, and 586.

## Section 14: Safety Requirements.

The Lessee must:

   a.  maintain all places of employment for activities authorized under this lease in compliance with occupational safety and health standards and, in addition, free from recognized hazards to employees of the Lessee or of any contractor or subcontractor operating under this lease;

   b.  maintain all operations within the leased area and project easement(s) in compliance with regulations in 30 CFR Part 285 and 30 CFR Part 585 and orders from the Lessor and other Federal agencies with jurisdiction, intended to protect persons, property and the environment on the OCS; and

   c.  provide any requested documents and records, which are pertinent to occupational or public health, safety, or environmental protection, and allow prompt access, at the site of any operation or activity conducted under this lease, to any inspector authorized by the Lessor or other Federal agency with jurisdiction.

**Section 15:  Debarment Compliance.**

The Lessee must comply with the Department of the Interior's non-procurement debarment and suspension regulations set forth in 2 CFR Parts 180 and 1400 and must communicate the requirement to comply with these regulations to persons with whom it does business related to this lease by including this requirement in all relevant contracts and transactions.

**Section 16:  Equal Opportunity Clause.**

During the performance of this lease, the Lessee must fully comply with paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended (reprinted in 41 CFR 60-1.4(a)), and the implementing regulations, which are for the purpose of preventing employment discrimination against persons on the basis of race, color, religion, sex, or national origin.  Paragraphs (1) through (7) of Section 202 of Executive Order 11246, as amended, are incorporated in this lease by reference.

**Section 17:  Certification of Nonsegregated Facilities.**

By entering into this lease, the Lessee certifies, as specified in 41 CFR 60-1.8, that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained.  As used in this certification, the term "facilities" means, but is not limited to, any waiting rooms, work areas, restrooms and washrooms, restaurants and other eating areas, timeclocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees.  Segregated facilities include those that are segregated by explicit directive or those that are in fact segregated on the basis of race, color, religion, sex, or national origin, because of habit, local custom, or otherwise; provided, that separate or single-user restrooms and necessary dressing or sleeping areas must be provided to assure privacy as appropriate.  The Lessee further agrees that it will obtain identical certifications from proposed contractors and subcontractors prior to awarding contracts or subcontracts unless they are exempt under 41CFR 60-1.5.

**Section 18:  Notices.**

All notices or reports provided from one party to the other under the terms of this lease must be in writing, except as provided herein and in the applicable regulations in 30 CFR Part 585.  Written notices and reports must be delivered to the Lessee's or Lessor's Lease Representative, as specifically listed in Addendum "A," either electronically, by hand, by facsimile, or by United States first class mail, adequate postage prepaid.  Each party must, as soon as practicable, notify the other of a change to their Lessee's or Lessor's Contact Information in Addendum "A" by a written notice signed by a duly authorized signatory and delivered by hand or United States first class mail, adequate postage prepaid.  Until such notice is delivered as provided in this section, the last recorded contact information for either party will be deemed current for service of all notices and reports

required under this lease. For all operational matters, notices and reports must be provided to the party's Operations Representative, as specifically listed in Addendum "A," as well as the Lease Representative.

**Section 19: Severability Clause.**

If any provision of this lease is held unenforceable, all remaining provisions of this lease will remain in full force and effect.

**Section 20: Modification.**

Unless otherwise authorized by the applicable regulations in 30 CFR Part 585, this lease may be modified or amended only by mutual agreement of the Lessor and the Lessee. No such modification or amendment will be binding unless it is in writing and signed by duly authorized signatories of the Lessor and the Lessee.

**Section 21: Variance.**

The Lessee may submit a written request via email to the BOEM Office of Renewable Energy Programs Chief and/or the Bureau of Safety and Environmental Enforcement (BSEE) via TIMSWeb (https://timsweb.bsee.gov/), requesting a variance from the requirements of this lease. The request must explain why compliance with a particular requirement is not technically and/or economically practicable or feasible and any alternative actions the Lessee proposes to take. To the extent not otherwise prohibited by law and after consideration of all relevant facts and applicable legal requirements, BOEM and/or BSEE may grant the request for a variance if the appropriate Bureau(s) determine that the variance: (1) would not result in a change in the project impact levels described in the Environmental Assessment EA and the Finding of No Significant Impact issued for this lease; (2) would not alter obligations or commitments resulting from consultations performed by BOEM and BSEE under federal law in connection with this lease in a manner that would require BOEM to re-initiate or perform additional consultations (e.g., Endangered Species Act (ESA), Coastal Zone Management Act, National Historic Preservation Act (NHPA)); and (3) would not alter BOEM's determination that the activities associated with the project would be conducted in accordance with Section 8(p)(4) of the Outer Continental Shelf Lands Act (OCSLA). After making a determination regarding a request for a variance, BOEM and/or BSEE will notify the Lessee in writing whether the appropriate Bureau(s) will approve the proposed variance from the lease requirement(s) identified above. Approvals of variance requests will be made publicly available.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**ADDENDUM "A"**

DESCRIPTION OF LEASED AREA AND LEASE ACTIVITIES

Lease Number OCS-A 0512

I.    <u>Lessor and Lessee Contact Information</u>

Lessee Company Number:  _____15200_____

(a)  Lessor's Contact Information

|  | **Lease Representative** | **Operations Representative** |
|---|---|---|
| Title | Deputy Associate Director for Operations, Atlantic Outer Continental Shelf, Office of Renewable Energy Programs | |
| Address | U.S. Department of the Interior Bureau of Ocean Energy Management 45600 Woodland Road Mail Stop VAM-OREP Sterling, VA 20166 | |
| Phone | (703) 787-1300 | |
| Fax | (703) 787-1708 | |
| Email | renewableenergy@boem.gov | |

(b)  Lessee's Contact Information

|  | **Lease Representative** | **Operations Representative** |
|---|---|---|
| Name | David McSweeney | Sam Byrne |
| Title | Senior Counsel, Legal | V.P. Operations and Maintenance Management |
| Address | Equinor 53 State St, Suite 500 Boston, MA 02109 | Equinor 600 Washington Blvd., Suite 800 Stamford, CT 06901 |
| Phone | (781)987-4804 | (203) |
| Fax | | |
| Email | damc@equinor.com | |

II.     <u>Description of Leased Area</u>

The total acreage of the leased area is approximately 32,112 hectares (79,350 acres)

This area is subject to later adjustment, in accordance with applicable regulations (e.g., contraction, relinquishment).

**Lease OCS-A 0512**

The following Blocks or portions of Blocks lying within Official Protraction Diagram New York NK18-12 are depicted on the map below and comprise 32,112 hectares (79,350 acres), more or less.

<u>Official Protraction Diagram New York NK18-12</u>

1)     Block 6655 SE1/4 of SE1/4

2)     Block 6656, S1/2

3)     Block 6657, S1/2 of S1/2

4)     Block 6706, N1/2 of NE1/4, SE1/4 of NE1/4, NE1/4 of NW1/4

5)     Block 6707, N1/2, NE1/4 of SW1/4, N1/2 of SE1/4, SE1/4 of SE1/4

6)     Block 6708, All of Block

7)     Block 6709, S1/2 of N1/2, S1/2

8)     Block 6710, S1/2

9)     Block 6711, S1/2 of S1/2

10)    Block 6712, SW1/4 of SW1/4

11)    Block 6758, NE1/4, N1/2 of NW1/4

12)    Block 6759, N1/2, N1/2 of SW1/4, SE1/4

13)    Block 6760, All of Block

14)    Block 6761, All of Block

15)    Block 6762, All of Block

16)    Block 6763, NE1/4, NW1/4 of NW1/4, S1/2 of NW1/4, S1/2,

17)    Block 6764, S1/2 of NE1/4, NW1/4 of NW1/4, S1/2 of NW1/4, SW1/4, NW1/4 of SE1/4

18) Block 6810, NE1/4, N1/2 of NW1/4, NE1/4 of SE1/4

19) Block 6811, N1/2, N1/2 of SW1/4, SE1/4

20) Block 6812, All of Block

21) Block 6813, N1/2, SW1/4

22) Block 6814, NW1/4 of NW1/4

23) Block 6862, N1/2, NW1/4 of SE1/4

24) Block 6863, NW1/4 of NW1/4

For the purposes of these calculations, a full Block is 2,304 hectares.  The acreage of a hectare is 2.471043930.



Map of Lease OCS-A 0512

III.    <u>Renewable Energy Resource</u>

      Wind

IV.    <u>Description of the Lease Activities</u>

Generation of energy using wind turbine generators and associated offshore substation platforms, inner array cables, and subsea export cables. Site assessment activities consistent with 30 CFR § 585.600(a)(1).

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**ADDENDUM "B"**

LEASE PERIODS AND PAYMENTS

Lease Number OCS-A 0512

I.    <u>Lease Periods</u>

The duration of each period of the lease is described below.  The Lessor may  extend or otherwise modify the periods in accordance with applicable regulations in 30 CFR Part 585.

| Period | Duration |
|---|---|
| The Preliminary Period | begins on the effective date of the lease and ends either when a COP is received by the Lessor for review or at the expiration of six years, whichever occurs first. |
| The COP Review Period | begins when the Lessor receives a COP from the Lessee and ends upon COP approval, disapproval, or approval with conditions. |
| The Design and Construction Period | begins at COP approval and ends when the operations period begins. |
| The Operations Period | begins when the requirements of 30 CFR 285.637 are met and ends in 35 years or the duration included and approved as part of the Lessee's COP, whichever is lesser. |

Renewal:  The Lessee may request renewal for all lease periods for good cause,  in accordance with applicable regulations in 30 CFR Part 585. Good cause for extension of a Preliminary Period may include Lessee's inability to procure an offtake agreement after reasonable efforts, and good cause for extension of an Operations Period may include if a project's design and verification indicate a useful life longer than the leased Operations Period.

The Lessor, at its discretion, may approve a renewal request to conduct substantially similar activities as were originally authorized under this lease or in an approved plan.  The Lessor will not approve a renewal request that involves development of a type of renewable energy not originally authorized in the lease.  The Lessor may revise or adjust payment terms of the original lease as a condition of lease renewal.

II.    <u>Definitions</u>

"Available for Commercial Operations" means the date on which an individual wind turbine generator (WTG) is engaged in Commercial Operations on the lease. An individual WTG is

no longer available for Commercial Operations on the first day that it is permanently decommissioned.  These dates are determined by the COP, the Facility Design Report (FDR) or the Fabrication Installation Report (FIR).

"Commercial Operations" means the generation of electricity or other energy product for commercial use, sale, or distribution.

"Commercial Operation Date," or "COD," refers to the date on which the Lessee first begins Commercial Operations on the lease.

"Day(s)" means calendar day(s) unless otherwise specified.

"Delivery Point" is the meter identified in the COP where the Lessee's facility interconnects with the electric grid to deliver electricity for sale.

"Effective Date" has the same meaning as "effective date" in BOEM regulations provided in 30 CFR 585.237.

"End Date" refers to the earlier of a) the last calendar day of the last month of the Operations Period or b) the date on which the lease terminates for another reason under 30 CFR § 585.432.

"Lease Anniversary" refers to the anniversary of the Effective Date of the lease.

III.    <u>Lease Payments</u>

Unless otherwise authorized by the Lessor in accordance with the applicable regulations in 30 CFR Part 585, the Lessee must make payments as described below.

(a)    ***Rent.***  The Lessee must pay rent as described below:

Rent payments prior to the COD, or prior to the lease End Date in the event that the lease terminates prior to the COD, are calculated by multiplying the acres in the leased area times the rental rate per acre.  The acreage for the lease is documented in Addendum "A".  For example:

- Acres: 100,000
- Annual Rental Rate: $3.00 per acre or fraction thereof
- Rental Fee for Entire Leased Area: $3.00 x 100,000 = $300,000

The first year's rent payment of $238,050 is due within 45 days of the date that the lease is received by the Lessee for execution. Rent for the entire leased area for the next year and for each subsequent year is due on or before each Lease Anniversary through the year in which the COD occurs.  The rent for each year subsequent to the COD on the portion of the lease not authorized for Commercial Operations is due on or before each Lease Anniversary.

Rental payments account for lease acreage that will begin commercial operations during the upcoming lease year. Rent will only be due for the undeveloped or non-operating acreage. The rent calculation becomes a three-step process:

> (1) rent is calculated on the portion of the lease not authorized for commercial operations.

