**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Empire Leaseholder LLC, et al.,** | |
| *Plaintiffs,* | |
| v. | No. 1:26-cv-00004-CJN |
| **Douglas J. Burgum, et al.,** | |
| *Defendants.* | |

**BRIEF OF AMICUS CURIAE
NORTH AMERICA'S BUILDING TRADES UNIONS
IN SUPPORT OF PLAINTIFFS' MOTION
FOR A PRELIMINARY INJUNCTION**

Jonathan D. Newman (D.C. Bar No. 449141)
Jacob J. Demree (D.C. Bar No. 90012042)
Blake Phillips (D.C. Bar No. 90027926)*
Sherman Dunn, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com
demree@shermandunn.com
phillips@shermandunn.com

* Pro hac vice admission pending

January 9, 2026

# TABLE OF CONTENTS

Table of Authorities.................................................................................................................iii

Statement of Interest .............................................................................................................. 1

Argument ................................................................................................................................ 3

    A Preliminary Injunction Will Promote the Public Interest by Saving Countless
    Work Hours, Wages, and Benefits for Well-Trained, Hard-Working Union
    Construction Workers. ................................................................................................ 3

        A.      Offshore Wind Promotes Efficient Green Infrastructure
                Construction and Guarantees Solid, Middle-Class Union
                Construction Careers................................................................................. 3

        B.      NABTU's Members Are Building Cutting-Edge Offshore Energy
                Facilities.................................................................................................. 7

        C.      A Preliminary Injunction Will Protect NABTU's Members'
                Livelihoods. .............................................................................................11

Conclusion ............................................................................................................................ 13

Certificate of Compliance .....................................................................................................

Certificate of Service ............................................................................................................

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page(s)**

*Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218 (1993) ........................................................................ 3-4

*Gov't of Manitoba v. Zinke*,
    849 F.3d 1111 (D.C. Cir. 2017) ............................................................................ 12

*Nat'l Ass'n of Farmworkers Orgs. v. Marshall*,
    628 F.2d 604 (D.C. Cir. 1980) .............................................................................. 12

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
    50 F.4th 164 (D.C. Cir. 2022) ................................................................................ 3

*Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*,
    518 F. Supp. 3d 448 (D.D.C. 2021) ......................................................................... 3

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................................ 11

**Statutes**

29 U.S.C. § 158(e) ............................................................................................................... 3

29 U.S.C. § 158(f) ............................................................................................................... 3

**Other Authorities**

Empire Wind, *Equinor Establishes Major Union Partnership for New York's First Offshore Wind Hub* (Mar. 27, 2024), https://www.empirewind.com/2024/03/27/empire_wind_signs_first_pla/ ......................................................................... 6

1 Equinor, *Empire Offshore Wind: Empire Wind Project (EW 1 and EW 2) Construction and Operations Plan* (Nov. 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/Public_EOW_COP_v7_Volume%201_Project%20Information%20Redacted.pdf ............................................................ 7-8, 10

Heerema Marine Contractors, *Sleipnir*, https://www.heerema.com/heerema-marine-contractors/fleet/sleipnir (last visited Jan. 9, 2026) ............................................. 9

Macro Offshore, *Crossway Eagle*, https://macro-offshore.com/our-fleet/crossway-eagle/ (last visited Jan. 9, 2026) ................................................................................... 10

Order Granting NABTU's Motion for Leave to File a Brief as Amicus Curiae in Support of Plaintiff, *Revolution Wind, LLC v. Burgum*, No. 25-cv-2999 (D.D.C. Sept. 15, 2025) ................................................................................................................................3

## STATEMENT OF INTEREST

The December 22, 2025, Order issued by the Department of the Interior's Bureau of Ocean Energy Management "to suspend all ongoing activities related to the Empire Wind 1 Project on the Outer Continental Shelf" has thrown union construction workers out of work and threatens to cancel the project.    Empire Wind's Motion for Preliminary Injunction & Stay Pending Review Ex. A, Dkt. No. 8-1 [hereinafter "Suspension Order"].  If the project is canceled, even more union construction workers will be out of work as a result of the Suspension Order.

The workers performing work offshore are represented by affiliates of North America's Building Trades Unions ("NABTU") and are working under terms and conditions of employment established through a NABTU collective bargaining agreement.  They have undergone extensive training and have been performing the offshore work for eighteen months.  But now as a result of the unlawful Suspension Order, they are idled.

