# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EMPIRE LEASEHOLDER LLC, and EMPIRE
OFFSHORE WIND LLC,

     *Plaintiffs,*

          Case No. 1:26-cv-00004-CJN

          Judge Carl J. Nichols

v.


DOUGLAS J. BURGUM, in his official capacity
as Secretary of the U.S. Department of the
Interior,
U.S. DEPARTMENT OF THE INTERIOR,

MATTHEW GIACONA, in his official capacity
as Acting Director of the Bureau of Ocean Energy
Management, and

BUREAU OF OCEAN ENERGY
MANAGEMENT.

     *Defendants.*


**BRIEF OF AMICI CURIAE SAVE LONG BEACH ISLAND, INC. AND PROTECT OUR COAST - LINY IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

I.    Empire Wind Is Unlikely to Succeed on Its Claim That OCSLA § 1341 Provides the Exclusive Authority for National-Security Suspensions, and its Lease Terms do not Circumscribe the Secretary's Authority.................................................................................................. 3

II. Empire Wind Is Unlikely to Succeed on Its Due-Process and APA § 558 Claims.................... 5

III. The Public Interest Favors Denying Injunctive Relief as Offshore Wind Poses a Significant National Security Risk, is Ineffective in Climate Change Mitigatory Efforts and Unsafe for Marine Mammal Ecosystems......................................................................................... 6

　A.   Offshore Wind Projects Pose a Substantial National Security Risk ................................. 6

　B.   Offshore Winds' Efficacy in Greenhouse Gas Reduction is Dubious……………………..8

　C.   Environmental Harms of Offshore Wind are Substantial, Particularly on Marine Mammal Ecosystems................................................................................................11

　D.  Alternative Energy Supply Exists to Replace Offshore Wind…………………………………………………………………………………………..20

　CONCLUSION................................................................................. 22

# TABLE OF AUTHORITIES

**Cases**

Buckingham v. Sec'y of U.S. Dep't of Agric., 603 F.3d 1073, 1086 (9th Cir. 2010) .................... 6

Russello v. U.S., 464 U.S. 16, 23 (1983) ........................................................................ 3

**Statutes**

43 U.S.C. § 1337(p) .................................................................................................... 3

43 U.S.C. § 1337(p)(4)(F) .......................................................................................... 4

43 U.S.C. § 1337(p)(5) ............................................................................................... 4

43 U.S.C. § 1341 ....................................................................................................... 4

5 U.S. Code § 558(c) .................................................................................................. 5

5 U.S. Code § 558(c)(2) .............................................................................................. 6

**Other Authorities**

Appendix A - Vineyard Wind 1 Offshore Wind Energy Project Final Environmental Impact

Statement Volume II (Mar. 2021),

https://tethys.pnnl.gov/sites/default/files/publications/Vineyard-Wind-1-FEIS-Volume-2.pdf.. 9

Estimates of the Capacity Factor of Wind Farms in the United States, T.C. Larsen and P. Rez,

March 25, 2019, ................................................................................................... 7

Immature Offshore Wind Technology: UK Life Cycle Capacity Factor Analysis,

Sindre Lorentzen | Petter Osmundsen, 8 March 2023, https://docs.wind-

watch.org/Wind%20Energy%20-%202024%20-%20Lorentzen%20-%20Immature%20Offshore%20Wind%20Technology%20UK%20Life%20Cycle%20Capacity%20Factor%20Analysis.pdf ............................................................................ 7

Technical Assessment of Onshore and Offshore Wind Generation Potential in New England, May 1, 2007,  https://www.iso-ne.com/committees/comm_wkgrps/othr/sas/mtrls/may212007/levitan_wind_study.pdf ........... 8

United States - Land Based and Offshore Annual Average Wind Speed at 100 Meters, December 13, 2013,................................................................................................................................ 8

**Regulations**

30 C.F.R. § 585.417(b)............................................................................................................. 3

30 C.F.R. § 585.418 ................................................................................................................ 5

30 C.F.R. Part 585 ................................................................................................................... 3

## STATEMENT OF INTEREST

Save Long Beach Island Inc. ("Save LBI") is a 501(c)(3)non-profit corporation, of over 10,000 supporters, organized under the laws of New Jersey, and created to guard human and natural resources. These resources include, for example: marine mammals, fish, and other species that inhabit, use, or migrate off the New Jersey and New York coasts; the aesthetic elements of Long Beach Island and the New York Bight; economic interests strongly tied to the maintenance of the environmental features comprising Long Beach Island and the New York Bight, inter alia. These resources, in particular, the marine mammals off the NJ and NY coasts, are being harmed, harassed, and killed, in large part by the activities authorized by NMFS and BOEM in the waters of the NJ/NY Bight. These marine mammals, not only are exceptionally important to the oceanic ecosystems, but they also impart carbon dioxide mitigatory effects. Save LBI supporters have an ardent interest in preserving the marine mammals, some of which, like the North Atlantic Right Whale, are critically endangered species. Save LBI recently prepared and submitted a 232-page Critical Habitat Petition to NOAA, requesting, *inter alia*, designation of critical habitat throughout the migratory corridor of the North Atlantic Right Whale, and the prohibition of offshore wind turbine construction within same. Such a request demonstrates a redoubtable interest in protecting marine mammals, not only east of LBI, but throughout the migratory corridor of the North Atlantic Right Whale.

