**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

EMPIRE LEASEHOLDER LLC, AND EMPIRE
OFFSHORE WIND LLC,

                    PLAINTIFFS,

     *v.*

DOUGLAS J. BURGUM, in his official capacity
as Secretary of the Interior; U.S. DEPARTMENT
OF THE INTERIOR; MATTHEW GIACONA, in
his official capacity as Acting Director of the
Bureau of Ocean Energy Management; and
BUREAU OF OCEAN ENERGY MANAGE-
MENT,

                    DEFENDANTS.

Case No. 1:26-cv-00004-CJN

**FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR**
**PRELIMINARY INJUNCTION AND STAY PENDING REVIEW**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 2

    I.     Wind Energy Development on the Outer Continental Shelf .................................. 2

    II.    Factual Background ............................................................................................... 3

    III.   Relevant Procedural History for the Project ........................................................ 5

STANDARD OF REVIEW ................................................................................................... 7

ARGUMENT ........................................................................................................................ 8

    I.     Federal Defendants Are Not Required to Justify Withholding Classified
         Information or Provide Unclassified Summaries for the Purpose of
         Litigation ............................................................................................................. 9

    II.    BOEM Had Authority to Issue the Suspension Order ......................................... 11

    III.   The Balance of Harms Militates Against Broad Injunctive Relief ...................... 15

         A.    Empire Wind Has Not Shown Irreparable Harm Related to
              Construction Activities Planned for a Time After this Court Can
              Resolve the Merits or from Project Operations ........................................ 15

         B.    National Security Concerns Can Outweigh a Plaintiff's Irreparable
              Harm When Balancing the Harms ............................................................ 19

    IV.   Any Injunction Must Consider National Security Interests and be Narrowly
         Tailored to Any Shown Irreparable Harm ........................................................... 21

CONCLUSION .................................................................................................................... 22

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Trucking Ass'ns v. City of Los Angeles,*
  559 F.3d 1046 (9th Cir. 2009) ............................................................ 7

*Busic v. Transportation Sec. Admin.,*
  62 F.4th 547 (D.C. Cir. 2023) ................................................ 1, 2, 12, 21

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) ........................................................... 17

*CIA v. Sims,*
  471 U.S. 159 (1985) ........................................................................... 9

*Clevinger v. Advocacy Holdings, Inc.,*
  134 F.4th 1230 (D.C. Cir. 2025) .......................................................... 7

*Crowe v. Fed. Bureau of Prisons,*
  No. 24-cv-3582 (APM), 2025 WL 1635392 (D.D.C. June 9, 2025) ........................ 7

*Crowley Gov. Servs., Inc. v. Gen. Servs. Admin.,*
  38 F.4th 1099 (D.C. Cir. 2022) .......................................................... 15

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,*
  563 F.3d 466 (D.C. Cir. 2009) ............................................................. 2

*Cuomo v. U.S. Nuclear Regul. Comm'n,*
  772 F.2d 972 (D.C. Cir. 1985) ............................................................. 8

*Davis v. Pension Ben. Guar. Corp.,*
  571 F.3d 1288 (D.C. Cir. 2009) ........................................................... 7

*Dep't of the Navy v. Egan,*
  484 U.S. 518 (1988) ........................................................................... 9

*Dorsey v. Dist. of Columbia,*
  711 F. Supp. 2d 133 (D.D.C. 2010) ..................................................... 21

*Goldman v. Weinberger,*
  475 U.S. 503 (1986) ......................................................................... 19

*Haig v. Agee,*
  453 U.S. 280 (1981) ......................................................................... 12

*Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC,*
  902 F.3d 432 (4th Cir. 2018) ............................................................... 7

*Holy Land Foundation v. Ashcroft,*
  333 F.3d 156 (D.C. Cir. 2003) ........................................................... 10

*Ivy Sports Med., LLC v. Burwell*,
   767 F.3d 81 (D.C. Cir. 2014) ................................................. 13

*Lawless v. Dep't of Def.*,
   No. CV-21-2859, 2024 WL 4263851 (D.D.C. Sept. 23, 2024) ............................................. 10

*League of Women Voters of United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ................................................. 15

*Macktal v. Chao*,
   286 F.3d 822 (5th Cir. 2002) ................................................. 13

*Nat. Res. Def. Council, Inc. v. Pena*,
   972 F. Supp. 9 (D.D.C. 1997) ................................................. 19

*Nat'l Treasury Emps. Union v. Yeutter*,
   918 F.2d 968 (D.C. Cir. 1990) ................................................. 21

*National Parks Conservation Association v. Semonite*,
   282 F.Supp.3d 284 (D.D.C. 2017) ................................................. 16

*New York v. Trump*,
   No. 25-cv-11221, 2025 WL 3514301 (D. Mass. Dec. 8, 2025) ................................................. 11

*Nken v. Holder*,
   556 U.S. 418 (2009) ................................................. 8

*Olivares v. TSA*,
   819 F.3d 454 (D.C. Cir. 2016) ................................................. 19, 20

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
   831 F.3d 500 (D.C. Cir. 2016) ................................................. 7

*Save Long Beach Island, Inc. v. U.S. Dep't of Commerce ("SLBI")*,
   2025 WL 2996157 (D.D.C. Oct. 24, 2025) ................................................. 5, 6

*Sierra Club v. United States Army Corps of Engineers*,
   990 F.Supp.2d 9 (D.D.C. 2013) ................................................. 16

*Stagg, P.C. v. U.S. Dep't of State*,
   673 F. App'x 93 (2d. Cir. 2016) ................................................. 20

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
   560 F. Supp. 3d 81 (D.D.C. 2021) ................................................. 20

*United States v. Abu-Jihaad*,
   630 F.3d 102 (2d Cir. 2010) ................................................. 11

*United States v. Bolton*,
   514 F. Supp. 3d 158 (D.D.C. 2021) ................................................. 10

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) ................................................. 8

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ................................................................... 7, 8, 16, 19, 20

*Wisc. Gas Co. v. FERC*,
   758 F.2d 669 (D.C.Cir. 1985) ................................................................ 17

