# **EXHIBIT 1**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EMPIRE LEASEHOLDER LLC, *et al.*,  )
                                  )
     *Plaintiffs*,                 )
                                  )   Case No. 1:26-cv-00004
 v.                               )
                                  )   Judge Carl J. Nichols
DOUGLAS J. BURGUM, in his official )
capacity as Secretary of the Interior, *et al.*,  )
                                  )
     *Defendants*.                 )

## REPLY IN SUPPORT OF
## EMPIRE WIND'S MOTION FOR PRELIMINARY INJUNCTION
## AND STAY PENDING REVIEW

Tyler S. Johnson (DC Bar #1003009)
(*admitted pro hac vice*)
**BRACEWELL LLP**
701 Fifth Avenue
Suite 6850
Seattle, Washington 98104
Telephone:  (206) 204-6211
Facsimile:  (800) 404-3970
Email:  ty.johnson@bracewell.com

Ann D. Navaro (DC Bar #1643328)
David A. Super (DC Bar #429359)
Taylor M. Stuart (DC Bar #429359)
**BRACEWELL LLP**
2001 M Street NW, Suite 900
Washington, DC 20036
Telephone:  (202) 828-5800
Facsimile:  (800) 404-3970
Email:  ann.navaro@bracewell.com
     david.super@bracewell.com
     taylor.stuart@bracewell.com

Date:  January 13, 2026

*Counsel for Plaintiffs*
*Empire Leaseholder LLC and Empire Offshore*
*Wind LLC*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION .............................................................................................................. 1

ARGUMENT ...................................................................................................................... 2

    I.      The Court Enjoined the Suspension Order in *Revolution Wind v. Burgum* ................... 2

    II.     Empire Wind Is Likely To Succeed On The Merits Of Its Claims ............................ 4

        A.     Defendants concede that Empire Wind is likely to succeed on the merits of three of its four claims. .......................................................................... 4

        B.     Empire Wind is likely to succeed on the merits of its APA claim given Defendants' admission that the Order is overbroad and Defendants' recent public statements. ...................................................................... 4

        C.     Empire Wind is likely to succeed on the merits of its OCSLA claim. ................... 6

    III.    Empire Wind Faces Irreparable Harm ...................................................................... 9

    IV.    The Balance of Harms Favors Injunctive Relief ..................................................... 12

CONCLUSION ................................................................................................................. 16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*,
766 F. Supp. 3d 74 (D.D.C. 2025) ........................................................................12

*Davis v. Transportation Sec. Admin.*,
264 F. Supp. 3d 6 (D.D.C. 2017) ...........................................................................4

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
591 U.S. 1 (2020) ...............................................................................................2, 5

*Kirwa v. United States Dep't of Def.*,
285 F. Supp. 3d 257 (D.D.C. 2018) ......................................................................13

*Revolution Wind, LLC v. Douglas J. Burgum*,
No. 1:25-cv-02999 (RCL) (D.D.C. Sept. 22, 2025), Dkt. No. 63 ................1, 2, 10

*Russello v. United States*,
464 U.S. 16 (1983) ...........................................................................................6, 8

*Save Long Beach Island, Inc. et al., v. United States Department of Commerce, et al. ("SLBI")*,
No. 1:25-vc-02214-(CJN), Dkt. 27 .....................................................................9, 10

*Shawnee Tribe v. Mnuchin*,
984 F.3d 94 (D.C. Cir. 2021) ...............................................................................12

*Texas v. United States*,
798 F.3d 1108 (D.C. Cir. 2015) .............................................................................4

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) .................................................................................................9

**Statutes**

43 U.S.C. § 1334 ..................................................................................................7, 8

43 U.S.C. § 1334(a)(1) ........................................................................................7, 9

43  U.S.C. § 1334(a)(1)(B) ...................................................................................6

43 U.S.C. § 1334(a)(2) ........................................................................................7, 9

43 U.S.C. § 1334(a)(2)(A) .....................................................................................7

43 U.S.C. § 1337.................................................................................................6, 7, 8

43 U.S.C. § 1337(p)(4)...........................................................................................6, 8

43 U.S.C. § 1337(p)(4)(F).......................................................................................6, 8

43 U.S.C. § 1337(p)(D)...............................................................................................8

43 U.S.C. §§ 1337(p)(H) - (I)......................................................................................8

43 U.S.C. § 1341(c)..................................................................................................6, 7

