# **<u>EXHIBIT A</u>**

```
 1                   UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3   STATE OF RHODE ISLAND, et    )
     al.,                         )
 4                                )
            Plaintiffs,           )
 5                                )   CASE NO. 1:25-cv-04328-RCL
         vs.                      )
 6                                )
     UNITED STATES DEPARTMENT OF  )
 7   THE INTERIOR, et al.,        )
                                  )
 8          Defendants.           )
     _____)
 9                                )
     REVOLUTION WIND, LLC,        )
10                                )
            Plaintiff,            )
11                                )
         vs.                      )   CASE NO. 1:25-cv-02999-RCL
12                                )
     DOUGLAS J. BURGUM, et al.,   )
13                                )
            Defendants,           )
14   _____)

15

16            TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
          BEFORE THE HONORABLE ROYCE C. LAMBERTH, DISTRICT JUDGE
17                   Monday - January 12, 2026
                      2:07 p.m. - 3:59 p.m.
18                       Washington, DC

19   FOR PLAINTIFF REVOLUTION WIND:
          Latham & Watkins, LLP
20        BY:  JANICE SCHNEIDER, RACHAEL WESTMORELAND, STACEY
               VANBELLEGHEM, ROMAN MARTINEZ and DEVIN O'CONNOR
21        555 11th Street, NW, Suite 1000
          Washington, DC 20004
22   _____
                         SONJA L. REEVES
23                 Registered Diplomate Reporter
                   Certified Realtime Reporter
24                 Federal Official Court Reporter
                   333 Constitution Avenue, NW
25                     Washington, DC 20001
          Transcript Produced from the Stenographic Record
```

1  **FOR PLAINTIFF STATE OF RHODE ISLAND:**
       Rhode Island Department of the Attorney General
2      BY:  SARAH RICE
       150 South Main Street
3      Providence, Rhode Island 02903

4  **FOR PLAINTIFF STATE OF CONNECTICUT:**
       Office of the Connecticut Attorney General
5      BY:  BENJAMIN CHENEY
       165 Capitol Avenue
6      Hartford, Connecticut 06106

7  **FOR DEFENDANTS:**
       U.S. Department of Justice
8      Natural Resources Section
       BY:  PETER TORSTENSEN and AMANDA RUDAT
9      950 Pennsylvania Avenue, NW
       Washington, DC 20530
10

11 **FOR INTERVENOR-DEFENDANT GREEN OCEANS:**
       Marzulla Law, LLC
       BY: ROGER MARZULLA
12     1150 Connecticut Avenue, NW, Suite 1050
       Washington, DC 20036

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    (Call to Order of the Court at 2:07 p.m.)

3          DEPUTY CLERK:  Your Honor, we are on the record in

4   Civil Matter 25-2999, *Revolution Wind, LLC versus Douglas*

5   *Burgum, et al.*

6          Beginning with plaintiffs' counsel, please approach

7   the podium and identify yourselves for the record.

8          MS. SCHNEIDER:  Good afternoon, Your Honor.  Janice

9   Schneider for plaintiff Revolution Wind.

10          THE COURT:  Okay.

11          MR. TORSTENSEN:  Good afternoon, Your Honor.  Peter

12   Torstensen for the federal defendants.

13          THE COURT:  All right.

14          MR. MARZULLA:  And good afternoon, Your Honor.  Roger

15   Marzulla for intervenor Green Oceans and intervenor-defendants.

16          MS. RICE:  Good afternoon, Your Honor.  Sarah Rice for

17   the State of Rhode Island and Connecticut.  Thank you.

18          MR. CHENEY:  Good afternoon, Your Honor.  Ben Cheney,

19   Assistant Attorney General for the State of Connecticut.

20          THE COURT:  Okay.  Let's start with the plaintiffs.

21   Let me say one thing at the outset.

22          Because the case involves classified national security

23   information, I want to remind the parties to be mindful not to

24   reveal any such information as everyone in the courtroom

25   obviously is not cleared to receive it.

1          MS. SCHNEIDER:  Thank you, Your Honor.

2          May it please the Court, my name is Janice Schneider

3   with Latham & Watkins representing plaintiff Revolution Wind.

4          Your Honor, we have coordinated our argument time with

5   the States of Connecticut and Rhode Island, who are here today.

6   With the Court's permission, they will follow my presentation.

7          THE COURT:  All right.

8          MS. SCHNEIDER:  Once again, Your Honor, with no notice

9   or opportunity to be heard, the government has issued a second

10  stop work order suspending work on the Revolution Wind project

11  at a crucial stage of construction without considering our

12  reliance interests, again, in violation of the Administrative

13  Procedure Act, Revolution Wind's due process rights and the

14  Outer Continental Shelf Lands Act.

15         This time, Your Honor, the project is now 87 percent

16  built and was just weeks away from beginning to deliver power

17  to the electric grid needed this winter as part of testing the

18  system.  This shutdown is costing us at least $1.44 million per

19  day.  The last stop work order cost us approximately

20  $100 million, far more than we had initially projected.

21         The government does not contest our Administrative

22  Procedure Act or due process arguments, and thus concedes them,

23  and likelihood of success on the merits.

24         If the second stop work order is not enjoined, the

25  project will miss its contractual power purchase agreement

1    commercial operations date, which could be unilaterally

2    terminated and the entire project would fail.  This is

3    enterprise-threatening irreparable harm for Revolution Wind.

4            In order to meet the January 15, 2027 deadline in the

5    Rhode Island power purchase agreement, at least two things need

6    to happen.

7            First, we need to construct the project and we need to

8    do that within the short time that we have remaining for a

9    critical wind turbine installation vessel called the Scylla,

10   and that's spelled S-c-y-l-l-a, before it has a contractual

11   right to depart the project on February 22, 2026.  This is the

12   exact same issue, Your Honor, that we talked about in our

13   first --

14           THE COURT:  I take it the biggest part of the problem

15   is this specialty vessel that you can only use.  Tell me more

16   about the details of that.

17           MS. SCHNEIDER:  So the details of that particular

18   vessel is that it's required to actually install the remaining

19   seven turbines that are needed for the project.  The latest

20   vessel availability date for that vessel is February 22nd, as I

21   have said.  It's going to take --

22           THE COURT:  To come to your side?

23           MS. SCHNEIDER:  They are available now, and, on

24   February 22nd, they have a contractual right to depart the

25   site.

1          THE COURT:  To depart February 22nd?

2          MS. SCHNEIDER:  To leave, so we need to get the work

3   done between now and February 22nd.  That's 41 days.  The

4   estimate to complete the work is 41 days, which is why we asked

5   Your Honor for relief today.

6          THE COURT:  Okay.

7          MS. SCHNEIDER:  So second --

8          THE COURT:  Then if they depart, then you have got to

9   find another vessel, and there are only three, I take it?

