**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EMPIRE LEASEHOLDER LLC *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>DOUGLAS J. BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior, *et al.*,<br><br>        Defendants. | C.A. No. 26-cv-00004-CJN |
| STATE OF NEW YORK *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>DOUGLAS J. BURGUM, in his official capacity as Secretary of the United States Department of the Interior, *et al.*,<br><br>        Defendants. | C.A. No. 26-cv-00071-CJN<br>(consolidated) |

**THE STATE'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56, plaintiffs State of New York and the New York State Energy Research and Development Authority (NYSERDA and together, the State) hereby move this Court to enter summary judgment in the State's favor and to vacate the Bureau of Ocean Energy Management (BOEM) Acting Director Matthew Giacona's December 22, 2025 letter (the Suspension Order) requiring Empire Leaseholder LLC and Empire Offshore Wind LLC (together, Empire Wind) to halt construction of the Empire Wind Project (the Project) and permanently enjoin defendants (together, Agency Defendants) from enforcing the Suspension Order.

The Empire Wind Project is a commercial-scale offshore wind project that will contribute approximately 810 megawatts of electricity to New York pursuant to an agreement with NYSERDA. The Project has received approvals from all relevant federal, state, and local agencies and is currently under construction. As set forth by Empire Wind in this consolidated action, the Suspension Order poses an existential threat to the Project's completion.

The Suspension Order should be held unlawful under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), because it is arbitrary and capricious. Specifically, in issuing the Suspension Order, Agency Defendants failed to: (1) provide a reasoned explanation for suspending all work on the Project; (2) explain their change-in-position or account for New York's reliance interests; (3) explain why a narrower alternative would not have addressed Agency Defendants' alleged national security concerns; or (4) provide a genuine justification for suspending Project operations. The State has standing to challenge the Suspension Order because New York will lose a range of anticipated energy, economic, and environmental benefits if the Project is delayed and/or canceled.

The grounds for this motion are fully set forth in the State's accompanying statement of points and authorities and the declaration of Georges Sassine, which is attached as Exhibit 1. In further support of its argument that the Suspension Order is arbitrary and capricious, the State also relies on and incorporates by reference the statement of facts and Point D of the statement of points and authorities submitted by Empire Wind. The State also relies on and incorporates by reference Empire Wind's Point A, which establishes that Empire Wind has standing and that the Suspension Order is a final agency action subject to review under the Administrative Procedure Act. A proposed order is attached.

Dated:  New York, New York
   May 12, 2026

          Respectfully submitted,

          LETITIA JAMES
          Attorney General of New York

          By:  */s/ Libby Dimenstein*
             Monica Wagner
              *Deputy Bureau Chief*
             Rene F. Hertzog
             Laura Mirman-Heslin
              *Assistant Attorneys General*
             Libby Dimenstein
              *Special Assistant Attorney General*
             Environmental Protection Bureau
             28 Liberty Street
             New York, New York 10005
             (212) 416-8469
             Libby.Dimenstein@ag.ny.gov

             Morgan Costello
              *Deputy Bureau Chief*
             Environmental Protection Bureau
             The Capitol
             Albany, New York 12224

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EMPIRE LEASEHOLDER LLC *et al.*,<br><br>       Plaintiffs,<br><br>    v.<br><br>DOUGLAS J. BURGUM, in his official capacity as Secretary of the U.S. Department of the Interior, *et al.*,<br><br>       Defendants. | C.A. No. 26-cv-00004-CJN |
| STATE OF NEW YORK *et al.*,<br><br>       Plaintiffs,<br><br>    v.<br><br>DOUGLAS J. BURGUM, in his official capacity as Secretary of the United States Department of the Interior, *et al.*,<br><br>       Defendants. | C.A. No. 26-cv-00071-CJN<br>(consolidated) |

**STATEMENT OF POINTS AND AUTHORITIES
IN SUPPORT OF THE STATE'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

LEGAL BACKGROUND ............................................................................................................... 2

    I.     The Outer Continental Shelf Lands Act.................................................................... 2

    II.    New York's Offshore Wind Standard and Climate Act............................................ 3

STATEMENT OF FACTS ............................................................................................................... 5

    I.     The Empire Wind Project........................................................................................ 5

    II.    The Wind Memo and the Empire Wind Suspension Order ..................................... 7

    III.   Challenges to Other Offshore Wind Suspension Orders........................................11

    IV.   New York's Injuries............................................................................................... 12

    V.    Procedural History................................................................................................. 17

STANDARD OF REVIEW ........................................................................................................... 18

ARGUMENT................................................................................................................................. 18

    I.     The State Has Standing to Challenge the Suspension Order .................................. 19

    II.    The Suspension Order Is an Arbitrary and Capricious Final Agency Action. .............. 22

        A.    The Suspension Order Is a Reviewable Final Agency Action. ................................ 22

        B.    The Suspension Order Is Arbitrary and Capricious. ................................................ 23

            1. Agency Defendants Have Not Offered a Reasoned Explanation for the Suspension Order............................................................................................... 24

            2. Agency Defendants Did Not Consider New York's Serious Reliance Interests When They Changed Their Position. ................................................. 25

            3. Agency Defendants Did Not Address Alternative Means of Addressing the Purported National Security Concerns.......................................................... 27

            4. Agency Defendants Did Not Provide a Genuine Justification for the Suspension Order. ............................................................................................ 28

CONCLUSION.............................................................................................................................. 31

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Alaska v. U.S. Dep't of Transp.*,
    868 F.2d 441 (D.C. Cir. 1989)................................................................................................20

*Alfred L. Snapp & Son v. Puerto Rico*,
    458 U.S. 592 (1982)...............................................................................................................20

*Amerijet Int'l, Inc. v. Pistole*,
    753 F.3d 1343 (D.C. Cir. 2014)............................................................................................24

*Ardmore Consulting Grp., Inc. v. Contreras-Sweet*,
    118 F. Supp. 3d 388 (D.D.C. 2015).......................................................................................18

*Belmont Mun. Light Dep't v. FERC*,
    38 F.4th 173 (D.C. Cir. 2022)...............................................................................................20

*Bennett v. Spear*,
    520 U.S. 154 (1997)...............................................................................................................22

*California v. EPA*,
    72 F.4th 308 (D.C. Cir. 2023)...............................................................................................21

*Carpenters Indus. Council v. Zinke*,
    854 F.3d 1 (D.C. Cir. 2017)..................................................................................................21

*Chamber of Com. of the U.S. v. Sec. & Exch. Comm'n*,
    412 F.3d 133 (D.C. Cir. 2005)..............................................................................................28

*Clean Air Council v. Pruitt*,
    862 F.3d 1 (D.C. Cir. 2017)..................................................................................................23

*Czyzewski v. Jevic Holding Corp.*,
    580 U.S. 451 (2017)...............................................................................................................21

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019).........................................................................................................28, 31

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
    591 U.S. 1 (2020)..................................................................................................................25

*Ensco Offshore Co. v. Salazar*,
781 F. Supp. 2d 332 (E.D. La. 2011) .................................................................................23

*Env't Def. Fund, Inc. v. Gorsuch*,
713 F.2d 802 (D.C. Cir. 1983) ..........................................................................................23

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ...........................................................................................................24

*FDA v. Wages & White Lion Invs., L.L.C.*,
604 U.S. 542 (2025) ...........................................................................................................25

*Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*,
493 U.S. 331 (1990) ...........................................................................................................21

*Gutierrez v. Saenz*,
606 U.S. 305 (2025) ...........................................................................................................22

*Kaiser Found. Hosps. v. Sebelius*,
828 F. Supp. 2d 193 (D.D.C. 2011) ..................................................................................18

*Louisiana v. Biden*,
622 F. Supp. 3d 267 (W.D. La. 2022)...........................................................................21, 23

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992).......................................................................................................19, 22

*Maine v. Norton*,
257 F. Supp. 2d 357 (D. Me. 2003) ..................................................................................20

*Massachusetts v. EPA*,
549 U.S. 497 (2007).......................................................................................................19, 20

*Massachusetts v. Trump*,
790 F. Supp. 3d 8 (D. Mass. 2025) ...................................................................................23

*Motor Vehicle Mfrs. Ass'n of the U.S .v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..................................................................................................18, 24, 27–28

*N. Am.'s Bldg. Trades Unions v. Dep't of Def.*,
783 F. Supp.3d 290 (D.D.C. 2025) ...................................................................................21