> (2) rent is calculated on the portion of the lease authorized for commercial operations but without operating turbines.

> (3) the sum of (1) and (2) yield the rent due.

**Step (1)**: The Lessee will continue to pay rent at the lease rate for acreage outside the approved commercial project area. The demarcation between acreage for a commercial project and undeveloped acreage will be defined in the COP or supplemental documents approved by BOEM. For example, if the total lease acreage is 100,000 acres and exactly one-quarter of the lease acreage is approved for commercial operations, 75,000 acres is not authorized for commercial operations.

- Acres: 75,000
- Annual Rental Rate: $3.00 per acre or fraction thereof
- Rental Fee for Undeveloped Leased Area: $3.00 x 75,000 = $225,000

**Step (2)**: The portion of the acreage covered by approved Commercial Operations subject to rent will be equal to one minus the operating nameplate capacity divided by the total nameplate capacity, $\frac{M_t}{\sum N_w}$, as defined in Section III (b) (4) below, prior to any adjustments as specified in the most recent approved COP for turbine maintenance, replacements, repowering, or decommissioning. If contiguous acreage for an approved project cannot be developed due to buffers or other surface occupancy restrictions, it will be considered part of the operating area of the lease and covered by the lease's operating fee payment.

- Acres: 25,000
- Annual Rental Rate: $3.00 per acre or fraction thereof
- Rental Fee for Undeveloped Acreage Authorized for Commercial Operations: $3.00 x 25,000 x $(1 - \frac{M_t}{\sum N_w})$ = $Rent

Using the summed capacity of 14.21 megawatts (MW) from the 30 MW project in Table 1 from Section III (b) (4) below, the rental calculation for the project area is: $3.00 x 25,000 x (1 - 0.473667) = $39,475

**Step (3)**: Summing the rent due in steps (1) & (2): $225,000 + $39,475 = $264,475.

- The Adjusted Annual Rent Payment will be rounded up to the nearest dollar.

All rent payments must be made as required in 30 CFR 1218.51. Late rent payments will be charged underpayment interest in accordance with 30 CFR 1218.54.

All rent payments, including the last rent payment, are payable for the full year.

During the construction and decommissioning periods, the rental paid can be adjusted following a reconciliation process. The adjustment of rent for the commercial project area will be calculated based on actual construction and decommissioning dates and will equal the fractional remainder of the operating nameplate capacity as calculated for $M_t$ in (b)(4) below. The Lessee should work with BOEM's Office of Renewable Energy Programs and the Office of Natural Resources Revenue (ONRR) on any payment reconciliation as instructed in Section III (c).

(1) ***Project Easement.***

Rent for any project easement(s) is described in Addendum "D."

(2) ***Relinquishment.***

If the Lessee submits an application for relinquishment of a portion of the leased area within the first 45 calendar days following the date that the lease is received by the Lessee for execution, and the Lessor approves that application, no rent payment will be due on that relinquished portion of the leased area. Later relinquishments of any leased area will reduce the Lessee's rent payments due the year following the Lessor's approval of the relinquishment, through a reduction in the acres in the leased area, the corresponding rent payment for the entire leased area, and any related adjusted annual rent payments.

(b)    ***Operating Fee.*** The Lessee must pay an operating fee as described below:

(1) **Initial Operating Fee Payment.**

The Lessee must pay an initial prorated operating fee within 90 days after the COD. The initial operating fee payment covers the first year of Commercial Operations on the lease and will be calculated in accordance with subsection (4), below, using an operating fee rate of 0.02 and a capacity factor of 0.4.

(2) **Annual Operating Fee Payments.**

The Lessee must pay the operating fee for each subsequent year of Commercial Operations on or before each Lease Anniversary following the formula in subsection (4). The Lessee must calculate each operating fee annually subsequent to the initial operating fee payment using an operating fee rate of 0.02 through the operations period of the lease. The capacity factor of 0.4 will remain in effect until the Lease Anniversary of the year in which the Lessor adjusts the capacity factor.

(3) **Final Operating Fee Payment.**

The final operating fee payment is due on the Lease Anniversary prior to the End Date. The final operating fee payment covers the last year of Commercial Operations on the lease and will be calculated in accordance with the formula in subsection (4) below.

(4) **Formula for Calculating the Operating Fee in Year *t*.**

| $F_t$ | = | $M_t$ | * | H | * | $c_p$ | * | $P_t$ | * | $r_t$ |
|---|---|---|---|---|---|---|---|---|---|---|
| (annual operating fee) | | (nameplate capacity) | | (hours per year) | | (capacity factor) | | (power price) | | (operating fee rate) |

Where:

| | |
|---|---|
| $t$ = | the year of Commercial Operations on the lease starting from each Lease Anniversary, where $t$ equals 1 represents the year beginning on the Lease Anniversary prior to, or on, the COD. |
| $F_t$ = | the dollar amount of the annual operating fee in year $t$. |
| $M_t$ = | the nameplate capacity expressed in megawatts (MW) rounded to the nearest second decimal place in year $t$ of Commercial Operations on the lease. The capacity calculation is a two-step process: (1) scaling each turbine's nameplate capacity in proportion to the number of days in the year that it is operational and (2) summing these scaled values across all turbines.<br><br>The value of $M_t$, reflecting the availability of turbines, will be determined based on the FDR or FIR. This value will be adjusted to reflect any changes to installed capacity approved by BOEM as of the date each operating fee payment is due, in accordance with the calculation in Equation 1, for each year of Commercial Operations on the lease.<br><br>$$\text{(1)} \quad M_t = \sum_{w=1}^{W_t} \left( N_w \ x \left[ \frac{Y_{w,t}}{D} \right] \right)$$<br><br>Where:<br><br>$W_t$ = Number of individual wind generation turbines, $w$, that will be available for Commercial Operations during any day of the year, $t$, per the FDR or FIR.<br><br>$N_w$ = Nameplate capacity of individual wind generation turbine, $w$, per the FDR or FIR expressed in MW.<br><br>$Y_{w,t}$  = Number of days that turbine $w$ is commercially available during year.<br><br>$D$ = Days in the year set equal to 365 in all years for purposes of this calculation.<br><br>$M_t$ may be reduced only in the event that installed capacity is permanently decommissioned. $M_t$ will not be changed in response to routine or unplanned maintenance of units, including the temporary removal of a nacelle for off-site repair or replacement with a similar unit.<br><br>EXAMPLE: Table 1 illustrates the calculations represented by Equation (1) for a single lease year for a lease on which the Lessee plans to erect six turbines, each with a nameplate capacity of 5 MW. Based on the days in each turbine's Commercial Operations period (column B), the exhibit shows the number of days during the year that the turbine is available for Commercial Operations. Dividing this value by 365 (column D) yields the percent of days during the year that the turbine is available for Commercial Operations (column E). For each turbine, the resulting percentage (column E) is multiplied by its nameplate capacity (column A) to calculate its scaled capacity for the year (column F). The individual values |

in column F are then summed across all six turbines to calculate total capacity (Mt).

**Table 1:  Example of $M_t$ Calculations for Installation**

| Turbine | Nameplate Capacity ($N_w$) [A] | Days in Turbine's Commercial Operations Period [B] | Number of days available for Commercial Operations in year t ($Y_{w,t}$) [C] | Number of days in the Year [D] | Percent of days available for Commercial Operations $\left(\frac{Y_{w,t}}{D}\right)$ [E = C ÷ D] | Turbine capacity scaled based on percent of days in Commercial Operations $N_w \times \frac{Y_{w,t}}{D}$ [F = A × E] |
|---|---|---|---|---|---|---|
| #1 | 5 | January 1 to December 31 | 365 | 365 | 100% | 5.00 |
| #2 | 5 | January 1 to December 31 | 365 | 365 | 100% | 5.00 |
| #3 | 5 | October 1 to December 31 | 92 | 365 | 25.2% | 1.26 |
| #4 | 5 | October 1 to December 31 | 92 | 365 | 25.2% | 1.26 |
| #5 | 5 | October 1 to December 31 | 92 | 365 | 25.2% | 1.26 |
| #6 | 5 | December 1 to December 31 | 31 | 365 | 8.5% | 0.42 |
| Available capacity summed across all turbines: $M_t = \sum_{w=1}^{W_t}\left(N_w \times \left[\frac{Y_{w,t}}{D}\right]\right) = 14.21$ | | | | | | |

The same calculation would be performed for the lease during the decommissioning phase.

| H = | the number of hours in the year for billing purposes which is equal to 8,760 for all years of Commercial Operations on the lease. |
|---|---|
| $c_p$ = | the "Capacity Factor" in Performance Period p, which represents the share of anticipated generation of the facility that is delivered to where the Lessee's facility interconnects with the electric grid (i.e. the Delivery Point) relative to its generation at continuous full power operation at the nameplate capacity, expressed as a decimal between zero and one. Performance Period *(p)* is the period of Commercial Operation Years (*t*) during which each year has the same capacity factor.<br><br>The initial Capacity Factor ($c_0$) will be set to 0.4.<br><br>The Capacity Factor will be subject to adjustment at the end of each Performance Period. After the sixth year of Commercial Operations on the lease has concluded, the Lessee will utilize data gathered from years two through six of Commercial Operations on the lease and propose a revised Capacity Factor to be used to calculate subsequent annual payments, as provided for in Table 2 below.  A similar process will be conducted at the conclusion of each five-year Performance Period, thereafter. |

| Performance Period ($p$) | Commercial Operation Years ($t$) | Payments Affected by Adjustment | Capacity Factor ($c$) | |
|---|---|---|---|---|
| 0 (COD) | Not Applicable | Payments 1 to 7 | $c_0=0.4$ | -- |
| 1 | $t = 2$ to 6 | Payments 8 to 12 | $c_1$ | $n_1=6$ |
| 2 | $t = 7$ to 11 | Payments 13 to 17 | $c_2$ | $n_2=11$ |
| 3 | $t = 12$ to 16 | Payments 18 to 22 | $c_3$ | $n_3=16$ |
| 4 | $t = 17$ to 21 | Payments 23 to 27 | $c_4$ | $n_4=21$ |
| 5 | $t = 22$ to 26 | Payments 28 to 32 | $c_5$ | $n_5=26$ |
| 6 | $t = 27$ to 31 | Payments 33 through 37 (as applicable) | $c_6$ | $n_6=31$ |

**Table 2:  Definition of Performance Periods[1]**

**Adjustments to the Capacity Factor**

The Actual 5-year Average Capacity Factor ($Xp$) is calculated for each Performance Period after COD ($p > 0$) per Equation 2 below.  $Xp$ represents the sum of actual, metered electricity generation in megawatt-hours (MWh) at the Delivery Point to the electric grid ($A_t$) divided by the amount of electricity generation in MWh that would have been produced if the facility operated continuously at its full, stated capacity ($M_t$) in all of the hours ($h_t$) in each year, $t$, of the corresponding five-year period.

$$(2) \quad X_p = \frac{\sum_{t=n-4}^{n} A_t}{\left(\sum_{t=n-4}^{n} M_t \; x \; h_t\right)}$$

Where:

$M_t$ = Nameplate Capacity as defined above.

$n$ = "Date End Year" value for the Performance Period, $p$, as defined in Table 2.

$p$ = Performance Period as defined in Table 2.

$A_t$ = Actual generation in MWh associated with each year of Commercial Operations, $t$, on the lease that is transferred at the Delivery Point; Delivery Point meter data supporting the values submitted for annual actual generation must be recorded, preserved, and timely provided to the Lessor upon request.  The generation data for the facility must be the same data reported on the Energy Information Administration's EIA-923.

$h_t$ = Hours in the year on which the Actual Generation associated with each year of Commercial Operations, $t$, on the lease is based; this definition of "hours in the year" differs from the definition of H in the operating fee equation above.  The hours in the year for purposes of calculating the capacity factor must take into account the actual number of hours, including those in leap years.