If the project is canceled, not only will the livelihoods of the union construction workers performing the offshore work be adversely impacted, but many more union construction workers performing work onshore will be terminated.  The workers performing work onshore are doing so under a separate collective bargaining agreement to which NABTU's affiliate, the Building and Construction Trades Council of Greater New York and Vicinity, is party.  Those workers are performing the assembly and onshore construction necessary for the project as well as the work necessary to upgrade the staging and operations port to support the project.

As a result of the unlawful Suspension Order, the workers who had been employed offshore are idled, and those working onshore are threatened with the cancellation of the project.  A preliminary injunction is necessary, and for the reasons stated herein, is wholly consistent with the public interest.

NABTU is a labor organization composed of fourteen national and international unions

1

and 327 provincial, state, and local building and construction trades councils representing more than three million workers. Members of NABTU's affiliated unions are scheduled to work countless offshore hours on the Empire Wind 1 ("EW 1") project. When completed, the project is expected to generate approximately 810 megawatts of renewable energy — enough to power approximately 500,000 homes. The construction of the project has provided and, but for the Suspension Order, would continue to provide solid, middle-class wages and benefits to many skilled union construction craftworkers. NABTU has a strong interest in this case because the Suspension Order has imperiled the job security of its affiliates' members, who would continue to work on the EW 1 project if not for the Suspension Order.

Plaintiffs (together, "Empire Wind") consent to the filing of this brief, and the Defendants do not oppose NABTU's motion for leave to file the brief. NABTU and its counsel declare that: (1) no party's counsel authored this brief in whole or in part; (2) no party or party's counsel contributed money to fund the preparation or submission of the brief; and (3) no person other than NABTU, its members, or its counsel has contributed money to fund the preparation or submission of the brief.

# ARGUMENT

**A Preliminary Injunction Will Promote the Public Interest by Saving Countless Work Hours, Wages, and Benefits for Well-Trained, Hard-Working Union Construction Workers.**

### A.    *Offshore Wind Promotes Efficient Green Infrastructure Construction and Guarantees Solid, Middle-Class Union Construction Careers.*

In 2024, NABTU and Empire Wind signed a project labor agreement ("PLA") to govern labor relations for the offshore portion of the EW 1 project.[1]  The EW 1 PLA is a multi-union and multi-employer prehire collective bargaining agreement that sets terms and conditions for work performed in the ocean (i.e., offshore) for the EW 1 project.

Congress authorized the use of PLAs like the EW 1 PLA under Sections 8(e) and (f) of the National Labor Relations Act, 29 U.S.C. § 158(e), (f).  A typical construction project involves work performed by multiple contractors, with multiple unions representing the employees working for those contractors.  A PLA brings labor-relations uniformity to a construction project by setting out terms and conditions of employment and work rules applicable across the project, irrespective of the contractor or union involved.  PLAs typically create forums for communication and coordination, include no-strike, no-lockout provisions, and contain speedy dispute-resolution mechanisms.  They also set standard pay and benefit rates and provide for hiring through union job referral systems.  *See, e.g.*, *Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated*

---

[1]    This Court has "broad discretion to allow amicus briefs when they provide 'unique information or perspective.'"  *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 50 F.4th 164, 193 (D.C. Cir. 2022) (quoting *Wash. All. of Tech. Workers v. U.S. Dep't of Homeland Sec.*, 518 F. Supp. 3d 448, 453 n.2 (D.D.C. 2021)).  To the extent this brief refers to facts outside the record, those facts are merely intended to provide perspective on labor relations governing the EW 1 project.  *See, e.g.*, Order Granting NABTU's Motion for Leave to File a Brief as Amicus Curiae in Support of Plaintiff, *Revolution Wind, LLC v. Burgum*, No. 25-cv-2999 (D.D.C. Sept. 15, 2025) (allowing NABTU to participate as amicus curiae in similar preliminary injunction-stage case challenging order to stop offshore wind construction).

*Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 221-22, 230-32 (1993).

By signing the EW 1 PLA, NABTU and Empire Wind sought to promote efficient completion of a high-quality offshore wind project. The EW 1 PLA streamlines hiring procedures to ensure a reliable supply of skilled U.S. labor on offshore wind projects. Under the PLA, NABTU's affiliated national and international unions each designated local unions with expertise in the relevant trades. When contractors need employees, they contact the designated local union for a referral, and the union provides applicants for employment. The unions promise to share training requirements with applicants and commit to recruiting enough employees to meet project demands. Offshore wind construction workers need unique, specialized training, such as Helicopter Underwater Escape Training and Global Wind Organization Sea Survival Training. That training requires significant investments of resources and time.