Protect Our Coast – LINY ("POC – LINY") is an organization formed to protect the environment in all of Long Island's coastal waters. They are committed to protecting every inch of Long Island's coasts, be it the ocean or the sound as well as the natural communities and neighborhoods that surround them. The group seeks to identify, and mitigate or avoid, any adverse impacts that could result from the transmission line cables, substation(s) and other infrastructure.

The group also seeks to conserve the natural environments on land and in the sea; preserve natural habitats; protect human health and welfare; and, preserve the community character through orderly development. The group opposes the inappropriate industrialization of Long Island's remaining natural environment.

As such, the ongoing suspension order halting Empire Wind's activities, and ultimately what eventuates from that order in the coming weeks to months, bears strongly on the interests of both organizations. Both Save LBI and POC – LINY have engaged strenuously in litigation, administrative proceedings, and other venues over the years to prevent the unnecessary destruction of the marine environment via unsafe and ineffective offshore wind. Hence, these organizations strongly posit – for a multiplicity of reasons – that Empire Wind's preliminary injunction should not be granted. As described *infra*, the public interest factor strongly militates against granting injunctive relief.

I.    **Empire Wind Is Unlikely to Succeed on Its Claim That OCSLA § 1341 Provides the Exclusive Authority for National-Security Suspensions, and its Lease Terms do not Circumscribe the Secretary's Authority**

Empire Wind avers – erroneously – that "A suspension for national security reasons is authorized only under Section 1341 of OCSLA" and "Aside from Section 1341, OCSLA contains no authority for Interior to suspend operations for 'national security' reasons." ECF 8 at 31. Empire Wind then invokes the "Russello"[1] negative implication statutory canon of construction (expressio unius est exclusio alterius) in furtherance of this argument, but their analysis fails at the threshold as OCSLA is not otherwise silent on national security suspension authority outside § 1341.

In 2005, Congress enacted a separate later-in-time statutory section for renewable energy leasing on the Outer-Continental Shelf, at OCSLA § 8(p),  codified at 43 U.S.C. § 1337(p) (via Energy Policy Act of 2005 (Pub. L. 109-58)). Congress did not merely impose an abstract duty to consider national security in that section; rather it expressly directs the Secretary to "provide for the duration, issuance, transfer, renewal, **suspension**, and cancellation of a lease, easement, or right-of-way under this subsection [emphasis added]." 43 U.S.C. § 1337(p)(5).

The express statutory authority of 43 U.S.C. § 1337(p) was implemented through the renewable energy regulations in 30 C.F.R. Part 585, which in turn sanctions BOEM to order a suspension "(b)When the suspension is necessary for reasons of national security or defense." 30 C.F.R. § 585.417(b). 30 C.F.R. Part 585's authority derives from the renewable energy statutory provisions of OCSLA, 43 U.S.C. § 1337(p). Accordingly, Empire Wind's spurious claim that § 1341(c) supplies the exclusive national security suspension pathway is discordant with the text of 43 U.S.C. § 1337(p)(5) and the cognate implementing regulations, namely, 30 C.F.R. § 585.417(b).

---

[1] Russello v. U.S., 464 U.S. 16, 23 (1983).

43 U.S.C. § 1337(p)(4)(F) provides further evidence that Congress intended to endow the Secretary with the authority to suspend leases in the context of renewable energy, as (F) requires the Secretary to provide for the "protection of national security interests of the United States." Such a charge cannot be enforced absent authority to suspend leases due to national security.

Conversely, OCSLA 43 U.S.C. § 1341 is the specialized wartime / declared emergency mechanism which necessitates a Defense recommendation and includes a compensation regime, features absent from 43 U.S.C. § 1337(p)(5)'s general directive that the Secretary provide for suspension in administering the renewables leasing program. As such, OCSLA 43 U.S.C. § 1341 addresses the specific circumstance of war/national emergency while 43 U.S.C. § 1337(p)(5) and 30 C.F.R. Part 585 provide the general suspension authority within the renewable energy program. Therefore, Empire Wind's citation to Russello is inapposite here as Congress did address the relevant issue in the renewable energy provisions of OCSLA which govern in this situation. The Secretary possesses clear statutory and regulatory authority to suspend lease operations due to reasons of national security.