**Statutes**

18 U.S.C. § 798 ........................................................................................... 9

28 U.S.C. § 1491(a)(1) ............................................................................... 15

43 U.S.C. § 1331(a) ................................................................................. 2, 12

43 U.S.C. § 1337(p) ............................................................................... 13, 14

43 U.S.C. § 1337(p)(1)(C) ........................................................................ 2, 3

43 U.S.C. § 1337(p)(4) ............................................................................... 13

43 U.S.C. § 1337(p)(4)(F) ........................................................................... 12

43 U.S.C. § 1341(c) .................................................................... 1, 12, 13, 14

43 U.S.C. § 1341(d) ..................................................................................... 14

5 U.S.C. § 702 ............................................................................................. 14

5 U.S.C. § 705 ............................................................................................... 8

**Regulations**

30 C.F.R. § 585.102(a) .................................................................................. 3

30 C.F.R. § 585.105(h) ................................................................................ 13

30 C.F.R. § 585.200(a) .................................................................................. 3

30 C.F.R. § 585.417(b) ....................................................................... 4, 5, 12

30 C.F.R. §§ 585.600 ................................................................................ 3, 4

**Other Authorities**

Executive Order No. 13,526,
   75 Fed. Reg. 707 (Dec. 29, 2009) ............................................................. 9

Executive Order No. 14,347,
   90 Fed. Reg. 43893 (Sept. 5, 2025) .......................................................... 1

## INTRODUCTION

On December 22, the Department of the Interior's Bureau of Ocean Energy Management ("BOEM") suspended Empire Leaseholder LLC's ("Empire Wind's) offshore wind lease given new national security information provided by the Department of War ("DoW").[1]  The information DoW provided "includ[ed] the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects."  Letter from Matthew Giacona to David McSweeney (Dec. 22, 2025) ("Suspension Order"), Ex. B to Decl. of Jacob Tyner (Jan. 12, 2026).  BOEM concluded that those national security considerations are implicated by Empire Wind's offshore wind project.  Decl. of J. Tyner ¶¶ 7, 10 ("Tyner Decl.").

Empire Wind now seeks to preliminarily enjoin the entirety of the Suspension Order so it can continue construction activities on a project that poses a serious national security threat. That is, it seeks to immediately install an offshore substation topside that will be used to transmit electricity generated by the Project to an onshore substation in Brooklyn.  Decl. of T. Muhlfelder ¶ 9 ("Muhlfelder Decl."), Dkt. No. 8-2; *see also id.* ¶ 14 (explaining "critical remaining stages" of the Project that focus on offshore substation topside in the short run).  But Empire Wind has not shown it is entitled to broad preliminary relief.

BOEM had statutory authority to issue the Suspension Order to "protect[] national security"—"a government interest of the highest order."  *Busic v. Transportation Sec. Admin.*, 62 F.4th 547, 550 (D.C. Cir. 2023).  Empire Wind too quickly dismisses "professional judgment of military authorities" that the Court must grant "great deference when balancing the harms.  *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24 (2008).  BOEM, informed by DoW, concluded that national

---

[1] In September 2025, President Trump signed an Executive Order authorizing the Secretary of Defense to use the title "Secretary of War" and to refer the U.S. Department of Defense as "the Department of War."  *Restoring the United States Department of War,* Exec. Order 14347 (Sept. 5, 2025).  Relevant statutes here nonetheless say "Defense."  *See, e.g.*, 43 U.S.C. § 1341(c).

security risks "arise from the operation of" the Empire Wind Project, and it sought to prevent those risks . Tyner Decl. ¶¶ 4, 6, 10. Applying *Winter*, this Court must balance the requested "injunction's consequent adverse impact on the public interest in national defense" arising from those risks against Plaintiffs' alleged economic harms. *Winter*, 555 U.S. at 24. Federal Defendants submit that the balance tips in their favor. DoW is submitting classified information to the Court related to those risks. Given these national security risks, the Court should maintain the Suspension Order with respect to at least construction activities beyond the offshore substation topside and Project operations.

## BACKGROUND

### I.    Wind Energy Development on the Outer Continental Shelf

This case involves a wind energy project on the Outer Continental Shelf ("OCS"). The OCS consists of the submerged lands beneath the ocean, generally from 3 to 200 miles seaward of the coastline. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009); 43 U.S.C. § 1331(a). Under the Outer Continental Shelf Lands Act ("OCSLA"), the United States holds these lands as a "vital national resource reserve" that "should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition *and other national needs*[.]" *Id.* § 1332(3) (emphasis added). Other national needs encompass national security interests—which are the most "compelling" governmental interests. *Basic*, 62 F.4th at 549.

Interior approvals related to wind energy development on the OCS are governed by OCSLA and Interior's implementing regulations. *See* 43 U.S.C. § 1337(p)(1)(C) (authorizing the Secretary of the Interior to "grant a lease, easement, or right-of-way" for activities that "produce or support production, transportation, storage, or transmission of energy from sources other than

oil and gas"); *id.* § 1337(p)(8) (authorizing the Secretary to "issue any necessary regulations to carry out this subsection"); *see also id.* § 1334(a) ("The Secretary shall administer the provisions of this subchapter relating to the leasing of the outer Continental Shelf, and shall prescribe such rules and regulations as may be necessary to carry out such provisions.").

In granting Interior that authority, Congress directed that "[t]he Secretary shall ensure that any activity under this subsection is carried out in a manner" that satisfies multiple criteria. *Id.* § 1337(p)(4). Among them are: "protection of national security interests of the United States." *Id.* § 1337(p)(4)(F). Interior regulations delegate to BOEM the responsibility to implement Section 1337(p)(4). *See* 30 C.F.R. § 585.102(a).

Under BOEM's renewable energy regulations and lease terms, a lease issued under OCSLA does not itself authorize development. 30 C.F.R. § 585.200(a). A lessee must first assess the site, obtain BOEM's approval of a site assessment plan, and obtain BOEM's approval of a Construction and Operations Plan ("COP"). 30 C.F.R. §§ 585.600, 585.605–585.613, 585.620–585.628.