Administrative Procedure Act Section 558.............................................................1, 4, 5

**Other Authorities**

Agreement Between the Government of the United States and the Government of
    Canada on the North American Aerospace Defense Command (April 2006),
    available at
    https://www.norad.mil/Portals/29/Documents/History/NORAD%20Agreemen
    ts/2006%20NORAD%20Agreement.pdf?ver=52SH6UU_1njFmjaq4fQUTg%
    3d%3 ..................................................................................................................15

Statement by President Trump During Oil and Gas Roundtable (Jan. 9, 2025),
    available at https://www.youtube.com/watch?app=desktop&v=LpdPuJoBmts.......................6

## **INTRODUCTION**

Just as Judge Lamberth ruled on Monday in *Revolution Wind, LLC v. Douglas J. Burgum*, No. 1:25-cv-02999 (RCL) (D.D.C. Sept. 22, 2025), Dkt. No. 63, regarding a nearly identical order as the Suspension Order against a similarly situated offshore wind project, a preliminary injunction is necessary and appropriate in this case. First, Defendants do not dispute—and thereby concede—that the Suspension Order is arbitrary and capricious, unconstitutional, and violates Section 558 of the Administrative Procedure Act ("APA"). In short, Empire Wind's likelihood of success is established. Further, Defendants' only merits argument is wrong—Defendants failed to comply with the Outer Continental Shelf Land Act ("OCSLA") when issuing the Suspension Order.

Defendants' arguments on irreparable harm fare no better. Defendants simply cannot legitimately contest the fact that the Suspension Order threatens to kill the Project and poses an existential threat to Empire Wind. Defendants' suggestion that the Suspension Order will not impact the Project's future operations simply ignores the fact that there will *be no operations* if the Project is terminated in the near term. Stated simply, the Suspension Order threatens to kill the Project *immediately* to address the mere possibility of national security concerns that may or may not arise, at the very earliest, ten months from now if the Project were to become operational.

Defendants' claim of a public interest in national security does not overcome Empire Wind's conceded success on the merits and established irreparable harm. Indeed, Defendants can only claim a public interest if the national security justification is not arbitrary and not pretextual. Here, the rationalizations provided in Defendants' declarations do not constitute a compelling public interest that is served by the Suspension Order but instead provide further evidence that Suspension Order is arbitrary and capricious. The Court should stay the Suspension Order and enter a preliminary injunction enjoining its enforcement.

<u>**ARGUMENT**</u>

**I.    THE COURT ENJOINED THE SUSPENSION ORDER IN *REVOLUTION WIND V. BURGUM***

On Monday, January 12, 2026, Judge Lamberth issued an order granting a stay and preliminary injunction in *Revolution Wind*, enjoining the government's enforcement of a suspension order nearly identical to the Order at issue here. *Revolution Wind,* Dkt. No. 63.  Judge Lamberth explained the basis for his ruling from the bench after reviewing the classified information submitted by the government *in camera*.  *See Revolution Wind,* 1/12/26 Hearing Transcript (Exhibit A).

First, Judge Lamberth found that Revolution Wind is likely to succeed on the merits of its claim that the suspension order violates the change-in-position doctrine because BOEM failed to explain which features of, or activities related to, the Revolution Wind project "implicated new national security concerns" and failed to explain how these national security concerns differed from the same concerns Revolution Wind committed to mitigating.  Tr. at 42.  Judge Lamberth held that BOEM's "failure to account for its previous assurances the project does not improperly interfere with national security clearly amounts to a change in position by the government."  *Id.* Judge Lamberth also found that "[p]ointing to ongoing national security concerns based on purportedly new classified information does not constitute a sufficient explanation for [BOEM]'s decision to entirely stop work on the Revolution Wind project," and any explanations offered by the government in press releases issued after the suspension order are insufficient because "'[i]t is a foundational principle of administrative law that judicial review of agency action is limited to the grounds that the agency invoked when it took the action."  *Id*. at 43 (quoting *Dep't of Homeland Sec. v. Regents of the Univ. of California,* 591 U.S. 1, 20 (2020)).  Finally, Judge Lamberth expressed concern regarding the pretextual nature of the order: "[BOEM's] failure to explain or

apply that reasoning suggests that the stated national security reason may have been pretextual. My concern is heightened by Interior Secretary Burgum's press appearances on December 22nd and 23rd in which he criticized offshore wind projects for a variety of reasons unrelated to national security." *Id*. at 44.