10          MS. SCHNEIDER:  That's correct, Your Honor, and two of

11   them are already contracted and this one has a right to leave.

12   So it's very, very problematic.

13          THE COURT:  So that's the critical part from your

14   point of view?

15          MS. SCHNEIDER:  That's the critical part from a

16   construction standpoint.

17          But there is also a critically important operations

18   point that we need to talk about here today.  We also need to

19   be operating well in advance of the January 15, 2027 commercial

20   operations date deadline.  The schedule includes months and

21   months of operation and testing that is essential to achieve

22   the contractual requirements on time.

23          Now, the government ignores or purposefully tries to

24   obfuscate critical distinctions between the contractual

25   definition for commercial operations date versus commercial

1    operations more generally, which are defined in BOEM's

2    regulations and the project's large generator interconnection

3    agreement with the grid operator, the New England Independent

4    System Operator.

5              So we need to be able to do three things to meet that

6    PPA.  We need to construct.  We need to test.  And we need to

7    make sure the whole system --

8              THE COURT:  The test is making sure you have got

9    things in place that you're testing?

10             MS. SCHNEIDER:  Exactly.  We have things in place, and

11   each of the turbines needs to be tested to make sure that it's

12   working in proper order and that the entire system together is

13   operable as a system.  So --

14             THE COURT:  Before January?

15             MS. SCHNEIDER:  Before January 15th of 2027.  All of

16   that work, which includes operations, is going to take months

17   and months and months and months, and that's why we need to be

18   able to not only construct, because we're going to lose the

19   vessel, but also conduct operations and put power on the grid

20   to test this operability.  And so the project needs to be

21   operational.  We were scheduled to start that testing this

22   month.

23             THE COURT:  Right.

24             MS. SCHNEIDER:  Your Honor enjoined their first stop

25   work order finding it the height of arbitrary and capricious

1  behavior, and that Revolution Wind would suffer irreparable

2  existential harm from the terms of the first order halting all

3  of the ongoing activities on the outer continental shelf.  You

4  should make that same irreparable harm finding here.

5        Now, notwithstanding the DoD mitigation agreement that

6  we executed with the Department of War after a four-year DoD

7  clearinghouse review with all branches of the military,

8  including NORAD, which concluded to DoD's satisfaction, the

9  government is now stating -- BOEM actually is now stating that

10  it's relying on new national security issues and classified

11  information to support the second order, which was supplied to

12  Your Honor ex parte and for in-camera review.

13        We take national security issues very, very seriously,

14  but we do think that this Court should be very skeptical of the

15  government's true motives here.  We're flying a little blind

16  admittedly because we have not had access to the classified

17  material or been provided the unclassified summaries that we

18  requested.

19        BOEM and the Justice Department, in our view, have

20  purposely hamstrung us as a litigation tactic.  But there are

21  five reasons we are very concerned about BOEM's order, then we

22  think it's pretextual, and you should at least be skeptical of

23  this.

24        First, the context of the first stop work order, BOEM

25  asserted national security concerns --

1          THE COURT:  Let me go back one step.  Up until this

2     point, you have had people with classified authority that are

3     working with the government on getting to this point.  In other

4     words, they have -- your personnel, besides your lawyers, your

5     personnel operating this system have worked with the government

6     and made sure that the government and they agreed on how the

7     system worked and used classified information and had access to

8     classified information making all of that work to the

9     government's satisfaction.  Am I correct?

10          MS. SCHNEIDER:  Just to be clear, Your Honor, I am not

11     sure that any classified information was shared with us during

12     the DoD clearinghouse process.  But we have --

13          THE COURT:  But under the 2024 agreement, they were

14     given clearances.  I don't know to what extent they were given

15     access then.  They had clearances, right?

16          MS. SCHNEIDER:  I was not involved in that process.

17     What I can tell you is that the government asked us for

18     information.  We provided all of the information that they

19     requested.  And then they reviewed that information based on

20     the height, the location, all of the attributes of the project,

21     and then the government concluded an agreement with us that

22     satisfied them that national security issues were fairly

23     addressed.

24          So we concluded that, and now they are coming back and

25     now they are saying there may be something new, and that's

1  what's in what they provided to you.

2        THE COURT:  You're not sure that classified

3  information was shared with your people then?

4        MS. SCHNEIDER:  I cannot confirm that, Your Honor.

5  But what I can tell you is since the stop work order was

6  issued, we have provided representatives, experts, U.S.

7  citizens with top secret security clearances, and we have asked

8  the government please show them the information.  And for

9  people who don't -- and they have not done that to date.

10       For people who don't have security clearances, we have

11  asked please share unclassified summaries of that information

12  so that we can try to assess it to see if there is truly an

13  issue.  And we are dubious, Your Honor, candidly.  But if there

14  is truly an issue, we want to have that conversation.

15       I mean, I think what's really important for Your Honor

16  to understand is the project is equipped with significant

17  surveillance and other measures.  Based on what we can tell

18  from the media and other sources that have been supplied, like

19  the declarations that have been supplied, we have experience in

20  these issues.

21       The company has access to significant experience, to

22  people who have been involved in extensive coordination with

23  other military and governmental agencies around the world,

24  including NATO, Central Europe, the Baltics, the United Kingdom

25  and Asia.  We understand these issues.  But they are

1   purposefully, for reasons that we cannot understand, keeping

2   the information from us.  So we think it's very, very

3   problematic.

4          If they really want to -- if there is really an issue

5   and if they really want to solve it, why not have a

6   conversation about it?  And candidly they should have had this

7   conversation before they even issued the stop work order to

8   begin with, and we think that is a violation of our due process

9   rights.

10          So, Your Honor, some of the other concerns that we

11  have go to the administration -- this goes to their motivation,

12  the administration's statements.  Administration leadership,

13  including but not limited to the Secretary of the Interior,

14  have been clear in the media that they are trying to shut down

15  offshore wind for reasons that are entirely unrelated to

16  national security:  the birds, the whales, the cost, it's a

17  rip-off, reliability, it's a scam, oil and gas is better.  The

18  list goes on and on.

19          And there have been real clear public statements, even

20  just a few days ago, in a meeting with oil and gas executives,

21  which we cited in our reply papers, and there is a USA Today

22  article from January 9th that I would urge the Court to look

23  at, and I would urge the Court to look at our reply brief and

24  look at the video clip that we provided there.  It is clear,

25  Your Honor, that the administration's goal is to not let any

1    windmill be built.  And that's a quote.

2         So third, the DoD, the Department of War role.  Based

3    on what little we can tell, and when we look at the Department

4    of War declaration, we actually don't see "DOW."  Maybe it's in

5    there, I don't know.  But we don't see in the unredacted

6    portion the Department of War asserting that there is a

7    national security threat that requires the suspension.

8         Revolution Wind has been in regular communication with

9    numerous agencies for the project, and none have raised

10   national security issues to us.  And I will say, Your Honor,

11   separately, notwithstanding our mitigation agreement, no

12   military agency has raised any concerns directly with us.