*Nat'l TPS All. v. Noem*,
166 F.4th 739 (9th Cir. 2026) ...........................................................................................31

*New Jersey v. EPA*,
989 F.3d 1038 (D.C. Cir. 2021) .........................................................................20–21

*New York v. Burgum*,
No. 26-cv-00071 (D.D.C. filed Jan. 9, 2026) .........................................................17

*New York v. Trump*,
811 F. Supp. 3d 215 (D. Mass. 2025) ..........................................................8, 22, 26

*NRDC v. Wheeler*,
955 F.3d 68 (D.C. Cir. 2020) ............................................................................21, 23

*Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*,
461 U.S. 190 (1983)..............................................................................................26

*Physicians for Soc. Resp. v. Wheeler*,
956 F.3d 634 (D.C. Cir. 2020) ...............................................................................25

*Revolution Wind, LLC v. Burgum*,
No. 25-cv-02999 (D.D.C. filed Sept. 4, 2025)...........................................11–12, 28–29

*Roberts v. United States*,
883 F. Supp. 2d 56 (D.D.C. 2012) ..........................................................................18

*Sec'y of the Interior v. California*,
464 U.S. 312 (1984)..............................................................................................19

*Spirit Airlines, Inc. v. U.S. Dep't of Transp.*,
997 F.3d 1247 (D.C. Cir. 2021) ..............................................................................27

*Sunrise Wind LLC v. Burgum*,
No. 26-cv-00028 (D.D.C. filed Jan. 6, 2026) ...............................................12–13, 29

*Va. Elec. & Power Co. v. U.S. Dep't of the Interior*,
No. 25-cv-00830 (E.D. Va. filed Dec. 23, 2025)......................................................12, 28

*Vineyard Wind 1 LLC v. U.S. Dep't of the Interior*,
No. 26-cv-10156 (D. Mass. filed Jan. 15, 2026)......................................................12, 29

*Wyoming v. Oklahoma*,
502 U.S. 437 (1992)..............................................................................................21

*Yakima Valley Cablevision, Inc. v. FCC*,
794 F.2d 737 (D.C. Cir. 1986).................................................................................27

**Federal Statutes**

5 U.S.C. § 704.................................................................................................................22

5 U.S.C. § 706.....................................................................................................1, 18, 23

43 U.S.C. § 1332...........................................................................................................2, 10

43 U.S.C. § 1337.............................................................................................................3, 7

43 U.S.C. § 1341.............................................................................................................2, 6

Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331–1356c .......................................2–3, 6–7

**State Statutes**

Climate Leadership and Community Protection Act, 2019 N.Y.
  ch. 106 §§ 1–2 (codified in part at N.Y. Env't Conserv. Law §§ 75-0101 *et seq.*; N.Y.
  Pub. Serv. Law § 66-p) .................................................................................................4, 16

N.Y. Env't Conserv. Law § 75-0103 ....................................................................................4

N.Y. Env't Conserv. Law § 75-0107 ..................................................................................16

N.Y. Pub. Serv. Law § 66-p...............................................................................................4, 16

**Federal Regulations**

30 C.F.R. § 585.102.............................................................................................................3

30 C.F.R. § 585.417.............................................................................................................3

30 C.F.R. § 585.418.............................................................................................................3

30 C.F.R. § 585.600.............................................................................................................2

30 C.F.R. § 585.620.............................................................................................................2

30 C.F.R. § 585.621.............................................................................................................3

30 C.F.R. § 585.628.............................................................................................................3

30 C.F.R. Part 585............................................................................................................2, 6

43 C.F.R. Part 46 ...............................................................................................................3

Restoring the United States Department of War, Exec. Order 14347 of Sept. 5, 2025, 90
    Fed. Reg. 43893 (Sept. 10, 2025) .............................................................................2

Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind
    Leasing and Review of the Federal Government's Leasing and Permitting Practices
    for Wind Projects, Presidential Mem. of Jan. 20, 2025, 90 Fed. Reg. 8363 (Jan. 29,
    2025) ...........................................................................................................................7

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................18, 19

**Miscellaneous Authorities**

Aaron Rupar (@atrupar), X, (Jan. 9, 2026, at 4:10 p.m.),
    https://x.com/atrupar/status/2009734529045364757?s=46 ......................................11

Helena Horton, *Tilting at Windmills? Trump's Claims About Turbines Fact-Checked,* The
    Guardian, (July 28, 2025, at 8:21 a.m.),
    https://www.theguardian.com/environment/2025/jul/28/are-trump-claims-about-wind-
    power-correct .............................................................................................................11

Jennifer McDermott, *An Offshore Wind Project for New York May Be Abandoned over
    Trump Administration Delays*, AP News (May 9, 2025, at 5:03 p.m.),
    https://apnews.com/article/offshore-wind-energy-trump-empire-wind-
    9f895b06d2d535c2e1369c7a38464b76 .......................................................................8

Managing Federal Energy Resources and Protecting the Environment, SOI Order
    No. 3,438 (Aug. 1, 2025), 2025 WL 2272321 ...........................................................8

Press Release, U.S. Dep't of the Interior, The Trump Administration Protects U.S.
    National Security by Pausing Offshore Wind Leases (Dec. 22, 2025),
    https://www.doi.gov/pressreleases/trump-administration-protects-us-national-
    security-pausing-offshore-wind-leases ......................................................................10

Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 22, 2025, at 3:23 p.m.),
    https://x.com/SecretaryBurgum/status/2003199842152251802 ...............................10

Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 23, 2025, at 2:04 p.m.),
    https://x.com/SecretaryBurgum/status/2003542190170210637 ...............................10

Spencer Kimball, *Offshore Wind Has No Future in the U.S. Under Trump Administration, Interior Secretary Says*, CNBC, (Sept. 11, 2025, at 9:45 a.m.), https://www.cnbc.com/2025/09/11/offshore-wind-renewables-energy-trump-burgum.html?msockid=3e5ad34f0c9566c01293c5a60df76719 ..............................................11

*Trump Orders Suspension of New Offshore Wind Power Leasing*, Reuters (Jan. 21, 2025, at 11:03 a.m.) .................................................................................................................11

**INTRODUCTION**

On December 22, 2025, defendant Bureau of Ocean Energy Management (BOEM) Acting Director Giacona (together with the other defendants, Agency Defendants) directed Empire Leaseholder LLC and Empire Offshore Wind LLC (together, Empire Wind) to "suspend all ongoing activities related to [the Empire Wind Project] on the Outer Continental Shelf for the next 90 days for reasons of national security" (the Suspension Order). Administrative Record (AR) 0001. Plaintiffs Empire Wind and the State of New York and the New York State Energy Research and Development Authority (NYSERDA and together, the State) brought these consolidated actions to challenge the Suspension Order, which the Court preliminarily enjoined in January 2026.

For years, New York has relied on offshore wind as a major part of its long-term energy strategy. Pursuant to this strategy, offshore wind will help New York ensure a reliable source of electricity for its residents and meet its statutory climate objectives by decreasing its reliance on electricity generated by fossil fuels. After years of review and approvals by relevant federal, state, and local agencies, the State entered into a long-term contract with Empire Wind to construct and operate the commercial-scale offshore Empire Wind Project (the Project), which will provide much-needed energy to New York City.

The Suspension Order should be vacated and enjoined under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), because it is arbitrary and capricious. In issuing the Suspension Order, Agency Defendants failed to: offer a reasoned and reasonable explanation for suspending all work on the Project; explain their change-in-position or account for New York's significant reliance interests in the Project's completion; explain why a narrower alternative to a complete suspension would not have addressed the national security concerns purportedly identified by the Department

of War (DOW);[1] or provide a genuine justification for suspending Project construction and operations.

## LEGAL BACKGROUND

### I.      The Outer Continental Shelf Lands Act

Offshore wind energy on the Outer Continental Shelf is a highly regulated industry governed at the federal level by the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. §§ 1331–1356c, which is designed to ensure responsible siting, planning, construction, operation, and decommissioning of offshore wind projects. OCSLA states that the Outer Continental Shelf is "a vital national resource reserve held by the Federal Government for the public" and directs the Secretary of the U.S. Department of the Interior (Interior) to facilitate its "expeditious and orderly development" while maintaining competition and environmental safeguards. *Id.* § 1332(3). The Interior Secretary "shall ensure that any activity" authorized "is carried out in a manner that provides for" twelve factors, including safety, protection of the environment, and protection of the national security interests of the United States. *Id.* § 1337(p)(4).