The value of the Capacity Factor at the outset of Commercial Operations ($p = 0$) is set to 0.4 as stated in equation 3:

---

[1] The Lessor acknowledges that there is a potential scenario where the design and construction period under 585.235(a)(3) may significantly overlap commercial operations as defined in Section II of this Addendum "B". In the event that the payment schedule appears likely to extend beyond 37 payments, the Lessor will provide an updated payment schedule to the Lessee.

| | |
|---|---|
| | **(3)** $c_0 = 0.4$ |
| $P_t =$ | a measure of the annual average wholesale electric power price expressed in dollars per MW hour.<br><br>The Lessee must calculate Pt at the time each operating fee payment is due, subject to approval by the Lessor.  The Price ($P_t$) must equal the simple average of the "on-the-hour" spot price indices for the NYISO NYC-J power market (NYC Zone J) for the most recent calendar year of data available.  Aggregated data from commercial subscription services such as S&P Global Market Intelligence Platform or Hitachi ABB Velocity Suite can also be used and may be posted by BOEM for reference.<br><br>The source of data used in the calculations must be noted in the Lessee's documentation supporting its estimate of the value of Pt each year for review and approval by the Lessor. BOEM will use the posted prices to verify the Lessee's calculations. |
| $r_t =$ | the operating fee rate of 0.02 (2%). |

**(c)    Reporting, Validation, Audits, and Late Payments.**

The Lessee must submit the values used in the operating fee formula to the Lessor at the time the annual payment based on these values is made.  Submission of this and other reporting, validation, audit and late payment information as requested by the Lessor must be sent to the Lessor using the contact information indicated in Addendum "A", unless the Lessor directs otherwise.  Failure to submit the estimated values and the associated documentation on time to the Lessor may result in penalties as specified in applicable regulations.

Within 60 days of the submission by the Lessee of the annual payment, the Lessor will review the data submitted and validate that the operating fee formula was applied correctly.  If the Lessor validation results in a different operating fee amount, the amount of the annual operating fee payment will be revised to the amount determined by the Lessor.

The Lessor also reserves the right to audit the meter data upon which the Actual 5-year Average Capacity Factor is based at any time during the lease term.  If, as a result of such audit, the Lessor determines that any annual operating fee payment was calculated incorrectly, the Lessor has the right to correct any errors and collect the correct annual operating fee payment amount.

If the annual operating fee is revised downward as a result of the Lessee's calculations, as validated by the Lessor, or an audit of meter data conducted by the Lessee or Lessor, the Lessee will be refunded the difference between the amount of the payment received and the amount of the revised annual operating fee, without interest.  Similarly, if the payment amount is revised upward, the Lessee is required to pay the difference between the amount of the payment received and the amount of the revised annual operating fee, plus underpayment interest on the balance, in accordance with 30 CFR § 1218.54.

Late operating fee payments will be charged underpayment interest in accordance with 30 CFR § 1218.54

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**ADDENDUM "C"**

LEASE-SPECIFIC TERMS, CONDITIONS, AND STIPULATIONS

Lease Number OCS-A 0512

The Lessee's rights to conduct activities on the leased area are subject to the following terms, conditions, and stipulations. The Lessor reserves the right to impose additional terms and conditions incident to the future approval or approval with modifications of plans, such as a Site Assessment Plan (SAP) or Construction and Operations Plan (COP).

1   DEFINITIONS ........................................................................................................ 2

2   SCHEDULE............................................................................................................ 3

3   NATIONAL SECURITY AND MILITARY OPERATIONS ...................................... 4

    3.1   Hold and Save Harmless ............................................................................. 4

    3.2   Evacuation or Suspension of Activities ...................................................... 5

    3.3   Electromagnetic Emissions ......................................................................... 6

4   STANDARD OPERATING CONDITIONS .............................................................. 6

    4.1   General Requirements ................................................................................. 6

    4.2   Vessel Strike Avoidance Measures............................................................. 7

    4.3   Archaeological Survey Requirements.......................................................... 9

    4.4   Geological and Geophysical (G&G) Survey Requirements...................... 11

    4.5   Protected-Species Reporting Requirements............................................. 16

    4.6   Avian and Bat Survey and Reporting Requirements ................................ 18

# 1   DEFINITIONS

1.1   Definition of "Archaeological Resource":  The term "archaeological resource" has the same meaning as "archaeological resource" in BOEM regulations provided in 30 CFR 585.113.

1.2   Definition of "Dynamic Management Area (DMA)":  The term "DMA" refers to a temporary area designated by the National Oceanic and Atmospheric Administration (NOAA) National Marine Fisheries Service (NMFS) and a circle around a confirmed North Atlantic right whale sighting.  The radius of this circle expands incrementally with the number of whales sighted, and a buffer is included beyond the core area, as designated by NMFS, to allow for whale movement.  NOAA NMFS may apply mandatory or voluntary speed restrictions.  Information regarding the location and status of applicable DMAs is available from the NMFS Office of Protected Resources.

1.3   Definition of "Effective Date":  The term "Effective Date" has the same meaning as "effective date" in BOEM regulations provided in 30 CFR 585.237.

1.4   Definition of "Geological and Geophysical Survey (G&G Survey)":  The term "G&G Survey" serves as a collective term for surveys that collect data on the geology of the seafloor and landforms below the seafloor.  High resolution geophysical surveys and geotechnical (sub-bottom) exploration are components of G&G surveys.

1.5   Definition of "Geotechnical Exploration":  The term "Geotechnical Exploration" is used to refer to the process by which site-specific sediment and underlying geologic data are acquired from the seafloor and the sub-bottom and includes geotechnical surveys utilizing borings, vibracores, and cone penetration tests.

1.6   Definition of "High Resolution Geophysical Survey (HRG Survey)":  The term "HRG Survey" means a marine remote-sensing survey using, but not limited to, such equipment as side-scan sonar, magnetometer, shallow and medium (seismic) penetration sub-bottom profiler systems, narrow beam or multibeam echo sounder, or other such equipment employed for the purposes of providing data on geological conditions, identifying shallow hazards, identifying archaeological resources, charting bathymetry, and gathering other site characterization information.

1.7   Definition of "Listed Species":  The term "listed species," also referred to in adjective form as "listed," means any species of fish, wildlife, or plant that has been determined to be endangered or threatened under Section 4 of the Endangered Species Act.  Listed species are provided in 50 CFR 17.11-17.12.

1.8   Definition of "Plan":  The term "plan" means a Site Assessment Plan (SAP) and/or a Construction and Operations Plan (COP).

1.9   Definition of "Protected-Species Observer":  The term "protected-species observer" or "PSO" means an individual who is trained in the shipboard identification and behavior of protected species.  Protected species include marine mammals (those protected under the Endangered Species Act and those protected under the Marine Mammal Protection Act) and sea turtles.

1.10  Definition of "Ramp-up":  The term "ramp-up" means the process of incrementally increasing the acoustic source level of the survey equipment when conducting HRG surveys until it reaches the operational setting.

1.11  Definition of "Site Assessment Activities":  The term "site assessment activities" or "site assessment," has the same meaning as "site assessment activities" in 30 CFR 585.113.

1.12  Definition of "Qualified Marine Archaeologist":  The term "qualified marine archaeologist" means a person retained by the Lessee who meets the Secretary of the Interior's Professional Qualifications Standards for Archaeology (48 FR 44738-44739), and has experience analyzing marine geophysical data.

1.13  Definition of "Take":  The terms "Takes," "Taken," and "Taking" have the same meaning as the term "take" as defined in 16 U.S.C. § 1532(19).


# 2   SCHEDULE

## 2.1   Site Characterization

2.1.1  <u>Survey Plan(s)</u>.  Prior to conducting survey activities in support of the submission of a plan, the Lessee must submit to the Lessor at least one complete survey plan.  Each distinct survey effort (e.g., mobilization) must be addressed by a survey plan, although a single survey plan may cover more than one effort.  Each survey plan must include details and timelines of the survey activities to be conducted on this lease necessary to support the submission of a plan (i.e., necessary to satisfy the information requirements in the applicable regulations, including but not limited to 30 CFR 585.606, 610, 611, 621, 626, 627).  Each survey plan must include a description of historic property identification surveys that will be conducted to gather the information required by BOEM to complete review of a plan under the National Historic Preservation Act (e.g., offshore and onshore archaeological surveys and surveys within the viewshed of proposed renewable energy structures).  Each survey plan must be consistent with the Lessee's Fisheries Communication Plan (see 4.1.5) and include a description of the Lessee's intentions to coordinate with the U.S. Coast Guard to prepare a Notice to Mariners for the specific survey activities described in the survey plan.

The Lessee must submit each survey plan to the Lessor at least 30 calendar days prior to the date of the required pre-survey meeting with the Lessor (See 2.1.2). Prior to the commencement of any survey activities described in the survey plan, the Lessee must modify each survey plan to address any comments the Lessor submits to the Lessee on the contents of the survey plan in a manner deemed satisfactory by the Lessor.

2.1.2  <u>Pre-Survey Meeting(s) with the Lessor</u>.  At least 60 days prior to the initiation of survey activities in support of the submission of a plan, the Lessee must hold a pre-survey meeting with the Lessor to discuss the applicable proposed survey plan and timelines.  The Lessee must ensure the presence at this meeting of a Qualified Marine Archaeologist  and/or other relevant subject matter experts (e.g., terrestrial archaeologists, architectural historians) related to the proposed historic property identification surveys described in the survey plan.  The Lessor may request the presence of other relevant subject matter experts at this meeting.

## 2.2  Progress Reporting

2.2.1  <u>Semi-Annual Progress Report</u>.  The Lessee must submit to the Lessor a semi-annual (i.e., every six months) progress report through the duration of the site assessment term that includes a brief narrative of the overall progress since the last progress report, or – in the case of the first report – since the Effective Date.  The progress report must include an update regarding progress in executing the activities included in the survey plan(s), and include as an enclosure an updated survey plan(s) accounting for any modifications in schedule.

# 3  NATIONAL SECURITY AND MILITARY OPERATIONS

The Lessee must comply with the requirements specified in stipulations 3.1, 3.2, and 3.3 when conducting site characterization activities in support of plan submittal.

## 3.1  Hold and Save Harmless

The Lessee assumes all risks of damage or injury to persons or property that occurs in, on, or above the OCS, to any persons or to any property of any person or persons in connection with any activities being performed by the Lessee in, on, or above the OCS, if such injury or damage to such person or property occurs by reason of the activities of any agency of the United States Government, its contractors, or subcontractors, or any of its officers, agents or employees, being conducted as a part of, or in connection with, the programs or activities of the individual military command headquarters (hereinafter "the appropriate command headquarters") listed in the contact information provided as an Enclosure to this lease, whether compensation for such damage or injury might be due under a theory of strict or absolute liability or otherwise.
Notwithstanding any limitation of the Lessee's liability in Section 9 of the lease, the Lessee assumes this risk whether such injury or damage is caused in whole or in part by any act or omission, regardless of negligence or fault, of the United States, its contractors or

subcontractors, or any of its officers, agents, or employees.  The Lessee further agrees to indemnify and save harmless the United States against all claims for loss, damage, or injury in connection with the programs or activities of the command headquarters, whether the same be caused in whole or in part by the negligence or fault of the United States, its contractors, or subcontractors, or any of its officers, agents, or employees and whether such claims might be sustained under a theory of strict or absolute liability or otherwise.

## 3.2    Evacuation or Suspension of Activities

3.2.1    <u>General</u>.  The Lessee hereby recognizes and agrees that the United States reserves and has the right to temporarily suspend operations and/or require evacuation on this lease in the interest of national security pursuant to Section 3(c) of this lease.

3.2.2    <u>Notification</u>.  Every effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations and/or evacuate.  Advance notice will normally be given before requiring a suspension or evacuation.  Temporary suspension of operations may include but is not limited to the evacuation of personnel and appropriate sheltering of personnel not evacuated.

"Appropriate sheltering" means the protection of all Lessee personnel for the entire duration of any Department of Defense activity from flying or falling objects or substances, and will be implemented by an order (oral and/or written) from the BOEM Office of Renewable Energy Programs (OREP) Program Manager, after consultation with the appropriate command headquarters or other appropriate military agency or higher Federal authority.  The appropriate command headquarters, military agency or higher authority will provide information to allow the Lessee to assess the degree of risk to, and provide sufficient protection for, the Lessee's personnel and property.

3.2.3  <u>Duration</u>.  Suspensions or evacuations for national security reasons will not generally exceed 72 hours; however, any such suspension may be extended by order of the OREP Program Manager.  During such periods, equipment may remain in place, but all operations, if any, must cease for the duration of the temporary suspension if so directed by the OREP Program Manager.  Upon cessation of any temporary suspension, the OREP Program Manager will immediately notify the Lessee that such suspension has terminated and operations on the leased area can resume.