The EW 1 PLA sets standard workweek and workday lengths for all covered employees, allowing contractors to plan work on the project well in advance. The agreement also sets out covered employees' wages and benefits, allowing contractors to predict their labor costs in advance. Employees covered by the PLA earn family-sustaining compensation, ranging from $93.12 to $166.93 per hour in total wages and benefits.

The EW 1 PLA also ensures that once work is underway, projects are completed smoothly and on time. It establishes a five-step grievance process that includes input from union and employer representatives. The grievance process includes fast turnarounds between steps, making sure that any dispute is settled quickly and without disrupting construction. The agreement also prohibits all work stoppages, including strikes and lockouts, meaning work continues while disputes are resolved. If such a work stoppage ever occurs, the PLA provides for an expedited arbitration procedure to resume work within twenty-four hours. The agreement also provides for

speedy resolution of craft jurisdictional disputes between unions.

The EW 1 PLA contains a "Standard of Excellence" provision to "reinforce the pride of every construction worker and the commitment to be the most skilled, most productive, and safest workforce available to construction employers and users in the United States." Under that provision, both labor and management make commitments to each other. The members represented by NABTU's affiliates agree to:

1. Provide a full day's work for a full day's pay;

2. Safely work toward the timely completion of the job;

3. Arrive to the work location on time and work until the established quitting time;

4. Adhere to established meal periods;

5. Promote a drug- and alcohol-free work site;

6. Work in accordance with all applicable safety rules and procedures, as well as vessel rules and procedures;

7. Allow union representatives to handle jobsite disputes and grievances without resort to slowdowns or unlawful job disruptions;

8. Respect management directives that are safe, reasonable, and legitimate;

9. Respect the rights of coworkers; and

10. Respect the property rights of the owner, prime contractor, management, and contractors.

Management, in turn, agrees that the unions should expect the following from contractors working on the project:

1. Management adherence to the EW 1 PLA;

2.       Communication and cooperation with trade foremen and stewards;

3.       Efficient, safe, and sanitary management of the jobsite;

4.       Efficient job scheduling to mitigate and minimize unproductive time;

5.       Efficient and adequate staffing by properly trained employees by trade;

6.       Availability of equipment and tools to ensure efficient job progress;

7.       The provision of proper blueprints, specification, direction, and materials in a timely manner;

8.       The promotion of jobsite dispute resolution and leadership skills to mitigate such disputes; and

9.       The treatment of all employees in a respectful and dignified manner, acknowledging their contributions to a successful project.

EW 1 contractors have further agreed to provide comprehensive safety, equipment, and other training to building trades workers, fueling the growth of a U.S. base of qualified offshore wind workers. The PLA prioritizes worker safety and reduces the risk of lost time due to injuries by requiring contractors to follow strict safety standards. All applicants for employment offshore must be certified as fit for duty and must have passed a recent medical examination.

Empire Wind signed a separate PLA with the Building and Construction Trades Council of Greater New York and Vicinity, a NABTU affiliate, for related onshore construction work.[2] That agreement creates over 1,000 union construction jobs and apprenticeships in connection with the construction of the South Brooklyn Marine Terminal. The South Brooklyn Marine Terminal will

---

[2]       Empire Wind, *Equinor Establishes Major Union Partnership for New York's First Offshore Wind Hub* (Mar. 27, 2024), https://www.empirewind.com/2024/03/27/empire_wind_signs_first_ pla/.

be a construction and staging site and operations port for the EW 1 project. Decl. of Theodore Muhlfelder ¶ 4, Dkt. No. 8-2 [hereinafter Muhlfelder Decl.].

To date, 4,000 employees have worked on the EW 1 project and associated construction, including workers engaged in onshore construction work and workers fabricating specialized vessels and equipment for the project. Muhlfelder Decl. ¶ 36. Members of NABTU's affiliates are working offshore under the EW 1 PLA and, but for the Suspension Order, expected to continue to do so. Even more members of NABTU's affiliates are working onshore. If the Suspension Order remains in place after January 16, 2026, the likely result is the cancellation of the project, and the termination of the union construction workers building the project. *Id.* ¶¶ 45-55.

### B. NABTU's Members Are Building Cutting-Edge Offshore Energy Facilities.

Equinor Wind US LLC won the lease for the EW 1 project area in December 2016 and secured permits for the project between January 2017 and February 2024. Muhlfelder Decl. ¶ 42. Empire Wind began construction of an onshore substation at the South Brooklyn Marine Terminal in April 2024, which is close to 90% complete and is expected to be commissioned in July 2026. *Id.* ¶ 7. Offshore work began in July 2024. *Id.* ¶ 8. Employees working under the EW 1 PLA are set to install fifty-four wind turbines and an offshore substation approximately fourteen miles off the coast of New York. *Id.* ¶ 3.