Empire Wind's argument that their lease terms purportedly circumscribe the Secretary's authority to suspend lease operations is unavailing. As an initial matter, lease provisions cannot invalidate duly enacted and promulgated statutory and regulatory authority (authority which, as described *supra*, confers ostensible authority to suspend lease operations due to national security reasons). Secondly, the putative "lease amendment" of December 2024 (Exhibit K, ECF 8-11) on which Empire Wind relies is not a proper touchstone for this Court's analysis because its validity and effect are disputed and are the subject of ongoing administrative challenge.[2] Regardless, the

_____

[2] Save Long Beach Island, Inc. and Green Oceans submitted an administrative petition to BOEM on October 20, 2025, requesting that BOEM reconsider and correct the December 2024 lease

existence or scope of the Secretary's suspension authority does not turn on the phrasing of a lease addendum; it turns on Congress's delegation in OCSLA § 43 U.S.C. § 1337(p) and the duly promulgated implementing regulations, interpreted in light of statutory structure and purpose.

## II. Empire Wind Is Unlikely to Succeed on Its Due-Process and APA § 558 Claims

Empire Wind errs in arguing that the Suspension Order is unlawful because it allegedly issued without prior notice or an opportunity to be heard (ECF 8 at 34). The governing regulations for suspensions do not impose any requirement of advance notice or a pre-suspension hearing. 30 C.F.R. § 585.418 ("How will BOEM issue a suspension?") provides: "a) BOEM will issue a suspension order orally or in writing; b) BOEM will send you a written suspension order as soon as practicable after issuing an oral suspension order; and, c) The written order will explain the reasons for its issuance and describe the effect of the suspension order on your lease or grant and any associated activities. BOEM may authorize certain activities during the period of the suspension, as set forth in the suspension order."

That framework contemplates prompt agency action with written reasons provided post-issuance.

Moreover, nor does any putative absence of prior notice or hearing contravene the APA, Section 558. 5 U.S. Code § 558(c) clearly provides that prior notice and hearing are inapplicable in situations of public safety, "Except in cases of willfulness or those in which public health, interest, or safety requires otherwise." National security concerns irrefragably fall within the ambit

---

amendments relied upon by Empire Wind, on the grounds (inter alia) that the amendments exceeded BOEM's lawful authority and are discordant with OCSLA § 1337(p) and its implementing regulations. Amici do not ask the Court to resolve that administrative matter here; it is noted only to underscore that the Lease addendum is not a stable or dispositive source of the Secretary's suspension authority.

of public safety concerns. Additionally, fact patterns wherein APA Section 558 becomes relevant deviate from the instant case. 5 U.S. Code § 558 is a "second-chance" provision which enables a licensee to endeavor to achieve compliance; this is evidenced by 5 U.S. Code § 558(c)(2), "opportunity to demonstrate or achieve compliance with all lawful requirements." "The purpose of § 558(c) is to give permittees a 'second chance." Buckingham v. Sec'y of U.S. Dep't of Agric., 603 F.3d 1073, 1086 (9th Cir. 2010). This case does not involve an alleged compliance failure that Empire Wind could 'demonstrate or achieve' compliance with.

Therefore, Empire Wind has not demonstrated any due process deprivation or APA Section 558 violation.

### III. The Public Interest Favors Denying Injunctive Relief as Offshore Wind Poses a Significant National Security Risk, is Ineffective in Climate Change Mitigatory Efforts, and Unsafe for Marine Mammal Ecosystems

#### A. Offshore Wind Projects Pose a Substantial National Security Risk

The claim that prior approvals found that national security issues were resolved is not credible. The problem of interference with military radars has been raised repeatedly by the Department of War, numerous commentors, and the Bureau of Ocean Energy Management itself in its 2020 Report titled, "Radar Interference Analysis for Renewable Energy Facilities on the Atlantic Outer Continental Shelf." OCS Study, 2020-039, without resulting in the inclusion of corrective action into the projects. Moreover, the assertions that this serious problem can readily be corrected is wrong. Basic geometry and publicly available information make clear that large offshore wind complexes inevitably interfere with long-range radar systems, and that no corrective action is in sight.