## II. Factual Background

On November 21, 2023, BOEM issued a joint Record of Decision with the National Marine Fisheries Service documenting its approval of two offshore wind facilities: Empire Wind 1 and Empire Wind 2. *See* BOEM Record of Decision, Empire Offshore Wind: Empire Wind Project (EW 1 and EW2) Construction and Operations Plan ("ROD") 7, Exhibit 1. BOEM approved a final COP in February 2024 and later re-issued the COP approval as two separate approvals for each facility. *See* Letter from David Diamond to Matthew Brotmann (Dec. 12, 2024), Dkt. No. 8-4 at 2. The Empire Wind 1 Project ("Project") has been under construction in federal waters off the coast of New York. *See* Compl. ¶ 28, Dkt. No. 3. BOEM reviewed the COP under several statutes, including OCSLA. *See* ROD 1. The COP included multiple conditions to mitigate known

risks to national security.  *See* Conditions of COP Approval (Feb. 21, 2024), Ex. A to Tyner Decl..
The COP, as approved for Empire Wind 1, includes up to fifty-seven wind turbine generators, 214
kilometers of inter-array cable, one offshore substation, one onshore substation, and other offshore
and onshore components.  *Id.*  Plans for Empire Wind 2 include up to ninety wind turbine genera-
tors, 267 kilometers of inter-array cables, one onshore substation, and other offshore and onshore
components.  *Id.*

In January 2025, the President issued a Presidential Memorandum entitled, "Temporary
Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review
of the Federal Government's Leasing and Permitting Practices for Wind Projects[.]"  90 Fed. Reg.
8363 (Jan. 20, 2025).  Section 1 of that memorandum instructs the Secretary of the Interior to
"conduct a comprehensive review of the ecological, economic, and environmental necessity of
terminating or amending any existing wind energy leases[.]"  *Id.*

"In November 2025, the DoW completed an additional assessment regarding the national
security implications of offshore wind projects, and provided senior leadership at the Department
of the Interior with new classified information, including the rapid evolution of relevant adversary
technologies and the resulting direct impacts to national security from offshore wind projects."
Suspension Order.  DoW provided that classified information to Interior on or around November
26, 2025.  Tyner Decl. ¶ 6.  Nearly three weeks later, during which time BOEM conferred with
DoW about the information, *id.*, BOEM issued an order, "pursuant to 30 C.F.R. § 585.417(b), to
suspend all ongoing activities related to the [Project] on the Outer Continental Shelf for the next
90 days for reasons of national security."  Suspension Order.

BOEM based its decision in part on the classified information it received from DoW, as-
sessing that information in the context of existing national security-based mitigation measures for

the Project. Tyner Decl. ¶¶ 4-7, 10. BOEM determined that the Project's current mitigation measures did not adequately provide for protection of national security interests. *Id.* ¶ 7. And BOEM recognized the national security risks that the Project could pose once it became operational and acted in order to assess whether additional mitigation can be imposed to address those concerns. *Id.* ¶ 10. BOEM "[a]t this time[] is not aware whether the national security risks can be mitigated[.]" *Id.* BOEM also believes "any potential mitigation measures may be more effectively incorporated into the Empire Wind Project before construction is completed." *Id.*

Concurrent with this filing, Federal Defendants are submitting the classified Declaration of Dale R. Marks ("Marks Decl.") for *ex parte*, *in camera* review. An unclassified version of Mr. Marks's declaration is attached to this brief.

## III.    Relevant Procedural History for the Project

The Project is subject to multiple ongoing actions. First, in June 2025, a group of plaintiffs (fishing industry participants, trade groups, and environmental groups) filed a complaint challenging ongoing construction activities for the Project. *See Protect Our Coast NJ, et al. v. United States, et al.*, No. 3:25-cv-06890 (D.N.J.). The lawsuit alleges that the Federal Government had a substantial basis to issue a stop work order in April 2025 to determine whether the Project will cause ecological, environment, or economic harm. *Id.* Dkt. No. 1. ¶¶ 1–6. The plaintiffs challenge a May 2025 order reinstating work, claiming that the lease for the Project is not authorized under OCSLA and that BOEM failed to comply with the Administrative Procedure Act ("APA") when it issued its May 2025 reinstatement order. The case is still in the preliminary stages.

Second, in July 2025, a group of plaintiffs challenged, among other things, BOEM's approval of the Project's COP and requested the Court to enjoin construction. *See Save Long Beach Island, Inc. v. U.S. Dep't of Commerce*, (*SLBI*), No. 1:25-CV-02214 (CJN), 2025 WL 2996157, at

*2 (D.D.C. Oct. 24, 2025). Empire Wind intervened as a defendant. *Id*. The *SLBI* plaintiff's motion for preliminary injunction only raised a claim under the Marine Mammal Protection Act, arguing that the Project would exceed permitted effects to Bottlenose Dolphins. *Id*. The Court denied preliminary relief, in part, because plaintiffs substantially delayed in requesting relief and failed to establish that construction of the Project would harm dolphins. *Id*. at 4-5. The case is also in the preliminary stages.

Finally, this case. In January 2026, Empire Wind brought this challenge to BOEM's Suspension Order, alleging violations of OCSLA, the APA, and due process. Compl. ¶¶ 9, 14. Empire Wind then moved for a preliminary injunction shortly after filing its complaint. In support of its motion, Empire Wind submitted a declaration from Mr. Theodore Muhlfelder, who is "the Vice President, Power US" for the owner of Empire Wind. Muhlfelder Decl. ¶ 1. The Muhlfelder Declaration is the basis for Empire Wind's claims for irreparable harm. *See* Pls.' Mot. for Prelim. Injunction & Stay Pending Review 37-43, Dkt. No. 8 ("Pls.' Br.").. As he explains, Empire Wind is posed to install an "offshore substation topside" that "contains transformers and electrical equipment to increase the voltage of the power received from the wind turbines so that the electricity generated by the Project can be efficiently transmitted through the export cable to the onshore substation in Brooklyn." Muhlfelder Decl. ¶ 10. He claims that, absent immediate injunctive relief to allow Empire Wind to install the offshore substation topside, the Project is at risk. The timeframe for installing the offshore substation topside is January 2026 through July 2026. *Id*. ¶ 14.