Regarding BOEM's authority to issue Revolution Wind's suspension order, Judge Lamberth found that "while the Bureau may order a suspension of operations for legitimate reasons of national security under [OCSLA] and Revolution Wind's own lease, those suspensions are limited to emergency situations and demonstrated findings of particularized harm that cannot be averted short of a total stop to project activity." *Id*. Judge Lamberth also stated that because BOEM failed to act on the Department of War's assessment between November 2025 and December 22, 2025, he was "not persuaded that any such emergency exists" and noted that he had not "been provided any evidence of a new finding of particularized harm such that the government could order an immediate suspension." *Id*. at 44-45.

Next, Judge Lamberth found that Revolution Wind is likely to suffer irreparable harm in the absence of an injunction. *Id*. at 45. He explained that the Revolution Wind project is 87% complete and that "[a]t every step, Revolution Wind has relied on approval from Interior and BOEM decisions that are currently being defended in related cases before this Court, meaning that there are strong reliance interests at stake." *Id*. Judge Lamberth also found that the suspension order threatens the collapse of the entire Revolution Wind project due to delays in the construction schedule and the potential for loss of Revolution Wind's $5 billion investment. Finally, Judge Lamberth noted that "a specialized ship necessary to complete the project will be no longer available after February of this year, which means if the stop work order is not stayed, it will be impossible for Revolution Wind to deliver energy under its power purchase agreements by its

deadline of early 2027." *Id*. Judge Lamberth concluded that the balance of harms favors allowing Revolution Wind to continue construction while the government considers the need for and means of addressing any national security concerns. *Id*. at 45-46.

Empire Wind respectfully submits that all of Judge Lamberth's conclusions apply with equal force to Empire Wind's Motion and the same result is warranted here.

## II.    EMPIRE WIND IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS

### A.    Defendants concede that Empire Wind is likely to succeed on the merits of three of its four claims.

In its Opposition, Defendants fail to even address, let alone refute, three of the four claims argued in Empire Wind's Motion:  that the Suspension Order is arbitrary and capricious, violates the Due Process Clause of the U.S. Constitution, and violates Section 558 of the APA.  Motion at 21-29 (arbitrary and capricious), 29-30 (APA § 558), 35-37 (Due Process).  The only merits argument from Empire Wind's Motion that the Opposition addresses is the argument that the Suspension Order violates OCSLA.  Opp. at 11-15.  By ignoring the remaining arguments, Defendants have conceded them. *Texas v. United States*, 798 F.3d 1108, 1114 (D.C. Cir. 2015) (courts should treat "unaddressed arguments as conceded" when "a party file[s] an opposition that addresses only some of the arguments raised in the underlying motion"); *Davis v. Transportation Sec. Admin.*, 264 F. Supp. 3d 6, 10 (D.D.C. 2017) (same).

### B.    Empire Wind is likely to succeed on the merits of its APA claim given Defendants' admission that the Order is overbroad and Defendants' recent public statements.

In the Opposition, Defendants suggest that the Court should issue only a limited injunction to suspend solely "operations and future construction beyond the offshore substation topside until mitigation measures acceptable to DoW and BOEM are adopted."  Opp. at 27.  The Court should reject Defendants' attempt to have it rewrite Defendants' unlawful Suspension Order.  First, as

explained below (*see infra* at 10-12), Defendants' proposed rewrite would do nothing to alleviate Empire Wind's irreparable harm. But more fundamentally, Defendants' *post-hoc* attempt to narrow the scope of the Suspension Order to apply solely to "operations and future construction beyond the offshore substation topside" would not make the Order any less unlawful under the APA, the Constitution, or OCSLA. As discussed in the Motion, the Suspension Order was overly broad *when it was issued* because it suspended *all construction activities* on the Lease, even those that do not have the potential to impact national security. Motion at 43-44. Indeed, Defendants have now conceded that the Suspension Order is facially unlawful by failing even to address Empire Wind's arguments on that point. Defendants ask the Court to correct their unlawful Suspension Order by crafting a narrower version of the Order in the interest of granting narrowly tailored relief. Opp. at 27. But the Court is limited to "the grounds that the agency invoked when it took the action," *see Regents,* 591 U.S. at 20, not *post-hoc* rationalizations offered to preserve portions of an entirely unlawful agency action when Empire Wind satisfies all four factors required to obtain an injunction. Considering Defendants' admission that the Suspension Order violates the APA, this Court should enjoin the Order in its entirety.