13        Fourth reason to be skeptical, timing and BOEM's

14   stonewalling.  BOEM and the Department of War had the

15   Department of War information for six weeks, but waited to

16   issue the order right before Christmas.  Since then, we have

17   been trying to engage with the agency to discuss their

18   concerns.  It's now been three weeks.

19        And our experts, who are U.S. citizens with top secret

20   security clearance, including a vice admiral, have not been

21   given access, and they continue to basically just string us

22   out.

23        Finally, Your Honor, we think the order is overbroad.

24   At the very least, you know, there is no reason -- if they are

25   really concerned about radar, which is what they have told us

1    and what we can glean from the media, then why do we have to

2    stop all undersea work, just by way of example, why do we need

3    to stop testing, why do we need to stop the commissioning

4    process.

5            So, Your Honor, we think this is all --

6            THE COURT:  The people who could best figure out how

7    to solve it would be your people, wouldn't they?

8            MS. SCHNEIDER:  You would think, Your Honor.

9            THE COURT:  You've spent billions of dollars now.

10           MS. SCHNEIDER:  You would you think, Your Honor --

11           THE COURT:  Wouldn't you have the most incentive to

12    solve it?

13           MS. SCHNEIDER:  We have extremely high incentive to

14    solve it, Your Honor.  And, in fact, we are working in other

15    parts of the world to solve these very issues.

16            So for purposes of today's hearing, I want to just

17    focus on three particular arguments.

18            First, that the government has conceded likelihood of

19    success on the merits;

20            Second, that the government has deprived and continues

21    to deprive, by not letting us have access to this information,

22    Revolution Wind's due process;

23            And then finally, the balance of harms and the public

24    interest.

25            So moving to the preliminary injunction test itself,

1  Your Honor, the government concedes that Revolution Wind is

2  likely to succeed on the merits of most of its claims.  They

3  make no rebuttal at all to our Administrative Procedure Act or

4  due process arguments.

5        They thereby concede that the second stop work order

6  is arbitrary and capricious because it's overbroad.  See our

7  motion at pages 26 and 27.  It lacks any reasonable basis or

8  explanation.  See our motion at page 17 to 23.  It violates the

9  change in position doctrine and ignores our substantial

10  reliance issues, which is in our motion at pages 23 to 26.  And

11  that it was issued without the procedures required by law under

12  APA Section 558(c).  So that's in our motion at pages 31 to 32.

13        They also do not grapple at all with our due process

14  argument.  These concessions confirm that we are likely to

15  succeed on the success of the merits in a number of our claims.

16        And both the DC Circuit and this Court have been clear

17  that unaddressed arguments should be treated as conceded when a

18  party files its opposition.

19        And the cases -- we cite the cases in our brief, but,

20  you know, *Texas versus United States*, as well as Your Honor's

21  opinion in *Hays v. Sebelius*.

22        The intervenor's arguments on these claims are also

23  cursory and conclusory, and they're not sufficient to preserve

24  the argument.  Indeed, the vast majority of Green Oceans'

25  arguments simply rehash their arguments from the first

1    go-around on the first stop work order and are largely reliant

2    on deference to the government's national security allegations.

3         But the government has not even sought to defend their

4    national security judgments against our arguments that they are

5    arbitrary and capricious.  And that's all we need to show, Your

6    Honor, to check the box.

7         And so we just need to show we have likelihood of

8    success on the merits of one claim, and we believe that we have

9    done so with both our APA arguments and our due process

10   arguments.

11        And I would direct the Court to the *Mid-Atlantic*

12   *Equity Consortium* case at 793 F. Supp. 3d 166 as well as

13   *Express One International versus Postal Service* at 814 F. Supp.

14   87.

15        We have talked a bit about irreparable harm in my

16   introduction.  And I want to just see if the Court has any

17   questions related to either the need for the Scylla or our

18   operations.  I do think the operational point is very important

19   to make sure that everyone understands, because it's clear that

20   the government either doesn't understand it or is trying to

21   make things a little confusing for the record.

22        But the bottom line, as I mentioned, is that in order

23   for us to achieve the commercial operations date under the PPA,

24   we have to do the three things:  Construction, performance

25   testing, and test the whole system so that it's capable of

1  regular operation.  And all of that takes time.

2         And the PPA requirements in the commercial

3  operation -- for the commercial operations date cannot be met

4  if Revolution Wind is precluded from commercial operations,

5  i.e., testing and commissioning.

6         And so, therefore, defendants are wrong to argue that

7  a restriction on project operations will not irreparably harm

8  the project.  They seem to have conceded construction, and then

9  they make this operations argument, but we think that's not

10  correct.

11         Then on due process, as we have noted, we believe that

12  the government violated Revolution Wind's due process argument

13  by issuing the order initially without notice or opportunity to

14  respond, and that it continues to violate our due process

15  rights by denying us access to the information that is

16  necessary to resolve this issue.

17         We can't work other than under the environment, health

18  and safety exception.  The stop work order deprives Revolution

19  Wind of its property interests in the lease and being able to

20  actually construct the turbines and complete the project.

21         Obviously, Your Honor, our view is if they had taken

22  these steps beforehand, we believe that we would have been able

23  to work with them and address any potential issues and avoid

24  the order, but -- and that would have been normal -- that would

25  have been the normal course.  That would have been how a normal

1    regulatory process would have worked, but BOEM has done nothing

2    of the sort here.

3           And I will say also on a timing perspective, they have

4    really not shown that this is an exigent circumstance that

5    justifies skipping pre-deprivation process, particularly since

6    they've sat on the information now for six weeks and issued

7    this extreme sweeping order.

8           We did meet, Your Honor, with the agency on

9    December 30th.  Their order invited us to come in.  We did come

10    in.  We brought our three experts with top secret clearances.

11    We told them ahead of time we were bringing them to facilitate

12    a transfer of information.  The Department of the Interior has

13    a SCIF, and so we thought let's just have a conversation.  They

14    did not facilitate access to the information, and so none was

15    provided, and none has been provided to date.

16           Initially, we were told, yes, we'll set something up.

17    Then we were told, no, we're not going to do it because of the

18    litigation.  Today in the courtroom, I was told that's no

19    longer a reason, but there is no timeline to provide you with

20    the information.

21           The Tyner declaration takes a completely different

22    approach to why we can't see the information, and that's

23    foreign control over the project.  But the upstream partial

24    foreign ownership of the project, which is itself a U.S.

25    corporation, is irrelevant.

1            We presented experts.  As I said, they are U.S.

2   citizens, they have top secret clearances, long, distinguished

3   histories serving the United States, and so we don't understand

4   why the classified information couldn't be shared with them,

5   and we certainly don't understand why the unclassified

6   summaries can't be shared with the rest of us.