BOEM administers the Outer Continental Shelf offshore wind leasing program pursuant to its renewable energy regulations in 30 C.F.R. Part 585. BOEM identifies leasing areas, conducts environmental assessments prior to leasing, and then leases the areas out to wind developers, usually through a competitive bidding process. Lessees must prepare a proposal for the development of a wind energy facility and submit a construction and operations plan. *Id*. §§ 585.600, 585.620–585.628. The construction and operations plan must demonstrate, among

---

[1] On September 5, 2025, President Trump issued an executive order seeking to change the name of this federal agency from the Department of Defense to the Department of War. Restoring the United States Department of War, Exec. Order 14347 of Sept. 5, 2025, 90 Fed. Reg. 43893 (Sept. 10, 2025). This statement uses "Department of War" or "DOW."

other things, that the project will be conducted in a manner that does not unreasonably interfere with other uses of the Outer Continental Shelf, including those relating to national security or defense. *Id.* § 585.621(d).

BOEM conducts a thorough review of a project's construction and operations plan, including developing an environmental impact statement, coordinating with other agencies (including DOW) and interested stakeholders, and complying with numerous other federal laws. *Id.* § 585.628; 43 C.F.R. Part 46. BOEM must ensure the construction and operations plan complies with OCSLA and that activities are carried out "in a manner that provides for and reaches a rational balance among" the twelve factors enumerated by OCSLA. 30 C.F.R. § 585.102(a).

OCSLA provides very narrow authority for suspending operations due to national security concerns. It directs the Interior Secretary to include in all leases "a provision whereby authority is vested in the Secretary, upon a recommendation of the Secretary of Defense, during a state of war or national emergency declared by Congress or the President of the United States, after August 7, 1953, to suspend operations under any lease." 43 U.S.C. § 1341(c). BOEM's regulations provide that BOEM may order a "suspension" of a lease in only two circumstances: (1) "[w]hen necessary to comply with judicial decrees prohibiting some or all activities under [the] lease" or (2) "[w]hen the suspension is necessary for reasons of national security or defense." 30 C.F.R. § 585.417(a)–(b). Under OCSLA's regulations, if BOEM orders a lease suspension, BOEM's "written order [must] explain the reasons for its issuance and describe the effect of the suspension order on [the] lease . . . and any associated activities." *Id.* § 585.418(c).

## II.    New York's Offshore Wind Standard and Climate Act

In 2018, NYSERDA released a comprehensive plan to encourage the development of offshore wind. The plan states that "[t]he development of offshore wind energy . . . will stimulate

the State's economy, support revitalization of maritime communities, spur infrastructure investment, and help create a new American industry centered in New York State that will create thousands of new jobs for skilled workers." Ex. 1, Decl. of Georges Sassine (Sassine Decl.) ¶ 9.

That same year, New York's Public Service Commission adopted an "Offshore Wind Standard" calling for the procurement of offshore wind energy generation to serve New York's electricity needs. The Public Service Commission found that due to "its proximity and direct access to load centers, offshore wind would provide substantial reliability and diversity benefits to the electric system." *Id.* ¶ 6.  It also noted that offshore wind energy would reduce greenhouse gas emissions and "produce significant public health benefits by displacing fossil-fired generation in the downstate area." *Id*.

In its role as central procurement administrator, NYSERDA issues solicitations seeking proposals to deliver offshore wind energy to New York. *Id.* ¶¶ 4–5, 12, 15–16. The competitively selected projects enter into contracts to sell offshore renewable energy certificates, which represent the environmental attributes of offshore wind-generated renewable energy delivered into New York, to NYSERDA. *Id.* ¶¶ 5–7. NYSERDA then sells the certificates to utilities and other load serving entities (entities that provide electricity to customers) that are required to procure those certificates to comply with the Offshore Wind Standard. *Id.*

In 2019, the New York Legislature passed the Climate Leadership and Community Protection Act (the Climate Act) to combat climate change by instituting statewide clean energy targets, 2019 N.Y. Laws ch. 106 §§ 1–2 (codified in part at N.Y. Env't Conserv. Law §§ 75-0101 *et seq.*; N.Y. Pub. Serv. Law § 66-p), including the procurement of at least 9 gigawatts of electricity generated by offshore wind by 2035, N.Y. Env't Conserv. Law § 75-0103(13)(e).

**STATEMENT OF FACTS**

In addition to the facts below, the State incorporates by reference the statement of facts in Empire Wind's statement of points and authorities in support of its motion for summary judgment (Empire St.).

## I.      The Empire Wind Project

In November 2018, NYSERDA launched its first offshore wind solicitation. AR0467, AR1858, AR4076. In July 2019, the Empire Wind Project was announced as a winner of the solicitation, contingent on negotiation of a final agreement. AR4076. In October 2019, NYSERDA entered into an agreement with Equinor Wind US LLC (Equinor US), which owns Empire Wind, to purchase renewable energy certificates from Equinor US. AR4076. The agreement was subsequently assigned by Equinor US to Empire Offshore Wind LLC. AR4076. In 2024, following a subsequent solicitation process, that contract was replaced with a new contract with similar terms. *See* Sassine Decl. ¶¶ 15–17. The contract's purchase and sale obligations last for a term of 25 years, starting after the Empire Wind Project begins delivering energy to New York. AR0034.

The Empire Wind Project is a wind turbine farm that is being developed by Empire Wind in federal waters on the Outer Continental Shelf, approximately 14 miles off the New York shore. AR1816, AR1854. The Project is expected to have a nameplate capacity (maximum power output) of 810 megawatts generated from 54 turbines, enough to power 500,000 New York homes.[2] AR0034–35, AR0100. As BOEM acknowledged in its Environmental Impact Statement and Record of Decision for the Project, the Project "would contribute to New York's goal of 9 gigawatts (GW) of offshore wind energy generation by 2035 as outlined in the [Climate Act] and likewise advance the

---

[2] Although the administrative record states that the Project will have a nameplate capacity of 816 megawatts, the 2024 contract between Empire Wind and NYSERDA calls for a nameplate capacity of 810 megawatts. *See* Sassine Decl. ¶ 11; Empire St. at 4 n.3.

goals of the 2015 New York State Energy Plan as amended on April 8, 2020." AR0467, AR1858; *see also* AR4076 ("The Project is an essential element in addressing the need identified by the State for renewable energy and will help the State achieve its [Climate Act] mandate and other renewable energy goals."). The Project is also anticipated to support thousands of jobs, AR1303, which will lead to an increase in state and local tax revenue, AR1304–05. Because the power generated from the Project will likely displace fossil fuel-based electricity generation, the Project will result in lower emissions of pollutants like nitrogen oxides and fine particulate matter, AR2102, AR2109, delivering millions of dollars of benefits from avoided health impacts, AR1304, AR2109. The first power from the Project is expected to be delivered in late 2026, and the Project is expected to be fully operational by the end of 2027. AR0032.

As Empire Wind has explained, the Empire Wind Project has undergone extensive review for potential national security issues, including consultation with DOW. *See* AR0641–43, AR1648–50, AR1806–08; *see also* Empire St. at 4–10. The Record of Decision for the Project issued by BOEM and other agencies found that approving the Construction and Operations Plan, as modified by the terms and conditions included in the Record of Decision, "would be in accordance with the regulations at 30 C.F.R. Part 585 and would ensure that all the activities on the [Outer Continental Shelf] are carried out in a manner that provides for the factors in [OCSLA, 43 U.S.C. § 1337(p)(4)]," which include "protection of national security interests of the United States." AR0642–43, AR0655. The Record of Decision also requires Empire Wind to mitigate any potential impacts on national security, including by entering into a mitigation agreement with DOW to minimize adverse impacts of interference on radar systems. AR0545, AR0642–43.

BOEM approved the Construction and Operations Plan in February 2024. AR0317–18. Two days later, Empire Wind reached out to DOW requesting a call to discuss the mitigation agreement.

AR0314–16. Empire Wind has continued to communicate with DOW about the agreement and has been advised that the agreement has been drafted and is under review by DOW. AR0310–16. Empire Wind has also been in communication with the U.S. Department of the Navy and the U.S. Coast Guard. *See* AR1507. The record does not contain evidence that Empire Wind has at any time failed to comply with the terms and conditions of the Construction and Operations Plan approval.