3.2.4  <u>Lessee Point-of-Contact for Evacuation/Suspension Notifications</u>.  The Lessee must inform the Lessor of the persons/offices to be notified to implement the terms of 3.2.2 and 3.2.3.

3.2.5  <u>Coordination with Command Headquarters</u>.  The Lessee must establish and maintain early contact and coordination with the appropriate command headquarters (see Contact Information for Reporting Requirements Enclosure), in order to avoid or minimize the potential to conflict with and minimize the potential effects of conflicts with military operations.

3.2.6  <u>Reimbursement</u>.  The Lessee is not entitled to reimbursement for any costs or expenses associated with the suspension of operations or activities or the evacuation of property or personnel in fulfillment of the military mission in accordance with 3.2.1 through 3.2.5 above.

## 3.3  Electromagnetic Emissions

Prior to entry into any designated defense operating area, warning area, or water test area for the purpose of commencing survey activities undertaken to support plan submittal, the Lessee must enter into an agreement with the commander of the appropriate command headquarters to coordinate the electromagnetic emissions associated with such survey activities.  The Lessee must ensure that all electromagnetic emissions associated with such survey activities are controlled as directed by the commander of the appropriate command headquarters.

# 4  STANDARD OPERATING CONDITIONS

## 4.1  General Requirements

4.1.1  Prior to the start of operations, the Lessee must hold a briefing to establish responsibilities of each involved party, define the chains of command, discuss communication procedures, provide an overview of monitoring procedures, and review operational procedures. This briefing must include all relevant personnel, crew members and PSOs.  New personnel must be briefed as they join the work in progress.

4.1.2    The Lessee must ensure that all vessel operators and crew members, including PSOs, are familiar with, and understand, the requirements specified in ADDENDUM "C".

4.1.3    The Lessee must ensure that a copy of ADDENDUM "C" is made available on every project-related vessel.

4.1.4    <u>Marine Trash and Debris Prevention</u>.  The Lessee must ensure that vessel operators, employees, and contractors actively engaged in activities in support of plan (i.e., SAP and COP) submittal are briefed on marine trash and debris awareness and elimination, as described in the Bureau of Safety and Environmental Enforcement (BSEE) Notice to Lessees and Operators (NTL) No. 2015-G03 ("Marine Trash and Debris Awareness and Elimination") or any NTL that supersedes this NTL, except that the Lessor will not require the Lessee, vessel operators, employees, and contractors to undergo formal training or post placards.  The Lessee must ensure that these vessel operator employees and contractors are made aware of the environmental and socioeconomic impacts associated with marine trash and debris and their responsibilities for ensuring that trash and debris are not intentionally or accidentally discharged into the marine environment.  The above-referenced NTL provides information the Lessee may use for this awareness briefing.

4.1.5    <u>Fisheries Communications Plan (FCP) and Fisheries Liaison</u>.  The Lessee must develop a publicly available FCP that describes the strategies that the Lessee intends to use for communicating with fisheries stakeholders prior to and during activities in support of the submission of a plan.  The FCP must include the contact information for an individual retained by the Lessee as its primary point of contact with fisheries stakeholders (i.e., Fisheries Liaison).  If the Lessee develops a project website, the FCP must be posted on the Lessee's project website.  If the Lessee does not develop a project website, the FCP must be made available to the Lessor and the public upon request.

## 4.2    Vessel Strike Avoidance Measures

4.2.1    The Lessee must ensure that all vessels conducting activities in support of plan submittal, including those transiting to and from local ports and the lease area, comply with the vessel-strike avoidance measures specified in Section 4.2, except under extraordinary circumstances when complying with these requirements would put the safety of the vessel or crew at risk.

4.2.2    The Lessee must ensure that vessel operators and crews maintain a vigilant watch for cetaceans, pinnipeds, and sea turtles and slow down or stop their vessel to avoid striking protected species.

4.2.3    The Lessee must ensure that all vessel operators comply with 10 knot (18.5 km/hr) speed restrictions in any DMA.

4.2.4    The Lessee must ensure that vessels 19.8 meters (65 ft) in length or greater, operating from November 1 through April 30, operate at speeds of 10 knots (18.5 km/hr) or less.

4.2.5    The Lessee must ensure that all vessel operators reduce vessel speed to 10 knots or less when mother/calf pairs, pods, or large assemblages of non-delphinoid cetaceans are observed near an underway vessel.

4.2.6    North Atlantic right whales.

4.2.6.1    The Lessee must ensure all vessels maintain a separation distance of 500 meters (1,640 ft) or greater from any sighted North Atlantic right whale.

4.2.6.2    The Lessee must ensure that the following avoidance measures are taken if a vessel comes within 500 meters (1,640 ft) of any North Atlantic right whale:

4.2.6.2.1    If underway, vessels must steer a course away from any sighted North Atlantic right whale at 10 knots (18.5 km/h) or less until the 500-meter (1,640 ft) minimum separation distance has been established (except as provided in 4.2.6.2.2).

4.2.6.2.2    If a North Atlantic right whale is sighted within 100 meters (328 ft) of an underway vessel, the vessel operator must immediately reduce speed and promptly shift the engine to neutral.  The vessel operator must not engage engines until the North Atlantic right whale has moved outside the vessel's path and beyond 100 meters (328 ft), at which point the vessel operator must comply with 4.2.6.2.1.

4.2.6.2.3    If a vessel is stationary, the vessel must not engage engines until the North Atlantic right whale has moved beyond 100 meters (328 ft), at which point the Lessee must comply with 4.2.6.2.1.

4.2.7    Non-delphinoid cetaceans other than the North Atlantic right whale.

4.2.7.1    The Lessee must ensure all vessels maintain a separation distance of 100 meters (328 ft) or greater from any sighted non-delphinoid cetacean.

4.2.7.2    The Lessee must ensure that the following avoidance measures are taken if a vessel comes within 100 meters (328 ft) of any sighted non-delphinoid cetacean:

4.2.7.2.1    If any non-delphinoid cetacean is sighted, the vessel underway must reduce speed and shift the engine to neutral, and must not engage the engines until the non-delphinoid cetacean has moved beyond 100 meters (328 ft).

4.2.7.2.2    If a vessel is stationary, the vessel must not engage engines until the sighted non-delphinoid cetacean has moved beyond 100 meters (328 ft).

4.2.8   Delphinoid cetaceans and Pinnipeds.

4.2.8.1   The Lessee must ensure that all vessels underway do not divert to approach any delphinoid cetacean and/or pinniped.

4.2.8.2   The Lessee must ensure that if a delphinoid cetacean and/or pinniped approaches any vessel underway, the vessel underway must avoid excessive speed or abrupt changes in direction to avoid injury to the delphinoid cetacean and/or pinniped.

4.2.9   Sea Turtles.

4.2.9.1   The Lessee must ensure all vessels maintain a separation distance of 50 meters (164 ft) or greater from any sighted sea turtle.

## 4.3   Archaeological Survey Requirements

4.3.1   Archaeological Survey Required.  The Lessee must provide the results of an archaeological survey with its plans.

4.3.2   Qualified Marine Archaeologist.  The Lessee must ensure that the analysis of archaeological survey data collected in support of plan submittal and the preparation of archaeological reports in support of plan submittal are conducted by a Qualified Marine Archaeologist.

4.3.3   Tribal Pre-Survey Meeting.   The Lessee must invite by certified mail the Shinnecock Indian Nation to a tribal pre-survey meeting.  The purpose of this meeting will be for the Lessee and the Lessee's Qualified Marine Archaeologist to discuss the Lessee's survey plan and consider requests to monitor portions of the archaeological survey and the geotechnical exploration activities, including the visual logging and analysis of geotechnical samples (e.g., cores).  This meeting must be held subsequent to the pre-survey meeting with the Lessor (see 2.1.2).  Invitation to the tribal pre-survey meeting must be made at least 15 calendar days prior to the date of the proposed tribal pre-survey meeting.  The meeting must be scheduled for a date at least 30 calendar days prior to the commencement of survey activities performed in support of plan submittal and at a location and time that affords the participants a reasonable opportunity to participate.  The anticipated date for the meeting must be identified in the timeline of activities described in the applicable survey plan (see 2.1.1).

4.3.4   Geotechnical Exploration.

4.3.4.1   The Lessee may only conduct geotechnical exploration activities in support of plan submittal in locations where an archaeological analysis of the results of geophysical surveys has been completed.  This analysis must include a determination by a Qualified Marine Archaeologist as to whether any potential archaeological resources are present in the area that could be impacted by bottom-disturbing activities.

4.3.4.2   Except as allowed by the Lessor under 4.3.6, the geotechnical exploration activities must avoid potential archaeological resources by a minimum of 50 meters, and the Qualified Marine Archaeologist must calculate the avoidance distance from the maximum discernible extent of the archaeological resource.

4.3.4.3   Upon completion of geotechnical exploration activities, a Qualified Marine Archaeologist must certify, in the Lessee's archaeological report(s) submitted with a plan, that such activities did not impact potential historic properties identified as a result of the HRG surveys performed in support of plan submittal, except as follows:  in the event that the geotechnical exploration activities did impact potential historic properties identified in the archaeological surveys without the Lessor's prior approval, the Lessee and the Qualified Marine Archaeologist who prepared the report must instead provide a statement documenting the extent of these impacts.

4.3.5   <u>Monitoring and Avoidance</u>.  The Lessee must inform the Qualified Marine Archaeologist that he or she is permitted to be present during HRG surveys and bottom-disturbing activities performed in support of plan submittal to ensure avoidance of potential archaeological resources, as determined by the Qualified Marine Archaeologist (including bathymetric, seismic, and magnetic anomalies; side scan sonar contacts; and other seafloor or sub-surface features that exhibit potential to represent or contain potential archaeological sites or other historic properties). In the event that the Qualified Marine Archaeologist indicates that he or she wishes to be present, the Lessee must facilitate the Qualified Marine Archaeologist's presence, as requested by the Qualified Marine Archaeologist, and provide the Qualified Marine Archaeologist the opportunity to inspect data quality.

4.3.6   <u>No Impact without Approval</u>.  The Lessee must not knowingly impact a potential archaeological resource without the Lessor's prior approval.

4.3.7   <u>Post-Review Discovery Clauses</u>.  If the Lessee, while conducting site characterization activities in support of plan submittal, discovers a potential archaeological resource, such as the presence of a shipwreck (e.g., a sonar image or visual confirmation of an iron, steel, or wooden hull, wooden timbers, anchors, concentrations of historic objects, piles of ballast rock) or pre-contact archaeological site (e.g., stone tools, pottery) within the project area, the Lessee must:

4.3.7.1   Immediately halt seafloor/bottom-disturbing activities within the area of discovery;

4.3.7.2   Notify the Lessor within 24 hours of discovery;

4.3.7.3   Notify the Lessor in writing via report to the Lessor within 72 hours of its discovery;

4.3.7.4   Keep the location of the discovery confidential and take no action that may adversely affect the archaeological resource until the Lessor conducts an evaluation and instructs the applicant on how to proceed; and

4.3.7.5   Conduct any additional investigations as directed by the Lessor to determine if the resource is eligible for listing in the National Register of Historic Places (30 CFR 585.802(b)).  The Lessor will direct the Lessee to conduct such investigations if: (1) the site has been impacted by the Lessee's project activities; or (2) impacts to the site or to the area of potential effect cannot be avoided.  If investigations indicate that the resource is potentially eligible for listing in the National Register of Historic Places, the Lessor will tell the Lessee how to protect the resource or how to mitigate adverse effects to the site.  If the Lessor incurs costs in protecting the resource, under Section 110(g) of the National Historic Preservation Act, the Lessor may charge the Lessee reasonable costs for carrying out preservation responsibilities under the OCS Lands Act (30 CFR 585.802(c-d)).

## 4.4   Geological and Geophysical (G&G) Survey Requirements

4.4.1   The Lessee must ensure that all vessels conducting activity in support of a plan (i.e., SAP and COP) submittal comply with the G&G survey requirements specified in 4.4, except under extraordinary circumstances when complying with these requirements would put the safety of the vessel or crew at risk.

4.4.2   <u>Visibility</u>.  The Lessee must not conduct G&G surveys in support of plan submittal at any time when lighting or weather conditions (e.g., darkness, rain, fog, sea state) prevent visual monitoring of the high-resolution geophysical (HRG) survey exclusion zone (see 4.4.6) or the geotechnical exploration exclusion zone (see 4.4.7), except as allowed under 4.4.3.