The EW 1 construction project is extremely complex. Employees began installing monopile foundations for the turbines in June 2025. Muhlfelder Decl. ¶ 9. The monopiles are steel tubes measuring thirty-six feet across that are driven 180 feet into the seabed. 1 Equinor, *Empire Offshore Wind: Empire Wind Project (EW 1 and EW 2) Construction and Operations Plan*

3-8 (Nov. 2023) [hereinafter Equinor, *COP*].[3]  Employees will use a vessel to place scour protection rock to prevent erosion due to currents and waves around the cables, the base of the monopiles, and the base of the offshore substation foundation.  Muhlfelder Decl. ¶ 14.  Then, employees will install the turbine towers, nacelles, and blades on top of the monopiles.  *Id.*

The turbines will be connected to an offshore substation by miles of inter-array cables, approximately 75% of which workers have already installed.  Muhlfelder Decl. ¶ 12.  The cables consist of bundled copper cores and a fiber optic cable surrounded by insulation and protective shielding, with diameters of up to 170 millimeters and lengths of up to 116 nautical miles.  Equinor, *COP*, *supra*, at 3-18.  Employees install the inter-array cables in trenches dug six feet into the seabed.  *Id.*  The offshore substation will transform the energy generated by the turbines into higher voltage electricity for transmission onshore through offshore export cables.  Muhlfelder Decl. ¶ 10.  The offshore substation topside, which has yet to be installed, contains transformers and other electrical equipment, as well as safety and navigation features.  *Id.* ¶¶ 10-11.  Employees will install the offshore substation's topside over four to six days using a specialized heavy lift vessel called the *Sleipnir* (pictured below).  *Id.* ¶ 22.

---

[3]     https://www.boem.gov/sites/default/files/documents/renewable-energy/Public_EOW_ COP_v7_Volume%201_Project%20Information%20Redacted.pdf



Photograph of the *Sleipnir*, *in* Heerema Marine Contractors, *Sleipnir*.[4]  Employees will then use the *Crossway Eagle* (pictured below), a specialized accommodation jack-up vessel, to commission the offshore substation's safety systems, power up the offshore substation, and complete necessary air conditioning system work.  Muhlfelder Decl. ¶ 23.

---

[4]     https://www.heerema.com/heerema-marine-contractors/fleet/sleipnir (last visited Jan. 9, 2026).



Photograph of the *Crossway Eagle*, *in* Macro Offshore, *Crossway Eagle*.[5]

Electricity will run from the offshore substation to the onshore cable landing location through ninety-two miles of submarine export cables.  Muhlfelder Decl. ¶ 13.  The two export cables each have one-foot diameters and are buried between six and fifteen feet under the seabed.  Equinor, *COP*, *supra*, at 3-17.  So far, employees have buried eighty-four miles of export cables.  Muhlfelder Decl. ¶ 13.

Employees working under the EW 1 PLA finished installing the fifty-four monopiles in October 2025.  Muhlfelder Decl. ¶ 9.  The *Sleipner* is fully loaded with the over 3,000-ton offshore substation topside and is expected to arrive on or around January 10, 2026.  *Id.* ¶ 31.  If the topside is not installed by January 26, 2026, the *Sleipner* will be unavailable for at least a year, and the

---

[5]        https://macro-offshore.com/our-fleet/crossway-eagle/ (last visited Jan. 9, 2026).

installation will have to be delayed or cancelled. *Id.* ¶ 30. At the time of the Suspension Order, members of NABTU's affiliated unions had started to load scour protection rock onto ships for installation, were finishing installation of the inter-array cables, and were repairing part of the export cable damaged by a recent storm. *Id.* ¶ 21. Though employees continue trenching inter-array cables and monitoring EW 1 infrastructure, all other offshore work has been suspended. *Id.* ¶ 28.