Modern offshore wind complexes pose a serious risk to the effectiveness of ARSR-4 long-range military radars. The immense size of turbine structures arranged in dense rows creates a radar cross-section thousands of times larger than that of the smaller aircraft or objects these systems are designed to detect. This results in significant blind spots behind wind complexes that are invisible to radar coverage. In addition, ARSR-4 radars rely on Doppler processing (changes in detected frequency from moving objects) to identify moving targets. The outer part of turbine blades can approach speeds of 200 mph, closely matching the Doppler signatures of real airborne targets, making it extremely difficult to distinguish legitimate objects from turbine blade interference.

The publicly released "Summary of Test Results for the Interagency Field Test and Evaluation of Wind Turbine–Radar Interference Mitigation Technologies" (September 2013) concluded that software or mitigation measures on the radar itself cannot restore its capability. The only possible remedy was the installation of new "infill" radars to see behind the wind complex, or install much smaller turbines which, for economic reasons, the companies don't want to consider.

Shoreline and ocean geometry makes effective placement of <u>onshore</u> infill radars impractical. Radars would need to be positioned far from the blind spots to see them, which introduces their own coverage gaps due to the curvature of the earth. For example, at 45 miles, a target below 1,100 feet in altitude would not be visible to a radar antenna positioned 100 feet above ground level. Proposals to place sensitive "infill" military radars on <u>offshore</u> wind turbines, substations, or platforms are unacceptable. These facilities are owned and operated by foreign corporations—often supported by foreign governments—and may be co-located with electronic equipment from potential adversaries. This raises serious national security concerns.

Sea-based radars introduce further problems, including corrosion, harsh operating environments, sea clutter, maintenance challenges, platform motion instability, and the need for guaranteed power and secure communications. Floating radar platforms would require complex stabilization systems and currently present no reliable solution. The federal SENSR program, intended to replace legacy radars, remains in development, has released no public testing data demonstrating effectiveness against wind turbine interference, faces uncertain funding, and would still require offshore infill radars. It offers no viable solution now or in the foreseeable future. The ARSR-4 radar interference problem cannot be adequately corrected now or in the foreseeable future. If workable solutions existed, they would have already been incorporated as mitigating measures into approved offshore wind projects. They were not.

### B. Offshore Winds' Efficacy in Greenhouse Gas Reduction is Dubious

A capacity factor is the ratio between actual energy produced and the hypothetical maximum energy possible. It's a key metric in assessing emission displacement potential. Research demonstrates that a minimum capacity factor of 33% is necessary for wind power to induce any net reduction in $CO_2$ emissions when displacing combined cycle natural gas (CCGT). An Arizona State University study explained, "if wind power is displacing combined cycle natural gas the capacity factor has to be greater than 33% for a net reduction in CO2 emissions."[3] This is partially due to the inefficient ramping and cycling of gas plants required to compensate for wind variability. Combined cycle natural gas (CCGT) is currently the primary source of electricity

---

[3] Estimates of the Capacity Factor of Wind Farms in the United States, T.C. Larsen and P. Rez, March 25, 2019,
https://www.degruyterbrill.com/document/doi/10.7569/jsee.2017.629514/html

generation in the United States, both in terms of total generation and dominance among fossil fuel sources.

Empirical data from numerous existing offshore wind projects generally suggests that capacity factors are insufficient to engender any significant greenhouse gas reduction. For example, the average capacity factor for 36 wind farms in/near United Kingdom was stated to be 37%,[4] but notably the study found that capacity factors for offshore wind decrease much more celeritously than onshore wind projects. "Hughes [6] found that the capacity factor of Danish offshore wind farms decreased from 39% to 15% during 10 years of operation, from 2002 to 2012. This indicates that the deterioration in capacity factor tends to be more rapid in offshore wind farms."[5] Given a linear rate of decline, that implies that the Danish offshore wind farms' capacity factor was already below the aforesaid 33% between year 2 and year 3 of operation.

Moreover, Stateside, modelling simulations strongly corroborate the notion that observational capacity factors will be quite significantly lower than offshore wind manufacturers' aggressive projections. Based upon a best-case theoretical estimate, the AWS Truewind model estimates a 27% capacity factor for New England (onshore wind) and 35% for New England (offshore wind). "Based on the AWS Truewind model, the theoretical average capacity factor is

---

[4] Immature Offshore Wind Technology: UK Life Cycle Capacity Factor Analysis, Sindre Lorentzen | Petter Osmundsen, 8 March 2023, https://docs.wind-watch.org/Wind%20Energy%20-%202024%20-%20Lorentzen%20-%20Immature%20Offshore%20Wind%20Technology%20UK%20Life%20Cycle%20Capacity%20Factor%20Analysis.pdf

[5] Immature Offshore Wind Technology: UK Life Cycle Capacity Factor Analysis, Sindre Lorentzen | Petter Osmundsen, 8 March 2023, https://docs.wind-watch.org/Wind%20Energy%20-%202024%20-%20Lorentzen%20-%20Immature%20Offshore%20Wind%20Technology%20UK%20Life%20Cycle%20Capacity%20Factor%20Analysis.pdf

27% for onshore New England and 35% for offshore."[6] Given offshore New England contains some of the strongest average annual wind speeds on the East Coast of the USA,[7] the estimate of 35% for offshore New England would indubitably be even lower for locations south of New England in latitude, such as where Empire Wind is located to the south of Long Island.