The next construction activities include "transporting all wind turbine generator components to the onshore work site and the Lease area between April 2026 and October 2026 . . . [and] installing the wind turbine generator towers, nacelles, and blades beginning in October 2026." *Id*.

Empire Wind does not focus on these activities in its irreparable harm argument. "First power from the Project . . . is expected to be delivered in late 2026." *Id.* ¶ 15. "Empire Wind is scheduled to complete construction of the [Empire Wind 1] phase by the summer of 2027, with all turbines generating power and the Project being fully operation by the end of 2027." *Id.*

**STANDARD OF REVIEW**

Empire Wind seeks a preliminary injunction under Federal Rule of Civil Procedure 65(a). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter,* 555 U.S. at 24. The movant must make a "clear showing" that it satisfies *all* four factors: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *Id.* at 22; *Crowe v. Fed. Bureau of Prisons*, No. 24-cv-3582 (APM), 2025 WL 1635392, at *6 (D.D.C. June 9, 2025) (recognizing that the "D.C. Circuit has [] repeatedly suggested that [a] 'sliding scale' approach *does not* remain good law after *Winter*" (emphasis added)); *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1235–36 (D.C. Cir. 2025) ("[W]e have (somehow) gone seventeen years without needing to say if *Winter* really meant what it can be read to have said."); *Davis v. Pension Ben. Guar. Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., Concurring) ("[T]he old sliding-scale approach to preliminary injunctions . . . is 'no longer controlling, or even viable.'" (quoting *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)); *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 439 (4th Cir. 2018) ("*Winter* made clear that *each* of these four factors must be satisfied to obtain preliminary injunctive relief." (emphasis in original)).

The balance of equities and public interest merge when preliminary relief is sought against the government, because "the government's interest is the public interest." *Pursuing Am.'s*

*Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009). Courts "should pay particular regard for the public consequences in employing the extraordinary remedy of an injunction." *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

Empire Wind also requests preliminary relief under Section 705 of the APA, which authorizes "the reviewing court" to "postpone the effective date of an agency action or to preserve status or rights pending" judicial review "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. The same factors governing preliminary injunctions also govern relief under Section 705. *See Cuomo v. U.S. Nuclear Regul. Comm'n*, 772 F.2d 972, 974 (D.C. Cir. 1985). The relief available under Section 705, however, is not the same, since the relief allowed under Section 705 can only "postpone the effective date of an agency action" or "preserve status or rights" through a stay. 5 U.S.C. § 705.

## ARGUMENT

In requesting preliminary relief, Empire Wind alleges that the Suspension Order is contrary to the APA, was issued without adequate due process, and that BOEM lacked authority for the Suspension Order. *See* Pl.'s Br. 16-35. Empire Wind bases its alleged irreparable harms on short-term *construction* delays and financing concerns that could together allegedly result in cancellation of the Project. Empire Wind does not argue that it would be irreparably harmed if relief is denied as to *operating* the Project. Empire Wind then argues that preliminarily enjoining the Order would be in the public interest. *See id.* at 35–41.

But BOEM had authority under OCSLA to issue the Suspension Order. And Empire Wind still has to demonstrate *all four Winter* factors to prevail on its motion. *Winter* made clear that, as here, national security interests can outweigh alleged irreparable harm. *See Winter*, 555 U.S. at 23

("[E]ven if plaintiffs have shown irreparable injury . . . , any such injury is outweighed by the public interest and the [military's] interest in effective, realistic training of its sailors."). In any event, preliminary injunctive relief, if appropriate for a project that poses national security risk, must be narrowly tailored to remedy the specific harm shown—which here centers on alleged harm for construction delays in the short term.

## I.    Federal Defendants Are Not Required to Justify Withholding Classified Information or Provide Unclassified Summaries for the Purpose of Litigation.

To begin, Federal Defendants are not required to justify withholding classified information from Empire Wind or its counsel and should not be required to provide an unclassified summary of those materials. *Ex parte*, *in camera* review of those materials is sufficient for this Court to determine whether to grant preliminary relief.

The information upon which BOEM relied is classified information designated as secret. Marks Decl. ¶ 7(e). The treatment, handling, and authority to determine access to classified information "is committed by law to the appropriate agency of the Executive Branch," and "flows primarily from [a] constitutional investment of power in the President." *Dep't of the Navy v. Egan*, 484 U.S. 518, 526-27, 29 (1988); *see also, e.g., CIA v. Sims*, 471 U.S. 159, 180 (1985); 75 Fed. Reg. 707 (Dec. 29, 2009). Federal law prohibits disclosure of classified information except to individuals cleared for access to the information by the head of a federal agency or designee; who have signed a nondisclosure agreement; and who have a "need to know" that information. *See id.* § 4.1(a); Exec. Order No. 13,526, § 6.1(dd), 75 Fed. Reg. at 729 (defining need to know as "a determination within the executive branch . . . that a prospective recipient requires access to specific classified information in order to perform or assist in a lawful and authorized governmental function."). In fact, unauthorized disclosure of classified information to an "unauthorized person" violates federal criminal law. 18 U.S.C. § 798.