Moreover, the evidence demonstrating that Defendants acted arbitrarily and capriciously when issuing the Suspension Order grows stronger by the day. Most notably, on January 9, 2026, President Trump stated the following at a roundtable for oil and gas executives: "I can proudly say Doug [Secretary Burgum], that we have not approved one windmill since I've been in office and we're going to keep it that way. My goal is to not let any windmill be built. They're losers. They lose money, they destroy your landscape, they kill your birds, they're all made in China . . . We

will not approve any windmills in this country."[1]

### C.    Empire Wind is likely to succeed on the merits of its OCSLA claim.

While Defendants at least responded to Empire Wind's argument that Interior lacks authority under OCSLA to issue the Suspension Order (Opp. at 11-15), that response is baseless, and Empire Wind is likely to succeed on its OCSLA claim as well.  As an initial matter, Interior does not dispute—and thus concedes—that it has not complied with the statutory requirements set forth in 43 U.S.C. §§ 1334(a)(1)(B) and 1341 to issue the Order.  According to Defendants, those statutory provisions are irrelevant here because 43 U.S.C. § 1337(p)(4) allegedly grants unlimited authority to Interior to ensure that "any activity under this subsection is carried out in a manner that provides for . . . protection of national security interests of the United States," even if that means suspending activities on a lease without any prior notice or opportunity to address Interior's allegation. Opp. at 12.  Defendants' argument fails for multiple reasons.

BOEM does not have "broad authority" to suspend Empire Wind's Lease for national security reasons under Section 1337 Of OCSLA.  Defendants offer only conclusory statements to argue that "Section 1337(p)(4) grants the Secretary of the Interior broad authority to ensure 'protection of national security interests of the United States,'" and that this authority is not limited by the requirement that "Interior be prompted by 'a recommendation of the Secretary of Defense.'" Opp. at 12-13 (comparing 43 U.S.C. § 1341(c) with 43 U.S.C. § 1337(p)(4)(F)).  But Defendants offer no support for this theory, which, if accepted, would provide Interior with essentially limitless authority to suspend a lease for any reason it deems inconsistent with its policy priorities. Defendants' reading of Section 1337 continues to ignore the explicit limitations set out by Section 1341, violating the most basic canons of statutory interpretation.  *Russello v. United States*, 464

---

[1] *See* Statement by President Trump During Oil and Gas Roundtable (Jan. 9, 2025), available at
https://www.youtube.com/watch?app=desktop&v=LpdPuJoBmts.

U.S. 16, 23 (1983) (holding that "it is generally presumed that Congress acts intentionally and purposely" when including or excluding statutory language).

As explained in the Motion, OCSLA carefully structures Interior's ability to suspend lease operations due to potential national security concerns and imposes specific requirements—incorporated in the Empire Wind Lease—that have not been satisfied here.  Motion at 34-35. Interior is permitted to suspend the Lease (1) for reasons of national security pursuant to 43 U.S.C. § 1341(c) (allowing suspension based on a recommendation of the Secretary of Defense and during a state of war or national emergency); or (2) based on "a threat of serious, irreparable, or immediate harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits . . . or to the marine, coastal, or human environment . . . ." pursuant to 43 U.S.C. § 1334(a)(1). After a suspension imposed pursuant to either of the foregoing provisions, Interior may cancel a lease pursuant to 43 U.S.C. § 1334(a)(2) but only after clearing several hurdles designed to protect the rights of the lessee.  Specifically, under Section 1334(a)(2), Interior must conduct a hearing and find that "continued activity pursuant to such lease or permit would probably cause serious harm or damage" to (1) interests identified in Section 1334(a)(1) (*i.e.*, life, property, mineral interests, or the environment) or (2) "national security or defense."  43 U.S.C. § 1334(a)(2)(A). Sections 1334 and 1341 work together to create a comprehensive scheme that protects the rights of lessees that have invested long-term capital to develop the OCS expeditiously, consistent with OCSLA's stated goals, while providing Interior with the ability to address serious harms or threats to national security resulting from a lessee's activities.