7            The Tyner declaration is very telling.  It actually

8   states that the stop work order is needed because they are

9   concerned that Revolution Wind, and this is a quote, "Will

10  ignore those risks and claim it's too late to address the issue

11  since the Revolution Wind project would then be supplying power

12  to customers."

13           This admission that this is simply an attempt to gain

14  leverage is remarkable, in my view, and ignores a key fact that

15  no responsible company, Your Honor, wants to facilitate an

16  attack on its own facilities, costing billions of dollars, or

17  on the communities that it serves.

18           The other reason we haven't been given access to the

19  information is the Justice Department has stated there is no

20  need to know.  That just strikes us as an obvious due process

21  problem, particularly where the information is the basis for

22  the second stop work order, and we have really no way to defend

23  ourselves.

24           The other thing I'll note about the Tyner declaration,

25  Your Honor, it says in paragraphs 10 and 12 that BOEM is not

1    aware of whether the national security risks can be mitigated

2    and BOEM is not aware of measures that would mitigate the

3    national security risk.  This makes things all the more dubious

4    and curious from our perspective given our experience.

5            The government actions here, Your Honor, including its

6    delays, are designed to keep us in the dark for as long as

7    possible.  Your Honor should be very skeptical of the

8    government's motivation here.

9            Just briefly, Your Honor, on public interest and

10   balance of harms, the government argues its national security

11   point actually in the third prong of the test in the balance of

12   harms rather than in the first prong of the test.

13           But their claim of an interest, the public interest in

14   national security, cannot overcome the fact that they have

15   conceded likelihood of success on the merits.  And defendants,

16   in our view, can only claim a public interest if the national

17   security justification is not arbitrary, not a violation of due

18   process and not pretextual or the result of political pressure.

19           They have failed to do that here, Your Honor.  The

20   public has an interest in the agency following the law and the

21   project provides significant public benefits as outlined in our

22   brief.

23           Your Honor, we ask that you grant our motion for

24   preliminary injunction.

25           THE COURT:  All right.

1          MS. SCHNEIDER:  Thank you.

2          MS. RICE:  Good afternoon, Your Honor.  The States of

3    Rhode Island and Connecticut agree with the merits that have

4    been aptly briefed and argued by Revolution Wind and we would

5    join them in those arguments.  But we are grateful for this

6    opportunity to explain a little bit about the irreparable harm

7    that will be befalling our government or citizens and how that

8    factors into the public interest test here.

9          There are a number of different ways in which the

10   state plaintiffs are harmed.  First is harm to the grid.  And I

11   think that this a really important point that dovetails with

12   the operations arguments that Revolution Wind was just here

13   making.

14         As described in the declaration of Director Dykes, the

15   first power for Revolution Wind was anticipated to happen in

16   the coming weeks, in the month of January.  That is not a

17   symbolic deadline.  That is when electricity actually begins to

18   flow from the project into the ISO New England grid.  That

19   means all of those benefits that ISO New England, the State of

20   Rhode Island and the State of Connecticut have been counting on

21   would begin to flow.

22         They are not going to be at their maximum at that

23   point.  It would ramp up until that last contractual commercial

24   operations deadline to the full for Rhode Island 400 megawatts

25   but the full power of the plant over time.

1          THE COURT:  The notion is for those users, that will

2     now be their power from then on, not just for some temporary

3     time.

4          MS. RICE:  Correct.

5          THE COURT:  They are now going to have power through

6     this source.

7          MS. RICE:  They will have power through this source

8     sort of beginning in that deadline at those quantities.  Before

9     that, we're still getting some power and some benefits from

10    those quantities.  For Rhode Island, the 400 megawatts is

11    actually 20 percent of Rhode Island's power consumption.

12         THE COURT:  That's a pretty good amount.

13         MS. RICE:  It's a pretty good amount.  Rhode Island is

14    not very big.  We also don't consume that much electricity.  I

15    think we are last in the nation in terms of electricity

16    consumption.  So it's about 5 percent for Connecticut.  They

17    have some other baseload power generation.  They have a nuclear

18    plant.  But that is still not an insignificant amount of power

19    for either Rhode Island or Connecticut, especially in these

20    winter months, a fraction of that can be very helpful,

21    especially as we are in colder degree days.  We often have to

22    turn to natural gas generation, which can be volatile and

23    expensive in the ISO New England market.

24         And there have been times when there have been

25    significant shortages, and this is covered, especially I think

1  in the Dykes declaration periods of significant shortages in

2  the past during those low degree days.

3         So that reliability -- winter reliability, the

4  capacity planning and ISO New England, which has been a

5  long-running problem for ISO New England, this is not

6  generation that will displace other generation.  This is

7  generation that is needed to make this market a functioning

8  market and to have enough electricity for everybody in New

9  England at achievable prices for people to heat their homes.

10        That ISO New England has recently stated, and both

11 Director Kearns and Director Dykes discuss this statement,

12 Kearns at paragraph 31, Dykes at paragraphs 17 through 19, that

13 these projects, Revolution Wind and also the project in

14 Massachusetts, have been part of their long-term planning and

15 that delay of these projects onto the grid has significant

16 impacts on the capacity markets.

17        The second is harm to the environment.  Director

18 Dykes, at paragraph 20, discusses a study that shows

19 significant avoided greenhouse gas emissions when wind capacity

20 is available in ISO New England in the winter because of

21 switching to that cheaper and more reliable power.  This has

22 downstream health effects which, in fact, Revolution Wind

23 discussed in their briefing at page 45 of their preliminary

24 injunction brief.

25        The third effect is in pricing.  And Director Dykes

1  has stated that it will cost hundreds of millions of dollars to

2  New England rate payers if this energy does not eventually come

3  online to ISO New England.  And she broke that down further,

4  and it's going to be about $31 million per 90-day interval.  I

5  think she estimated that -- but that 90 days could be repeated

6  under the second stop work order.  So that's for each 90 days

7  that is delayed.  We're talking about millions of dollars in

8  increased electricity costs in the region.

9         THE COURT:  That's just in Connecticut.

10         MS. RICE:  I think she may have talked about it in

11  terms of Connecticut and New England.

12         THE COURT:  And Rhode Island.  Okay.

13         MS. RICE:  Those are just the effects on the

14  electricity market, which are incredibly substantial.  They are

15  -- in real terms, it is about people being able to turn on

16  their heat in the winter.  These are essential issues for Rhode

17  Islanders and the people of Connecticut.

18         But in addition to these issues with the electricity,

19  there are also significant job effects.  In Rhode Island alone,

20  there are 1,000 union construction jobs that Revolution Wind

21  has been supporting.  Many of those are idle at this time.

22  It's the winter.  And Rhode Island, we're a very seasonal

23  economy.  It's not the easiest to find different or additional

24  work in the winter.