Pursuant to OCSLA, Empire Wind's lease provides that, in the event of a suspension for reasons of national security or defense under 43 U.S.C. § 1341, "[e]very effort will be made by the appropriate military agency to provide as much advance notice as possible of the need to suspend operations," and "[a]dvance notice will normally be given before requiring a suspension[.]" AR0068. Such "[s]uspensions . . . for national security reasons will not generally exceed 72 hours[.]" AR0069.

## II.     The Wind Memo and the Empire Wind Suspension Order

On January 20, 2025, President Trump issued a memorandum that halted all federal approvals for the development of offshore and onshore wind energy (the Wind Memo). Temporary Withdrawal of All Areas on the Outer Continental Shelf from Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects, Presidential Mem. of Jan. 20, 2025, 90 Fed. Reg. 8363 (Jan. 29, 2025).[3] Pursuant to the Wind Memo, several federal agencies ordered an immediate pause in the issuance of all wind energy authorizations (the Wind Order). On December 8, 2025, the United States District Court for the District of Massachusetts ruled that the Wind Order "constitutes a final agency action that is arbitrary and

---

[3] The actions taken by the Trump Administration that are described in this section are not in the administrative record but should be considered by the Court for the reasons stated in the State's motion to consider extra-record evidence. State Mot. Consider Extra-R. Evid. at 4–8, ECF No. 43.

capricious and contrary to law" and vacated it. *New York v. Trump*, 811 F. Supp. 3d 215, 226 (D. Mass. 2025), *appeal docketed*, No. 26-1174 (1st Cir. Feb. 23, 2026).

On April 16, 2025, BOEM issued a Stop Work Order instructing Empire Wind "to halt all ongoing activities related to the Empire Wind Project on the outer continental shelf" for an indefinite period of time to address "feedback" regarding environmental analysis by the National Oceanic and Atmospheric Administration (the Stop Work Order). Empire Mot. Complete Admin. R., Ex. A, ECF No. 42-1.[4] Empire Wind ceased work on the Project, and by May 9, 2025, Equinor US stated that it would need to terminate the Project if a resolution was not reached.[5] On May 19, 2025, without explanation, BOEM allowed Empire Wind to resume construction. *See* Empire Mot. Complete Admin. R., Ex. B, ECF No. 42-2.

A few months later, on August 1, 2025, Interior Secretary Burgum instructed Interior to consider a new metric, capacity density, when evaluating proposed energy projects on federal lands. Managing Federal Energy Resources and Protecting the Environment, SOI Order No. 3438 (Aug. 1, 2025), 2025 WL 2272321. Capacity density, or an energy project's anticipated generation capacity divided by its physical area, would disadvantage offshore wind energy because, according to Interior Secretary Burgum, "[b]ased on common sense, arithmetic, and physics, wind and solar projects are highly inefficient uses of Federal lands." *Id.* at *2.

Then, on December 22, 2025, only two weeks after the Wind Order was vacated and with no advance notice, Acting Director Giacona directed Empire Wind to "suspend all ongoing

---

[4] The Stop Work Order and its subsequent rescission are the subjects of Empire Wind's pending motion to consider extra-record evidence. Empire Mot. Complete Admin. R. at 5–7, ECF No. 42.

[5] Jennifer McDermott, *An Offshore Wind Project for New York May Be Abandoned over Trump Administration Delays*, AP News (May 9, 2025, at 5:03 p.m.), https://apnews.com/article/offshore-wind-energy-trump-empire-wind-9f895b06d2d535c2e1369c7a38464b76.

activities related to the Empire Wind Project on the Outer Continental Shelf for the next 90 days for reasons of national security." AR0001. The Suspension Order states that BOEM could "further extend the 90-day suspension" pending its discussions with DOW. AR0001. At the time the Suspension Order was issued, Empire Wind had installed all 54 monopile foundations that will support the Project's wind turbines and was working on installing the array cables, which run from the turbines to the offshore substation, and the export cables, which run from the offshore substation to the onshore infrastructure. AR0032, AR0035.

The Suspension Order is purportedly based on "national security threats" raised in a November 2025 classified assessment conducted by DOW. AR0001. Even though BOEM claims to base the Suspension Order on the Empire Wind Project's "potential to cause serious, immediate, and irreparable harm" to national security, AR0001, Acting Director Giacona did not issue the Order until December 22, 2025, nearly a month after BOEM assertedly reviewed the classified information purportedly supporting that determination.

The Suspension Order did not identify any component of the Project that raised new national security concerns; explain why the Project's existing mitigation measures would not sufficiently address such concerns; explain BOEM's change in position; consider Empire Wind's or New York's reliance on BOEM's past approval of and support for the Project; or consider alternatives to completely suspending the Project. The Suspension Order "invites" Empire Wind to "meet and confer" about potential mitigation measures, AR0001, but offers no explanation for why it was necessary to take the drastic step of broadly suspending activities with no notice given existing mitigation measures that could have alleviated the need for suspension, or why 90 days or more may be required for resolution.

9

In a press release issued the same day as the Suspension Order, DOI discussed "unclassified reports from the U.S. Government," including a 2024 Department of Energy report.[6] DOI also attempted to justify the Suspension Order by citing alleged "national security risks inherent to large-scale offshore wind projects," namely, "the movement of massive turbine blades and the highly reflective towers [that] create radar interference called 'clutter,'" which purportedly "obscures legitimate moving targets and generates false targets in the vicinity of the wind projects." As DOI acknowledges in the press release, the potential for "clutter" is not new information; in fact, the issue was described in the 2024 unclassified Department of Energy report.

Despite OCSLA's directive to the Interior Secretary to facilitate the "expeditious and orderly development" of wind energy on the Outer Continental Shelf, 43 U.S.C. § 1332(3), the Interior Secretary and the President have made countless statements in public interviews and official announcements maligning offshore wind energy for reasons unrelated to national security.[7] Interior Secretary Burgum has described offshore wind energy as "a scam"[8] and as "one of the most expensive, unreliable, subsidy-dependent schemes ever pushed upon American taxpayers."[9]

---

[6] Press Release, U.S. Dep't of the Interior, The Trump Administration Protects U.S. National Security by Pausing Offshore Wind Leases (Dec. 22, 2025), https://www.doi.gov/pressreleases/trump-administration-protects-us-national-security-pausing-offshore-wind-leases.

[7] Those statements are not in the administrative record but should be considered by the Court for the reasons laid out in the State's motion to consider extra-record evidence. State Mot. Consider Extra-R. Evid. at 4–8.

[8] Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 23, 2025, at 2:04 p.m.), https://x.com/SecretaryBurgum/status/2003542190170210637.

[9] Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 22, 2025, at 3:23 p.m.), https://x.com/SecretaryBurgum/status/2003199842152251802.

He has also stated that, "[u]nder this administration, there is not a future for offshore wind because it is too expensive and not reliable enough."[10]

President Trump, meanwhile, has called wind "the worst" and "most expensive form of energy"[11] and has stated that offshore wind projects "kill your birds and . . . ruin your beautiful landscapes."[12] At a press conference on January 9, 2026, President Trump announced, "my goal is not to let any windmill be built."[13] He offered several reasons for his opposition to wind energy but did not mention national security.

### III.    Challenges to Other Offshore Wind Suspension Orders

On August 22, 2025, BOEM ordered Revolution Wind, an offshore wind project under construction off the coast of Connecticut and Rhode Island, to halt all ongoing activities so that BOEM could "address concerns that have arisen during the review that the Department is undertaking pursuant to the President's Memorandum of January 20, 2025." Compl., Ex. 1, *Revolution Wind, LLC v. Burgum* (*Revolution Wind*), No. 25-cv-02999 (D.D.C. Sept. 4, 2025), ECF No. 1-1. Revolution Wind sued and this Court preliminarily enjoined the order. Order, *Revolution Wind* (Sept. 22, 2025), ECF No. 36.

---

[10] Spencer Kimball, *Offshore Wind Has No Future in the U.S. Under Trump Administration, Interior Secretary Says,* CNBC (Sept. 11, 2025, at 9:45 a.m.), https://www.cnbc.com/2025/09/11/offshore-wind-renewables-energy-trump-burgum.html?msockid=3e5ad34f0c9566c01293c5a60df76719.

[11] Helena Horton, *Tilting at Windmills? Trump's Claims About Turbines Fact-Checked,* The Guardian (July 28, 2025, at 8:21 a.m.), https://www.theguardian.com/environment/2025/jul/28/are-trump-claims-about-wind-power-correct.