4.4.3   <u>Modification of Visibility Requirement</u>.  If the Lessee intends to conduct G&G survey operations in support of plan submittal at night or when visual observation is otherwise impaired, the Lessee must submit to the Lessor an alternative monitoring plan detailing the alternative monitoring methodology (e.g., active or passive acoustic monitoring technologies).  The alternative monitoring plan must demonstrate the effectiveness of the methodology proposed to the Lessor's satisfaction.  The Lessor may, after consultation with NMFS, decide to allow the Lessee to conduct G&G surveys in support of plan submittal at night or when visual observation is otherwise impaired using the proposed alternative monitoring methodology.

4.4.4    Protected-Species Observer.  The Lessee must ensure that the exclusion zone for all
G&G surveys performed in support of plan submittal is monitored by NMFS-approved
PSOs around the sound source.  The number of PSOs must be sufficient to effectively
monitor the exclusion zone at all times.  In order to ensure effective monitoring, PSOs
must be on watch for no more than 4 consecutive hours, with at least a 2-hour break
after a 4-hour watch, unless otherwise accepted by the Lessor.  PSOs must not work for
more than 12 hours in a 24-hour period. PSO reporting requirements are provided in
4.5. Prior to the scheduled start of the surveys performed in support of plan submittal,
the Lessee must provide to the Lessor a list of PSOs currently approved by NMFS for
G&G surveys.  For PSOs not currently approved by NMFS, the Lessee must provide to
the Lessor PSO résumés, no later than 45 calendar days prior to the scheduled start of
such surveys. If additional PSO approvals are required after this time, the Lessee must
provide the additional PSO résumés to the Lessor at least 15 calendar days prior to each
PSO's start date.  The Lessor will send the PSO résumés to NMFS for approval.

4.4.5    Observation Location and Optical Device Availability.  The Lessee must ensure that
monitoring occurs from the highest available vantage point on the associated
operational platform, allowing for 360-degree scanning.  The Lessee must ensure
that each PSO has access to reticle binoculars and other suitable equipment to
adequately perceive and monitor protected species within the exclusion zone during
surveys conducted in support of plan submittal.

4.4.6    High-Resolution Geophysical (HRG) Surveys.  The following stipulations are specific
to HRG surveys conducted in support of plan submittal where one or more acoustic
sound source is operating at frequencies below 200 kilohertz (kHz):

4.4.6.1    Establishment of Default Exclusion Zone.  The Lessee must ensure that a PSO
monitors a 200-meter default exclusion zone for cetaceans, pinnipeds, and sea
turtles.  In the case of the North Atlantic right whale, the Lessee must observe a
minimum separation distance of 500 meters (1,640 ft), as required under 4.2.6.1.

4.4.6.1.1    If the Lessor determines that the exclusion zone does not encompass the sound-
exposure threshold for ear injury to protected species (Level A harassment)
calculated for the acoustic source having the highest source level, the Lessor will
consult with NMFS and may impose additional, relevant requirements on the
Lessee, including, but not limited to, required expansion of this exclusion zone.

4.4.6.2   <u>Field Verification of HRG Survey Exclusion Zone</u>.  The Lessee must submit to the Lessor the results of field verification to verify the exclusion zone for the HRG survey equipment operating below 200 kHz.  If no applicable data are available, the Lessee must conduct field verification of the exclusion zone for HRG survey equipment operating below 200 kHz.  As part of such field verification, the Lessee must take acoustic measurements at a minimum of two reference locations and in a manner that is sufficient to establish the following:  source level (Peak, SEL, and RMS sound levels at 1 meter), pattern of spreading loss, and the sound-exposure distance for ear injury for each marine mammal hearing group, sea turtles, and fish.  The distance to the 166, 160, and 150 dB RMS behavioral thresholds (Level B harassment) must also be reported.  The first location must be at a distance of 200 m from the sound source, and the second location must be as close to the sound source as technically feasible.  The Lessee must take these sound measurements at the reference locations at two depths (i.e., a depth at mid-water and a depth at approximately 1 meter (3.28 ft) above the seafloor).  The Lessee must report the field verification results to the Lessor in the applicable survey plan(s), unless otherwise authorized by the Lessor.

4.4.6.3   <u>Modification of Exclusion Zone Per Lessee Request</u>.  The Lessee may use the field verification results to request modification of the exclusion zone for the specific HRG survey equipment under consideration.  The Lessee must base any proposed new exclusion zone radius on the largest safety zone configuration of the target Level A or Level B harassment sound-exposure thresholds as defined by NMFS.  The Lessee must use this modified zone for all subsequent use of field-verified equipment.  The Lessee may periodically reevaluate the modified zone using the field verification procedures described in 4.4.6.2.  The Lessee must obtain Lessor approval of any new exclusion zone before it is implemented.

4.4.6.4   <u>Clearance of Exclusion Zone</u>.  The Lessee must ensure that active acoustic sound sources are not activated until the PSO has reported the exclusion zone clear of all marine mammals and sea turtles for at least 60 minutes.

4.4.6.5   <u>HRG Survey Mid-Atlantic Seasonal Management Areas Right Whale Monitoring</u>.  The Lessee must ensure that between November 1 and April 30, vessel operators monitor NMFS North Atlantic Right Whale reporting systems (e.g., the Early Warning System, Sighting Advisory System, and Mandatory Ship Reporting System) for the presence of North Atlantic right whales during HRG survey operations.

4.4.6.6   <u>Dynamic Management Area Shutdown Requirement</u>.  The Lessee must ensure that vessels cease HRG survey activities within 24 hours of NMFS establishing a DMA in the Lessee's HRG survey area.  The Lessee may resume HRG survey activities in the affected area as soon as the DMA has expired.

4.4.6.7  <u>Electromechanical Survey Equipment Ramp-Up</u>.  The Lessee must ensure that, when technically feasible, a ramp-up of the electromechanical survey equipment occurs at the start or re-start of HRG survey activities.  A ramp-up must begin with the power of the smallest acoustic equipment for the HRG survey at its lowest power output.  The power output must be gradually increased and other acoustic sources added in such a way that the source level would rise in steps not exceeding 6 dB per 5-minute period.

4.4.6.8  <u>Shutdown for Non-Delphinoid Cetaceans and Sea Turtles</u>.  If a non-delphinoid cetacean or sea turtle is sighted at or within the exclusion zone, the Lessee must immediately shut down all the electromechanical survey equipment.  The Lessee must ensure that the vessel operator immediately complies with such a call by the PSO.  Any disagreement or discussion must occur only after shutdown.  Subsequent restart of the electromechanical survey equipment must use the ramp-up provisions described in 4.4.6.7 and must only occur following clearance of the exclusion zone of all marine mammals and sea turtles for at least 60 minutes as described in 4.4.6.4.

4.4.6.9  <u>Power Down for Delphinoid Cetaceans and Pinnipeds.</u>  If a delphinoid cetacean or pinniped is sighted at or within the exclusion zone, the Lessee must immediately power down the electromechanical survey equipment to the lowest power output that is technically feasible.  The Lessee must ensure that the vessel operator immediately complies with such a call by the PSO.  Any disagreement or discussion must occur only after power-down.  Subsequent restart of the electromechanical survey equipment must use the ramp-up procedures described in 4.4.6.7 and may occur only after (1) the exclusion zone is clear of delphinoid cetaceans and pinnipeds or (2) a determination by the PSO after a minimum of 10 minutes of observation that the delphinoid cetacean and/or pinniped is approaching the vessel or towed equipment at a speed and vector that indicates voluntary approach to bow-ride or chase towed equipment.

4.4.6.9.1  <u>Pauses in Electromechanical Survey Sound Source.</u>  If the electromechanical sound source shuts down for reasons other than encroachment into the exclusion zone by a non-delphinoid cetacean or sea turtle, including, reasons such as, but not limited to, mechanical or electronic failure, resulting in the cessation of the sound source for a period greater than 20 minutes, the Lessee must ensure that restart of the electromechanical survey equipment commences only after clearance of the exclusion zone, as described in 4.4.6.4, and the implementation of ramp-up procedures, as described in 4.4.6.7.  If the shutdown is less than 20 minutes, the equipment may be restarted as soon as practicable at its operational level as long as visual surveys were continued diligently throughout the silent period and the exclusion zone remained clear of marine mammals and sea turtles.  If visual surveys were not continued diligently during a shutdown of 20 minutes or less, the Lessee must clear the exclusion zone, as described in 4.4.6.4, and implement ramp-up procedures, as described in 4.4.6.7, prior to restarting the electromechanical survey equipment.

4.4.7   Geotechnical (Sub-bottom) Exploration.  Stipulations specific to geotechnical exploration limited to borings and vibracores conducted in support of plan submittal are provided in 4.4.7.1 through 4.4.7.6.

4.4.7.1   Establishment of Default Exclusion Zone.  The Lessee must ensure that a PSO monitors a 200-meter (656 ft) default exclusion zone for all marine mammals and sea turtles around any vessel conducting geotechnical surveys.

4.4.7.2   Modification of Default Exclusion Zone Per Lessee Request.  If the Lessee wishes to modify the 200 meter (656 ft) default exclusion zone for specific geotechnical exploration equipment, the Lessee must submit a plan for verifying the sound source levels of the specific geotechnical exploration equipment to the Lessor.  The plan must demonstrate how the field verification activities will comply with the requirements of 4.4.7.3.  The Lessor may require that the Lessee modify the plan to address any comments the Lessor submits to the Lessee on the contents of the plan in a manner deemed satisfactory to the Lessor prior to the commencement of field verification activities.  Any new exclusion zone radius proposed by the Lessee must be based on the largest safety zone configuration of the target Level A or Level B harassment sound-exposure thresholds as defined by NMFS.  The Lessee must use this modified zone for all subsequent use of field-verified equipment.  The Lessee may periodically reevaluate the modified zone using the field verification procedures described in 4.4.7.3.  The Lessee must obtain Lessor approval of any new exclusion zone before it is implemented.

4.4.7.3   Field Verification of Geotechnical Exclusion Zone.  If the Lessee wishes to modify the existing exclusion zone, the Lessee must submit the results of field verification to verify the exclusion zone for the specific geotechnical exploration equipment being used.  If no applicable data are available, the Lessee must conduct field verification of the exclusion zone for the specific geotechnical exploration equipment being used.  As part of such field verification, the Lessee must take acoustic measurements at a minimum of two reference locations and in a manner that is sufficient to establish the following:  source level (Peak, SEL, and RMS sound levels at 1 meter), pattern of spreading loss, and the sound exposure distance for ear injury for each marine mammal hearing group, sea turtles, and fish.  The distance to the 166, 160, and 150 dB RMS behavioral thresholds must also be reported.  The first location must be at a distance of 200 m from the sound source and the second location must be as close to the sound source as technically feasible.  The Lessee must take these sound measurements at the reference locations at two depths (i.e., a depth at mid-water and a depth at approximately 1 meter above the seafloor).  The Lessee must use the results to establish a new exclusion zone, which may be greater than or less than the 200 meter (656 ft) default exclusion zone.

4.4.7.4   Clearance of Exclusion Zone.  The Lessee must ensure that the geotechnical sound source is not activated until the PSO has reported the exclusion zone clear of all marine mammals and sea turtles for 60 minutes.

4.4.7.5  <u>Shutdown for Non-Delphinoid Cetaceans and Sea Turtles</u>. If any non-delphinoid cetaceans or sea turtles are sighted at or within the exclusion zone, the Lessee must immediately shut down the geotechnical survey equipment. The vessel operator must comply immediately with such a call by the PSO. Any disagreement or discussion must occur only after shutdown. Subsequent restart of the geotechnical survey equipment must only occur following clearance of the exclusion zone as described in 4.4.7.4.

4.4.7.6  <u>Pauses in Geotechnical Survey Sound Source</u>. If the geotechnical sound source shuts down for reasons other than encroachment into the exclusion zone by a non-delphinoid cetacean or sea turtle, including, but not limited to, mechanical or electronic failure resulting in the cessation of the sound source for a period greater than 20 minutes, the Lessee must ensure that restart of the geotechnical survey equipment commences only after clearance of the exclusion zone, as described in 4.4.7.4. If the shutdown is less than 20 minutes, the equipment may be restarted as soon as practicable as long the Lessee has continued visual surveys diligently throughout the silent period and the exclusion zone remained clear of marine mammals and sea turtles. If visual surveys were not continued diligently during a shutdown of 20 minutes or less, the Lessee must clear the exclusion zone, as described in 4.4.7.4, prior to restarting the geotechnical survey equipment.