Empire Wind anticipated energizing the offshore substation, inter-array cables, and export cables between February and June 2026. Muhlfelder Decl. ¶ 14. The wind turbine generator components are currently scheduled to arrive at the onshore work site beginning in April 2026, for offshore installation in October 2026. *Id.* ¶ 9. Building trades employees were set to install the turbine towers, nacelles, and blades, with the first turbine to be completed and delivering power late this year. *Id.* ¶ 15. Construction was scheduled to end by summer of 2027, with all turbines generating power by the end of next year. *Id.*

The above description of the project demonstrates that although much work has been performed by members of NABTU's affiliated unions, much work remains to be done. The Suspension Order, however, has thrown skilled union trades workers out of work; threatens to idle substantially more union construction workers; and has left a massive semi-completed construction project standing still fourteen miles off the coast of New York.

### C. *A Preliminary Injunction Will Protect NABTU's Members' Livelihoods.*

Empire Wind is entitled to a preliminary injunction because it is likely to succeed on the merits of its claims; it is likely to suffer irreparable harm in the absence of preliminary relief; the balance of equities tips in its favor; and an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). When evaluating whether a preliminary injunction is in the public interest, courts weigh the social and economic costs of maintaining the status quo.

*See Nat'l Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 616 (D.C. Cir. 1980); *see also Gov't of Manitoba v. Zinke*, 849 F.3d 1111, 1121-22 (D.C. Cir. 2017) (weighing the costs of delaying construction of a water treatment plant in determining the public interest of modifying an injunction).[6]

The Suspension Order jeopardizes not only the just transition to clean energy, but also the livelihoods of construction workers represented by NABTU's affiliates. The offshore portion of the project has already started to provide steady employment and solid, middle-class wages and benefits to building trades workers. The average hourly wage on the project is $76.13, and the average fringe benefit contribution is $69.50 per hour (found by averaging the second-highest and second-lowest rates). Empire Wind contractors, unions, and joint labor-management apprenticeship programs provide training opportunities for the next generation of building trades workers, securing a pipeline of expert offshore wind employees for the future and providing those workers with the credentials and experience they need to support their families.

At the time of the Suspension Order, workers represented by NABTU's affiliates anticipated many more work hours on the project to finish trenching cable, install the offshore substation topside, and install the turbine towers, nacelles, and blades. The workers who have invested the time to obtain the specialized skills necessary to work offshore have been forced to seek work elsewhere. Even if the Suspension Order is eventually declared unlawful, without an injunction, those workers trained to work on the EW 1 project will need to find work elsewhere to support their families. As a result, without a preliminary injunction, other workers will have to be

---

[6]    For the reasons explained in Empire Wind's motion and brief, NABTU agrees that a preliminary injunction is appropriate here due to the likelihood of success on the merits, the irreparable harm that will be suffered, and the balance of equities. This brief addresses only the public interest prong.

trained, which will delay the project even further.

The apparent temporary nature of the Suspension Order does not lessen these harms. Though the order suspends activities only "for the next 90 days," the federal government retains the authority to "further extend the 90-day suspension period." Suspension Order, *supra*. More importantly, as Empire Wind explains in its brief, even a ninety-day delay will likely result in the cancellation of the project. Employees working under the EW 1 PLA cannot put their bills on hold for three (or probably more) months, waiting for a permanent injunction. They will have to find new employment, and new workers will have to be trained to perform the specialized offshore construction work.

This Court should promptly protect the wages, benefits, training, and livelihoods of the U.S. unionized offshore construction workforce by enjoining the Suspension Order.

## CONCLUSION

This Court should grant Empire Wind's motion for a preliminary injunction.

Respectfully submitted,

/s/ Jonathan D. Newman
Jonathan D. Newman (D.C. Bar No. 449141)
Jacob J. Demree (D.C. Bar No. 90012042)
Blake Phillips (D.C. Bar No. 90027926)*
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com
demree@shermandunn.com
phillips@shermandunn.com

* Pro hac vice admission pending

January 9, 2026

## CERTIFICATE OF COMPLIANCE

In accordance with Local Rule 7(o), I certify that this brief conforms to the requirements of Local Rule 5.4, complies with the requirements set forth in Federal Rule of Appellate Procedure 29(a)(4), and does not exceed twenty-five pages.

/s/ Jonathan D. Newman
Jonathan D. Newman (D.C. Bar No. 449141)
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com

January 9, 2026

## CERTIFICATE OF SERVICE

I certify that on January 9, 2026, this brief was filed using the Court's CM/ECF system.

All attorney participants in the case are registered CM/ECF users and will be served electronically

via that system.

<u>/s/ Jonathan D. Newman</u>
Jonathan D. Newman (D.C. Bar No. 449141)
SHERMAN DUNN, P.C.
900 Seventh Street, N.W.
Suite 1000
Washington, D.C. 20001
(202) 785-9300
newman@shermandunn.com

January 9, 2026