As such, it is entirely unreasonable to dogmatically assert that offshore wind along the East Coast of the U.S. will induce meaningful reductions in greenhouse gas emissions; in fact, it is controvertible whether any such reductions will result. Both empirical and modelling data suggest the evidence is borderline that offshore wind will even exceed the break-even point of 33%. At capacity factors below 33%, negative net GHG emission reductions can result (i.e., more emissions than would have otherwise occurred without offshore wind), especially when accounting for the inefficiencies introduced by the intermittent nature of wind power and the resultant cycling of backup fossil fuel plants. Indeed, even Vineyard Wind concedes that there will be no climate mitigation impact, "Overall, it is anticipated that there would be no collective impact on global warming as a result of offshore wind projects, including the Proposed Action alone . . ."[8]

---

[6] Technical Assessment of Onshore and Offshore Wind Generation Potential in New England, May 1, 2007, https://www.iso-ne.com/committees/comm_wkgrps/othr/sas/mtrls/may212007/levitan_wind_study.pdf

[7] United States - Land Based and Offshore Annual Average Wind Speed at 100 Meters, December 13, 2013, https://www.energy.gov/eere/wind/articles/united-states-land-based-and-offshore-annual-average-wind-speed-100-meters

[8] Appendix A - Vineyard Wind 1 Offshore Wind Energy Project Final Environmental Impact Statement Volume II (Mar. 2021), https://tethys.pnnl.gov/sites/default/files/publications/Vineyard-Wind-1-FEIS-Volume-2.pdf, page 66.

Similarly, these projects have virtually no effect on sea level rise. Save LBI, in its November 14, 2024 Report titled Climate Change & Sea level Rise Effects from the Atlantic Shores South Offshore Wind Project, shows - based on data from International Panel on Climate Change (IPCC) Reports - that the Atlantic Shores project will not reduce or stop sea level rise at all; it only delays whatever sea level rise is coming by about 9 days. That is because sea level rise occurs from heat transfer from the land to the oceans and ice caps, which is in turn depends on temperature differences and elapsed time. So modest land temperature reductions with increased time results in the same heat transfer and sea level rise.

This estimate is confirmed by another study titled Estimation of Climate Change Damage Functions for 140 Regions in the GTAP9 Database by Roberto Roson and Martina Sartori Development Economics, Development Prospects Group of June, 2016.[9] The formula shows the same effect from the IPCC data, that when the change in global temperature decreases but the time period increases proportionately, you get the same sea level rise. So, the only effect now of greenhouse gas reductions is to delay, but not to stop or reduce sea level rise. Their formula, using a value of 3.3 degrees centigrade for the expected change in global land temperature by 2100, shows a delay of 2 days in sea level rise from the Atlantic Shores project, consistent with the Save LBI/IPCC estimate of 9 days.

### C. Environmental Harms of Offshore Wind are Substantial, Particularly on Marine Mammal Ecosystems

---

[9] Their formula for sea level rise (SLR) is: SLR= [($\alpha$+$\beta\Delta$t) (T −2000)], where $\Delta$t is the change in average global temperature with respect to the baseline [1985-2005], and $T$ is the year period. A panel estimation of the equation gives a value for the $\alpha$ coefficient of 0.000954281, and a corresponding value for $\beta$ is 0.003421296.

Save LBI and POC-LINY have been vigorously engaged in litigation efforts over the past three years to defend these voiceless creatures which have suffered (and will suffer) profound harm, attributable in substantial part to the environmentally improvident progression toward offshore wind development.

Apostolos Gerasoulis, Ph.D. has produced research findings which offer highly compelling statistical evidence demonstrating that offshore wind activity as the primary cause of the rapid increase in whale mortalities. As one can see depicted in the below Table 1, there was an 11.8-fold statistically significant increase in humpback whale mortality rates in the "Central Region" (see map below under "Change Factor") during 2023 which precisely harmonizes with a tripling of **offshore wind survey vessel traffic** from an annual average of 58,895 vessel miles (2015-2022) to 171,440 vessel miles in 2023. Note that general shipping traffic exhibited only a marginal increase – from 1,800,359 to 1,973,891 vessel miles per year (less than 10%), clearly insufficient to induce the sharp increase in mortalities.