To the extent that Empire Wind asserts that *ex parte* review of the DoW classified materials is improper in this case, Empire Wind is incorrect. *See* Pls.' Br. 19 n. 9. The Court's *ex parte*, *in camera* review is sufficient to determine whether to grant preliminary relief. Courts frequently conduct *ex parte*, *in camera* review of classified information without providing that information to opposing counsel even where the underlying agency decision relied on the classified material. *See, e.g.*, *Lawless v. Dep't of Def.*, No. CV-21-2859, 2024 WL 4263851, at *12 (D.D.C. Sept. 23, 2024) (rejecting former Central Intelligence Agency officer and Department of Defense employee's request to have his counsel access the classified information); *Lawless v. Dep't of Def.*, No. 21-cv-2859, Order 4-5 (D.D.C. Mar. 6, 2023) (denying former CIA officer and Department of Defense employee's motion to compel access to a secure computer and concluding that the court would "proceed with an ex parte, in camera examination of the classified materials"); *United States v. Bolton*, 514 F. Supp. 3d 158, 169 (D.D.C. 2021) (holding that the government was not required to disclose classified information to a former National Security Advisor even though the former National Security Advisor's lawsuit turned on that classified information). Federal Defendants have submitted the classified Declaration of Dale R. Marks to the Court in conjunction with this response for the benefit of the Court. Federal Defendants and their counsel are not permitted to share those materials with Empire Wind's counsel.

Empire Wind also requests the Court to require Federal Defendants to submit an unclassified summary of the classified materials. Pls.' Br. 19. But that is unnecessary. Courts routinely consider agency decisions relying on classified materials without requiring agencies to provide unclassified summaries of the classified information. *See e.g., Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003) (government "need not disclose the classified information to be presented *in camera* and *ex parte*") (quotation marks omitted); *Nat'l Council of*

*Resistance of Iran v. Dep't of State*, 251 F.3d 192, 208 (D.C. Cir. 2001) (government "need not disclose the classified information to be presented *in camera* and *ex parte* to the court").[2]

The process of preparing unclassified summaries of classified information also is extremely laborious and time-consuming, particularly where the underlying information might reveal intelligence sources and methods. The process requires extensive inter-agency consultation and input from intelligence community subject-matter experts to ensure that classified information is not inadvertently disclosed. This can take months. *See United States v. Abu-Jihaad*, 630 F.3d 102, 142 (2d Cir. 2010) (describing the extensive process necessary for the district court to determine that unclassified summaries of classified evidence should be provided to a criminal defendant and evaluate the adequacy of proposed summaries). There is no basis to require the extensive preparation of new documents that were not before the agency, and not part of the administrative record, to resolve Empire Wind's motion for preliminary injunction or the merits.[3]

## II.  BOEM Had Authority to Issue the Suspension Order.

BOEM was within its authority to issue the Suspension Order. BOEM regulations explicitly set forth the authority to issue the Order: "BOEM may order a suspension . . . [w]hen the

---

[2] *See also, e.g.*, *China Telecom (Ams.) Corp. v. FCC,* No. 21-1233, Order (D.C. Cir. July 14, 2022); *United States v. China Telecom (Ams.) Corp.,* No. 21-5215, Order (D.C. Cir. Mar. 30, 2022); *Muir v. Dep't of Homeland Sec,* No. 22-1318, Order (D.C. Cir. Dec. 7, 2023); *Kidd v. Transp. Sec. Admin,* No. 16-1337 (D.C. Cir. Apr. 25, 2018); *Competitive Enter. Inst. v. Dep't of Homeland Sec.,* Nos. 16-1135, 16-1139, Order (D.C. Cir. Nov. 9, 2016); *Olivares v. Transp. Sec. Admin.,* 819 F.3d 454, 462 (D.C. Cir. 2016); *People's Mojahedin Org. of Iran v. Dep't of State*, 327 F.3d 1238, 1242 (D.C. Cir. 2003).

[3] Empire Wind also asserts that the Court should consider the timing of BOEM's Order, including that BOEM issued its Order two weeks after a decision in the District Court of Massachusetts to vacate an Interior action implementing Section 2 of President Trump's January 20, 2025 Presidential Memorandum. *New York v. Trump*, No. 25-cv-11221-PBS, 2025 WL 3514301 (D. Mass. Dec. 8, 2025). That decision is irrelevant to the Suspension Order at issue here, which BOEM issued as part of the lease review directed under to Section 1 of the Presidential Memorandum.

suspension is necessary for reasons of national security or defense." 30 C.F.R. § 585.417(b). And although Empire Wind observes that OCSLA encourages responsible development of the OCS, *see* Pls.' Br. 30–31, that purpose cannot supersede interests in national security or defense obligations set out in OSCLA or BOEM regulations, *see, e.g.*, 43 U.S.C. § 1332(3) (requiring Interior to act "consistent with . . . other national needs"). This is because "protecting national security is a government interest of the highest order." *Busic*, 62 F.4th at 550. "[N]o governmental interest"— not even development of the OCS with renewable energy sources—"is more compelling than the security of the Nation." *Id*. (quoting *Haig v. Agee*, 453 U.S. 280, 307 (1981)).

Empire Wind argues that that Government can suspend a lease for national security reasons "only under Section 1341 of OSCLA," which Empire Wind argues are not present. Pls.' Br. 31. Section 1341(c) provides that leases "shall contain or be construed to contain a provision whereby authority is vested in the Secretary [of the Interior,] upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by the Congress or the President . . . to suspend operations under any lease[.]" 43 U.S.C. § 1341(c); *see also id.* § 1331(b) ("The term 'Secretary' means the Secretary of the Interior" except with regard to functions performed by the Secretary of Energy or FERC.). Section 1341(d) concerns the Secretary of Defense's designation as "restricted from exploration and operation that part of the [OCS] needed for national defense[.]"

But Section 1341 is not the sole source of statutory authority related to national security issues. *See* 43 U.S.C. § 1337(p)(4)(F), (5). Section 1337(p)(4) additionally provides that "[t]he Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for … protection of national security interests of the United States[.]" The Suspension Order issued to Empire Wind is a valid exercise of this statutory authority.