Ignoring Congress' careful balancing of these interests, Defendants ask the Court to simply disregard Sections 1334 and 1341 and read into Section 1337 a separate and overlapping "broad authority" allowing the government to suspend leases for reasons related to any of the twelve

factors articulated at Section 1337(p)(4) (including such factors like fair compensation to the U.S., or coordination with federal agencies). Opp. at 13. Accepting Defendants' reading of Section 1337 would grant Interior unfettered authority to revisit fully permitted offshore activities at any time to "provide for" *any* of the twelve factors listed in Section 1337(p)(4), including "conservation of natural resources," "a fair return for the United States," or "prevention of interference with other uses" of the OCS. 43 U.S.C. § 1337(p)(D), (H), (I). In practice, this would mean that Interior could suspend offshore operations for any reason that fits its policy goals, so long as Interior's proffered reason fits into the list of twelve factors. Defendants' interpretation must be rejected because it ignores the explicit limitations on suspension authority contained in Sections 1334 and 1341 that Congress is presumed to have included intentionally. 43 U.S.C. §§ 1334, 1341; *Russello*, 464 U.S. at 23.

Defendants' remaining rationales are conclusory, would violate fundamental canons of statutory interpretation, and result in untenable consequences for regulated entities operating offshore. Defendants seek to support their claim of duplicative suspension authority in Section 1337(p)(4) by noting that this section is drafted in the present tense. Opp. at 13. But drafting the requirement to ensure that activities are "carried out in a manner that provides" for the twelve factors in the past tense would be non-sensical, and regardless, BOEM *already satisfied* its duty under Section 1337(p)(4)(F) to ensure that leasehold activities "provide[] for . . . protection of national security interests of the United States" when it approved Empire Wind's Construction and Operations Plan ("COP") in consultation with DoW and issued the OCSLA Factors Memorandum. 43 U.S.C. § 1337(p)(4)(F); Motion at 13-14, Ex. E. Similarly, Defendants assert that Empire Wind's "cancel-but-no-suspend interpretation for national security reasons" is illogical because the "Government [sic] allows mitigation efforts for national security concerns."

-8-

Opp. at 14.  Not so, for the reasons set forth above explaining how Sections 1341 and 1334(a)(1)

work harmoniously with the cancellation provisions in Section 1334(a)(2) and because BOEM

already exercised its authority to impose conditions for national security when it approved Empire

Wind's COP.  *See* Mot. at 13-15 (reviewing national security COP approval terms and conditions).

## III.    EMPIRE WIND FACES IRREPARABLE HARM

Defendants remarkably suggest that Empire Wind has not shown irreparable harm because

"many of its alleged harms are hedged in permissive language."  Opp. at 16.  That argument ignores

both the governing standard for assessing irreparable harm—*i.e.*, the movant "must establish . . .

that he is *likely* to suffer irreparable harm," *Save Long Beach Island, Inc. et al., v. United States

Department of Commerce, et al. ("SLBI")*, No. 1:25-vc-02214-(CJN), Dkt. 27 at 6-7 (emphasis

added) (quoting *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008))—as

well as the most fundamental evidence of Empire Wind's harm due to the Suspension Order.  For

example, the Muhlfelder Declaration states:

> If the Suspension Order is not lifted, *the resulting construction delays and limited
> vessel availability, coupled with the impairment of Empire Wind's financing, will
> likely result in Project termination*.  As explained below, multiple key risks created
> by the Suspension Order threaten the Project's viability. *Taken together, these risks
> resulting from the Suspension Order have produced massive uncertainty and
> created an untenable regulatory and commercial environment that makes it
> difficult, and probably impossible, for Empire Wind to complete the Project.*

Muhlfelder Declaration (Ex. B to Motion) at ¶ 44 (emphasis added); *see also id*. ¶ 48 ("Failure to

timely complete installation of the offshore substation topside *will result in multiple substantial

harms, including jeopardizing Empire Wind's ability to construct the Project at all*.") (emphasis

added); *id.* ¶ 50 ("The threat of Project cancellation will become increasingly severe for each day

the Project is delayed due to the sequential nature of the Project's construction schedule. . . .  If

Empire Wind is not able to begin the construction activities stopped by the Suspension Order by