25         There is an amicus brief that was lodged in the first

1    PI, that NABTU brief that describes these jobs in a little bit

2    more detail.  They are good-paying jobs.  The average wage is

3    $55 an hour, and the people that hold these jobs have had to

4    take additional training over and above what they might have

5    taken for their profession in order to work on wind farms.

6         This is a workforce that is specialized, that has the

7    ability to provide for their family and is now sitting idle for

8    however many days or weeks or months a delay stays in place.

9    That's a significant harm to Rhode Island and Connecticut's

10   economy.  I think for Connecticut, it's hundreds of jobs, but

11   that can still be significant to a state's economy.  Neither

12   Connecticut nor Rhode Island are very large states.  In Rhode

13   Island, we only have a million people.  So 1,000 jobs is quite

14   a lot.

15         It also has eventual impact on the 3,300 jobs that

16   Rhode Island has projected from the wind industry in the coming

17   years.  And those impacts may be permanent as we see that these

18   jobs are not -- could be interrupted or that people can't count

19   on them to put food on their tables.

20         The third category is to Rhode Island and

21   Connecticut's sovereign interests, and these are our reliance

22   interests which Revolution Wind also talks about at page 45.

23   It has taken years of intense coordination between the state

24   and Connecticut legislative branches, the executive branch, ISO

25   New England, which is an intergovernmental organization,

1   private companies, all kinds of community groups and

2   participants that have had to spend countless hours oftentimes

3   after work to negotiate complex fisheries agreements and other

4   aspects of this project.  All of this, to the extent that the

5   project is interrupted or delayed, may need to be renegotiated

6   because different times, different weather conditions, for

7   example, for phases of construction or operation could change

8   some of these things.

9        They also very much injure the sovereign interests of

10  Rhode Island and Connecticut in terms of our enacted public

11  policies.  Both Rhode Island and Connecticut, as detailed in

12  the supporting declarations, have statutes that required

13  procurement of wind power or other kinds of renewable energies,

14  of which this project fulfills some of those goals.

15       And they also have greenhouse gas reduction mandates.

16  Those mandates have timelines on them, and as both Director

17  Dykes and Director Kearns testified, there are no readily

18  available projects to substitute for Revolution Wind, so it

19  could be that missing a deadline or being without this project

20  for too long puts Rhode Island and Connecticut in a place they

21  can't recover from in terms of meeting those time goals, even

22  though they are in the future.

23       I think that this is a moment too to talk a little bit

24  about why these harms to the state and the state's people

25  should have -- weigh heavily in your consideration of this

1    preliminary injunction.

2        And this connects back to some of what my colleague

3    for Revolution Wind was saying.  But it is that the underlying

4    national security justification for these actions has also not

5    been shared with the appropriate state officials.  For example,

6    Senator Jack Reed, Rhode Island Senator, is the ranking member

7    of the Arms Services Committee and he's on the Select Committee

8    For Intelligence.

9        On January 2nd, he had a press conference where he

10   stated that he requested information about why this project had

11   been halted and has not been given that information.

12       This aligns with an amicus that was recently filed in

13   an Eastern District of Virginia case, the *Virginia Electric*

14   *Power versus the Interior* case there.  It's 25-00830.

15       It's an amicus of Senators Warner, Kaine and

16   Representative Scott, where they also describe their efforts to

17   receive a briefing or some explanation of this set of second

18   stop work orders, and they were not given that opportunity.

19       THE COURT:  They didn't get it either?

20       MS. RICE:  Yes.  It was not just some issue with

21   Senator Reed.

22       So, again, this is in -- raises questions when we do

23   see in the media just two days ago the President telling oil

24   executives that wind farms will never be approved, that it

25   is -- in fact, talking to Secretary Burgum directly to say that

1  if he can stop them, he will.

2          So we would ask this Court to please enter the

3  preliminary injunctive relief requested by Revolution Wind and

4  the preliminary injunctive relief requested by the State of

5  Rhode Island and the State of Connecticut.  Thank you.

6          THE COURT:  Thank you very much.

7          MR. TORSTENSEN:  Good afternoon, Your Honor.  Peter

8  Torstensen for the federal defendants.  Before addressing Your

9  Honor's questions, I want to make three quick points.

10         First, BOEM received classified information from the

11 Department of War in November 2025, detailing new national

12 security risks from offshore wind projects, concerns that are

13 amplified when these projects are owned or controlled by

14 foreign entities.

15         Based on this new information, which has been provided

16 to the Court for ex parte in-camera review, BOEM reasonably

17 suspended ongoing activities for 90 days to ensure that there

18 was an opportunity to attempt to find mitigation measures

19 before these projects began operating.

20         Second, under *Winter*, plaintiff bears the burden of

21 satisfying all four preliminary injunction factors.  The

22 balance of the equities and the public interest are the most

23 salient factors here --

24         THE COURT:  Let me start with one easy question first.

25 In the papers that I saw, the statute actually requires that

 1    when there is a suspension for national security reasons, it

 2    will generally not exceed 72 hours, and it's only if there is a

 3    finding of particularized harm that it can exceed that

 4    72 hours.

 5            I take it that somehow that's not really addressed

 6    here, but how do you get around the statutory requirement that

 7    a suspension be for only a 72-hour period and here you have

 8    done it for 90 days.  I don't understand that, is the first

 9    point.

10            MR. TORSTENSEN:  Yes.  So I think that's a provision

11    that's construed as part of the lease, if I'm not mistaken,

12    under 1334 -- sorry, 1341(c).

13            THE COURT:  I'm citing from -- in the statute itself,

14    1341 or 1334 under the national security provisions in 1341, I

15    think.

16            MR. TORSTENSEN:  I believe 1341(c) construes each

17    lease should contain a provision relating to national security,

18    but that's subject, if I recall correctly, to a determination

19    by the Department of War or recommendation by the Department of

20    War in a state of war or, I believe, in -- where is the

21    language?  Or a national emergency.

22            So I think the answer to that is I don't believe that

23    is the basis -- the statutory basis for the order here.  I

24    believe the statutory basis is under 13 --

25            THE COURT:  I'll let you make your argument and we'll

1    come back to that then.  Go ahead.

2            Right now you have got it open-ended.  You have done

3    it for 90 and said we may do it forever.

4            MR. TORSTENSEN:  Sorry, I didn't hear that.

5            THE COURT:  Right now you have got it open-ended.  You

6    said you have done it for 90, but we may do it for more.

7            MR. TORSTENSEN:  Right.  Yes.  It certainly doesn't

8    comply with the 72-hour timeframe from that specific provision,

9    but I don't believe that's the statutory basis for --

10           THE COURT:  There is $6 million just thrown away right

11   now.

12           MR. TORSTENSEN:  I wouldn't say -- I mean, I think we

13   understand that there are substantial, like, costs or

14   investment costs that have been, I guess, devoted to the

15   project, but there are also substantial national security

16   interests on the other side.