[12] *Trump Orders Suspension of New Offshore Wind Power Leasing,* Reuters (Jan. 21, 2025, at 11:03 a.m.), https://www.reuters.com/sustainability/climate-energy/trump-signals-end-new-us-wind-power-leasing-2025-01-21/.

[13] Aaron Rupar (@atrupar), X, (Jan. 9, 2026, at 4:10 p.m.), https://x.com/atrupar/status/2009734529045364757?s=46.

On December 22, 2025, the same day that the Suspension Order was sent to Empire Wind, Acting Director Giacona sent nearly identical suspension orders to four other offshore wind projects.[14] Those suspension orders have also been challenged by both developers and impacted States. Between January and February 2026, federal district courts, including this Court, stayed or preliminarily enjoined all five suspension orders based on determinations that the classified assessment did not, contrary to BOEM's assertion, identify an immediate national security risk. Prelim. Inj., *Revolution Wind* (Jan. 12, 2026), ECF No. 63; Min. Order, Jan. 15, 2026; Order, *Va. Elec. & Power Co. v. U.S. Dep't of the Interior* (*Va. Elec. & Power*), No. 25-cv-00830 (E.D. Va. Jan. 16, 2026), ECF No. 81; Order, *Vineyard Wind 1 LLC v. U.S. Dep't of the Interior* (*Vineyard Wind*), No. 26-cv-10156 (D. Mass. Jan. 27, 2026), ECF No. 71; Min. Order, *Sunrise Wind LLC v. Burgum* (*Sunrise Wind*), No. 26-cv-00028 (D.D.C. Feb. 2, 2026).

## IV.    New York's Injuries

The Empire Wind Project provides myriad benefits to New York, benefits on which New York relies. By imperiling the viability of the Project, the Suspension Order jeopardizes these benefits. The Suspension Order threatens New York's energy interests, economic interests, and environmental and public health interests.

*The Suspension Order Threatens the Viability of Empire Wind.* The wind energy industry operates in a tremendously complex logistical and regulatory environment, where even minor setbacks can dramatically increase costs and lead to projects being severely delayed and even abandoned. This is true for the Empire Wind Project. Empire Wind has carefully sequenced its construction schedule and has contracted specialized vessels necessary for construction. Prelim.

---

[14] These suspension orders are not in the administrative record but should be considered by the Court for the reasons laid out in the State's motion to consider extra-record evidence. State Mot. Consider Extra-R. Evid. at 4–8.

Inj. Mot., Ex. B, Decl. of Theodore Muhlfelder (Muhlfelder Decl.) ¶¶ 16, 30–34, ECF No. 8-2. These vessels are in limited supply globally and are tightly scheduled, with back-to-back contractual commitments. *See id*. ¶¶ 30–34. This Court determined that "the obstacles created by the Suspension Order unquestionably make it more difficult for Empire Wind to accomplish its primary mission of constructing the Project. . . . Empire Wind has established on this record that losing access to specialized vessels that cannot be replaced in time to meet binding deadlines, will not just cause substantial financial loss, but it will threaten Empire Wind's entire existence." *Empire* Hearing Tr. at 10:5–14, *Sunrise Wind* (Jan. 20, 2026), ECF No. 26-2.

*The Suspension Order Threatens New York's Energy Interests*. The Suspension Order threatens harm to New York's energy interests by decreasing electricity generating capacity, resource diversity, and reliability. First, without the Suspension Order, the Empire Wind Project is expected to begin delivering power to New York's electricity grid late this year and be fully operational by the end of next year. AR0031–32. If the Suspension Order remains in place and the Project is canceled, New York will lose the addition of 810 megawatts to its grid at a time when more capacity is needed. According to analysis performed for New York's 2025 State Energy Plan, future electricity demand is projected to grow due to large new loads and electrification of transportation and buildings. Sassine Decl. ¶ 31. Consistent with those findings, the New York Independent System Operator (NYISO), in its October 2025 Q3 Short-Term Assessment of Reliability Report, identified a need for additional electric generation in New York City as early as the summer of 2026. *Id*. ¶ 32. The 2025 State Energy Plan finds that offshore wind is expected to make up a material component of new generation needed to meet New York's growing need for abundant, reliable, affordable, and clean energy. *Id*. ¶ 31. Thus, the Project is an essential

13

component of New York's energy adequacy. *See* AR4076 ("The Project is an essential element addressing the need identified by the State for renewable energy . . . .").

Second, the addition of offshore wind generation from the Empire Wind Project to New York's energy mix provides critical resource diversity benefits to New York's energy system. A report authored on behalf of NYISO noted that "[g]enerating resource diversity of all types—in fuel source, mode of operation, geography, size, etc.—can contribute to the resilience and reliability of the power system." Sassine Decl. ¶ 30. For example, the Empire Wind Project would reduce New York's dependency on electricity generated by oil and natural gas in cold weather. *Id*. ¶ 34. If the Suspension Order remains in place and the Project is canceled, these benefits will be lost.

Third, the electricity from the Empire Wind Project will enhance the reliability of the grid in New York City. The 2025 State Energy Plan identifies a number of stressors to New York's electricity system that require substantial deployment of new sources of electricity as well as modernization of transmission and distribution infrastructure. *Id*. ¶ 31. NYISO reports that by 2028, 6.5 gigawatts of fossil fuel-generated electricity in New York will come from sources that will be at an age beyond which 95% of similarly aged U.S. generators are expected to retire. *Id*. Aging generators pose reliability risks, so investing in new energy sources is essential for long-term reliability. *Id*. Moreover, NYISO identified a short-term reliability need in New York City beginning in summer 2026 due to the deactivation of certain in-city generators. *Id*. ¶ 33. Near-term alternatives to offshore wind energy in constrained areas like New York City are limited. *Id*. ¶ 35. The Empire Wind Project will contribute materially to ensuring grid reliability in New York City when it comes online. *Id*. ¶ 32. But if the Project is canceled, New York would likely need additional investments to maintain reliability. *See id*. ¶¶ 31, 36.

14

*The Suspension Order Threatens New York's Economic Interests*. The Suspension Order harms New York's economic interests by depriving New York of the benefits of its contract with Empire Wind, imposing major costs on New York, and chilling investment in and development of offshore wind in New York. First, the Empire Wind Project is projected to pay hundreds of millions of dollars in taxes to New York State and local governments over the life of the Project. *Id.* ¶ 20. NYSERDA's agreement with Empire Wind specifically calls for over $1.7 billion in total economic benefits to accrue to New York by the end of the third year of the Project's operations, with more to accrue afterward. *Id*. ¶¶ 21–22. The economic benefits expected to accrue to New York include investments in ports and electrical infrastructure; establishment of a local Empire Wind office; the sourcing of goods, services, and materials from New York businesses; workforce development initiatives; expenditures toward fish and wildlife monitoring; property rents; and fees paid to New York financial institutions. *Id*. ¶24. The Project also supports numerous jobs in New York that generate income taxes for New York. *Id*. ¶ 23. If the Project does not proceed, these benefits will not accrue to New York.

Second, the Empire Wind Project's cancellation also would impose major costs on New York. NYSERDA and other state agencies would need to invest substantial time and money to analyze the impact of the Project's cancellation and to determine whether the clean energy from the Project could be replaced. *Id.* ¶ 45. Any such replacement, if one existed, would not be available on the same timeline as the Project. *Id*. Also, it would likely be more expensive because the pricing of NYSERDA's contract with Empire Wind was fixed years ago and inflation has put upward pressure on the cost of offshore wind projects. *Id.*

Third, cancellation of the Project would reflect a highly uncertain federal regulatory environment and chill the investment in and development of offshore wind in New York, making

15

any timely replacement of the Project even more unlikely. *Id.* ¶ 47. The Project began construction in 2024 and is the result of over a decade and a half of work by New York's public and private sectors to develop the offshore wind industry. The Suspension Order reduces the ability of New York's public and private sectors to rely upon rational, non-arbitrary federal permitting processes when investing money, time, and other resources in offshore wind projects. *Id.* As a result of the Suspension Order, offshore wind developers will be far more cautious about investing in project development, and financing costs will rise, driving longer development timelines and resulting in adverse financial impacts on ratepayers. *Id.*

*The Suspension Order Threatens New York's Climate Objectives and Environmental and Public Health Interests.* The Suspension Order threatens New York's sovereign interests by impeding its ability to implement state law. The Climate Act sets greenhouse gas-reduction objectives of 40% by 2030 and 85% by 2050 from 1990 levels. N.Y. Env't Conser. Law § 75-0107. It calls for New York to have a 100% greenhouse gas emissions-free electricity sector by 2040 and to be powered by 70% renewable energy. N.Y. Pub. Serv. Law § 66-p(2). Offshore wind projects are expected to play a significant role as New York pursues a zero-emissions electric system pursuant to the Climate Act, which targets the development of 9 gigawatts of offshore wind energy by 2035. *Id.* § 66-p(5). The suspension of the Empire Wind Project's construction will impede New York's ability to fulfill its statutory objectives under the Climate Act, thereby injuring New York's ability to implement its own laws. Sassine Decl. ¶ 47. It also risks forcing New York to incur additional expenses to meet the Climate Act's emissions and renewable energy targets. *Id.* ¶¶ 44–45.