## 4.5  Protected-Species Reporting Requirements

The Lessee must ensure compliance with the following reporting requirements for site characterization activities performed in support of plan submittal, and, where appropriate, must fulfill these requirements using the contact information provided as an Enclosure to this lease, or updated contact information as provided by the Lessor:

4.5.1  <u>Field Verification of Exclusion Zone Preliminary Report for HRG Survey Equipment</u>. The Lessee must report the results of field verification to verify the exclusion zone for the HRG survey equipment operating below 200 kHz to the Lessor and NMFS prior to using the HRG equipment during survey activities conducted in support of plan submittal. The Lessee must include in its report a preliminary interpretation of the results for all sound sources, which will include details of the operating frequencies, SPLs (measured in Peak, SEL, and RMS), the distance to the ear injury and behavior thresholds, frequency bands measured, as well as associated latitude/longitude positions, ranges, depths and bearings between sound sources and receivers.

4.5.2  <u>Reporting Injured or Dead Protected Species</u>.  The Lessee must ensure that sightings of any injured or dead protected species (e.g., marine mammals, sea turtles or sturgeon) are reported to the Lessor, NMFS and the NMFS Greater Atlantic (Northeast) Region's Stranding Hotline (866-755-6622 or current) within 24 hours of sighting, regardless of whether the injury or death is caused by a vessel.  In addition, if the injury or death was caused by a collision with a project-related vessel, the Lessee must notify the Lessor of the strike within 24 hours.  The Lessee must use the form provided in Appendix A to ADDENDUM "C" to report the sighting or incident.  If the Lessee's activity is responsible for the injury or death, the Lessee must ensure that the vessel assists in any salvage effort as requested by NMFS.

4.5.3  <u>Reporting Observed Impacts to Protected Species</u>.

4.5.3.1  The Lessee must report any observed takes (as defined in 1.13) of listed marine mammals, sea turtles or sturgeon resulting in injury or mortality within 24 hours to the Lessor and NMFS.

4.5.3.2  The Lessee must report any observations concerning any impacts on Endangered Species Act listed marine mammals, sea turtles or sturgeon to the Lessor and NMFS Northeast Region's Stranding Hotline within 48 hours.

4.5.3.3  The Lessee must record injuries or mortalities using the form provided in Appendix A to ADDENDUM "C".

4.5.4  <u>Protected Species Observer Reports</u>.  The Lessee must ensure that the PSO record all observations of protected species using standard marine mammal PSO data collection protocols.  The list of required data elements for these reports is provided in Appendix B to ADDENDUM "C".

4.5.5  <u>Reports of G&G Survey Activities and Observations</u>.  The Lessee must provide the Lessor and NMFS with reports every 90 calendar days following the commencement of HRG and/or geotechnical exploration activities, and a final report at the conclusion of the HRG and/or geotechnical exploration activities.  Each report must include a summary of survey activities, all PSO and incident reports (See Appendices A and B),  and an estimate of the number of listed marine mammals and sea turtles observed and/or taken during these survey activities.  The final report must contain a detailed analysis and interpretation of the sound source verification data, if such data was collected by the Lessee.

4.5.6  <u>Field Verification Plan for HRG Survey Exclusion Zone</u>.  No later than 45 calendar days prior to the commencement of any required field verification activities, the Lessee must submit a plan for verifying the sound source levels of any electromechanical survey equipment operating at frequencies below 200 kHz.  The plan must demonstrate how the field verification activities will comply with the requirements of 4.4.6.2.  Prior to the commencement of the field verification activities, the Lessor may require the Lessee to modify the plan to address any comments the Lessor submits to the Lessee on the contents of the plan in a manner deemed satisfactory to the Lessor.

4.5.7   <u>Marine Mammal Protection Act Authorization(s)</u>.  If the Lessee is required to obtain an authorization pursuant to section 101(a)(5) of the Marine Mammal Protection Act prior to conducting survey activities in support of plan submittal, the Lessee must provide to the Lessor a copy of the authorization prior to commencing these activities.

## 4.6   Avian and Bat Survey and Reporting Requirements

4.6.1   <u>Lighting Requirements</u>.  When conducting survey activities in support of plan submittal, the Lessee must use lighting only when necessary, and the lighting must be hooded downward and directed when possible, to reduce upward illumination and illumination of adjacent waters.

4.6.2   <u>Annual Report</u>.  The Lessee must provide an annual report to the Lessor and U.S. Fish and Wildlife Service using the contact information provided as an Enclosure to this lease, or updated contact information as provided by the Lessor.  This report must document any dead or injured birds or bats found during activities conducted in support of plan submittal.  The first report must be submitted within 6 months of the start of the first survey conducted in support of plan submittal, and subsequent reports must be submitted annually thereafter until all surveys in support of plan submittal have concluded and all such birds and bats have been reported.  If surveys are not conducted in a given year, the annual report may consist of a simple statement to that effect.  The report must contain the following information:  the name of species, date found, location, a picture to confirm species identity (if possible), and any other relevant information.  In addition to the Annual Report, the Lessee must report carcasses with Federal or research bands to the U.S. Geological Society Bird Band Laboratory, within 30 calendar days, using the following website: https://www.pwrc.usgs.gov/bbl/, or updated contact information as provided by the Lessor.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**APPENDIX A TO ADDENDUM "C"**

Lease Number OCS-A 0512

**Incident Report: Protected Species Injury or Mortality**

*Photographs/Video should be taken of all injured or dead animals.*

Observer's full name: _____

Reporter's full name: _____

Species Identification: _____

Name and type of platform: _____

Date animal observed: _____ Time animal observed: _____

Date animal collected: _____ Time animal collected: _____

Environmental conditions at time of observation (i.e. tidal stage, Beaufort Sea State, weather):

_____

_____

Water temperature (°C) and depth (m/ft) at site:_____

Describe location of animal and events 24 hours leading up to, including and after, the incident (incl. vessel speeds, vessel activity and status of all sound source use):

_____

_____

_____

_____

_____

Photograph/Video taken:  YES  /  NO        If Yes, was the data provided to NMFS?  YES  /  NO
(Please label *species, date, geographic site* and *vessel name* when transmitting photo and/or video)

Date and Time reported to NMFS Stranding Hotline:_____

**Sturgeon Information:** *(please designate cm/m or inches and kg or lbs)*

Species: _____

Fork length (or total length):_____Weight:_____

Condition of specimen/description of animal: _____

Fish Decomposed:    NO    SLIGHTLY    MODERATELY    SEVERELY

Fish tagged:   YES /   NO    If Yes, *please record all tag numbers.*

Tag #(s):_____

Genetic samples collected:    YES /  NO

Genetics samples transmitted to:_____on____/_____/20....


**Sea Turtle Species Information**: *(please designate cm/m or inches)*

Species:_____Weight (kg or lbs):_____

Sex:    Male    Female    Unknown

How was sex determined?:_____

Straight carapace length:_____Straight carapace width:_____

Curved carapace length:_____Curved carapace width:_____

Plastron length:_____Plastron width:_____

Tail length:_____Head width:_____

Condition of specimen/description of animal:_____

_____

_____


**Existing Flipper Tag Information**

Left:_____Right:_____

PIT Tag#:_____

**Miscellaneous:**

Genetic biopsy collected:    YES    NO              Photographs taken:    YES    NO

**Turtle Release Information:**

Date:_____Time:_____

Latitude:_____Longitude:_____

State:_____County:_____

**Remarks:**  (note if turtle was involved with tar or oil, gear or debris entanglement, wounds, or

mutilations, propeller damage, papillomas, old tag locations, etc.)_____

_____

_____

_____

**Marine Mammal information**: *(please designate cm/m or ft/inches)*

Length of marine mammal (note direct or estimated): _____

Weight (*if possible, kg or lbs*):_____

Sex of marine mammal (if possible):_____

How was sex determined?:_____

Confidence of Species Identification:        SURE        UNSURE        BEST GUESS

Description of Identification characteristics of marine mammal:_____

_____

_____

_____

_____

Genetic samples collected:        YES  /  NO

Genetic samples transmitted to:_____ on_____/_____/20....

Fate of marine mammal:_____

_____

_____

_____

Description of Injuries Observed:_____

_____

_____

_____

Other Remarks/Drawings:_____

_____

_____

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**APPENDIX B TO ADDENDUM "C"**

Lease Number OCS-A 0512

**REQUIRED DATA ELEMENTS FOR PROTECTED SPECIES OBSERVER REPORTS**

The Lessee must ensure that the PSO record all observations of protected species using standard marine mammal observer data collection protocols. The list of required data elements for these reports is provided below:

1. Vessel name;

2. PSOs' names and affiliations;

3. Date;

4. Time and latitude/longitude when daily visual survey began;

5. Time and latitude/longitude when daily visual survey ended; and

6. Average environmental conditions during visual surveys including:

       a. Wind speed and direction;

       b. Sea state (glassy, slight, choppy, rough, or Beaufort scale);

       c. Swell (low, medium, high, or swell height in meters); and

       d. Overall visibility (poor, moderate, good).

7. Species (or identification to lowest possible taxonomic level);

8. Certainty of identification (sure, most likely, best guess);

9. Total number of animals;

10. Number of juveniles;

11. Description (as many distinguishing features as possible of each individual seen, including length, shape, color and pattern, scars or marks, shape and size of dorsal fin, shape of head, and blow characteristics);

12. Direction of animal's travel relative to the vessel (preferably accompanied by a drawing);

13. Behavior (as explicit and detailed as possible, noting any observed changes in behavior);

14. Activity of vessel when sighting occurred.

U.S. DEPARTMENT OF THE INTERIOR
BUREAU OF OCEAN ENERGY MANAGEMENT

**ADDENDUM "D"**

PROJECT EASEMENTS

Lease Number OCS-A 0512
**Granted**: February 21, 2024

This section includes a description of the Project Easements associated with this lease, and the financial terms associated with any such Project Easements.

I.    Project Easement Description

These project easements are subject to all terms and conditions of Lease OCS-A 0512, executed effective April 1, 2017; the Construction and Operation Plan (COP); the terms and conditions of the COP approval issued February 21, 2024; and any subsequent revisions, amendments, or supplements to the same.

The maps in Figures 1, 2a, and 2b below depict two offshore export cable corridors and project easements and 7 inter-array cable easement areas for the project described in the COP. The 2 export cable corridor routes include a western section (Empire Wind 1 Cable Easement) and an eastern section (Empire Wind 2 Cable Easement). The 7 inter-array cable easements include unleased areas for inter-array cables serving wind turbine generators at the lease area boundary.

The federal portion of the Empire Wind 1 export cable easement extends a total of approximately 29 statute miles and includes approximately 1,750.94 acres. This includes the main section of 26.5 statute miles in length and an intersecting loop section within OCS blocks 6606 and 6607 of 2.6 statute miles in length. The federal portion of the Empire Wind 2 export cable easement extends a total of approximately 20.3 statute miles and includes approximately 1,276.29 acres. The width of each cable easement is approximately 500 feet (ft), with one section of the Empire Wind 2 (eastern) easement expanding to approximately 900 ft between points # 36 and 100. The inter-array cable easement areas identified below contain approximately 70.71 acres.