**Table-1: Statistical Significance and Strength of Humpback Whale Mortality Increases Across Regions in Image-3.**

| Region | 2006-2014 Before UME deaths/year | 2015-2024 During UME deaths/year | Change Factor | Statistical Significance / Correlation Strength | OSW Traffic (miles/year) | General Traffic >80m (miles/year) |
|---|---|---|---|---|---|---|
| Central | 1.78 | 9.69 | 5.45x | Yes / Strong | 58,895 | 1,800,359 |
| Central-2023 | 1.78 | 21.00 | 11.8x | Yes / Very Strong | 171,440 | 1,973,891 |
| South | 1.98 | 4.50 | 2.27x | Yes / Weak | 20,520 | 2,138,830 |
| North | 3.89 | 3.50 | 0.90x | No / No Correlation | 0 | 383,548 |

To further enforce this causal relationship, the "North region" (see map below) serves as a useful control due to the absence of offshore wind survey vessel traffic. There (North Region), note that there was no increase in humpback whale mortalities (change factor of 0.9X in the above chart, indicating essentially no change), notwithstanding the fact that significant general vessel traffic was present – 383,548 vessel miles per year. These **findings directly belie** the assertion that increase whale mortality is ascribed to general vessel strikes. Rather, offshore wind surveying and concomitant activities are the primary etiologic factor in the mortality uptick. **The fact that the central region saw such a significant uptick in mortalities but the north region did not (a region with no increase in offshore wind activities) is strongly suggestive of a causal relationship between offshore wind activities and whale mortalities.**

There were 97 humpback whale carcasses recovered along the "Central Region" (NY/NJ) 2016-2024; the likely total is at least 485 due to carcass recovery rates of near 20%. 388 of those circa 485 are likely attributable to offshore wind activities. As another clear pictorial depiction of the far greater offshore wind activity in the "Central Region" see the below image (c/o Apostolos Gerasoulis, Ph.D):

13



Offshore wind activity and whale mortalities have been strongly correlated as a function time during the 2016-2024 period, as depicted in the below graph (c/o Apostolos Gerasoulis, Ph.D):

**Image-6: Offshore Wind Traffic vs Whale Deaths in the Central Region from 2015-2024(excluding 2021 outlier year)**



These statistical data are strongly corroborated by biological and empirical data globally, evincing robust spatiotemporal correlations between marine mammal strandings and high-intensity noise events. Indeed, there have been innumerable such events globally over the years utilizing noise devices which highly approximate the devices employed in offshore wind activities in the NY/NJ Bight and elsewhere. Here's a small selection. This list includes but is certainly not limited to:

- National Oceanic & Atmospheric Administration. "Navy Sonar Exercises May Have Played Role in Stranding of Melon-headed Whales in Hawaii." Science Daily. Science Daily, 28 April 2006. www.sciencedaily.com/releases/2006/04/060428094046.htm

- The near mass stranding of about 200 whales in Hawaii on the heels of a naval sonar exercise this week is drawing new attention to the growing evidence that sonar activity has been linked to many more deadly stranding, https://www.nbcnews.com/id/wbna5397896.

- What Caused the Largest Known Mass Stranding of Stejneger's Beaked Whales? March 19, 2021, New scientific article is the first comprehensive paper on this elusive, deep diving species, Stejneger's beaked whale. https://www.fisheries.noaa.gov/feature-story/whatcaused-largest-known-mass-stranding-stejnegers-beaked-whales.

- Cárdenas-Henao, H., & Reyes, J. C. (2015). Stranding of sei whales (Balaenoptera borealis) in southern Chile: An evidence of mass mortality due to harmful exposure. Marine pollution bulletin, 91(1), 278-287.

- Lacerda, M. V., Santos, M. C. O., & Souto, A. S. (2021). Strandings of marine mammals associated with seismic surveys in Brazil. Aquatic Mammals, 47(2), 183-191.

- Stone, C. J., &amp; Tasker, M. L. (2012). Potential effects of seismic surveys on cetaceans in UK waters. Journal of the Marine Biological Association of the United Kingdom, 92(8),1825-1836.

  http://www.smru.standrews.ac.uk/files/2015/10/MR1_and_MR2_update_VF1.pdf

Indeed, throughout Save LBI's litigation efforts, Dr. Robert Stern[10] has convincingly demonstrated, *inter alia*, that the sparker noise devices employed in offshore wind activities closely approximate the effects of many of the stranding events cited hereinabove, that the authorized marine mammal takes via offshore wind are significantly underestimated due to use of

---

[10] He holds a Doctorate degree in Applied Mathematics and Aeronautical Engineering from the New York University Courant Institute of Mathematics and Engineering School respectively. He previously managed the Office of Environmental Compliance in the United States Department of Energy that was responsible for the review of all of that Department's environmental impact assessments and statements.

inappropriate, scientifically unsound auditory weighting functions, understated noise source levels at the turbine site, overstated noise transmission loss as the noise propagates, and overstated disturbance noise level criteria, which, when all are combined in the calculation, results in a significant underestimate in the spatial extent of the elevated propagating noise and its impact on marine mammals.