12

Empire Wind contends that Section 1337(p)(4) does not give Interior "authority to suspend a lease." Pls.' Br. 33. But paragraph (p)(4) is stated in the present tense: "The Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for" the enumerated criteria. The statute also does not limit itself to the initial decision to grant a lease. Rather, it applies broadly to "*any* activity under [the] subsection" and explicitly contemplates "[t]he Secretary [] provid[ing] for the duration, issuance, transfer, renewal, *suspension*, and cancellation of a lease, easement, or right-of-way under this subsection." 43 U.S.C. § 1337(p)(4), (p)(5) (emphasis added). In accordance with the statute, BOEM regulations require that a lessee "[c]onduct all activities authorized by the lease or grant in a manner consistent with the provisions of [43 U.S.C. § 1337(p)]." 30 C.F.R. § 585.105(h). This construction of OCSLA is also supported by general administrative law principles, as "it is generally accepted that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions." *Macktal v. Chao*, 286 F.3d 822, 825–26 (5th Cir. 2002) (citations omitted*); see also Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (agencies generally have authority to reconsider unless "Congress has spoken").

Contrary to Empire Wind's argument, *see* Pls.' Br. 32–33, Interior's authority to suspend a lease for national security reasons is not limited to the specific situations contemplated by Section 1341(c), *i.e.*, where the Secretary of Defense makes a recommendation during a state of war or national emergency. *See* 43 U.S.C. § 1341(c). Section 1337(p)(4) grants the Secretary of the Interior broad authority to ensure "protection of national security interests of the United States[.]" *Id.* § 1337(p)(4)(F). Congress did not limit the United States' interest in national security to just times of war or national emergencies, as Empire Wind seems to suggest, and Section 1337 does not require that Interior be prompted by "a recommendation of the Secretary of Defense."

*Compare* 43 U.S.C. § 1341(c), *with id.* § 1337(p)(4)(F).  Indeed, OCSLA allows the Secretary of the Interior to *cancel* leases for national security reasons outside of those circumstances.  *See, e.g.*, 43 U.S.C. § 1334(a)(2)(A)(i).  It would be incongruous with the structure and purpose of OSCLA to assume, as Empire Wind does (Pls.' Br. 32), that Congress meant to allow cancellations but withhold the lesser authority to suspend leases for national security reasons.  Empire Wind's cancel-but-no-suspend interpretation for national security reasons also makes no sense because the Government allows mitigation efforts for national security concerns.  Those efforts take time to study and, if allowed, implement.  Congress allowed BOEM to suspend a lease in these situations rather than take the more extreme cancel step any time national security arise.

The same goes for Section 1341(d). This provision "reserves and retains the right to designate by and through the Secretary of Defense, with the approval of the President, as areas restricted from exploration and operation that part of the [OCS] needed for national defense[.]"  43 U.S.C. § 1341(d).  The rights Section 1341(d) retains "through the Secretary of Defense" are separate from the obligations Section 1337(p) places on the Secretary of the Interior.  And, of course, national security interests go far beyond "need[ing]" "part of the [OCS] . . . for national defense[.]" 43 U.S.C. § 1341(d).

Finally, Empire Wind's arguments about the terms of its lease are irrelevant to the question of statutory authority.  *See.* Pls.' Br. 34–35.  Any claim that BOEM has violated the lease is a breach of contract claim over which the Court lacks jurisdiction.  The only applicable waiver of sovereign immunity Empire Wind has identified is the APA.  But the APA's waiver does not apply where "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702; *see also id.* § 704 (APA only available to challenge "final agency action for which there is no other adequate remedy in a court.").  The Tucker Act waives sovereign

immunity for suits against the United States alleging a breach of contract, placing jurisdiction exclusively in the Court of Federal Claims for any claim more than $10,000.  28 U.S.C. § 1491(a)(1); *see also id.* § 1346(a)(2).  The D.C. Circuit has "interpreted the Tucker Act . . . to impliedly forbid contract claims against the Government from being brought in district court under the waiver in the APA[.]"  *Crowley Gov't. Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (citation modified) (internal quotations omitted).

### III.    The Balance of Harms Militates Against Broad Injunctive Relief

Empire Wind's allegations of economic injuries, with no counterbalancing of national security risks, do not warrant the sweeping injunctive relief that it requests.  Beyond installing "the offshore substation topside to the offshore installation site" and energizing the electrical system for the Project's eventual operation, Empire Wind does not seriously attempt to satisfy its burden to show irreparable harm for construction-related activities that will take place before this Court can rule on the merits (perhaps later this year).  *See* Muhlfelder Decl. ¶ 14; *see also id.* ¶ 15 (describing construction activities in late 2026 and 2027).  Nor does Empire Wind allege any harms related to operation of the Project.  At all events, national security concerns can "outweigh[]" a plaintiff's irreparable harm when balancing the harms.  *Winter*, 555 U.S. at 23.

#### A.    Empire Wind Has Not Shown Irreparable Harm Related to Construction Activities Planned for a Time After this Court Can Resolve the Merits or from Project Operations

The party seeking a preliminary injunction must make two showings to demonstrate irreparable harm: (1) "the harm must be certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm"; and (2) beyond remediation. *League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016).  Empire Wind focuses on alleged economic harms related to construction delays in the

immediate future. *See, e.g.*, Pls.' Br. 37 (arguing that "critical construction activities" must commence now); Muhlfelder Decl. ¶¶ 14, 30, 48 (arguing critical construction stages). Empire Wind contends that four events, "[t]aken together," *id*. ¶ 54, threaten Project cancellation and its very existence. *See* Pls.' Br. (arguing (i) possible construction delays, (ii) potential termination fees, (iii) inability to draw down on its construction loan, and (iv) "potential for lenders[] to call the loan making it due and payable"). For a few reasons, Empire Winds fails to satisfy its burden for the sweeping injunctive relief it requests.

First, many of its alleged harms are hedged in permissive language. For example, Empire Wind raises the *potential* that lenders "may decide to seek" repayment of loans due to "impairments to government approvals." Pls.' Br. 40; Muhlfelder Decl. ¶ 41 (similar). This is not enough to show irreparable harm, as the mere *possibility* of irreparable harm is insufficient. *Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." (citation omitted)).