January 16, 2026, *there is a substantial risk that Empire Wind will not be able to complete the*

*Project at all.*") (emphasis added); ¶ 54 ("Taken together, *these harms will likely result in cancellation of the Project* and pose an existential threat to Empire Wind, which exists solely to construct and operate the Project. If Empire Wind is prevented from constructing the Project, *Empire Wind will be unable to fulfill its sole corporate function* of developing, constructing, and operating the Project.") (emphasis added).  In short, there is no question that Empire Wind faces irreparable, existential harm due to the Suspension Order.[2]

Notably, in denying the plaintiffs' motion for preliminary injunction in *SLBI*, this Court recognized and relied upon these same types of substantial harms that would be inflicted upon Empire Wind if Project construction were stopped.  *See, e.g.*, *SLBI*, Dkt. 27 at 12 ("Because halting construction would impose substantial costs and likely upend Empire Wind's ability to finish the project, the equities do not favor Plaintiffs."); *id.* ("Illustrative of this strict schedule, if the Court granted emergency relief to Plaintiffs that prevented Empire Wind from finishing installation of the monopile foundations for the wind turbines by the end of October 2025, the entire project would be put in jeopardy because the specialized ship for this kind of installation is not available during the entirety of 2026.").  Moreover, Judge Lamberth relied upon the same types of harms in granting a preliminary injunction in *Revolution Wind*.  *See* Hearing Transcript (Ex. A) at 45 (finding that suspension order threatens collapse of entire Revolution Wind project due to delays in construction schedule and potential for loss of Revolution Wind's $5 billion investment).  The same conclusions apply here.

---

[2] Defendants' suggestion that the installation of the topside is the only critical construction activity, (Opp. at 22) is refuted by Empire Wind's Motion and attached declarations.  As explained therein, Empire Wind must utilize the *Crossway Eagle* and undertake the offshore substation commissioning work from February through June to reach electrical system testing in July, and then turbine installation in the fall.  Muhlfelder Decl. ¶¶ 33-34, 49-50.

Defendants further argue that "Empire Wind has not made a showing of likely irreparable harm related to Project *operations*" during either (i) the initial 90-day suspension period or (ii) during the pendency of this suit if the suspension period is extended. Opp. at 18. (emphasis in original). But Defendants ignore the fact that if Empire Wind is not permitted to proceed with construction within days, the Project will likely be terminated and *never become operational*. *See* Muhlfelder Decl. ¶ 48 (Ex. B to Motion).

Finally, Defendants are wrong that Empire Wind has not made a showing of irreparable harm concerning the Project's operations. Opp. at 23. Prior to the Suspension Order, the Project was on track to reach "first power," (*i.e.*, power from the first wind turbine generator) in late 2026. Muhlfelder Decl. ¶ 15 (Ex. B to Motion). Even if this Court issued a narrower injunction resulting in an order that only suspends "operations," Empire Wind will continue to suffer irreparable harm. With any version of the Suspension Order casting a dark cloud over the Project's future, Empire Wind will be unable to draw on its construction loan and its lenders may call the loan, requiring Empire Wind to pay back $2.7 billion before the Project has generated any revenue. Muhlfelder Decl. ¶¶ 52-53. And given the indefinite nature of the Suspension Order's duration, BOEM's multiple attempts to halt construction of the Project, and innumerable statements from the Administration disparaging offshore wind projects, there is no reason to believe that the Suspension Order will be resolved in the short term. In the Tyner Declaration, BOEM admits that "[a]t this time, BOEM is not aware whether the national security risks can be mitigated and, if they can, whether Developers would find the proposed mitigation measures acceptable." Dkt No. 29-2 at ¶ 12. There is no end in sight, and a narrower Suspension Order limited to "operations" would neither address Empire Wind's irreparable harm nor return the parties to the prior status quo.