17           Turning to the second point, under *Winter*, plaintiff

18   bears the burden of satisfying all four factors, and those

19   factors include the balancing of the harms.

20           So third, and this goes without saying, but national

21   security concerns are of paramount importance, and federal

22   courts do not second-guess the informed judgment of officials

23   whose duty it is to assess national security risks.

24           As the Supreme Court held in *Winter*, even when the

25   government loses on irreparable harm or on a likelihood of

 1   success, national security risks can outweigh other irreparable

 2   harms.  That is true here, and the Court should deny

 3   plaintiffs' requested injunction.

 4          Turning specifically to the balance of the harms and

 5   the public interest, we submit that when implicated, protecting

 6   against the new national security risks identified in the

 7   classified materials outweighs any alleged irreparable harm

 8   that will arise before this case can be litigated on the

 9   merits.

10          As for the alleged operational harms, plaintiffs fail

11   to show that these harms are irreparable.  These alleged harms,

12   as we heard this morning or heard this afternoon, include lost

13   revenue from not meeting the commercial operations deadlines in

14   the power purchase agreements.

15          But even if these harms are irreparable and even if

16   they would materialize before this case can be litigated on the

17   merits, plaintiffs still fail to show that these harms outweigh

18   the national security interests identified in the classified

19   materials.

20          As for their alleged construction-related harms,

21   plaintiffs fail to show that these harms -- sorry.  As for the

22   construction-related harms, these are the only harms that their

23   allegations show may be irreparable, but these harms must be

24   balanced against the national security concerns that we have

25   discussed, specifically, BOEM's conclusion that the national

1  security risks from operations made it necessary to stop

2  ongoing activities now to see if mitigation measures were

3  possible and, if so, to make sure that there was an opportunity

4  to incorporate them into the remaining construction.

5        But if the Court finds that the harms tied to

6  plaintiffs' construction-related activities outweigh the

7  national security risks identified in the classified materials,

8  it should narrowly tailor any injunction to allow only those

9  specific activities to continue during the litigation and it

10 should leave the suspension order in place as to everything

11 else.

12       THE COURT:  I guess I don't understand that.  You

13 don't know whether it can be mitigated at all, but you want to

14 stop everything in place now while you decide whether it can be

15 mitigated.  What is the harm in continuing what they are doing?

16       MR. TORSTENSEN:  I think the idea is primarily that if

17 they get all the way down the line to completing construction

18 and everything becomes operational and there was mitigation

19 measures that could have addressed the concern and then been

20 incorporated into construction, then you lose that opportunity

21 if you don't stop and actually try to engage in the discussion

22 to determine appropriate mitigation measures now.

23       And BOEM has reflected willingness to continue those

24 conversations with the project operators to determine if there

25 are mitigation measures available.  They don't know if there

1  are any now, but I don't think that they are crossing their

2  fingers and hoping that there won't be an available mitigation

3  measure.

4          THE COURT:  I don't understand that reason.  You want

5  to stop everything in place, cost them a million and a half a

6  day while you figure out what you are going to do?

7          MR. TORSTENSEN:  I think they want to figure out if

8  there is something they can do.  They want to make sure that if

9  they get all the way to the end of construction and it turns

10  out that nothing can be done to mitigate the national security

11  interest that's been identified in the classified materials,

12  then they don't want to have them continue to devote more

13  resources to that in the interim period.  So the idea is try to

14  stop and have that discussion now.

15          THE COURT:  Go ahead.

16          MR. TORSTENSEN:  If Your Honor doesn't have any

17  further questions, I don't have more to add.

18          THE COURT:  All right.  I'll hear from Green Oceans.

19          MR. MARZULLA:  Good afternoon, Your Honor.  Roger

20  Marzulla appearing on behalf of Green Oceans.

21          It seems to me that the elephant in the room is the

22  Court's review of the classified materials that have been

23  supplied to you and have not been supplied to the rest of us,

24  at least other than perhaps the Department of Justice.

25          If, as Revolution Wind would have it, this is all

1  pretextual, this is all made up, there is no national security

2  issue, and the Court doesn't have anything in the documents

3  that were provided to you that would serve as an administrative

4  record to demonstrate that there is a legitimate national

5  security interest issue here, then, by all means, we would

6  expect the Court to summarily grant this motion for preliminary

7  injunction.

8         If, on the other hand, there is, in fact, a serious

9  concern about the radar interference with the Falmouth radar

10 surveillance facility, with the Providence radar facility, with

11 the NORAD-operated defense radar facility, then indeed this is

12 a much more close question than counsel would have you think by

13 suggesting, oh, this is just -- this is what she calls the

14 second stop work order.  It's just like the other one, Your

15 Honor, which had different authority, different facts,

16 different everything, and no national defense issues involved.

17        The company tells you, Your Honor, we have 41 days

18 with the boat out there and 41 days of construction.  It's

19 January 12th.  You have to make a decision today.  They got

20 this notice back on December 22nd, and it took them two weeks

21 to even file this motion.

22        It is a somewhat manufactured -- if we're going to be

23 casting aspersions upon the motives here of the various

24 parties, we might at least suggest that had the issue been as

25 critical to the project as suggested by Revolution Wind, that

1    41 days, this is the very last day for you to save this

2    project, then we might have thought that they would have raised

3    the issue a little bit earlier.

4         The legal authorities here are two.  First of all,

5    there has been no discussion of the Outer Continental Shelf

6    Lands Act, which requires -- says the Secretary of Interior

7    shall ensure for all activities on the outer continental shelf,

8    and one of those things is protection of the national defense.

9         So unless this is not a protection of the national

10    defense, the secretary has not only the authority but the

11    obligation to ensure that this activity is consistent with the

12    protection of the national defense.

13         Second, you also have not heard discussion of

14    paragraph 3(c) of the lease itself.  Mind you, this is a letter

15    suspending the lease.  What does paragraph 3(c) say?  It says

16    that the United States reserves the right to suspend the lease

17    for the protection of the national security.  It's a

18    contractual arrangement that Revolution Wind made with the

19    United States.  It is an exercise of a contractual right that

20    the United States reserved.

21         And you know what, even if this were a breach of the

22    lease, the United States would be liable in a suit for breach

23    of contract to be filed in the Court of Federal Claims, which

24    has jurisdiction over breach of contract cases for money

25    damages.

1          What is the irreparable injury here?  It's money

2   damages.  In the end, we hear Revolution Wind talking about all

3   of the other factors, about supplying power and so forth, but

4   in the end, their damage is this million dollars a day, their

5   damage is whatever they suffered before, but it is monetary

6   damage.

7          Is it irreparable if they have conceded that right to

8   the United States in their lease, which they have attached to

9   their amended complaint as Exhibit E?  Is it an irreparable

10  damage if they can recover those monetary losses in a contract

11  suit against the United States?