Finally, if left in place, the Suspension Order will injure public health in New York. By reducing the need for electric generation from combustion turbines, the Empire Wind Project is

anticipated to reduce emissions of fine particulate matter, nitrogen oxides, volatile organic compounds, and other toxic and hazardous air pollutants. *Id*. ¶¶ 37–39. These anticipated local air quality improvements will not be achieved if the Project does not move forward.

## V.    Procedural History

On January 2, 2026, Empire Wind commenced this action challenging the Suspension Order. Empire Compl., ECF No. 3. On January 6, Empire Wind filed a motion for a preliminary injunction. Prelim. Inj. Mot., ECF No. 8. A hearing was held on January 14, and this Court granted the preliminary injunction on January 15. Min. Orders, Jan. 14 & 15, 2026.

The State filed its own action challenging the Suspension Order on January 9, 2026, Compl., *New York v. Burgum* (*New York*), No. 26-cv-00071 (D.D.C. Jan. 9, 2026), ECF No. 1, which the Court consolidated with this action on January 30, 2026, ECF No. 14. Agency Defendants certified the administrative record on February 13 and filed a motion to stay the action on February 25, which the Court denied. ECF Nos. 40–41; Min. Order, Mar. 9, 2026.

On February 27, 2027, Empire Wind moved to complete the administrative record or in the alternative for the Court to consider extra-record evidence, and the State moved for the Court to consider extra-record evidence. Empire Mot. Complete Admin. R., ECF No. 42; State Mot. Consider Extra-R. Evid. The Court denied Empire Wind's motion insofar as it sought to complete the administrative record but held in abeyance Empire Wind's and the State's motions to consider extra-record evidence until the Court could assess the arguments and responses that the parties will raise in their summary judgment papers. Order, ECF No. 52. In the meantime, the Court wrote, the parties are "free to rely on the proposed extra-record evidence in their briefs at summary judgment, but the government's objections will remain under advisement." *Id.* at 5.

17

## STANDARD OF REVIEW

"Ordinarily, summary judgment is appropriate when the pleadings and the evidence demonstrate that 'there is no genuine dispute as to any material fact'" within the meaning of Federal Rule of Civil Procedure 56(a). *Ardmore Consulting Grp., Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 393 (D.D.C. 2015). However, "when, as here, the court is reviewing a final agency action under the APA, the standard set forth in Rule 56(a) does not apply." *Id.* (citing *Roberts v. United States*, 883 F. Supp. 2d 56, 62–63 (D.D.C. 2012)). "Instead of reviewing the record for disputed facts that would preclude summary judgment, the function of the district court is . . . 'to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.'" *Id.* (quoting *Kaiser Found. Hosps. v. Sebelius*, 828 F. Supp. 2d 193, 198 (D.D.C. 2011)). Under the Administrative Procedure Act, "the reviewing court shall" set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A). "This standard requires the agency to 'examine the relevant [evidence]' and 'articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Ardmore*, 118 F. Supp. 3d at 393 (quoting *Motor Vehicle Mfrs. Ass'n of the U.S .v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## ARGUMENT

Empire Wind has established that it has standing to challenge the Suspension Order, and the State does not need to separately establish its standing in these consolidated cases. In any event, the State has standing because, if the Suspension Order is not vacated, Empire Wind may be forced to cancel the Project, depriving New York of a myriad of energy, environmental, and economic benefits. As to the merits, the Suspension Order, which constitutes final agency action, is arbitrary

18

and capricious and should be vacated under the Administrative Procedure Act because Agency Defendants failed to: (1) provide a reasoned explanation for suspending all Project activities; (2) explain their change-in-position or account for New York's significant reliance interests; (3) explain why an alternative to the Project's complete suspension would not have addressed the purported national security concerns; or (4) provide a genuine justification for suspending Project operations.

## I.    The State Has Standing to Challenge the Suspension Order

To establish standing, "a litigant must demonstrate that it has suffered a concrete and particularized injury that is either actual or imminent, that the injury is fairly traceable to the defendant, and that it is likely that a favorable decision will redress that injury." *Massachusetts v. EPA*, 549 U.S. 497, 517 (2007) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). In response to (or in support of) a motion for summary judgment, a plaintiff "must 'set forth' by affidavit or other evidence 'specific facts'" supporting standing. *Lujan,* 504 U.S. at 561 (quoting Fed. R. Civ. P. 56(e)). The State may rely on Empire Wind's standing in these consolidated cases, *see Sec'y of the Interior v. California,* 464 U.S. 312, 319 n.3 (1984) ("Since the State of California clearly does have standing, we need not address the standing of the other respondents, whose position here is identical to the State's."), as established in Point A of Empire Wind's statement of points and authorities (pp. 14–15), which the State relies on and incorporates by reference here. In any event, the State also has standing in its own right based on the threat the Suspension Order poses to New York's numerous interests.

As shown by Empire Wind, the Project is existentially threatened by the Suspension Order. Muhlfelder Decl. ¶¶ 44–54. The Project provides myriad benefits to the State that will be lost if the Suspension Order forces the Project's cancellation. The Suspension Order therefore poses an

19

immediate threat of injury to New York that is traceable to the Suspension Order and redressable if the Order is vacated.

*Injuries to New York.* The Suspension Order threatens New York's energy interests; sovereign interests; economic interests; and environmental and public health interests. First, if the Suspension Order forces Empire Wind to cancel the Project, the State will lose a significant component of its energy plan, threatening grid reliability and leading to higher costs for ratepayers. *See* pp. 15–17 above; *Belmont Mun. Light Dep't v. FERC*, 38 F.4th 173, 185 (D.C. Cir. 2022) (finding that States suffered injury from increased electricity costs due to their interest "in protecting their citizens and electric ratepayers in the traditional government field of utility regulation"); *New Jersey v. EPA*, 989 F.3d 1038, 1045–49 (D.C. Cir. 2021) (finding standing where a rule made the State's task of devising an adequate state implementation plan more onerous).

Second, because the State will lose a source of offshore wind energy, the Suspension Order threatens New York's sovereign interests by impeding its ability to meet the requirements of both the Offshore Wind Standard and the Climate Act's statewide clean energy targets, which include the procurement of at least 9 gigawatts of electricity generated by offshore wind by 2035. *See Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (explaining that "States have an interest, as sovereigns, in exercising 'the power to create and enforce a legal code'" (quoting *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 601 (1982))); *Massachusetts*, 549 U.S. at 520 (recognizing a State's "stake in protecting its quasi-sovereign interests"); *Maine v. Norton*, 257 F. Supp. 2d 357, 374 (D. Me. 2003) (federal interference with State sovereign interests in managing its natural resources and "enacting and enforcing its own legal code" constitutes injury in fact).

Third, the Suspension Order threatens New York's economic interests by jeopardizing its investments in the Empire Wind Project's infrastructure and facilities, undermining countless

hours of planning and depriving New York of the economic benefits and tax revenue expected from the Project. *See* pp. 17–19 above; *Wyoming v. Oklahoma*, 502 U.S. 437, 447 (1992) (holding that decreased tax revenues constitute injury in fact); *Franchise Tax Bd. of Cal. v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990) (same as to diminished return on investment); *New Jersey*, 989 F.3d at 1046 (noting that "exacerbated administrative costs and burdens . . . constitute a concrete and particularized injury"); *Louisiana v. Biden*, 622 F. Supp. 3d 267, 285 (W.D. La. 2022) (finding standing where States alleged "loss of proceeds" and "loss of jobs and economic damage"); *see also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) (holding that "a loss of even a small amount of money is ordinarily an 'injury'").