**Figure 1. Offshore Export Cable Corridors and Project Easements (OCS-A 0512)**

Empire Wind 1 Cable Easement (western section) Centerline Points – Points 1–67 in the table below follow the primary section of the centerline beginning from the Fed/State line and proceeding eastward to the OCS-A 0512 Lease Area Boundary. The easement also contains an intersecting loop section at approximately 3/4 of the easement's distance seaward within OCS blocks 6606 and 6607. This loop section of the centerline is depicted in the table below beginning with point number 68 and proceeds eastward until it rejoins the main section of the main easement centerline with point number 113.

| Point Number | Longitude | Latitude | UTM Easting | UTM Northing |
|---|---|---|---|---|
| 1 | -73.902911 | 40.494098 | 592969.6 | 4483177.7 |
| 2 | -73.895781 | 40.491581 | 593577.3 | 4482905.8 |
| 3 | -73.888880 | 40.489143 | 594165.6 | 4482642.5 |
| 4 | -73.887303 | 40.488772 | 594299.7 | 4482603.0 |
| 5 | -73.885628 | 40.488379 | 594442.3 | 4482561.2 |
| 6 | -73.880925 | 40.487679 | 594841.8 | 4482488.5 |
| 7 | -73.876111 | 40.486964 | 595250.8 | 4482414.3 |

| Point Number | Longitude | Latitude | UTM Easting | UTM Northing |
|---|---|---|---|---|
| 8 | -73.846504 | 40.486635 | 597760.6 | 4482410.2 |
| 9 | -73.816934 | 40.486300 | 600267.2 | 4482406.2 |
| 10 | -73.815390 | 40.486119 | 600398.4 | 4482387.9 |
| 11 | -73.814006 | 40.485956 | 600516.0 | 4482371.4 |
| 12 | -73.812658 | 40.485646 | 600630.7 | 4482338.5 |
| 13 | -73.811160 | 40.485297 | 600758.2 | 4482301.5 |
| 14 | -73.808699 | 40.484390 | 600968.0 | 4482203.6 |
| 15 | -73.806265 | 40.483493 | 601175.7 | 4482106.8 |
| 16 | -73.772979 | 40.471539 | 604015.4 | 4480818.5 |
| 17 | -73.739673 | 40.459563 | 606857.9 | 4479529.0 |
| 18 | -73.733114 | 40.457640 | 607417.0 | 4479323.4 |
| 19 | -73.726476 | 40.455693 | 607983.0 | 4479115.4 |
| 20 | -73.718985 | 40.454118 | 608620.7 | 4478949.8 |
| 21 | -73.711556 | 40.452555 | 609253.1 | 4478785.5 |
| 22 | -73.695030 | 40.450801 | 610657.4 | 4478611.3 |
| 23 | -73.678632 | 40.449059 | 612050.9 | 4478438.7 |
| 24 | -73.657677 | 40.448289 | 613829.2 | 4478380.0 |
| 25 | -73.636750 | 40.447515 | 615605.2 | 4478321.3 |
| 26 | -73.606461 | 40.445935 | 618176.6 | 4478186.0 |
| 27 | -73.574539 | 40.444260 | 620886.7 | 4478043.2 |
| 28 | -73.574539 | 40.444260 | 620886.7 | 4478043.2 |
| 29 | -73.571756 | 40.444047 | 621123.1 | 4478023.4 |
| 30 | -73.570498 | 40.443911 | 621230.0 | 4478010.1 |
| 31 | -73.562762 | 40.443077 | 621887.6 | 4477928.1 |
| 32 | -73.543536 | 40.441000 | 623522.0 | 4477724.3 |
| 33 | -73.537874 | 40.440388 | 624003.4 | 4477664.2 |
| 34 | -73.536208 | 40.440208 | 624144.9 | 4477646.6 |
| 35 | -73.534543 | 40.440027 | 624286.5 | 4477628.9 |
| 36 | -73.528600 | 40.439233 | 624792.0 | 4477549.1 |
| 37 | -73.528600 | 40.439233 | 624792.0 | 4477549.1 |
| 38 | -73.526926 | 40.439015 | 624934.4 | 4477527.3 |
| 39 | -73.526155 | 40.438911 | 625000.0 | 4477516.8 |
| 40 | -73.526155 | 40.438911 | 625000.0 | 4477516.8 |
| 41 | -73.522931 | 40.438475 | 625274.2 | 4477473.0 |
| 42 | -73.518610 | 40.437896 | 625641.8 | 4477414.9 |
| 43 | -73.514575 | 40.437356 | 625985.1 | 4477360.7 |
| 44 | -73.511600 | 40.436913 | 626238.2 | 4477315.7 |
| 45 | -73.508582 | 40.436462 | 626495.0 | 4477270.1 |
| 46 | -73.507093 | 40.436074 | 626622.1 | 4477229.0 |
| 47 | -73.505759 | 40.435723 | 626735.9 | 4477192.0 |
| 48 | -73.504501 | 40.435234 | 626843.5 | 4477139.6 |

| Point Number | Longitude | Latitude | UTM Easting | UTM Northing |
|---|---|---|---|---|
| 49 | -73.503132 | 40.434701 | 626960.6 | 4477082.4 |
| 50 | -73.501905 | 40.434046 | 627065.9 | 4477011.4 |
| 51 | -73.500749 | 40.433428 | 627165.1 | 4476944.5 |
| 52 | -73.499579 | 40.432595 | 627266.0 | 4476853.7 |
| 53 | -73.498546 | 40.431859 | 627354.9 | 4476773.5 |
| 54 | -73.497659 | 40.431023 | 627431.8 | 4476681.9 |
| 55 | -73.496710 | 40.430126 | 627514.0 | 4476583.8 |
| 56 | -73.495926 | 40.429131 | 627582.3 | 4476474.5 |
| 57 | -73.495199 | 40.428208 | 627645.8 | 4476373.0 |
| 58 | -73.494648 | 40.427216 | 627694.4 | 4476263.7 |
| 59 | -73.494036 | 40.426114 | 627748.4 | 4476142.3 |
| 60 | -73.493650 | 40.425017 | 627783.2 | 4476021.1 |
| 61 | -73.493285 | 40.423978 | 627816.1 | 4475906.2 |
| 62 | -73.493012 | 40.422134 | 627842.8 | 4475701.9 |
| 63 | -73.492752 | 40.420345 | 627868.3 | 4475503.8 |
| 64 | -73.491100 | 40.412095 | 628024.0 | 4474590.3 |
| 65 | -73.489450 | 40.403851 | 628179.7 | 4473677.6 |
| 66 | -73.486161 | 40.387300 | 628490.3 | 4471845.2 |
| 67 | -73.482851 | 40.370634 | 628803.0 | 4470000.0 |
| 68 | -73.572991 | 40.443325 | 621019.6 | 4477941.6 |
| 69 | -73.571038 | 40.442612 | 621186.6 | 4477865.1 |
| 70 | -73.570200 | 40.442322 | 621258.2 | 4477834.1 |
| 71 | -73.569499 | 40.442080 | 621318.1 | 4477808.2 |
| 72 | -73.568621 | 40.441777 | 621393.1 | 4477775.7 |
| 73 | -73.567251 | 40.441304 | 621510.1 | 4477725.1 |
| 74 | -73.566283 | 40.441019 | 621592.7 | 4477694.8 |
| 75 | -73.565855 | 40.440903 | 621629.2 | 4477682.5 |
| 76 | -73.565286 | 40.440765 | 621677.8 | 4477668.0 |
| 77 | -73.564544 | 40.440591 | 621741.0 | 4477649.7 |
| 78 | -73.563896 | 40.440446 | 621796.2 | 4477634.5 |
| 79 | -73.563008 | 40.440260 | 621871.8 | 4477615.1 |
| 80 | -73.562455 | 40.440154 | 621919.0 | 4477604.1 |
| 81 | -73.561371 | 40.439965 | 622011.2 | 4477584.6 |
| 82 | -73.560667 | 40.439850 | 622071.2 | 4477572.8 |
| 83 | -73.559527 | 40.439673 | 622168.2 | 4477554.8 |
| 84 | -73.558666 | 40.439546 | 622241.4 | 4477541.8 |
| 85 | -73.557876 | 40.439448 | 622308.6 | 4477532.1 |
| 86 | -73.557870 | 40.439448 | 622309.1 | 4477532.0 |
| 87 | -73.556307 | 40.439255 | 622442.0 | 4477512.8 |
| 88 | -73.555640 | 40.439173 | 622498.8 | 4477504.6 |
| 89 | -73.554095 | 40.438983 | 622630.1 | 4477485.7 |

| Point Number | Longitude | Latitude | UTM Easting | UTM Northing |
|---|---|---|---|---|
| 90 | -73.553706 | 40.438935 | 622663.3 | 4477480.9 |
| 91 | -73.552827 | 40.438827 | 622737.9 | 4477470.1 |
| 92 | -73.551583 | 40.438674 | 622843.8 | 4477454.8 |
| 93 | -73.550367 | 40.438524 | 622947.2 | 4477439.9 |
| 94 | -73.549105 | 40.438369 | 623054.5 | 4477424.4 |
| 95 | -73.548015 | 40.438235 | 623147.2 | 4477411.1 |
| 96 | -73.546790 | 40.438100 | 623251.3 | 4477397.8 |
| 97 | -73.544888 | 40.437910 | 623413.0 | 4477379.4 |
| 98 | -73.544002 | 40.437835 | 623488.3 | 4477372.3 |
| 99 | -73.543303 | 40.437784 | 623547.7 | 4477367.6 |
| 100 | -73.542869 | 40.437764 | 623584.5 | 4477366.0 |
| 101 | -73.542400 | 40.437761 | 623624.3 | 4477366.3 |
| 102 | -73.542000 | 40.437772 | 623658.2 | 4477368.1 |
| 103 | -73.541482 | 40.437790 | 623702.1 | 4477370.9 |
| 104 | -73.540817 | 40.437814 | 623758.5 | 4477374.4 |
| 105 | -73.539622 | 40.437856 | 623859.7 | 4477380.8 |
| 106 | -73.538339 | 40.437901 | 623968.5 | 4477387.6 |
| 107 | -73.537380 | 40.437935 | 624049.8 | 4477392.7 |
| 108 | -73.535897 | 40.437987 | 624175.5 | 4477400.6 |
| 109 | -73.534231 | 40.438046 | 624316.6 | 4477409.4 |
| 110 | -73.533519 | 40.438071 | 624377.0 | 4477413.2 |
| 111 | -73.532477 | 40.438108 | 624465.3 | 4477418.8 |
| 112 | -73.530924 | 40.438162 | 624596.9 | 4477427.0 |
| 113 | -73.529334 | 40.438300 | 624731.5 | 4477444.5 |

Empire Wind 2 Cable Easement (eastern section) Centerline Points – Points 1-117 follow the centerline of the easement from the Fed/State line to the OCS-A 0512 Lease Area Boundary. of the easement from the Fed/State line to the OCS-A 0512 Lease Area Boundary.

| Point Number | Longitude | Latitude | UTM Easting | UTM Northing |
|---|---|---|---|---|
| 1 | -73.537059 | 40.532081 | 623903.7 | 4487843.9 |
| 2 | -73.537044 | 40.532078 | 623904.9 | 4487843.5 |
| 3 | -73.532121 | 40.531046 | 624323.9 | 4487735.9 |
| 4 | -73.527194 | 40.530013 | 624743.1 | 4487628.2 |
| 5 | -73.527173 | 40.530008 | 624744.9 | 4487627.7 |
| 6 | -73.525801 | 40.529665 | 624861.7 | 4487591.5 |
| 7 | -73.524446 | 40.529326 | 624977.1 | 4487555.8 |
| 8 | -73.524432 | 40.529322 | 624978.3 | 4487555.4 |
| 9 | -73.524136 | 40.529240 | 625003.5 | 4487546.7 |
| 10 | -73.523819 | 40.529152 | 625030.5 | 4487537.3 |
| 11 | -73.523794 | 40.529144 | 625032.7 | 4487536.5 |
| 12 | -73.523508 | 40.529049 | 625057.1 | 4487526.4 |
| 13 | -73.523244 | 40.528961 | 625079.6 | 4487517.0 |
| 14 | -73.523225 | 40.528955 | 625081.2 | 4487516.3 |
| 15 | -73.521332 | 40.528241 | 625242.9 | 4487439.8 |
| 16 | -73.519416 | 40.527519 | 625406.5 | 4487362.4 |
| 17 | -73.519392 | 40.527509 | 625408.6 | 4487361.4 |
| 18 | -73.519172 | 40.527413 | 625427.4 | 4487351.0 |
| 19 | -73.518975 | 40.527328 | 625444.2 | 4487341.8 |
| 20 | -73.518960 | 40.527321 | 625445.5 | 4487341.0 |
| 21 | -73.518952 | 40.527317 | 625446.2 | 4487340.6 |
| 22 | -73.518668 | 40.527175 | 625470.5 | 4487325.3 |
| 23 | -73.518361 | 40.527022 | 625496.8 | 4487308.7 |
| 24 | -73.518338 | 40.527010 | 625498.8 | 4487307.4 |
| 25 | -73.518123 | 40.526888 | 625517.2 | 4487294.2 |
| 26 | -73.517928 | 40.526778 | 625533.9 | 4487282.2 |
| 27 | -73.517921 | 40.526773 | 625534.5 | 4487281.7 |
| 28 | -73.517909 | 40.526766 | 625535.6 | 4487280.9 |
| 29 | -73.517675 | 40.526617 | 625555.6 | 4487264.8 |
| 30 | -73.517421 | 40.526455 | 625577.5 | 4487247.1 |
| 31 | -73.517398 | 40.526440 | 625579.5 | 4487245.5 |
| 32 | -73.512867 | 40.523137 | 625969.5 | 4486885.3 |
| 33 | -73.508346 | 40.519842 | 626358.6 | 4486526.0 |
| 34 | -73.505662 | 40.517885 | 626589.7 | 4486312.6 |
| 35 | -73.502960 | 40.515916 | 626822.3 | 4486097.9 |
| 36 | -73.502951 | 40.515912 | 626823.0 | 4486097.5 |