By way of example, the Atlantic Shores South Project authorized east of NJ, National Marine Fisheries Service's estimate of "0" Level A takes for the critically endangered North Atlantic Right Whale is far underestimated, and Dr. Stern estimates that with proper scientific assumptions, the number of Level A North Atlantic Right Whale Takes from permitted pile driving construction in December could be as high as 9 to 18, depending on the extent of night pile driving, or two orders of magnitude greater than that shown in the BiOp, clearly exceeding the right whale's biological removal rate and jeopardizing its continuing existence. If it is interested, Save LBI encourages the Court to view the extensive evidence for Save LBI's conclusions in its other litigations (such evidence is too protracted to fully perlustrate herein). However, below are key extracts from Dr. Stern's compelling executive summary on the impact of the proposed offshore wind projects in the NY Bight (in operational phase) on the North Atlantic Right Whale, which demonstrates that the offshore wind projects in the NY Bight will effectively block its migration, thereby threatening its continued survival.

## Executive Summary

- The final EIS does not quantify the underwater noise level from the operation of the turbines to be used. This is information that is essential to know in order to determine the impact of turbine operation from the full project on migrating endangered whales.

- The extent of operational turbine noise above the disturbance level criterion of 120 decibels(dB) from the wind complexes planned off the New Jersey and New York coasts is analyzed and presented in this report.

- Prior measurement studies of the trends in turbine noise source level versus turbine power allow for a reliable prediction of a noise source level between 181 to 192 dB from the turbines and foundations expected.

- Past agency practice and measurements of noise transmission loss, including one study on the New Jersey Continental Shelf, provide reliable noise transmission loss factors of 15 dB for noise spreading loss and 0.35 dB per kilometer for seabed attenuation. l

- With the lower source level of 181 dB and those noise loss parameters, it **requires 12 miles from the perimeter of the wind complex for the noise to dissipate to 120 dB.**

- The results are shown in the map below. The green line represents the North Atlantic right whale's (NARW) historic migration range, which is within 60 miles from shore.

- The red lines represent the distance from the wind complexes where the noise level will exceed the 120 dB level that will according to National Marine Fisheries Service (NMFS) critieria disturb the whale's behavior.

**Figure ES-1 , Extent of Operational Noise Levels Exeeding the Disturbance Criterion**



- There is general scientific consensus that the whale will try to avoid or stand-off from continuous noise above 120 dB.

- Given that, there is no route the whale could take within its historic migration range and avoid the 120 and greater decibel noise levels, thus jeopardizing its migration and continuing existence.

- There are no practical, observational mitigation measures that can be applied in an operational turbine setting.

- To leave the whale a migration corridor, wind energy projects in either the closer to shore New Jersey lease areas or the farther out New York Bight areas must cease. Given the other adverse impacts of the close-in lease areas on shore communities the choice should be obvious to any responsible decision maker.

In sum, there exists compelling, multi-disciplinary evidence that offshore wind has been, is, and will deleteriously impacting marine mammals; assertions to the contrary simply are not objectively examining the available evidence.

### D.  Alternative Energy Supply Exists to Replace Offshore Wind

Finally, offshore wind companies and various States have purported that their projects are critical to their electric supply and economy, and therefore must proceed immediately. To test that hypothesis, Save LBI did an assessment using various AI search engines to look for consistent results as to what new alternative electric energy sources are available to the affected states within a four-year timeframe (2026 through 2029). Those results are shown in the Table below.

Table 1 Alternative New Energy Supply in the Near Term, Five states

| State | Offshore Wind Projects | Wind project energy output in terawatt hours (Twh) per year (as a % of state use) | Four-year Growth (Twh) | Alternate electric energy in-state supply in the near term (Twh) |
|---|---|---|---|---|
| MA | Vineyard Wind 1 | 3.2 (6.4%) | 2.5 | 9.81 [1] |
| RI | Revolution Wind | 1.6 (21.3) | 0.4 | 0.72 [2] |
| CT | Revolution Wind | 1.2 (4.4) | 1.4 | 0.89 [3] |
| NY | Sunrise Wind Empire Wind 1 | 6.8 (4.9) | 2.8 | 23.6 [4] |

| VA | Coastal Virginia Offshore Wind | 9.5 (6.8) | 22.1 | 9.4 [5] |
|---|---|---|---|---|

Footnotes; all numbers are electric energy in terawatt hours (Twh) per year. One terawatt = one million megawatts.