Second, many of its alleged harms would take place after this Court can resolve the merits, obviating the need for the sweeping and immediate injunctive relief Empire Wind requests. "[I]t is well established that 'perhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm *before a decision on the merits can be rendered.*'" *Nat'l Parks Conservation Ass'n v. Semonite*, 282 F.Supp.3d 284, 288 (D.D.C. 2017) (citing *Sierra Club v. United States Army Corps of Eng'rs, ,* 990 F.Supp.2d 9, 38 (D.D.C. 2013)). In *National Parks Conservation Association,* for example, the court found a lack of irreparable harm where construction would not begin for six months, "leaving the parties' ample time to fully brief the merits." *Id*.

In this case, Empire Wind asserts only one, imminent construction-related harm it believes would pose a threat to the Project's viability: timely construction of the offshore substation topside. It explains that the vessel needed to complete topside installation (the *Sleipnir*) will be unavailable after February 1, 2026, and procurement of another vessel would be "highly unlikely." Muhlfelder Decl. ¶ 47.  According to Empire Wind, failure to timely install this topside may "jeapoardiz[e] Empire Wind's ability to construct the Project at all." *Id.* ¶ 48.  Empire Wind does not focus on other allegations of irreparable harm that would occur before this case may be litigated on the merits.  It notes that another specialized vessel, *Crossway Eagle*, will be unable to complete sub-station decommissioning after June 2026.  But Mr. Muhlfelder only claims that "the *Crossway Eagle* cannot readily be replaced by another vessel," and that these activities will be necessary to "produce electricity." *Id.* ¶ 49.  There is no indication that these activities cannot be delayed at least until this case may be decided on the merits, or that procurement of another vessel would constitute irreparable harm.  *See Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C. Cir. 2006) (explaining the "high standard for irreparable injury").

Empire Wind speculates more generally that "[t]he threat of Project cancellation will become increasingly severe for each day the Project is delayed due to the sequential nature of the Project's construction schedule." Muhlfelder Decl. ¶ 50.  He then alleges that "construction delays" will result in "termination costs." *Id*. ¶ 51.  These general allegations of construction delays and potential fees, however, are not sufficient to carry Empire Wind's burden. "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Chaplaincy of Full Gospel Churches,* 454 F.3d at 297 (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985)).

And other construction activities, such as installation of wind turbine generator components,

17

are not expected to begin until "late 2026." Muhlfelder Decl. ¶¶ 1–15, 48. That allows sufficient time for this Court to decide the merits of Empire Wind's claims before those alleged construction harms may occur. Put differently, if Empire Wind is allowed to complete construction of the offshore substation topside, even though ultimate project operations pose national security risks, there is no indication that any irreparable harms would likely occur before this Court reaches the merits. Other *potential* construction delays are not "ongoing or imminent," and they do not arise to the level of irreparable harm. *Singh v. Berger*, 56 F. 4th 88, 109 (D.C. Cir. 2022) (quotations omitted).

Finally, Empire Wind has not made a showing of likely irreparable harm related to Project *operations* during the ninety-day suspension period or, even if that period was extended, during the pendency of this suit. The company estimates that the Project will produce "first power" later this year. Muhlfelder Decl. ¶ 15 ("First power from the Project . . . is expected to be delivered in late 2026."). But Empire Wind does not expect to begin installing wind turbine generator components until October 2026 and will not complete construction until Summer 2027. *Id.* ¶¶ 14, 15. Empire Wind does not expect the Project will be fully operational until "the end of 2027." *Id.* ¶ 15.

Empire Wind concludes its irreparable harm argument with cases about BOEM actions to offshore infrastructure. But the cases Empire Wind cites do not support granting its motion. Most of the cases do not involve national security. *See* Pls.' Br. 41–43.[4] And *SLBI*, 2025 WL 2996157, which Empire Wind quotes in support of its ripple-effect arguments, did not implicate the same national security risks now known in this case. So there was no reason for the *SLBI* decision to

---

[4] *Whitman-Walker Clinic, Inc. v. U.S. Dep't of Health and Hum. Servs.*, 485 F. Supp. 3d 1 (D.D.C. 2020) (alleging APA and constitutional violations for Department of Health and Human Services rule); *Everglades Harvesting & Hauling, Inc. v. Scalia,* 427 F. Supp. 3d 101 (D.D.C. 2019) (alleging economic and reputational harms related to Department of Labor rule); *Louisiana v. Biden*, 622 F. Supp. 3d 267 (W.D. La. 2022), rev'd on other grounds, 64 F.4th 674 (5th Cir. 2023) (challenging executive order related to climate); *Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 335, 340 (E.D. La. 2011) (alleging improper delays in government permits).

balance national security risks with alleged irreparable harms. To be sure, Judge Lamberth said "national security" in *Revolution Wind v. Burgum, et al.*, No. 1:25-cv-2999, Dkt. No. 39 at 16-18 (D.D.C.), but that case did not involve national security issues that implicate the same balance of harms here. The court in *Revolution Wind* granted the plaintiffs' motion for a preliminary injunction, *see id*. Dkt. 63, but among other errors, the court failed to follow *Winter* by "giv[ing] great deference to the professional judgment of military authorities." *Winter*, 555 U.S. at 24; *see also* No. 1:25-cv-2999, Tr. of 1/12/2026 Hr'g at 43–46 (declining to defer to military authorities). This Court should not repeat that error.

### B. National Security Concerns Can Outweigh a Plaintiff's Irreparable Harm When Balancing the Harms.

Empire Wind fails to grapple with the counterbalancing national security risks here. In weighing the balance of equities and public interest, "[t]he national security interest here must be paramount." *Nat. Res. Def. Council, Inc. v. Pena*, 972 F. Supp. 9, 20 (D.D.C. 1997). BOEM's Suspension Order was based in part on new classified national security information from DoW. Tyner Decl. ¶¶ 4-7, 9-10; Marks Decl. ¶ 7. Federal Defendants are attaching to this brief a redacted version, *see* Marks Decl., and concurrently providing an unredacted, classified version of the Marks Declaration to the Court for *ex parte*, *in camera* review.