## IV.    THE BALANCE OF HARMS FAVORS INJUNCTIVE RELIEF.

Defendants argue that the public interest factor dominates the balance of harms, relying on the national security concerns they allege are outlined in the unredacted version of the Marks Declaration provided for the Court's *in camera* review. Opp. at 24-25. But Interior effectively concedes that its issuance of the Suspension Order for "reasons of national security" was arbitrary and capricious and based on unlawful pretext by failing to address those points.  *See, supra* at 5. In other words, Defendants have admitted to taking an arbitrary and capricious action yet now argue that such action is supported by the public interest.  There is no public interest in the perpetration of unlawful acts.  *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 102 (D.C. Cir. 2021).  At the same time, Empire Wind's "credible and unrebutted evidence of harm, and the absence of any such evidence on the other side, tilts both the balance of equities and the public interest in [Empire Wind's] favor."  *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, 766 F. Supp. 3d 74, 84 (D.D.C. 2025).

The declarations on which Defendants rely—the Tyner Declaration and Marks Declaration—merely present *post hoc* rationalizations that fail to establish how the Suspension Order addresses *new* national security concerns or otherwise serves the public interest. Dkt Nos. 29-2, 29-3.  Instead, those declarations further establish that the Suspension Order is arbitrary and capricious, especially considering that Defendants reviewed DoW's assessment on November 26, 2025, nearly *four weeks* before BOEM issued the Suspension Order.  Tyner Decl. ¶ 6.

First, Defendants' attempts to assert alleged harm to the public interest actually underscore the arbitrariness of the Suspension Order.  The scope and timing of the Order demonstrate that there are no new national security concerns requiring such a broad suspension and violation of Empire Wind's due process rights.  The Suspension Order "suspend[s] *all ongoing activities*

related to the Empire Wind 1 Project on the Outer Continental Shelf for the next 90 days for reasons of national security," Dkt. No. 3-1, but the Tyner Declaration only refers to a purported threat from "operation" of the Project, not construction. Tyner Decl. ¶¶ 4, 10. While Empire Wind cannot see the redacted portions of the Marks Declaration, it does not appear to explain why current *construction* activities pose any risk to national security, particularly a risk that requires immediate suspension of *all ongoing activities*. Defendants ask this Court to trust that their actions are meant to protect the homeland and weigh in the public interest, all while Defendants sat on the information received from DoW for weeks and made public statements characterizing offshore wind as a "scam" without citing concerns related to national security. *See* Tyner Decl. ¶ 6; Motion at n. 16. The Court should reject the notion that Defendants' admittedly arbitrary and capricious action weighs in the public interest "based on bare declarations from the agency amounting to 'trust us,' we had good national security reasons for what we did." *Kirwa v. United States Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018).

Second, there is strong evidence to suggest that no new information—meaning information DoW and BOEM were not previously aware of during the Project's seven-year permitting process—exists to show that national security concerns outweigh the harm to Empire Wind. The Tyner Declaration suggests that BOEM halted the Project based on its concern "that allowing the Empire Wind Project to become operational without addressing the national security risks may cause the Developers to ignore those risks and claim that it is too late to address the issues since Empire Wind would be providing power to customers." Tyner Decl. ¶ 12. This statement demonstrates that there is no immediate harm, and that BOEM's actual goal was to stop construction as quickly as possible in furtherance of the President's goal to "not let any windmill be built." *See supra* n.1. That explanation sheds light on why BOEM did not inform Empire Wind

of its alleged national security concerns during any of the biweekly meetings that occur between the Project team and BOEM staff, the most recent of which took place five days before the Suspension Order was issued. Treseder Decl. ¶ 33. As explained in the Treseder Declaration (Ex. C to Motion) and the Rebuttal Declaration of Patrick England (Ex. B hereto), the government communicates with Empire Wind's representatives regarding the Project's impacts and national security issues on a regular basis. Treseder Decl. ¶¶ 27, 32-37, England Decl. ¶¶ 4, 6-7. Mr. England explains that "[i]n eight years working on offshore wind in the United States," he has "never seen an instance in which the government perceives a threat involving critical energy infrastructure or national security concerns and fails to engage with the project developer about its concerns." England Decl. ¶ 12.