12         And by the way, will a suit lie to compel the United

13  States to live up to some contractual requirement?  Does

14  specific performance even lie against the United States?  I

15  think the cases say that it does not.

16         So in terms of the irreparable injury claims that have

17  been put forward, the monetary irreparable injury claims, they

18  become far less significant in the context of the contractual

19  arrangement that Revolution Wind has entered into and the fact

20  that this December 22nd letter is a lease suspension.

21         We certainly join the United States in saying -- and I

22  think the cases say this -- that national defense is paramount,

23  and this project, if it goes into operation -- and what I

24  thought I heard, Your Honor, was it's going into operation if

25  you grant this preliminary injunction, in a couple of weeks,

1  they are going to start revving this up, and that is the source

2  of -- assuming this is the radar interference we're talking

3  about, that is the source of the radar interference, it is

4  these 300-foot long blades spinning at 200 miles an hour that

5  create a wall of radar responses that can both block the

6  possibility of incoming or other objects behind that wall of

7  radar interference and can send messages to the radar operators

8  that are incorrect; that, in fact, show objects that aren't

9  there, hide objects that are there.

10        And that's the reason -- yes, this foreign company,

11  Orsted, does have significant experience.  They have had their

12  projects canceled in Sweden, in Finland, in Estonia precisely

13  for reasons of radar interference.

14        And you will note that those are nations that are

15  located either adjacent to or relatively nearby Russia and that

16  have concerns about their national defense, historical as well

17  as present.

18        So far from this being a situation in which we can

19  airily dismiss the fact that, no doubt, the President and the

20  administration have significant concerns and have expressed

21  even dislike of offshore wind, granted, does that mean that

22  they have no reason under the classified documents that have

23  been provided to the Court that there is nothing in national

24  defense that does need protecting here?

25        We suggest that ultimately, Your Honor, you have got

1    that answer, we don't.  But unless it is the case that the

2    government's claims of threats to national security are

3    pretextual, as Revolution Wind would have it, that national

4    defense concern, the protection of our country, resolves the

5    issues of what is the public interest, what is the weighing of

6    the equities in the case, and I suspect would address the

7    likelihood of success as well.

8            If the Court has no questions, thank you, Your Honor.

9            THE COURT:  Thank you, Mr. Marzulla.

10           MR. TORSTENSEN:  If I may have one quick thing.

11           If Your Honor is inclined to grant the injunction,

12   just wanted to ask that Your Honor would deny the portion of

13   the amended order that was submitted relating to the production

14   of classified materials.  We don't think that that is properly

15   before the Court.

16           THE COURT:  I agree.  I couldn't do that.  I agree

17   with that.

18           MR. TORSTENSEN:  We just wanted to put that on the

19   record.  Thank you, Your Honor.

20           MS. SCHNEIDER:  Thank you, Your Honor.  Just go point

21   by point on a few items for Your Honor's consideration and the

22   record.

23           With respect to the concern articulated that the

24   suspension order is necessary because we have to try to do

25   something during this construction process and we can't wait

1    until the project is in operation, I would point Your Honor to

2    the LeBlanc rebuttal declaration submitted with our reply at

3    paragraphs 5 and 6 of that declaration where Mr. LeBlanc states

4    that there are a multitude -- these are quotes:  "A multitude

5    of readily available tried and tested solutions that can be

6    employed to mitigate interference with military defense and

7    national security capabilities.  Orsted has firsthand

8    experience of a range of both land-based and offshore

9    measures."

10           And then in paragraph 6 he says, "Orsted regularly

11    works with military national security governmental agencies to

12    identify and deploy mitigation or enhancement measures during

13    the offshore facilities design stage.  Orsted also has

14    experience installing and deploying measures at operational

15    offshore wind facilities and those under construction.  Orsted,

16    in partnership with defense contractors Terma and Saab

17    installed and successfully tested supplementary infill radar on

18    Orsted's Hornsea One offshore wind facility, which was already

19    in operation and was the largest offshore wind facility in the

20    world at the time."

21           So while BOEM says it just doesn't know, there are

22    solutions, to the extent that the information provided to Your

23    Honor has identified a new issue that we're currently unaware

24    of.  That's point number one.

25           And then turning to the issues raised by intervenor's

1    counsel, this is not just about money, Your Honor.  This is an

2    existential threat to the very existence of the project.  There

3    is an abundant amount of case law that holds that that is an

4    irreparable harm.

5           With respect to the canceled wind farms in Sweden and

6    other places, those were all in the planning stage, Your Honor.

7    They were not involving projects that were already 87 percent

8    complete and about to deliver power to the states of Rhode

9    Island and Connecticut.

10          And then with respect to the timing of our filing,

11   candidly, Your Honor, we wanted to meet with the Department and

12   the government before filing our case.  We had that meeting on

13   December 10th -- excuse me, on December 30th, and then after it

14   was clear that they were not going to be providing the

15   information to us in any reasonable timeframe, we filed

16   immediately thereafter on the 2nd of this year.

17          And then finally, with respect to the lease provisions

18   that intervenor's counsel pointed you to, when you actually

19   look at that provision, it reserves the right for national

20   security per Section 12 of OCSLA, which is Section 1341(c) and

21   (d), which the government has not invoked here.  1337(p)(4) is

22   not some broad authority that they can use.  They need to use

23   the authorities that Congress provided to them in OCSLA itself,

24   in Section 1341(c) and (d), and perhaps at best 1334.

25          Thank you, Your Honor.

 1          THE COURT:  All right.

 2          MR. TORSTENSEN:  Your Honor, if I may, one quick

 3   response.

 4          I just want to say to the extent that any of the

 5   comments were relying on rebuttal declaration, we just wanted

 6   to note for the record that those were submitted yesterday, and

 7   so we haven't had a chance to respond to those specifically.

 8          THE COURT:  I'll take a short recess.

 9       (Recessed from 3:13 p.m. to 3:49 p.m.)

10          THE COURT:  The Bureau of Ocean and Energy Management,

11   BOEM, issued a stop -- a new stop work order to Revolution

12   Wind, LLC on December 22, 2025 to, quote, "suspend all ongoing

13   activities related to the Revolution Wind project on the outer

14   continental shelf for the next 90 days for reasons of national

15   security."

16          During this time, BOEM claimed that it would

17   coordinate with Revolution Wind to determine whether the

18   national security threats posed by the project could be

19   mitigated and reserved the right to extend the suspension at

20   the end of the 90-day period.

21          In arguing that the project posed a national security

22   threat, BOEM relied on the new classified information provided

23   to the Bureau by the Department of War in November 2025.

24          BOEM made it publicly known this report included

25   information relating to the rapid evolution of relevant

1   adversary technologies and the resulting direct impacts to

2   national security from offshore wind projects.

3          The classified information in question was shared with

4   the Court for ex parte in-camera review, but was not provided

5   in either a classified or redacted format to the plaintiffs or

6   their lawyers.