Fourth, the Suspension Order threatens New York's environmental and public health interests by delaying reductions in greenhouse gas emissions, which threatens the loss of state lands as a result of climate change-induced sea level rise and coastal erosion, and by delaying the reduction of air pollution that harms the health of New York's residents. *See* pp. 19–20 above; *NRDC v. Wheeler*, 955 F.3d 68, 77 (D.C. Cir. 2020) (finding standing where agency action "will lead to an increase in [greenhouse gas] emissions, which will in turn lead to an increase in climate change, which will threaten petitioners' coastal property"); *see also California v. EPA*, 72 F.4th 308, 313 (D.C. Cir. 2023) (similar).

*Traceability and redressability.* As to traceability and redressability, "if a government action causes an injury, enjoining the action usually will redress that injury." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017). The Suspension Order is indisputably the cause of the looming existential threat to the Project and the cascading injuries that will befall New York if the Project is severely delayed or canceled. *See N. Am.'s Bldg. Trades Unions v. Dep't of Def.*, 783 F. Supp. 3d 290, 305 (D.D.C. 2025) ("a plaintiff must show that his injury in fact is

21

'fairly traceable' to the challenged action of the defendant" (citation omitted) and "[t]he injuries must flow from Defendants' actions and cannot be the 'result [of] the independent action of some third party not before the court'" (quoting *Lujan*, 504 U.S. at 561)). For the same reason, a favorable resolution that allows the Project to proceed according to its intricate and sequenced construction plan will prevent the harms to the State discussed here. *See New York*, 811 F. Supp. 3d at 229 (*citing Gutierrez v. Saenz*, 606 U.S. 305, 320 (2025)) (finding States had standing to challenge agencies' implementation of an order halting permitting process for wind energy projects).

Accordingly, the State has standing to press its claims before this Court.

## II.     The Suspension Order Is an Arbitrary and Capricious Final Agency Action.

The Suspension Order should be vacated under the Administrative Procedure Act because it is (1) a final agency action that is (2) arbitrary and capricious.

### A.     The Suspension Order Is a Reviewable Final Agency Action.

The Administrative Procedure Act permits judicial review of "final agency action," 5 U.S.C. § 704, i.e., action (1) that "mark[s] the consummation of the agency's decisionmaking process" and (2) "from which legal consequences will flow," *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation modified). The Suspension Order is a reviewable final agency action because it satisfies both prongs.

First, BOEM's decision to suspend all ongoing activities related to the Empire Wind Project on the Outer Continental Shelf reflects its ultimate determination that the Project must be suspended for national security reasons. BOEM has not lifted the Suspension Order, and the Suspension Order itself notes that it may be further extended. AR0001. "A number of cases support the proposition that significant pauses and blanket moratoria are final agency actions that cannot

be exempted from judicial review merely by being characterized as being intermediate." *Massachusetts v. Trump*, 790 F. Supp. 3d 8, 26 (D. Mass. 2025) (first citing *Clean Air Council v. Pruitt*, 862 F.3d 1, 6 (D.C. Cir. 2017); then citing *NRDC*, 955 F.3d at 79; and then citing *Env't Def. Fund, Inc. v. Gorsuch*, 713 F.2d 802, 813 (D.C. Cir. 1983)).

Second, the Suspension Order has legal consequences, as it prevents Empire Wind from constructing the Project, thereby delaying the completion of the Project and ultimately threatening its viability. *See Louisiana*, 622 F. Supp. 3d at 291–92 (legal consequences from indefinite pause on oil and gas leasing); *Ensco Offshore Co. v. Salazar*, 781 F. Supp. 2d 332, 336 (E.D. La. 2011) (same, from deepwater drilling moratorium).

The State also relies on and incorporates by reference Empire Wind's argument that the Suspension Order is a final agency action, found in Point A of its statement of points and authorities (p. 15).

## B.     The Suspension Order Is Arbitrary and Capricious.

The Suspension Order should be held unlawful under the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), because it is arbitrary and capricious. Specifically, in issuing the Suspension Order, Agency Defendants failed to: (1) provide a reasoned explanation for suspending work on the Project; (2) explain their change-in-position or account for New York's reliance interests; (3) explain why a narrower alternative would not have addressed Agency Defendants' alleged national security concerns; or (4) provide a genuine justification for suspending Project operations. In further support of its argument that the Suspension Order is arbitrary and capricious, the State

relies on and incorporates by reference Point D of the statement of points and authorities submitted by Empire Wind (pp. 31–45).

**1.    Agency Defendants Have Not Offered a Reasoned Explanation for the Suspension Order.**

It is a "fundamental requirement of administrative law" that "an agency set forth its reasons for decision." *Amerijet Int'l, Inc. v. Pistole,* 753 F.3d 1343, 1350 (D.C. Cir. 2014) (citation modified); *see FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (an agency action is arbitrary and capricious where it is not "reasonable and reasonably explained"). "[C]onclusory statements will not do; an 'agency's statement must be one of *reasoning*.'" *Amerijet Int'l*, 753 F.3d at 1350 (emphasis in original) (citation omitted). The agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (citation modified). The court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Id.*

The Suspension Order is arbitrary and capricious because BOEM failed to provide a reasoned explanation for the decision to halt Empire Wind's lease activities. Agency Defendants have referred only to undisclosed national security concerns and new classified information, but this does not provide a meaningful or reasoned basis for the suspension of all activities, especially where national security was assessed and mitigation measures agreed to during the development of the Project.

The Suspension Order itself fails to supply the required reasoned basis, as it claims that "the particularized harm posed by this project can only be feasibly averted by suspension of on-lease activities." AR0001. Even if the Empire Wind Project posed particularized harm to national security, Agency Defendants failed to explain why that harm can only be averted by suspension of the construction activities being performed. Moreover, this Court already determined after *in*

24

*camera* review of the classified information in connection with Empire Wind's motion for a preliminary injunction that immediate suspension of all activities was not warranted.[15]

### 2. Agency Defendants Did Not Consider New York's Serious Reliance Interests When They Changed Their Position.

Under the change-in-position doctrine, agency action is arbitrary and capricious where the agency fails to acknowledge that it is changing its position, fails to provide a reasoned explanation for the change, and fails to consider serious reliance interests impacted by the change. *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025). "Reasoned decision-making requires that when departing from precedents or practices, an agency must offer a reason to distinguish them or explain rejection of their approach." *Physicians for Soc. Resp. v. Wheeler*, 956 F.3d 634, 644 (D.C. Cir. 2020) (citation modified).

Here, Agency Defendants are "not writing on a blank slate," having previously approved the Project and its attendant national security mitigation measures, and they therefore are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). They have failed to do so.

New York has relied on the Project as a component of its strategies to support grid reliability, energy diversification, and climate objectives, and the Project will provide significant energy, sovereign, economic, and environmental benefits to New York, most of which will be lost if the Project is canceled. There is no indication that Agency Defendants considered, much less accounted for, these serious reliance interests.

---

[15] The other courts that reviewed the same classified information agreed that immediate suspension of all activities was not justified by an imminent national security concern. *See* pp. 14 above.

First, as BOEM acknowledged, the Project is an "essential element" in addressing New York's need for renewable energy, AR4076, and would advance the goals of New York's State Energy Plan, AR0467, AR1858. By delaying or removing the 810 megawatts of electricity this Project will provide, the Suspension Order imperils those interests at a time when New York needs more capacity and resource diversity. Courts have repeatedly acknowledged the States' "traditional responsibility in the field of regulating electrical utilities," including "determining questions of need, reliability, cost, and other related state concerns." *See Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 205 (1983). Nonetheless, Agency Defendants did not consider these important state responsibilities when they issued the Suspension Order.

Second, if the Project is canceled, New York stands to lose significant economic benefits and tax revenue on which it has relied. AR1303–05; *see New York*, 811 F. Supp. 3d at 228–29 (finding that the federal government's indefinite suspension of permitting actions for wind projects would harm plaintiff States by reducing or deferring tax revenue and investments). The State's reliance on the Project is well-documented, and the State has devoted significant time and resources to the Project's planning and development.

Third, Agency Defendants also failed to consider New York's sovereign interests related to the Project. The Suspension Order impedes New York's ability to meet the requirements of both the Offshore Wind Standard and the Climate Act's statewide clean energy objectives, which include the procurement of at least 9 gigawatts of electricity generated by offshore wind by 2035. *See* AR0467, AR1858, AR4076.