| Point Number | Longitude | Latitude | UTM Easting | UTM Northing |
|---|---|---|---|---|
| 37 | -73.502082 | 40.514944 | 626898.5 | 4485991.3 |
| 38 | -73.500638 | 40.514312 | 627022.0 | 4485923.2 |
| 39 | -73.500625 | 40.514301 | 627023.2 | 4485922.0 |
| 40 | -73.500577 | 40.514257 | 627027.3 | 4485917.2 |
| 41 | -73.500564 | 40.514246 | 627028.4 | 4485915.9 |
| 42 | -73.500543 | 40.514225 | 627030.2 | 4485913.7 |
| 43 | -73.500497 | 40.514181 | 627034.2 | 4485908.8 |
| 44 | -73.500485 | 40.514168 | 627035.2 | 4485907.5 |
| 45 | -73.500442 | 40.514123 | 627039.0 | 4485902.5 |
| 46 | -73.500422 | 40.514102 | 627040.7 | 4485900.2 |
| 47 | -73.500410 | 40.514089 | 627041.7 | 4485898.8 |
| 48 | -73.500391 | 40.514068 | 627043.4 | 4485896.4 |
| 49 | -73.500350 | 40.514021 | 627047.0 | 4485891.3 |
| 50 | -73.500339 | 40.514008 | 627047.9 | 4485889.9 |
| 51 | -73.500300 | 40.513960 | 627051.3 | 4485884.6 |
| 52 | -73.500282 | 40.513938 | 627052.9 | 4485882.2 |
| 53 | -73.500272 | 40.513924 | 627053.8 | 4485880.7 |
| 54 | -73.500235 | 40.513875 | 627057.0 | 4485875.3 |
| 55 | -73.500218 | 40.513853 | 627058.4 | 4485872.8 |
| 56 | -73.500209 | 40.513839 | 627059.3 | 4485871.4 |
| 57 | -73.500193 | 40.513817 | 627060.6 | 4485868.9 |
| 58 | -73.500159 | 40.513767 | 627063.6 | 4485863.4 |
| 59 | -73.500150 | 40.513753 | 627064.4 | 4485861.8 |
| 60 | -73.500115 | 40.513696 | 627067.5 | 4485855.5 |
| 61 | -73.500093 | 40.513660 | 627069.4 | 4485851.6 |
| 62 | -73.500088 | 40.513653 | 627069.9 | 4485850.8 |
| 63 | -73.498899 | 40.511629 | 627174.4 | 4485627.8 |
| 64 | -73.497710 | 40.509606 | 627278.9 | 4485405.0 |
| 65 | -73.497704 | 40.509595 | 627279.5 | 4485403.9 |
| 66 | -73.497653 | 40.509515 | 627283.9 | 4485395.0 |
| 67 | -73.497618 | 40.509458 | 627287.1 | 4485388.8 |
| 68 | -73.497609 | 40.509445 | 627287.9 | 4485387.3 |
| 69 | -73.497607 | 40.509443 | 627288.0 | 4485387.0 |
| 70 | -73.497550 | 40.509359 | 627293.0 | 4485377.9 |
| 71 | -73.497512 | 40.509306 | 627296.3 | 4485372.0 |
| 72 | -73.497502 | 40.509292 | 627297.2 | 4485370.5 |
| 73 | -73.497501 | 40.509290 | 627297.3 | 4485370.2 |
| 74 | -73.497439 | 40.509208 | 627302.7 | 4485361.2 |
| 75 | -73.497399 | 40.509155 | 627306.2 | 4485355.5 |
| 76 | -73.497388 | 40.509142 | 627307.1 | 4485354.0 |
| 77 | -73.497387 | 40.509140 | 627307.3 | 4485353.7 |

| Point Number | Longitude | Latitude | UTM Easting | UTM Northing |
|---|---|---|---|---|
| 78 | -73.497321 | 40.509060 | 627313.0 | 4485344.9 |
| 79 | -73.497278 | 40.509009 | 627316.7 | 4485339.3 |
| 80 | -73.497267 | 40.508995 | 627317.7 | 4485337.9 |
| 81 | -73.497265 | 40.508993 | 627317.9 | 4485337.6 |
| 82 | -73.497194 | 40.508914 | 627324.0 | 4485329.0 |
| 83 | -73.497148 | 40.508863 | 627328.0 | 4485323.4 |
| 84 | -73.497136 | 40.508850 | 627329.0 | 4485322.0 |
| 85 | -73.497134 | 40.508848 | 627329.2 | 4485321.7 |
| 86 | -73.497059 | 40.508771 | 627335.7 | 4485313.3 |
| 87 | -73.497011 | 40.508722 | 627339.9 | 4485307.9 |
| 88 | -73.496998 | 40.508709 | 627341.0 | 4485306.5 |
| 89 | -73.496996 | 40.508707 | 627341.2 | 4485306.3 |
| 90 | -73.496917 | 40.508632 | 627348.0 | 4485298.0 |
| 91 | -73.496866 | 40.508584 | 627352.4 | 4485292.8 |
| 92 | -73.496852 | 40.508571 | 627353.6 | 4485291.4 |
| 93 | -73.496850 | 40.508569 | 627353.8 | 4485291.2 |
| 94 | -73.496762 | 40.508492 | 627361.4 | 4485282.7 |
| 95 | -73.496707 | 40.508444 | 627366.2 | 4485277.5 |
| 96 | -73.496696 | 40.508435 | 627367.1 | 4485276.5 |
| 97 | -73.495165 | 40.507174 | 627499.2 | 4485138.8 |
| 98 | -73.493246 | 40.505594 | 627664.8 | 4484966.1 |
| 99 | -73.492510 | 40.504592 | 627729.0 | 4484856.0 |
| 100 | -73.489669 | 40.502683 | 627973.4 | 4484648.2 |
| 101 | -73.489661 | 40.502681 | 627974.1 | 4484648.0 |
| 102 | -73.487934 | 40.501280 | 628123.1 | 4484495.0 |
| 103 | -73.487925 | 40.501273 | 628123.9 | 4484494.2 |
| 104 | -73.487925 | 40.501273 | 628123.9 | 4484494.2 |
| 105 | -73.487589 | 40.501000 | 628152.9 | 4484464.4 |
| 106 | -73.487589 | 40.501000 | 628152.9 | 4484464.4 |
| 107 | -73.487359 | 40.500814 | 628172.7 | 4484444.1 |
| 108 | -73.435610 | 40.458800 | 632640.5 | 4479856.7 |
| 109 | -73.435610 | 40.458800 | 632640.5 | 4479856.7 |
| 110 | -73.383915 | 40.416755 | 637109.1 | 4475268.5 |
| 111 | -73.383783 | 40.416648 | 637120.6 | 4475256.8 |
| 112 | -73.383783 | 40.416648 | 637120.6 | 4475256.8 |
| 113 | -73.383783 | 40.416648 | 637120.6 | 4475256.8 |
| 114 | -73.280454 | 40.332384 | 646069.4 | 4466068.5 |
| 115 | -73.280432 | 40.332367 | 646071.2 | 4466066.7 |
| 116 | -73.275195 | 40.328637 | 646524.2 | 4465661.3 |
| 117 | -73.269236 | 40.324392 | 647039.7 | 4465200.0 |



**Figure 2a – Inter-array Cable Easements 1-4 (OCS-A 0512)**

- Inter-array Cable Easement 1 – 4.63 acres within the NE corner of the NW1/4 of SW1/4 of Block 6707 (6707, sub block I)
- Inter-array Cable Easement 2 – 11.39 acres within the NE corner of the SW1/4 of SE1/4 of Block 6707 (6707, sub block O)
- Inter-array Cable Easement 3 – 0.47 acres within the NE corner of the SE1/4 of SW1/4 of Block 6759 (6759, sub block N)
- Inter-array Cable Easement 4 – 20.16 acres within the NE corner of the SE1/4 of SW1/4 of Block 6811 (6811, sub block N)



**Figure 2b: Inter-array Cable Easements 5-7 (OCS-A 0512)**

- Inter-array Cable Easement 5 – 19.20 acres within the NE corner of the NE1/4 of NE1/4 of Block 6861 (6861, sub block D)
- Inter-array Cable Easement 6 – 7.59 acres within the NE corner of the NE1/4 of SW1/4 of Block 6862 (6862, sub block J)
- Inter-array Cable Easement 7 – 7.26 acres within the SW corner of the NW1/4 of SW1/4 of Block 6711 (6711, sub block I)

II.  Rent

The Lessee must begin submitting annual rent payments for any project easement associated with this lease commencing on the date that BOEM approves the COP or modification of the COP describing the project easement. Annual rent for a project easement is $5.00 per acre per year, or a minimum of $450.00 per year. The first annual rent payment for the Project Easement is due within 45 days of the Lessee's receipt of the COP approval letter. The annual rent for the next year and for each subsequent year is due on or before each lease anniversary.

To calculate the required rent payment for the project easement, BOEM multiplied 3,098 acres by $5, totaling $15,490. Therefore, the total project easement annual rent payment due is $15,490.

**U.S. DEPARTMENT OF THE INTERIOR**

**BUREAU OF OCEAN ENERGY MANAGEMENT**

Lease Number OCS-A 0512

**CONTACT INFORMATION FOR REPORTING REQUIREMENTS**

The following contact information must be used for the reporting and coordination requirements specified in ADDENDUM "C", Stipulation 3.2.5:

> United States Fleet Forces (USFF) N46
> 1562 Mitscher Ave, Suite 250
> Norfolk, VA 23551
> Phone: (757) 836-6206

The following contact information must be used for the reporting requirements in ADDENDUM "C", Section 4.5:

> **Reporting Injured or Dead Protected Species**
>
> National Marine Fisheries Service
> Greater Atlantic Region Stranding Hotline
> Phone: 866-755-6622
>
> **All other reporting requirements in Section 4.5**
>
> Bureau of Ocean Energy Management
> Environment Branch for Renewable Energy
> Phone: 703-787-1340
> Email: renewable_reporting@boem.gov
>
> National Marine Fisheries Service
> Greater Atlantic Regional Fisheries Office, Protected Resources Division
> Section 7 Coordinator
> Phone: 978-281-9328
> Email: incidental.take@noaa.gov; Mark.Murray-Brown@noaa.gov

Vessel operators can register for automatic email alerts for Seasonal Management Areas and find additional information on ship strike reduction guidelines and requirements at http://www.nmfs.noaa.gov/pr/shipstrike/#sightings.

The following contact information must be used for the reporting requirements in ADDENDUM "C", Stipulation 4.6.2:

**Reporting Dead or Injured Avian and Bat Species**

U.S. Fish and Wildlife Office, New York Field Office
3817 Luker Road
Cortland, NY 13045
Phone: 607-753-9334
Email: FW5ES_NYFO@fws.gov

Bureau of Ocean Energy Management
Environment Branch for Renewable Energy
Phone: 703-787-1340
Email: renewable_reporting@boem.gov

Accepted and agreed to:

| Empire Leaseholder LLC | The United States of America |
|---|---|
| Lessee | Lessor |

DAVID DIAMOND
Digitally signed by DAVID DIAMOND
Date: 2025.01.15 16:28:28 -05'00'

(Signature of Authorized Officer)    (Signature of Authorized Officer)

Teddy Muhlfelder                      David B. Diamond

(Name of Signatory)                   (Name of Signatory)

President                             Deputy Associate Director for Operations, Atlantic Outer
                                      Continental Shelf, Office of Renewable Energy Programs

(Title)                               (Title)

12/29/2024                            1/15/25

(Date)                                (Date)