Massachusetts: Sum 9.81, from hydropower New England Clean Energy Connect (NECEC) project 9.45, anticipated <u>decrease</u> from the Hydro-Quebec project 6.64, small hydropower modernization and upgrades 0.2, utility-scale solar 2.6, distributed per MA Clean Energy and Climate Plan 2.9, biomass 1.0, onshore wind 0.3.

Rhode Island; Sum 0.72, from expanded rooftop and community solar 0.34, additional utility scale solar 0.37, new onshore wind projects 0.13, bio gas generators 0.09, plus purchases from the NECEC project (not included in sum).

Connecticut; Sum 0.89, from large scale solar projects, the Solar nursery project 0.32, the Freedom Pine and Crooked Trail projects in Maine serving Connecticut 0.509, and the Hartford fuel-cell project 0.058, plus grid purchases (not included in sum).

New York; Sum 23.6, from the hydropower Champlain Hudson Power Express (CHPE) project 8.1, solar (utility plus distributed) 9.0, onshore wind projects 5.5 (some may go to New England), biomass and fuel cell 1.0.

Virginia; Sum 9.4, from approved new solar projects (Dominion Energy and PPA's) 1.64, additional proposed solar capacity (Dominion Energy and others) 2.15, distributed solar growth by 2030 per VA Clean Economy Act target 3.5, one gas peaking unit 1.6, uprates at the Surry and North Ana nuclear plants 0.5, and 2.5 more from a small modular reactor expansion at the North Anna plant-if expedited (not included in sum).

The results indicate that Massachusetts, considering both the loss in energy from the Vineyard Wind 1 project and its four-year growth needs, should not have a problem providing alternative electric energy. In fact, it shows **a surplus of 4.1 terawatt hours of energy annually**. Connecticut and Rhode Island, again considering the loss of energy from the Revolution Wind project and their growth needs over four years, show a collective deficit of 2.8 terawatt hours per year. But since they are members, along with Massachusetts, of the ISO New England grid and Massachusetts is showing a surplus that exceeds their deficit, there should not be a problem for Connecticut and Rhode Island to purchase that deficit amount from their grid. **Finally, and most germane to here, New York should not have a problem providing alternative electric energy**. Considering both the loss of energy from the Sunrise Wind and Empire Wind 1 projects and their growth needs over four years they **show a surplus of 14 terawatt hours per year**. Amici offers the above analysis solely as it bears on the public-interest prong of preliminary-injunction review.

**CONCLUSION**

For the foregoing reasons, Save LBI and POC - LINY respectfully urge the Court to deny Empire Wind's request for a preliminary injunction.

Dated: January 12, 2026
Respectfully submitted,

*/s/ Thomas Stavola Jr. Esq.*
Thomas Stavola Jr. Esq.
DC Bar ID number: 90015331
Law Office of Thomas Stavola Jr. LLC
209 County Road 537
Colts Neck, NJ 07722
tstavolajr@stavolalaw.com
732-539-7244
*Counsel for Amicus Curiae Save Long Beach Island, Inc. and Protect our Coast - LINY*

## CERTIFICATE OF COMPLIANCE

In accordance with Local Rule 7(o), I certify that this brief conforms to the requirements of Local Rule 5.4, complies with the requirements set forth in Federal Rule of Appellate Procedure 29(a)(4), and does not exceed twenty-five pages.

Dated: January 12, 2026

Respectfully submitted,

*/s/ Thomas Stavola Jr. Esq.*
Thomas Stavola Jr. Esq.
DC Bar ID number: 90015331
Law Office of Thomas Stavola Jr. LLC
209 County Road 537
Colts Neck, NJ 07722
tstavolajr@stavolalaw.com
732-539-7244
*Counsel for Amicus Curiae Save Long Beach Island, Inc. and Protect our Coast - LINY*

**CERTIFICATE OF SERVICE**

I certify that on January 12, 2026, this brief was filed using the Court's CM/ECF system.

All attorney participants in the case are registered CM/ECF users and will be served electronically

via that system.

Dated: January 12, 2026

Respectfully submitted,

*/s/ Thomas Stavola Jr. Esq.*
Thomas Stavola Jr. Esq.
DC Bar ID number: 90015331
Law Office of Thomas Stavola Jr. LLC
209 County Road 537
Colts Neck, NJ 07722
tstavolajr@stavolalaw.com
732-539-7244
*Counsel for Amicus Curiae Save Long Beach Island, Inc. and Protect our Coast - LINY*