In assessing the balance of the harms here, the Court must "give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." *Winter*, 555 U.S. at 24 (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)). "[C]ourts do not second-guess expert agency judgments on potential risks to national security." *Olivares v. Transp. Sec. Admin.*, 819 F.3d 454, 462 (D.C. Cir. 2016). Indeed, in *Winter*, the Supreme Court concluded that the Navy's (and therefore the public's) interest in military readiness "plainly outweighed" the harms to marine mammals that could affect the plaintiffs' ability to

study and observe them.  *Winter*, 555 U.S. at 33.  Other courts have similarly highlighted the import of national security concerns in considering injunctive relief.  *See, e.g.*, *Stagg, P.C. v. U.S. Dep't of State*, 673 F. App'x 93, 95-96 (2d. Cir. 2016) (noting "matters of national security . . . present the most compelling national interest"); *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 100 (D.D.C. 2021) (agency actions that "are particularly important to national security . . . are subject to significant deference").

Here, and based on recent classified information from DoW, BOEM issued the Suspension Order to address the significant national security risks that would arise if the Project becomes operational and because further mitigation measures would be necessary before the Project reaches that stage.  Tyner Decl. ¶¶ 4–7, 9–12; *see also* Pls.' Br. at 10–13 (acknowledging national security risks from the Project and explaining mitigation measures for those risks).  Those of undersigned counsel who have reviewed the classified information submit that it provides a reasonable basis on which to find that, when it comes to operation of the Project, the public interest in national security outweighs Empire Wind's alleged economic harms.  In balancing the national security risks identified by DoW against the costs alleged by Empire Wind, the Court should "defer to the informed judgment of agency officials whose obligation it is to assess risks to national security." *Olivares*, 819 F.3d at 462; see also *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 100 (D.D.C. 2021) (denying preliminary injunction despite plaintiffs' "substantial harm" because "[i]n light of the national security interests involved, the equities and public interest d[id] not favor preliminary injunctive relief.").  The Court also will review that classified information to independently balance the harms here.

**IV.    Any Injunction Must Consider National Security Interests and be Narrowly Tailored to Any Shown Irreparable Harm**

Empire Wind declines to consider national security in its balancing of the equities or in considering the public interest. *See* Pls.' Br. at 43–45. That concession is understandable because "national security is a government interest of the highest order," *Busic*, 62 F.4th at 550. The public interest thus favors Federal Defendants' interest in suspending Empire Wind's activities that impair national interests until mitigation measures may be fully considered. *See also Pursuing Am.'s Greatness*, 831 F.3d at 511 ("the government's interest is the public interest").

Regardless, "any injunction that the court issues must be carefully circumscribed and 'tailored to remedy the harm shown.'" *Dorsey v. Dist. of Columbia*, 711 F. Supp. 2d 133, 135 (D.D.C. 2010) (quoting *Nat'l Treasury Emps. Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990)); *accord Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 284 (D.D.C. 2018) ("[B]ecause preliminary injunctions are extraordinary forms of judicial relief, . . . 'any injunction that the court issues must be carefully circumscribed and tailored to remedy the harm shown.'"). Further, the harm must be suffered "while the case is pending." *Nat'l Treasury Emps. Union v. Trump*, No. 25-55157, 2025 WL 1441563, at * 1 (D.C. Cir. May 16, 2025) (citing *Winter*, 555 U.S. at 20, 32).

Applying those principles here means that any preliminary injunction should be tailored to maintain the suspension of operational activities and, if necessary, construction-related activities occurring after resolution of the merits. As noted, Empire Wind does not allege that it will suffer irreparable harm from a suspension of construction-related activities that could commence after this Court resolves the merits of its claims. *See supra* III.A. Nor has Empire Wind made a showing that it will suffer irreparable harm from any delay or suspension to Project operations. *Id.* Moreover, considering the irreparable harm Empire Wind alleges related to the need to immediately construct the offshore substation topside distinguishes this case from *Revolution Wind*, No. 1:25-

cv-2999. The *Revolution Wind* court erred when it extended injunctive relief beyond the plaintiff's claimed irreparable harm of imminent construction delays, in contravention of the requirement to "carefully circumscribe[] and tailor[]" the injunction "to remedy the harm shown." *Beacon Associates,* 308 F. Supp. 3d at 284.

Thus, any injunction—assuming the Court finds one appropriate—should retain at minimum the suspension of Project operations and future construction beyond the offshore substation topside until mitigation measures acceptable to DoW and BOEM are adopted. *See id.* Indeed, the Suspension Order, as currently stated, is slated to expire well before the end of the year. Empire Wind is not expected to begin installation of wind turbine components until late 2026, and it is not expected to produce first power until the end of this year at the earliest. Muhlfelder Decl. ¶ 15 (also noting that construction will not be complete until the summer of 2027, and the Project will be operational "by the end of 2027"). Even if the initial suspension period is extended, Empire Wind's case, as an APA case, is likely to be litigated on the merits before any harm could occur to Empire Wind's operations, or to remaining construction.

## CONCLUSION

Empire Wind has not shown it is entitled to the broad preliminary injunction it seeks. BOEM had authority under OCSLA to issue the Suspension Order. Any likelihood of success may be outweighed by the balance of equities and public interest in national security, which the Court may assess through *ex parte, in camera* review. If the Court concludes preliminary relief is appropriate, the Court should allow Federal Defendants to maintain suspension of Project operations and construction activities occurring after a decision on the merits may be reached.

January 13, 2026

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

__/s/ Peter. M. Torstensen, Jr._____
PETER M. TORSTENSEN, JR.
Deputy Assistant Attorney General
(D.C. Bar No. 1697399)

_/s/ John K. Adams___
KRISTOFOR R. SWANSON*
(Colo. Bar. No. 39378)
JOHN K. ADAMS
(Ill. Bar No. 6323541)
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 598-9646 (Torstensen)
Telephone: (202) 598-1937 (Swanson)
peter.torstensen@usdoj.gov
kristofor.swanson@usdoj.gov

*Attorneys for Federal Defendants*

*Counsel contributed to the drafting of this brief but lacks the security clearance necessary to review the classified materials.