Third, the Tyner Declaration suggests that BOEM's national security concerns may not be mitigable at all, Tyner Decl. ¶ 12, but that assertion warrants skepticism for several reasons. DoW already determined the radar mitigation measures in place were sufficient when it consulted with BOEM and Empire Wind and approved of the mitigation measures incorporated in Empire Wind's COP Approval. *See* Treseder Decl. ¶¶ 13-21, 24 (Ex. C to Motion). Moreover, BOEM stated in its Final Environmental Impact Statement for the Project that DoW's mitigation agreement with Empire Wind could include several effective mitigation measures to address the Project's impacts, including modifications to the ARSR-4 radar system and installation of in-fill radar, the placement of radar throughout the Project area to cover gaps in radar coverage. Motion, Ex. F, Dkt. No 8-6 at 24. Further, Empire Wind has access to Equinor employees and contractors who have successfully employed various radar mitigation measures on offshore wind farms around the world. England Decl. ¶¶ 8-9. Empire Wind is also capable of installing radar mitigation *after* a Project is operational, demonstrating that the Suspension Order is not needed now *or* later to

address any new national security concerns that may arise. *Id*. ¶ 9.  Defendants have failed to demonstrate that national security mitigation concerns warrant the sweeping Suspension Order.

Fourth, the Marks Declaration also suggests that the DoW Clearinghouse process is inadequate because it "focuses on project disruption to military operations and readiness . . . rather than evaluating potential threats to . . . the homeland." Marks Decl. ¶ 8.  During the Project's permitting process, DoW informed Empire Wind that the Project's construction had the potential to impact the North American Aerospace Defense Command's ("NORAD") ARSR-4 radar in Riverhead, New York.  Treseder Decl. ¶ 15.   DoW then determined that the mitigation measures incorporated at Section 4.2 of the Project's COP Approval would mitigate these impacts, effectively finding that the operation of NORAD's radar would not be adversely impacted.  *Id*. ¶¶ 20-21.  One of NORAD's stated missions is providing "[a]erospace warning to North America," defined as "processing, assessing, and disseminating intelligence and information related to man-made in the aerospace domain and the *detection, validation, and warning of attack against North America whether by aircraft, missiles or space vehicles* . . . ."[3]  Detection and warning of potential attacks is one of NORAD's primary missions, and the DoW Clearinghouse process clearly focused on whether NORAD's mission would be adversely impacted.

The government has not established that the public interest weighs in favor of upholding a Suspension Order that Defendants *concede is unlawful*.  And Empire Wind's irreparable harms outweigh Defendants' unsubstantiated and unexplained allegations of harm.  The Suspension Order will prevent the Project's public benefits from being realized, leaving thousands

---

[3]  Agreement Between the Government of the United States and the Government of Canada on the North American Aerospace Defense Command (April 2006), available at https://www.norad.mil/Portals/29/Documents/History/NORAD%20Agreements/2006%20NORAD%20Agreement.pdf?ver=52SH6UU_1njFmjaq4fQUTg%3d%3 (emphasis added).

unemployed and the State of New York without billions of dollars in public benefits and 810 megawatts of power it is contractually entitled to receive.  Muhlfelder Decl. ¶¶ 54-55.  The balance of equities clearly tips in Empire Wind's favor.

## **CONCLUSION**

For the foregoing reasons, this Court should grant Empire Wind's motion for a stay of the Suspension Order and a preliminary injunction that bars Defendants from enforcing the Suspension Order.

Date:  January 13, 2026                                            Respectfully submitted,


                                                                                */s/ Ann D. Navaro*
Tyler S. Johnson (DC Bar #1003009)          Ann D. Navaro (DC Bar #1643328)
(*pro hac vice pending*)                              David A. Super (DC Bar #429359)
**BRACEWELL LLP**                                   Taylor M. Stuart (DC Bar #429359)
701 Fifth Avenue                                        **BRACEWELL LLP**
Suite 6850                                                  2001 M Street NW, Suite 900
Seattle, Washington 98104                           Washington, DC 20036
Telephone:  (206) 204-6211                          Telephone:  (202) 828-5800
Facsimile:  (800) 404-3970                           Facsimile:  (800) 404-3970
Email:  ty.johnson@bracewell.com               Email:  ann.navaro@bracewell.com
                                                                        david.super@bracewell.com
                                                                        taylor.stuart@bracewell.com

                                                                *Counsel for Plaintiffs*
                                                                *Empire Leaseholder LLC and Empire Offshore*
                                                                *Wind LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 13th day of January 2026, a true and complete copy of

*Reply in Support of Empire Wind's Motion for Preliminary Injunction and Stay Pending Review*

was filed with the Clerk of the Court pursuant to the Court's electronic filing procedures, and

served on counsel of record via the Court's electronic filing system.


  */s/ Ann D. Navaro*_____
Ann D. Navaro