7          I have reviewed the classified information and have

8   heard oral arguments from all parties and am now considering

9   motions for preliminary injunction and stay pending review from

10  both Revolution Wind and the State plaintiffs.

11         Issuance of a stay under the APA is governed by the

12  same four-factor test that governs preliminary injunctions.

13  One, whether the party seeking the stay is likely to succeed on

14  the merits.  Two, the likelihood that the moving party will be

15  irreparably harmed absent a stay.  Three, the prospect that

16  others will be harmed if the Court grants the stay.  And four,

17  the public interest in granting the stay, citing *Hill*

18  *Dermaceuticals, Incorporated versus FDA*, 524 F. Supp. 2d 5 at

19  8, DDC 2007.  Here, all four factors weigh in favor of granting

20  the motions.

21         Plaintiffs I find are likely to succeed on the merits.

22  As the basis for the stop work order, the Bureau cited national

23  security concerns based on classified information uncovered as

24  a part of new assessment completed by the Department of War in

25  November of 2025.

1        These were the same concerns cited in a number of near

2   identical stop work orders issued on the same day to multiple

3   wind projects up and down the East Coast.

4        The Bureau did not explain anywhere in the December 20

5   stop work order which features, specifications or activities

6   related to the Revolution Wind project implicated new national

7   security concerns, nor did the Bureau explain how these

8   national security concerns differed from the same ones that the

9   developers of Revolution Wind specifically committed to

10  mitigating in their 2024 agreement with the Department of

11  Defense or the ones which the project was extensively screened

12  out for as part of its multi-year, multi-agency approval

13  process under the Outer Continental Shelf Lands Act.

14       The Bureau's failure to account for its previous

15  assurances the project does not improperly interfere with

16  national security clearly amounts to a change in position by

17  the government.

18       As the Supreme Court has stated, an agency action is

19  arbitrary and capricious where it is not reasonable or

20  reasonably explained.  *FCC v. Prometheus Radio Project*, 592

21  U.S. 414 at 423, 2021.  Pointing to ongoing national security

22  concerns based on purportedly new classified information does

23  not constitute a sufficient explanation for the Bureau's

24  decision to entirely stop work on the Revolution Wind project.

25       Although the Department of the Interior did

1    subsequently issue a press release with additional

2    justification for all of the stop work orders, that action did

3    not solve the issue.

4        Under *DHS versus Regents of the University of*

5    *California*, I am limited to considering the specific grounds

6    the Bureau invoked at the time it acted.  591 U.S. 1 at 20,

7    2022 is the year.  That's because it is foundational -- quote:

8    "It is a foundational principle of administrative law that

9    judicial review of agency action is limited to the grounds that

10   the agency invoked when it took the action."

11       At the time that the Bureau issued the stop work

12   order, it merely cited national security concerns without

13   further explanation, and without applying the newly discovered

14   concerns to the Revolution Wind project specifically.  The

15   Bureau also admits that it's not sure that its new concerns can

16   be mitigated at all and does not explain why construction

17   cannot continue while it investigates that question further.

18       Revolution Wind has agreed at every stage of the

19   approval process to work with the government to mitigate

20   national security concerns.  I can see no reason why the

21   project will not continue to do so even when construction is

22   complete.

23       Because the Bureau failed to provide sufficient

24   reasoning for its change in position, because the Bureau failed

25   to explain why it could not take action short of a complete

1 stop to construction, the December 22nd stop work order likely

2 amounts to arbitrary and capricious action under the

3 Administrative Procedure Act.

4        When I stayed the Bureau's first stop work order back

5 in September of 2025, I said that the Bureau's failure to

6 provide any reasoning for its decision was the height of

7 arbitrary and capricious action.  This time the government did

8 provide a reason for its decision, but its failure to explain

9 or apply that reasoning suggests that the stated national

10 security reason may have been pretextual.

11        My concern is heightened by Interior Secretary

12 Burgum's press appearances on December 22nd and 23rd in which

13 he criticized offshore wind projects for a variety of reasons

14 unrelated to national security.

15        And while the Bureau may order a suspension of

16 operations for legitimate reasons of national security under

17 the Outer Continental Shelf Lands Act and Revolution Wind's own

18 lease, those suspensions are limited to emergency situations

19 and demonstrated findings of particularized harm that cannot be

20 averted short of a total stop to project activity.

21        Given that the Bureau became aware of the new

22 classified information in November of 2025 and did not act

23 until December 22, 2025, I'm not persuaded that any such

24 emergency exists in this case, nor have I been provided any

25 evidence of a new finding of particularized harm such that the

1   government could order an immediate suspension.

2        Moreover, I am persuaded that plaintiffs will be

3   irreparably harmed absent a stay.  As it stands, the Revolution

4   Wind project is 87 percent complete and many hundreds of

5   workers have stopped work.  At every step, Revolution Wind has

6   relied on approval from Interior and BOEM decisions that are

7   currently being defended in related cases before this Court,

8   meaning that there are strong reliance interests at stake.

9        Revolution Wind represents that the delays resulting

10  from the stop work order are costing the project $1.44 million

11  a day, but, more importantly, if Revolution Wind cannot meet

12  certain benchmark deadlines, the entire enterprise could

13  collapse, costing Orsted $5 billion of development funds and

14  another $1 billion in breakaway costs.

15       Of note, a specialized ship necessary to complete the

16  project will be no longer available after February of this

17  year, which means if the stop work order is not stayed, it will

18  be impossible for Revolution Wind to deliver energy under its

19  power purchase agreements by its deadline of early 2027.  If

20  Revolution Wind cannot meet its contractual deadlines, then the

21  States of Rhode Island and Connecticut will have the right to

22  terminate their agreements with the company.

23       In light of plaintiffs' significant reliance interests

24  and the government's unreasonable and seemingly unjustified

25  change in position, the balance of equities clearly cut in

1    favor of Revolution Wind continuing work while the government

2    considers ways to mitigate any new national security concerns

3    that the project may implicate.

4         For these reasons, both Revolution Wind and the State

5    plaintiffs' motions are granted.  The stays and injunction will

6    run only to the December 22nd stop work order.  I'll issue

7    plaintiffs' proposed orders and say "for the reasons stated on

8    the record in open court."

9         With that, the Court will be in recess.

10    (Proceedings concluded at 3:59 p.m.)

11

12                            CERTIFICATE

13    I, Sonja L. Reeves, Federal Official Court Reporter in and
      for the United States District Court of the District of
14    Columbia, do hereby certify that the foregoing transcript is a
      true and accurate transcript from the original stenographic
15    record in the above-entitled matter and that the transcript
      page format is in conformance with the regulations of the
16    Judicial Conference of the United States.

17    Dated this 12th day of January, 2026.

18

19                        /s/ Sonja L. Reeves
                          SONJA L. REEVES, RDR-CRR
20                        FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25