Fourth, New York is relying on the Project to help offset emissions of air pollutants that harm local air quality and public health by lessening its dependence on sources that emit those pollutants. *See* AR1304, AR2102, AR2109. The reduction of air pollution is a years-long process,

26

and the Suspension Order harms New York's interests by impeding its ability to make that steady and necessary progress.

In short, Agency Defendants failed to consider any of the State's serious reliance interests before changing their position and suspending the Project's activities. For this violation of the change-in-position doctrine, the Suspension Order should be vacated as arbitrary and capricious.

### 3.    Agency Defendants Did Not Address Alternative Means of Addressing the Purported National Security Concerns.

When an agency takes action, it must consider reasonable alternatives. *See Spirit Airlines, Inc. v. U.S. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) ("An agency is required to consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." (citation omitted)); *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986) ("The failure of an agency to consider obvious alternatives has led uniformly to reversal."); *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 51 (explaining that the agency needed to consider a major "technological alternative within the ambit of the existing standard").

The Suspension Order is arbitrary and capricious because in issuing it, Agency Defendants did not consider any alternatives to suspending "all ongoing activities related to the Empire Wind" Project. AR0001. At the time Agency Defendants issued the Suspension Order, Empire Wind had installed all 54 monopile foundations that will support the Project's wind turbines and was working on installing the array cables, which run from the turbines to the offshore substation, and the export cables, which run from the offshore substation to the onshore infrastructure. AR0032, AR0035. The record contains no evidence suggesting that Agency Defendants considered allowing Empire Wind to proceed with some operations while pausing those that implicated the purported national security concerns. Because such a course of action would have been "neither frivolous nor out of

27

bounds," Agency Defendants "had an obligation to consider it." *See Chamber of Com. of the U.S. v. Sec. & Exch. Comm'n*, 412 F.3d 133, 145 (D.C. Cir. 2005).

### 4.    Agency Defendants Did Not Provide a Genuine Justification for the Suspension Order.

Pursuant to the Administrative Procedure Act's reasoned explanation requirement, agencies must "offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). If an agency action is "so implausible that it could not be ascribed to a difference in view or the product of agency expertise," then it is arbitrary and capricious, in violation of the law. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. Here, the decisions of this Court and others preliminarily enjoining or staying all five suspension orders; Agency Defendants' own failure to treat their purported national security concerns as compelling; and President Trump and Agency Defendants' general opposition to wind energy demonstrate that national security was not a genuine justification for the Suspension Order.

First, the Court has already determined that national security did not justify the Suspension Order. *See* Min. Order, Jan. 15, 2026 (granting Empire Wind's motion to preliminarily enjoin the Suspension Order). In addition, each court that reviewed the other four suspension orders also found that national security did not justify those orders. Tr. at 44:21–45:1 (*Revolution* Tr.), *Revolution Wind* (Jan. 12, 2026), ECF No. 65 ("Given that [BOEM] became aware of the new classified information in November of 2025 and did not act until December 22, 2025, I'm not persuaded that any such emergency exists in this case, nor have I been provided any evidence of a new finding of particularized harm such that the government could order an immediate suspension."); Tr. at 51:20–23, *Va. Elec. & Power Co.* (Jan. 16, 2026), ECF No. 82 ("[T]he evidence the Court has reviewed does not demonstrate that the onset of the national security risk

28

is so imminent that the government needs to stop work on the Dominion project entirely."); Tr. at 51:23–52:4, 55:17-22, *Vineyard Wind* (Jan. 30, 2026), ECF No. 79 (describing the government's stated national security concerns as "speculative" and finding that the government's delay in issuing the suspension orders "undermin[es] any claim that [the DOW reports] presented an emergency in need of immediate addressing"); Tr. at 60:14–18, *Sunrise Wind* (Feb. 3, 2026), ECF No. 38 ("Pointing to ongoing national security concerns based on purportedly new classified information does not constitute a sufficient explanation for the Bureau's decision to entirely stop work on the Sunrise Wind project."). Indeed, one court found that Agency Defendants' actions "suggest[] that the stated national security reason may have been pretextual." *Revolution* Tr. at 44:9–10.

Second, Agency Defendants have not treated their purported national security concerns as compelling. Although Agency Defendants acknowledge that BOEM received and reviewed the classified information as early as November 26, 2025, BOEM did not issue the Suspension Order until December 22, 2025, nearly one month later. In addition, although the Suspension Order asserts that BOEM is "endeavor[ing] to reach a determination on feasible mitigation measures," AR0001, Agency Defendants have not provided Empire Wind's representatives with any information about the government's alleged security concerns, nor have they engaged in good faith with Empire Wind to determine how those purported concerns could be mitigated. *See* Empire St. at 8 n.8.[16]

---

[16] This information, which comes from a letter filed by Empire Wind as an attachment to its opposition to Agency Defendants' motion to stay, is not in the administrative record, and because it was filed after the State's deadline to move for consideration of extra-record evidence, the State did not include it in its motion. But for the same reasons discussed in the State's motion to consider extra-record evidence, the State hereby moves for the Court to consider Empire Wind's letter, Empire Opp'n to Defs.' Mot. to Stay, Ex. 1, ECF No. 45-1, which speaks to Agency Defendants' post-Suspension Order conduct.

Third, Agency Defendants and President Trump's opposition to offshore wind for reasons unrelated to national security provide further evidence that the Suspension Order was not motivated by national security concerns. Since taking office, President Trump has issued a memorandum withdrawing all areas of the Outer Continental Shelf from consideration for wind energy leasing and has halted the federal approvals necessary for the development of offshore and onshore wind energy. *See* pp. 8–13 above. Interior Secretary Burgum, meanwhile, has instructed Interior to consider a new metric, capacity density, when evaluating proposed energy projects on federal lands. *See* pp. 10 above. Capacity density, or an energy project's anticipated generation capacity divided by its physical area, would purposefully disadvantage offshore wind energy because, according to Interior Secretary Burgum, "[b]ased on common sense, arithmetic, and physics, wind and solar projects are highly inefficient uses of Federal lands." *Id.*

The Trump Administration's anti-wind energy statements, which the State has asked the Court to consider, *see* State Mot. Consider Extra-R. Evid. at 4–8, provide additional evidence that national security was a pretext and not the genuine justification for the Suspension Order. In September 2025, Interior Secretary Burgum asserted that, "[u]nder this administration, there is not a future for offshore wind because it is too expensive and not reliable enough." *See* pp. 12 above. On December 22, 2025, the same day that the Suspension Order was issued, Interior Secretary Burgum posted a statement on the social media platform X describing offshore wind as "one of the most expensive, unreliable, subsidy-dependent schemes ever pushed upon American taxpayers." *Id.* A few weeks later, President Trump stated at a press conference that "my goal is not to build any windmills in this country."[17] *See* pp. 13 above. The comments and actions

---

[17] Windmills perform mechanical tasks like grinding grain, in contrast to wind turbines, which generate electricity. In context, the President's statement should be read to refer to wind turbines.

described above, which comprise only a small portion of the Trump Administration's assault on offshore wind energy, signal that national security is not the driving force behind the Suspension Order. *See Nat'l TPS All. v. Noem*, 166 F.4th 739, 775 (9th Cir. 2026) (Mendoza, J., concurring) ("We cannot ignore the backdrop of extraordinary statements by direct decisionmakers when assessing whether the agency's proffered rationale was genuine or merely a pretext for an ulterior (and impermissible) motive.").

Because Agency Defendants' explanation for the Suspension Order is "incongruent with what the record reveals about the agency's priorities and decisionmaking process," *Dep't of Com.*, 588 U.S. at 785, the Suspension Order is arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the State respectfully requests that the Court grant its motion for summary judgment and vacate the Suspension Order.

Dated:  New York, New York
        May 12, 2026

Respectfully submitted,

LETITIA JAMES
Attorney General of New York

By:     /s/ *Libby Dimenstein*
        Monica Wagner
            *Deputy Bureau Chief*
        Rene F. Hertzog
        Laura Mirman-Heslin
            *Assistant Attorneys General*
        Libby Dimenstein
            *Special Assistant Attorney General*
        Environmental Protection Bureau
        28 Liberty Street
        New York, New York 10005
        (212) 416-8469
        Libby.Dimenstein@ag.ny.gov

31

Morgan Costello
 *Deputy Bureau Chief*
Environmental Protection Bureau
The Capitol
Albany, New York 12224