# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| EMPIRE LEASEHOLDER LLC, and EMPIRE OFFSHORE WIND LLC, <br><br> Plaintiffs, <br><br>   v. <br><br> DOUGLAS J. BURGUM, et al., <br><br> Defendants. | Case No. 1:26-cv-004-CJN |
| STATE OF NEW YORK, et al., <br><br> Plaintiffs, <br><br>   v. <br><br> DOUGLAS J. BURGUM, et al., <br><br> Defendants. | Case No. 1:26-cv-071-CJN (consolidated) |

## FEDERAL DEFENDANTS' MEMORANDUM IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

BACKGROUND ............................................................................................................. 1

    I.      Leasing and Energy Development on the Outer Continental Shelf ........................ 1

    II.     Empire Wind and Attendant National Security Issues .......................................... 3

STANDARD OF REVIEW ............................................................................................. 6

ARGUMENT .................................................................................................................. 7

    I.      The Suspension Order Has Expired and These Complaints Are Now Moot ......... 7

    II.     Summary Judgment Should be Granted to Federal Defendants on the Merits ..... 12

          A.    BOEM Had Authority to Issue the Suspension Order ............................. 12

               i.      Subsection 1337(p) Grants Interior Broad Authority to Suspend Leases Issued Under That Subsection, Including Wind Leases ................................................................................ 12

               ii.     Subsection 1337(p)(5)'s Grant of Authority Is Distinct from, and in Addition to, the Suspension Authority Granted in Subsection 1334(a) ........................................................................ 17

               iii.    Interior's Authority Under Section 1337(p) Is Not Limited by Section 1341(c) ..................................................................... 19

          B.    Plaintiffs Have Not Met Their Burden to Show an APA Violation ......... 26

               i.      The Suspension Order Reasonably Explained its Bases ............... 26

               ii.     BOEM Considered the Relevant Factors ..................................... 28

               iii.    BOEM Relied Upon New Materials from the Department of War ........................................................................................... 31

                    1.    BOEM's Decision Making ............................................... 31

                    2.    Empire and New York Have Not Met Their Burden ........ 33

                          a.    The COP Approval Does Not Foreclose New Issues .......................................................................... 34

                          b.    Arguments About Breadth Are Misplaced ........... 36

i

3.    Empire Wind and New York Have Not Demonstrated Pretext ............................................................................. 36

C.    Empire Has Not Established a Violation of the APA's Procedural Requirements ...................................................................... 39

D.    Empire Has Not Established a Due Process Violation ............................ 40

CONCLUSION............................................................................................................. 42

## TABLE OF AUTHORITIES

**Other Authorities**

*Adirondak Med. Ctr. v. Sebelius*,
740 F.3d 692 (D.C. Cir. 2014)...................................................................... 17, 18, 23

*Alphabet Workers Union-Communication Workers of Am. v. NLRB*,
134 F.4th 1217 (D.C. Cir. 2025)........................................................................ 9, 10

*Alvarez v. Smith*,
558 U.S. 87 (2009)............................................................................................... 7, 9

*Am. Forest Res. Council v. Williams*,
96 F.4th 417 (D.C. Cir. 2024)............................................................................. 9, 10

*Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*,
72 F.4th 1324 (D.C. Cir. 2023).................................................................................. 6

*Animal Legal Def. Fund, Inc. v. Vilsack*,
237 F. Supp. 3d 15 (D.D.C. 2017)............................................................................. 7

*Aptheker v. Sec'y of State*,
378 U.S. 500 (1964)................................................................................................. 41

*Basengezi v. Smith*,
No. 23-cv-1249, 2024 WL 1050340 (D.D.C. Mar. 11, 2024) .................................. 31

*Bates v. United States*,
522 U.S. 23 (1997)............................................................................................ 14, 17

*Bd. of Regents of State Colls. v. Roth*,
408 U.S. 564 (1972)................................................................................................. 40

*Bittner v. United States*,
598 U.S. 85 (2023)............................................................................................ 15, 18

*Bowman Transp., Inc. v. Ark.-Best Freight Sys.*, Inc.,
419 U.S. 281 (1974).................................................................................................. 7

*Busic v. Transp. Sec. Admin.*,
62 F.4th 547 (D.C. Cir. 2023).................................................................................. 19

*Campbell v. Clinton*,
203 F.3d 19 (D.C. Cir. 2000).................................................................................... 10

*Chafin v. Chafin*,
568 U.S. 165 (2012)............................................................................................... 7, 8

*Changji Esquel Co. Ltd. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022)................................................................ 18, 19, 22, 23

*China Telecom (Americas) Corp. v. Fed. Commc'ns Comm'n*,
   57 F.4th 256 (D.C. Cir. 2022)......................................................................... 33, 39

*City of Houston v. Dep't of Housing & Urban Dev.*,
   24 F.3d 1421 (D.C. Cir. 1994)............................................................................... 8

*City of Los Angeles v. Lyons*,
   461 U.S. 95 (1983)............................................................................................... 10

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
   38 F.4th 1099 (D.C. Cir. 2022)........................................................................... 25

*Ctr. for Auto Safety v. Fed. Highway Admin.*,
   956 F.2d 309 (D.C. Cir. 1992)............................................................................ 38

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
   563 F.3d 466 (D.C. Cir. 2009).............................................................................. 1

*Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*,
   146 F.4th 1144 (D.C. Cir. 2025)............................................................... 6, 28, 31

*Del Monte Fresh Produce v. United States*,
   570 F.3d 316 (D.C. Cir. 2009)...................................................................... 10, 11

*DeNaples v. Off. of the Comptroller of the Currency*,
   706 F.3d 481 (D.C. Cir. 2013)............................................................................ 24

*Dep't of Commerce v. New York*,
   588 U.S. 752 (2019)............................................................................................ 37

*Enbridge Energy, LP v. Nessel*,
   146 S. Ct. 1074 (2026)................................................................................. 15, 18

*Encino Motorcars, LLC v. Navarro*,
   579 U.S. 211 (2016)............................................................................................ 30

*Fares v. Smith*,
   901 F.3d 315 (D.C. Cir. 2018)............................................................................ 27

*FBME Bank Ltd. v. Lew*,
   125 F. Supp. 3d 109 (D.D.C. 2015).................................................................... 34

*FCC v. Fox Television Stations*,
   556 U.S. 502 (2009)............................................................................................ 29

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021)....................................................................................... 6, 26

*Fed. Trade Comm'n v. Raladam Co.*,
   283 U.S. 643 (1931)............................................................................................ 16

*Food & Drug Admin. v. Wages & White Lion Inv., LLC*,
   604 U.S. 542 (2025)...................................................................................... 29, 30

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
460 F.3d 13 (D.C. Cir. 2006) ................................................................................................ 9

*Gilbert v. Homar*,
520 U.S. 924 (1997) ............................................................................................................ 41

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
356 F. Supp. 3d 109 (D.D.C. 2019) .................................................................................... 21

*Haig v. Agee*,
453 U.S. 280 (1981) ............................................................................................................ 41

*Islamic Am. Relief Agency v. Gonzales*,
477 F.3d 728 (D.C. Cir. 2007) ............................................................................................ 31

*Ivy Sports Med., LLC v. Burwell*,
767 F.3d 81 (D.C. Cir. 2014) .............................................................................................. 16

*J.T. v. District of Columbia*,
983 F.3d 516 (D.C. Cir. 2020) ............................................................................................ 11

*Kirwa v. U.S. Dep't of Def.*,
285 F. Supp. 3d 257 (D.D.C. 2018) .................................................................................... 28

*Labat-Anderson, Inc. v. United States*,
346 F. Supp. 2d 145 (D.D.C. 2004) .................................................................................... 24

*Lomak Petroleum, Inc. v. FERC*,
206 F.3d 1193 (D.C. Cir. 2000) ............................................................................................ 7

*Long Island Care at Home, Ltd. v. Coke*,
551 U.S. 158 (2007) ............................................................................................................ 27

*Macktal v. Chao*,
286 F.3d 822 (5th Cir. 2002) .............................................................................................. 16

*Marsh v. Or. Nat. Res. Council*,
490 U.S. 360 (1989) .............................................................................................................. 6

*Mathews v. Eldridge*,
424 U.S. 319 (1976) ............................................................................................................ 41

*McKinney v. Dist. of Columbia*,
142 F.4th 784 (D.C. Cir. 2025) ........................................................................................... 40

*Mercy Hosp., Inc. v. Azar*,
891 F.3d 1062 (D.C. Cir. 2018) .......................................................................................... 18

*Moncrief v. U.S. Dep't of the Interior*,
339 F. Supp. 3d 1 (D.D.C. 2018) ........................................................................................ 35

*Morrissey v. Brewer*,
408 U.S. 471 (1972) ............................................................................................................ 40

*Motor Vehicle Mfts. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*,
 463 U.S. 29 (1983)................................................................................................ 6, 28, 31

*N.B. et al. v. District of Columbia*,
 244 F. Supp. 3d 176 (D.D.C. 2017).............................................................................. 41

*Nat'l Ass'n of Homebuilders v. U.S. Army Corps of Eng'rs*,
 264 Fed. App'x 10 (D.C. Cir. 2008).............................................................................. 11

*Nat'l Council of Resistance of Iran v. Dep't of State*,
 251 F.3d 192 (D.C. Cir. 2001)...................................................................................... 30

*Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv.*,
 416 F. Supp. 2d 92 (D.D.C. 2006)................................................................................ 14

*Nielson v. Preap*,
 586 U.S. 392 (2019)................................................................................................ 21, 22

*Olivares v. Transp. Sec. Admin.*,
 819 F.3d 454 (D.C. Cir. 2016)...................................................................................... 33

*Overdevest Nurseries, L.P. v. Walsh*,
 2 F.4th 977 (D.C. Cir. 2021)......................................................................................... 18

*Pension Ben. Guar. Corp. v. LTV Corp.*,
 496 U.S. 633 (1990)...................................................................................................... 24

*People for the Ethical Treatment of Animals v. Gittens*,
 396 F.3d 416 (D.C. Cir. 2025)...................................................................................... 11

*People for the Ethical Treatment of Animals, Inc. v. U.S. Fish & Wildlife Serv.*,
 59 F. Supp. 3d 91 (D.D.C. 2014)................................................................................... 9

*Pileggi v. Wash. Newspaper Publ'g Co., LLC*,
 146 F.4th 1219 (D.C. Cir. 2025)................................................................................... 23

*Planned Parenthood of Greater N.Y. v. Dep't of Health & Human Servs.*,
 No. 25-cv-2453, 2025 WL 2840318 (D.D.C. Oct. 7, 2025)....................................... 35

*Pres. Soc'y of Newport Cnty. v. Burgum*,
 No. 23-cv-03510, 2026 WL 787910 (D.D.C. March 20, 2026) ................................. 36

*RadLAX Gateway Hotel v. Amalgamated Bank*,
 566 U.S. 639 (2012)...................................................................................................... 21

*RENEW Ne. v. U.S. Dep't of the Interior*,
 No. 25-cv-13961, 2026 WL 1078282 (D. Mass. Apr. 21, 2026)............................... 15

*RFE/RL, Inc. v. Lake*,
 772 F. Supp.3d 79 (D.D.C. 2025)................................................................................. 28

*Rimini Street, Inc. v. Oracle USA, Inc.*,
 586 U.S. 334 (2019)...................................................................................................... 18

*Rodriguez v. United States*,
   480 U.S. 522 (1987).................................................................................................. 24

*Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*,
   123 F.4th 1 (1st Cir. 2024)....................................................................................... 15

*Sec. & Exch. Comm'n v. Familant*,
   910 F. Supp. 2d 83 (D.D.C. 2012)...................................................................... 19, 23

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*,
   605 U.S. 168 (2025)..................................................................................................... 6

*Snepp v. United States*,
   444 U.S. 507 (1980).................................................................................................. 41

*Solonex, LLC v. Haaland*,
   626 F. Supp. 3d 110 (D.D.C. 2022).......................................................................... 35

*Strait Shipbrokers Pte. Ltd. v. Blinken*,
   560 F. Supp. 3d 81 (D.D.C. 2021)............................................................................ 28

*Tourus Records, Inc. v. Drug Enf't Admin.*,
   259 F.3d 731 (D.C. Cir. 2001).................................................................................. 27

*United States v. James Daniel Good Real Prop.*,
   510 U.S. 43 (1993).................................................................................................... 41

*United States v. Naftalin*,
   441 U.S. 768 (1979).................................................................................................. 14

*Van Hollen, Jr. v. Fed. Election Comm'n*,
   811 F.3d 486 (D.C. Cir. 2016)..................................................................................... 7

**Statutes**

28 U.S.C. § 1346 (a)(2)..................................................................................................... 25

28 U.S.C. § 1491(a)(1)...................................................................................................... 25

43 U.S.C. § 1331(a) ............................................................................................................ 1

43 U.S.C. § 1331(b)............................................................................................................ 2

43 U.S.C. § 1334(a) .......................................................................................................... 18

43 U.S.C. § 1337(a)(1)...................................................................................................... 17

43 U.S.C. § 1337(b)(5) ................................................................................................ 14, 17

43 U.S.C. § 1337(i)........................................................................................................... 17

43 U.S.C. § 1337(p) ................................................................................................ 2, 12, 17

43 U.S.C. § 1337(p)(1) ..................................................................................................... 39

43 U.S.C. § 1337(p)(1)(C).................................................................................................. 2

43 U.S.C. § 1337(p)(4) ............................................................................................ passim

43 U.S.C. § 1337(p)(4)(F)............................................................................................. 2, 38

43 U.S.C. § 1337(p)(5) ............................................................................................ passim

43 U.S.C. § 1337(p)(8) ...................................................................................... 2, 13, 15, 21

5 U.S.C. § 558(c) ..................................................................................................... 38

5 U.S.C. § 702............................................................................................................ 25

5 U.S.C. § 704............................................................................................................ 25

5 U.S.C. § 706(2)(A)................................................................................................... 6

50 U.S.C. § 4813(a)(16).............................................................................................. 22

Pub. L. No. 109-58, 119 Stat. 744 (2005)............................................................. 2, 13, 15

Pub. L. No. 83-212, 67 Stat. 462 (1953)................................................................... 2

## Regulations

30 C.F.R. § 585.105(h) ............................................................................................ 3, 33

30 C.F.R. § 585.200(a)................................................................................................ 3

30 C.F.R. § 585.417 ................................................................................................... 10

30 C.F.R. § 585.417(b) ............................................................................................. 3, 12

30 C.F.R. § 585.421(b) ............................................................................................... 10

30 C.F.R. § 585.600 ................................................................................................... 3

30 C.F.R. §§ 585.605–585.613 ................................................................................. 3

30 C.F.R. §§ 585.620–585.62 ................................................................................... 3

## Other Authorities

151 Cong. Rec. S6440 (June 14, 2005) .................................................................... 24

74 Fed. Reg. 19,638 (Apr. 29, 2009) ......................................................................... 3

76 Fed. Reg. 64,432 (Oct. 18, 2011).......................................................................... 3

89 Fed. Reg. 42,602 (May 15, 2024) ......................................................................... 3

90 Fed. Reg. 8363 (Jan. 29, 2025) ............................................................................ 36

H.R. 6, 109th Cong. § 2010 (2005)............................................................................ 15

H.R. Rep. No. 109-215 (2005).................................................................................... 24

Henry J. Friendly, *Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199 ................................................................................... 27

S. Rep. No. 109-78 (2005) ........................................................................................................... 24

**INTRODUCTION**

The complaints in these consolidated cases are moot and should be dismissed. The challenged suspension order expired on its terms after ninety days, on March 22, 2026. The Court can therefore no longer provide Empire Leaseholder and Empire Offshore Wind (collectively, "Empire") or the State of New York with any effectual relief.  Nor is either of the exceptions to the mootness doctrine applicable here. The voluntary cessation doctrine is inapplicable because the Suspension Order expired on its own without any action from Interior. And under D.C. Circuit precedent, the Suspension Order does not "evade review" (because suspension orders are not typically of such short duration) and is not "capable of repetition" (because any future order would be based upon still-developing facts).

Should the Court reach the merits, summary judgment should be granted in favor of Federal Defendants. The Outer Continental Shelf Lands Act, 43 U.S.C. § 1337(p)(5), provided the authority for the Department of the Interior to issue the Suspension Order; Empire and New York have not met their burden to demonstrate arbitrary decision-making; and Empire has not met its burden to demonstrate that Interior violated Empire's procedural rights.

**BACKGROUND**

I.   **Leasing and Energy Development on the Outer Continental Shelf.**

This case involves a wind energy project on the Outer Continental Shelf ("OCS"). The OCS consists of offshore submerged lands, generally from 3 to 200 miles seaward of the coastline. *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009); 43 U.S.C. § 1331(a). Under the Outer Continental Shelf Lands Act ("OCSLA"), the United States holds these lands as a "vital national resource reserve" that "should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is

1

consistent with the maintenance of competition *and other national needs*[.]" *Id.* § 1332(3) (emphasis added).

Department of the Interior ("Interior") approvals related to wind energy development are authorized and governed by OCSLA and Interior's implementing regulations. As initially enacted, OCSLA authorized Interior to grant mineral leases on the OCS. OCSLA, Pub. L. No. 83-212, §§ 8(a)-(e), 67 Stat. 462, 468 (1953). Mineral leases grant rights to explore and develop deposits of oil, gas, and other minerals. *Id.* § 2(c) . Congress amended OCSLA in 2005 to allow Interior to authorize and regulate specified "alternate energy-related uses" of the OCS not otherwise authorized by OCSLA. Energy Policy Act of 2005, Pub. L. No. 109-58, § 388(a), 119 Stat. 744 (2005). This amendment is codified at 43 U.S.C. § 1337(p). Among the uses authorized by Subsection 1337(p) are those that "support production, transportation, storage, or transmission of energy from sources other than oil and gas[.]" 43 U.S.C. § 1337(p)(1)(C). This includes offshore wind.

Congress directed that "[t]he Secretary [of the Interior] shall ensure that any activity under [Subsection 1337(p)] is carried out in a manner that provides for" multiple interests. *Id.* § 1337(p)(4); *see also id.* § 1331(b) (defining "Secretary"). Among those is the "protection of national security interests of the United States[.]" *Id.* § 1337(p)(4)(F). The Secretary is also directed to "provide for the duration, issuance, transfer, renewal, suspension, and cancellation of a lease, easement, or right-of-way under this subsection" and to promulgate "any necessary regulations to carry out this subsection." *Id.* §§ 1337(p)(5), (p)(8) .

Through the Bureau of Ocean Energy Management ("BOEM") and Bureau of Safety and Environmental Enforcement, Interior has promulgated regulations implementing Subsection 1337(p). In accordance with the statute, BOEM regulations require that a lessee "[c]onduct all

activities authorized by the lease or grant in a manner consistent with the provisions of [43 U.S.C. § 1337(p)]." 30 C.F.R. § 585.105(h). BOEM's regulations also allow the Secretary to suspend or cancel leases for various reasons, including "[w]hen the suspension is necessary for reasons of national security or defense." *Id.* § 585.417(b);[1] *see also* Renewable Energy & Alternate Uses of Existing Facilities on the Outer Continental Shelf, 74 Fed. Reg. 19638, 19638 (Apr. 29, 2009) (explained that "in addition to providing the authority to issue leases," the Energy Policy Act of 2005 "included a requirement that any activity permitted under this authority" be carried out in a manner that provided for the interests articulated in Subsection 1337(p)(4)).

## II.     Empire Wind and Attendant National Security Issues

On November 21, 2023, BOEM issued a joint Record of Decision with the National Marine Fisheries Service documenting its approval of two offshore wind facilities: Empire Wind 1 and Empire Wind 2. *See* AR0461-506. The two projects are located in the same lease area off the coast of New York. AR0462-67. Under BOEM's renewable energy regulations and lease terms, a lease does not itself authorize development. 30 C.F.R. § 585.200(a). A lessee must first assess the site, obtain BOEM's approval of a site assessment plan, and obtain BOEM's approval of a Construction and Operations Plan ("COP"). 30 C.F.R. §§ 585.600, 585.605–585.613, 585.620–585.628. BOEM approved a final COP in February 2024 and later re-issued the COP approval as two separate approvals for each facility. AR0317, AR0202, AR0308. The Empire Wind 1 Project ("Empire Wind 1" or "Empire Project") has been under construction in federal waters off the coast of New

---

[1] Interior's regulations have been reorganized and amended over time. *See* Reorganization of Title 30: Bureaus of Safety and Environmental Enforcement and Ocean Energy Management, 76 Fed. Reg. 64432, 64434 (Oct. 18, 2011); Renewable Energy Modernization Rule, 89 Fed. Reg. 42602, 42695 (May 15, 2024). Regulations now in 30 C.F.R. Part 585 were previously located at Part 285. 76 Fed. Reg. at 64434.

York.[2] AR0032. The COP, as approved for Empire Wind 1, includes up to fifty-four wind turbine generators, inter-array cables, one offshore substation, one onshore substation, and other offshore and onshore components. AR0100, AR0467, AR0499. Plans for Empire Wind 2 include up to eighty-four turbine generators, inter-array cables, one onshore substation, and other components. AR0205, AR0467.

"Wind turbines that are located within the line-of-sight of civilian and defense radar systems are known to cause interference which impacts radar performance, and in turn can negatively impact the missions that depend on those radars." AR0420. The Department of War uses long-range radar systems, such as Air Route Surveillance Radars ("ARSR"), to detect and track targets that "can include anything in the airspace from commercial aircraft to non-cooperative homeland threats." AR0426. Wind turbines can interfere with radar by obscuring targets and hindering target tracking, reducing detection sensitivity, and creating false targets. AR0425; *see also, e.g.*, AR4924-4929; AR0426 ("The clutter created by wind turbines typically increases the false alarm detection rate of a radar. To suppress this, the radar system will raise the threshold for what is considered a detection and, as a result, may miss actual targets."). While mitigation strategies exist, "[t]o date, no mitigation technology has been able to fully restore the technical performance of impacted radars." AR0419. A 2024 report from the Department of Energy described the interaction between evolving wind energy technology and radar systems as "a significant challenge." AR0424.

During the Government's review that led to the approval of Empire Wind's COP, the then-Department of Defense found that Empire Wind 1 and 2 "may have an adverse impact on military

---

[2] Unless specifically referring to Empire Wind 2 (or Empire Wind 1 and 2), references in this brief to the "Empire Project" refer only to Empire Wind 1.

operations conducted in the area, more specifically, to the North American Aerospace Defense Command's (NORAD) homeland defense radar systems." AR5114; *see also* AR4913; AR4914; AR2313–14 (EIS Section 3.17, discussing potential impacts on radar systems). The Empire Project is within the line of sight of an ARSR located at Riverhead, New York. AR0545, 2311. Empire Wind 1, combined with Empire Wind 2, "is located close enough to the ARSR that nearly all turbines have at least some part visible to the radar[,] . . . creat[ing] a large region that will be affected by false targets and reduced detection probability for aerial radar targets[.]" AR5022. BOEM's environmental impact statement for the Empire Wind 1 and 2 described their impact to radar systems as "notable and adverse." AR2314. Empire Wind's developer agreed that "the proposed Equinor Wind Offshore Project may have an adverse impact on the [NORAD] homeland defen[se] radar system[.]" AR4915.

In the context of the national security risks known at the time, the Department of Defense believed the negative impact of Empire Wind 1 and 2 on radar systems could be mitigated to an acceptable degree. AR4913. The Department of Defense requested that BOEM include as mitigation measures: 1) notification of certain Project milestones to allow for Radar Adverse-Impact Management scheduling; 2) funding for mitigation; and 3) curtailment of operations in certain circumstances. *Id.* Based on input from the Department of Defense, in February 2024 BOEM approved the COP for Empire Wind 1 and 2 with conditions to mitigate national security risks. AR0317-318; AR0347-349. BOEM recognized, however, that "[s]ome impacts would remain, as the mitigation measures are not able to fully eliminate the potential line-of-sight impacts of the WTGs on radar systems." AR2325.

In November 2025—after the COP approval and after the Empire Project had begun construction—the now-Department of War provided Interior with new materials. AR0001. This

included classified information on "the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects." AR0001. After an initial review of the materials, BOEM suspended all ongoing activities related to the Empire Project on the OCS (with some exceptions) for ninety days to "determine whether the national security threats posed by this project can be adequately mitigated." *Id.* By its terms, the Suspension Order expired on March 22, 2026. *See id.*

## STANDARD OF REVIEW

The Administrative Procedure Act ("APA") allows a reviewing court to "hold unlawful and set aside" final agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989). Judicial review under the APA is "highly deferential to the agency's decision and presumes that the agency action is valid." *Am. Pub. Gas Ass'n v. U.S. Dep't of Energy*, 72 F.4th 1324, 1336 (D.C. Cir. 2023) (cleaned up). Under the arbitrary and capricious standard, "a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 180 (2025) (citing *Motor Vehicle Mfts. Ass'n of U.S. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983)); *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

"An agency acts arbitrarily or capriciously if it 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ctr. for Biological Diversity v. U.S. Fish & Wildlife Serv.*, 146 F.4th 1144, 1160 (D.C. Cir. 2025) (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). The court may not substitute its judgment

6

for that of the agency and must uphold a decision of less-than-ideal clarity if the agency's path may reasonably be discerned. *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *Van Hollen, Jr. v. Fed. Election Comm'n*, 811 F.3d 486, 497 (D.C. Cir. 2016) ("[I]deal clarity is not the standard."); *Animal Legal Def. Fund, Inc. v. Vilsack*, 237 F. Supp. 3d 15, 20-21 (D.D.C. 2017). The plaintiff holds the burden to demonstrate arbitrary decision-making. *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1198 (D.C. Cir. 2000).

<div align="center">

**ARGUMENT**

</div>

Plaintiffs' claims challenging the Suspension Order should be dismissed as moot because the Suspension Order expired on March 22. Even if they were not moot, however, Plaintiffs' claims fail on the merits. Thus, if the case is not dismissed, summary judgment should be granted in Federal Defendants' favor.

## I.   The Suspension Order Has Expired and These Complaints Are Now Moot.

The complaints in these consolidated cases challenge (and seek relief regarding) BOEM's December 22, 2025, Suspension Order. But the Order expired on its own terms after ninety days, on March 22, 2026. *See* AR0001. Thus, the Court can no longer offer Empire or New York any meaningful relief regarding the Order, and the complaints should be dismissed as moot.

Article III empowers federal courts "to decide legal questions only in the context of actual 'Cases' or 'Controversies.'" *Alvarez v. Smith*, 558 U.S. 87, 92 (2009) (quoting U.S. Const., Art. III, § 2). "Federal courts may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts." *Chafin v. Chafin*, 568 U.S. 165, 172 (2012) (cleaned up). "An actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Alvarez*, 558 U.S. at

<div align="center">

7

</div>

92 (cleaned up). A claim becomes moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Chafin*, 568 U.S. at 172.

Here, Empire's complaint seeks: (1) an order vacating the Suspension Order; (2) injunctive relief against implementation or enforcement of the Suspension Order; (3) injunctive relief against the "withholding" of any necessary approvals in reliance on the Suspension Order; and (4) declaratory relief that the Suspension Order is unlawful. *See* Compl. Request for Relief, *Empire Leaseholder v. Burgum*, No. 26-cv-0004-CJN (Jan. 2, 2026) ("Empire Compl."), Dkt. No. 3. New York similarly seeks declaratory relief and an order "[v]acting the Suspension Order" and "permanently enjoining Agency Defendants from enforcing the Suspension Order." *New York v. Burgum*, No. 26-cv-0071-CJN (Jan. 9, 2026) ("NY Compl."), Dkt. No. 1.

The Suspension Order suspended "all ongoing activities" related to the Project on the OCS "for the next 90 days." AR0001. That 90-day period concluded on March 22. Though the Suspension Order stated "BOEM may further extend the 90-day suspension period," BOEM did not do so. The Suspension Order was, of course, issued in recognition that BOEM was considering a more permanent action. *See* AR0001 ("BOEM and DoW endeavor to reach a determination on feasible mitigation measures within 90 days following the date of this letter."). And we understand from Interior that BOEM's review of national security issues associated with the Empire Project remains ongoing. But any potential future action based on BOEM's ongoing review would be a new agency action, not an extension of the now-expired Suspension Order.

Because the Suspension Order has expired, vacatur of the Order or an injunction barring BOEM from implementing or relying on the Order would not provide any effectual relief. And where, as here, a plaintiff challenges an isolated agency action, "the mooting of the specific claim moots any claim for a declaratory judgment that the specific action was unlawful." *City of Houston*

*v. Dep't of Housing & Urban Dev.*, 24 F.3d 1421, 1429 (D.C. Cir. 1994). Indeed, courts in this Circuit have found claims moot where the challenged action expired by its own terms. *See, e.g., Am. Forest Res. Council v. Williams*, 96 F.4th 417, 421 (D.C. Cir. 2024) ("[I]t would have been pointless to render a judgment on the validity of the First and Second Delay Rules. Both rules had by then expired and had no continuing effect."); *Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*, 460 F.3d 13, 18 (D.C. Cir. 2006) ("Because the [challenged] memo has expired, this claim is moot."); *People for the Ethical Treatment of Animals, Inc. v. U.S. Fish & Wildlife Serv.*, 59 F. Supp. 3d 91, 95 (D.D.C. 2014) ("[T]here is no point in this Court issuing an injunction prohibiting the extension of permits which already have not been extended.").

Empire and New York certainly "continue to dispute the lawfulness of the [Suspension Order]. But that dispute is no longer embedded in any actual controversy about the plaintiffs' particular legal rights. Rather, it is an abstract dispute about the law, unlikely to affect these plaintiffs any more than it affects [anyone else]." *Alvarez*, 558 U.S. at 93. The complaints therefore "fall[ ] outside the scope of the constitutional words 'Cases' and 'Controversies.'" *Id.* (citations omitted).

Neither of the exceptions to the mootness doctrine apply here. There are two exceptions to the mootness doctrine: (1) where the defendant ceases the conduct voluntarily in response to litigation, and (2) where the conduct is capable of repetition but would evade review. *Alphabet Workers Union-Communication Workers of Am. v. NLRB*, 134 F.4th 1217, 1225 (D.C. Cir. 2025). The party opposing mootness "ha[s] the burden of proving that a mootness exception applies." *Id.* at 1225–26 (citation omitted). Neither exception applies here. With respect to the first exception, the voluntary cessation exception is not implicated when the challenged agency action expires on its own terms. *Alphabet Workers*, 134 F.4th at 1226–27. That is the case with the Suspension

9

Order—BOEM did not cease anything, let alone in response to litigation. *See id.* (explaining that the exception is focused on preventing a defendant from manipulating the judicial process).

"The capable-of-repetition-yet-evading-review exception requires that (1) the challenged action be too short in duration to be fully litigated before its cessation or expiration and (2) there be a reasonable expectation that the same complaining party would face the same action again." *Alphabet Workers*, 134 F.4th at 1225. "[T]he capable-of-repetition doctrine applies only in exceptional situations." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). Neither of the exception's prongs are implicated here.

First, the Suspension Order does not "evade review" under D.C. Circuit precedent. The D.C. Circuit applies a "typicality" test in analyzing whether an agency action evades review. "T[he] court has held that agency actions of less than two years' duration cannot be 'fully litigated' prior to cessation or expiration, so long as the short duration is typical of the challenged action." *Del Monte Fresh Produce v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009) (citations omitted); *see Campbell v. Clinton*, 203 F.3d 19, 34 (D.C. Cir. 2000) (precedent requires the court "to determine whether the activity challenged is *inherently* of a sort that evades review" (emphasis added)). There is no typicality here. Neither OCSLA nor BOEM's regulations place a time limit of less than two years on suspension orders. *See* 43 U.S.C. § 1337(p)(5); 30 C.F.R. §§ 585.417, 585.421(b) . And there is no indication that any future suspension order would be time limited such that it would evade review. *See* AR0001 ("Given the construction status of this project, BOEM will consider all feasible mitigation measures before making a decision as to whether the project must be cancelled."). Empire and New York would remain free to challenge any future order (assuming other jurisprudential requirements were met). *See Am. Forest Res. Council*, 96

10

F.4th at 421 ("The plaintiffs, however, have neither alleged nor shown that Service delay rules such as those at issue in this case typically expire within two years.").

Nor is the Suspension Order "capable of repetition," as the D.C. Circuit analyzes that question. The inquiry focuses on "whether the legal wrong complained of by the plaintiffs is legally likely to occur." *Del Monte*, 570 F.3d at 324; *see id.* at 322–23 (discussing different approaches to assess what must be repeatable under the doctrine). This is defined by "the legal questions [the case] presents for decision." *People for the Ethical Treatment of Animals v. Gittens (PETA)*, 396 F.3d 416, 422–23 (D.C. Cir. 2025). Here, the alleged legal wrongs are allegedly (1) arbitrary and capricious decision-making that (2) was not authorized by OCSLA and (3) violated Empire's due process rights.

The Suspension Order certainly contemplates a future decision. *See* AR0001. But even if that future decision is another suspension or cancellation, it would be based on additional information gathered in the process of BOEM's ongoing review. That decision would be based on a different administrative record and therefore, given the nature of APA review, would present different legal questions. The questions of whether a future suspension order is arbitrary and capricious, contrary to OCSLA, or violative of due process cannot be answered by continuing to litigate the December 22 Suspension Order. *See PETA*, 396 F.3d at 424 ("a 'legal controversy so sharply focused on a unique factual context' would rarely" be capable of repetition); *Nat'l Ass'n of Homebuilders v. U.S. Army Corps of Eng'rs*, 264 Fed. App'x 10 (D.C. Cir. 2008) (per curiam) (finding a sequential series of permits with similar terms not to be repetitions); *accord J.T. v. District of Columbia*, 983 F.3d 516, 524–26 (D.C. Cir. 2020) (concluding expired, allegedly unlawful individual education plans were not capable of repetition given fact-specific assessment

11

that goes into each plan). Empire's and the State's complaints are moot and these consolidated cases should be dismissed without prejudice.

## II.   Summary Judgment Should be Granted to Federal Defendants on the Merits.

Plaintiffs collectively bring four claims challenging the Suspension Order. Those claims assert that BOEM lacked authority under OCSLA to issue the Suspension Order, that the Order was arbitrary and capricious in violation of the APA, and that the Order violated procedural requirements imposed by the APA and Constitution.[3] Empire Compl. ¶¶ 56-87; New York Compl. ¶¶ 91-112. Summary judgment should be granted in favor of Federal Defendants.

### A.   BOEM Had Authority to Issue the Suspension Order.

To start, BOEM acted within its authority in issuing the Suspension Order. As provided by BOEM's regulations, "BOEM may order a suspension . . . [w]hen the suspension is necessary for reasons of national security or defense." 30 C.F.R. § 585.417(b). This regulation is based on 43 U.S.C. § 1337(p), which by its plain text provides broad, ongoing authority to suspend renewable energy leases for national security reasons. Empire's argument that Interior's suspension authority is cabined by Sections 1334(a) and 1341(c) of OCSLA is unsupported by the statutory text and ignores context that shed important light on the interpretive issue at hand.

### i.   Subsection 1337(p) Grants Interior Broad Authority to Suspend Leases Issued Under That Subsection, Including Wind Leases.

On its face, 43 U.S.C. § 1337(p) gives BOEM broad authority to promulgate regulations for the suspension of leases to protect national security. As discussed above, Subsection 1337(p) was enacted in 2005 as an amendment to OCSLA and provides the Secretary of the Interior

---

[3] New York's complaint is limited to a claim alleging that the Suspension Order was arbitrary and capricious. Empire also asserts an arbitrary and capricious claim, as well as the other three claims referenced above. Empire Compl. ¶¶ 56-87; New York Compl. ¶¶ 91-112.

authority to grant leases for specific activities on the OCS that the statute had not previously authorized, such as renewable energy activities. Energy Policy Act of 2005, Pub. L. No. 109-58, § 388(a), 119 Stat. 594, 744 (2005). In addition to providing authority to issue leases, Interior "shall provide for the duration, issuance, transfer, renewal, *suspension*, and cancellation of a lease . . . under this subsection." 43 U.S.C. § 1337(p)(5) (emphasis added). Congress directed Interior to "ensure that any activity under this subsection is carried out in a manner that provides for" several enumerated factors, including "protection of the national security interests of the United States[,]" and to "issue *any* necessary regulations to carry out this subsection." *Id.* § 1337(p)(4), (p)(8) (emphasis added). Read together, BOEM has clear authority to suspend a lease, and one reason it may do so is to "ensure that any activity under" Subsection 1337(p) is carried out in a way that protects our national security.

Empire's argument that Subsection 1337(p) did not grant BOEM authority to issue the Suspension Order largely focuses on Subsection 1337(p)(4) rather than the explicit suspension authority granted in 1337(p)(5). Statement of P&A's in Supp. of Empire Wind's Mot. for Summ. J. ("Empire Br.") 18-21, Dkt. No. 55-1. Indeed, when Empire gets around to discussing (p)(5)—the last paragraph of a multi-page discussion of Subsection 1337(p)—Empire does not dispute that (p)(5) grants authority to issue regulations for suspending a lease. Instead, it argues that: 1) "BOEM fulfilled its obligations under Subsection 1337(p)(5) by adopting implementing regulations" at 30 C.F.R. Part 585, Subpart E (which, while Empire omits suspension provisions from its list of regulations therein, is where 30 C.F.R. § 585.417 is located); and 2) reading Susbection 1337(p)(5) to allow suspensions for national security reasons would be duplicative of Section 1341(c). Empire Br. 21-22. As to the first argument, it makes no sense to argue that BOEM had an obligation to promulgate regulations but lacks authority to implement them. The second

13

argument simply folds in the Subsection 1341(c) surplusage argument discussed below. *See infra* at 19–26.

To the extent Empire's arguments regarding 1337(p)(4) are taken as a broader argument that 1337(p)(5) does not grant BOEM authority to suspend renewable energy leases to serve the interests identified in (p)(4), that argument lacks merit. *See* Empire Br. 18-21. First and most importantly, "nothing on the face of the statute supports this reading[.]" *United States v. Naftalin*, 441 U.S. 768, 772 (1979). Empire adds an atextual modifier—"prior to approving an offshore wind project," Empire Br. 21—when it argues that BOEM may not consider the Subsection 1337(p)(4) factors after approving an offshore wind project. Courts "ordinarily resist reading words or elements into a statute that do not appear on its face." *Bates v. United States*, 522 U.S. 23, 29 (1997); *see also Naftalin*, 441 U.S. at 773 ("The short answer is that Congress did not write the statute that way."); *Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv.*, 416 F. Supp. 2d 92, 100 (D.D.C. 2006) ("The Court will not read into [the statute] what is not stated therein, nor will the Court ignore the plain language of [the statute]."). Contrary to the language Empire would add to the statute, Subsection 1337(p)(4) is stated in the present tense and refers directly "*any* activity" being carried out under the subsection rather than the terms or a lease or other authorization to be granted by Interior. Subsection 1337(p)(8) authorizes Interior to promulgate "any necessary regulations to carry out this subsection[,]" and Subsection 1337(p)(5) explicitly instructs the Secretary to provide for lease suspensions. Again, Empire does not dispute that Subsections 1337(p)(5) and (p)(8) provides authority to promulgate suspension regulations. Empire Br. 21-22. If those suspension regulations would not serve the interests in paragraph (p)(4), it is unclear what purposes Empire would have suspension regulations serve.

The absence of a tie to a specific lease stage in Subsection 1337(p)(4) and (p)(5) can be contrasted against the provisions in Section 1337 for oil and gas leases, which fall outside the scope of subsection (p). There, Congress specifically provides that the "*[t]erms and provisions* of oil and gas leases" shall "provide for suspension or cancellation of the lease[.]" 43 U.S.C. § 1337(b)(5) (emphasis added). "[W]hen Congress includes particular language in one section of a statute but omits it from a neighbor, [courts] normally understand that difference in language to convey a difference in meaning." *Enbridge Energy, LP v. Nessel*, 146 S. Ct. 1074, 1084 (2026) (quoiting *Bittner v. United States*, 598 U.S. 85, 94 (2023)). If Congress wanted to limit Interior's consideration of the factors in Subsection 1337(p)(4) to issuance of a lease or limit Interior's suspension authority under that subsection to lease terms, it had an example of how to do so in the very section it was amending. *See Bittner*, 598 U.S. at 98 (remarking that, in drafting amendment to statute, "it would have been the simplest thing for Congress to model its work" on a prior amendment, but "Congress didn't do anything like that"). And *Renew Northeast* and *Seafreeze Shoreside*, which Empire cites in support of its argument, Empire Br. 19, say nothing about whether or not Subsection 1337(p)(4) applies at other lease stages than those involved in those cases. *See generally RENEW Ne. v. U.S. Dep't of the Interior*, No. 25-cv-13961, 2026 WL 1078282 (D. Mass. Apr. 21, 2026); *Seafreeze Shoreside, Inc. v. U.S. Dep't of the Interior*, 123 F.4th 1 (1st Cir. 2024), *cert. denied*, 145 S. Ct. 2681 (2025).

In addition to being unsupported by the statutory text, Empire's argument is contrary to the context of Subsection 1337(p). The original version of the bill specified that BOEM would consider a number of factors, including national security and others that would end up in (p)(4), "[i]n determining whether a lease . . . shall be granted competitively or noncompetitively[.]" H.R. 6, 109th Cong. § 2010 (2005) (as introduced in House) (proposed paragraph (p)(4)(B)) (available

15

at https://www.congress.gov/109/bills/hr6/BILLS-109hr6ih.pdf (last visited June 16, 2026). It also specified that Interior would "consult with the Secretary of Defense and other appropriate agencies concerning issues related to national security" "*before* exercising authority under" Subsection 1337(p). *Id.* (emphasis added) (proposed paragraph (p)(3)). The enacted legislation, by contrast, separates consideration of the factors in paragraph (p)(4) and consultation with the Secretary of Defense from a determination to issue a lease. Pub. L. No. 109-58, § 388(a), 119 Stat. 744 (2005); *see also* 43 U.S.C. §§ 1337(p)(4), (p)(8) . Congress therefore knew how to include language tying BOEM's responsibilities under Subsection 1337(p) with respect to national security to a specific stage of decision-making—before issuance of a lease—and did not include that language in the bill it ultimately passed. Further, the original bill had no language instructing Interior to provide for the suspension of leases issued pursuant to Subsection 1337(p). *See* H.R. 6, 109th Cong. § 2010. The enacted text, of course, does. 43 U.S.C. § 1337(p)(5). Context therefore evidences Congressional intent to give BOEM ongoing authority to consider and act on national security issues beyond initial issuance of a lease. *Cf. Fed. Trade Comm'n v. Raladam Co.*, 283 U.S. 643, 648 (1931) (discussing amendments to language in original bill in interpreting statute).

Empire also argues that, if BOEM has ongoing statutory authority to consider national security issues, it would "illogically" allow BOEM to suspend a lease based on any of the (p)(4) factors. Empire Br. 21. That is not an illogical construction of the statute. Indeed, it is supported by the text and in line with the "generally accepted" principle "that in the absence of a specific statutory limitation, an administrative agency has the inherent authority to reconsider its decisions." *Macktal v. Chao*, 286 F.3d 822, 825-26 (5th Cir. 2002) (citations omitted)*; see also Ivy Sports Med., LLC v. Burwell*, 767 F.3d 81, 86 (D.C. Cir. 2014) (agencies generally have authority to reconsider unless "Congress has spoken"). Whether any such suspension would be a

16

breach of lease, arbitrary and capricious, or otherwise not in accordance with the law is a separate question from whether it would be *statutorily* permissible under OCSLA. And disagreements about good policy, or what the law *should* be, do not constitute illogical outcomes that change statutory text. *Adirondak Med. Ctr. v. Sebelius*, 740 F.3d 692, 700 (D.C. Cir. 2014).

> **ii.    Subsection 1337(p)(5)'s Grant of Authority Is Distinct from, and in Addition to, the Suspension Authority Granted in Subsection 1334(a).**

BOEM's authority under Subsection 1337(p)(5) is not limited by the separate suspension authority in Subsection 1334(a)(1). Subsection 1334(a), which pre-dates the enactment of Subsection 1337(p), provides Interior with authority to promulgate suspension regulations that are generally applicable to activities carried out under a lease issued pursuant to OCSLA. That extends beyond the lease activities governed by Subsection 1337(p)(1). Oil and gas production, for example, fall outside the scope of Subsection 1337(p). 43 U.S.C. § 1337(a)(1); *see also id.* § 1337(i) (authorizing issuance of Sulphur leases). Even if Interior's authority under Subsection 1334(a) were limited in the way Empire argues (which Federal Defendants do not concede), Subsection 1337(p)(5) is a distinct grant of authority specific to activities authorized by Subsection 1337(p)(1). Nothing in the text of the statute indicates that Congress intended for Section 1334 to limit the suspension of leases issued under Subsection 1337(p)(1). Rather, the text of Subsection 1337(p)(4) and (p)(5) give Interior broad, ongoing authority to consider and act on national security issues (among others). *Supra* at 12–17. Subsection 1337(p) makes no reference to Section 1334, and the Court should not read such a cross-reference into the statute. *Bates*, 522 U.S. at 29.

Here again, Subsection 1337(p) can be contrasted against Subsection 1337(b)'s provisions for oil and gas leases. In Subsection 1337(b), Congress specifically provided that lease terms must provide for suspension "pursuant to section 1334 of this title[.]" 43 U.S.C. § 1337(b)(5). As discussed above, a difference in language is "normally underst[ood] . . . to convey a difference in

17

meaning." *Enbridge Energy*, 146 S. Ct. at 1084 (quoting *Bittner*, 598 U.S. at 94). "Had Congress intended to unambiguously limit the reach of" Subsection 1337(p) to issuance of a lease and to have suspensions governed solely by Subsection 1334(a), "it could have simply reused th[e] language from" Subsection 1337(b). *Overdevest Nurseries, L.P. v. Walsh*, 2 F.4th 977, 983 (D.C. Cir. 2021); *see also Bittner*, 598 U.S. at 98.

The surplusage canon does not help Empire. When using the surplusage canon, courts "presume that Congress did not 'include words that have no effect,' and so [] generally 'avoid a reading that renders some words altogether redundant.'" *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1068 (D.C. Cir. 2018) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 176-77 (2012)). But the canon "does not apply when[,]" as here, "the text's meaning is plain." *Id.* And "[a] little overlap, either by accident or design, is to be expected in any complex statutory scheme[.]" *Id.*; *see also Rimini Street, Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019) ("Redundancy is not a silver bullet."). "[T]he surplusage canon 'is neither inviolable nor insurmountable,' particularly 'when agency authority is at stake.'" *Changji Esquel Co. Ltd. v. Raimondo*, 40 F.4th 716, 724 (D.C. Cir. 2022) (quoting *Adirondack Med. Ctr.*, 740 F.3d at 699).

Empire's reliance on the surplusage cannon cannot overcome the plain text of the statute and, in any case, fails to identify surplusage that favors Empire's statutory interpretation. When giving Subsection 1337(p) the breadth created by its plain text (and supported by its context), one of two scenarios is correct: either (1) Interior's authority under Subsection 1334(a)(1) to suspend leases is as broad as it is under Subsection 1337(p)(5), or (2) Subsection 1337(p)(5) provides suspension authority specific to certain activities that is broader than the authority granted by Subsection 1334(a)(1). In the first scenario, which reflects Federal Defendants' reading of

BOEM's authority under Subsection 1334(a), both provide separate suspension authority for some of the same reasons.[4] BOEM's interpretation is not problematic, as there is sometimes redundancy in statutes providing for agency authority. In the second scenario, which reflects Plaintiffs' reading of Subsection 1334(a), there is no surplusage problem with interpreting Subsection 1337(p) as allowing the suspension here because any limitations in Section 1334 would still apply to activities falling outside the scope of Subsection 1337(p). *See Sec. & Exch. Comm'n v. Familant*, 910 F. Supp. 2d 83, 95 (D.D.C. 2012) (holding that, as long some activities covered by one subsection fall outside of the scope of the other subsection, there is no surplusage); *Changji*, 40 F.4th at 724 (finding no intolerable surplusage where "each provision does meaningful, independent work, despite the possibility for partial overlap").

### iii. Interior's Authority Under Subsection 1337(p) Is Not Limited by Subsection 1341(c).

Nor is Interior's authority to promulgate suspension regulations under Subsection 1337(p) to protect national security interests limited by the minimum lease terms required by Subsection 1341(c). Subsection 1341(c) provides that all leases issued under OCSLA "shall contain or be construed to contain a provision whereby authority is vested in the Secretary, upon a recommendation of the Secretary of Defense, during a state of war or national emergency . . . to

---

[4] Subsection 1334(a) instructs Interior to promulgate regulations that "shall include, *but not be limited to*, provisions . . . for the suspension or temporary prohibition of any operation or activity . . . if there is a threat of serious, irreparable, or immediate harm or damage to life . . . , to property, to any mineral deposits (in areas leased or not leased), or to the marine, coastal, or human environment[.]" 43 U.S.C. § 1334(a) (emphasis added). BOEM does not read this provision as restrictive. And Empire's proposition that interference with the Government's ability to protect national security is somehow less attributable to the project itself than interference with aquatic life does not make sense. Empire Br. 17. Nor does it make sense to believe Congress intended to give Interior less latitude to protect national security—"a government interest of the highest order[,]" *Busic v. Transp. Sec. Admin.*, 62 F.4th 547, 550 (D.C. Cir. 2023)—than to address harm to fish.

19

suspend operations under any lease[.]" This provision sets a minimum requirement for leases and ensures that, absent any further regulatory action from Interior, leases can be suspended in certain circumstances. But a statutory provision setting a minimum requirement is not equivalent to a provision stating Interior can do nothing else. Nothing in the text of Subsection 1341(c) bars Interior from using authority granted by other provisions of OCSLA to promulgate regulations for suspending leases for national security reasons in other circumstances. The United States' interest in national security is not limited to times of war or national emergency, and nothing in Subsection 1337(p) indicates that Congress intended for Interior to wait until national security risks materialize into an active emergency before acting.

For the reasons discussed above, Subsection 1337(p) grants Interior such additional authority for renewable energy leases and other activities specified in (p)(1). Indeed, it affirmatively instructs Interior to "ensure that any activity under [that] subsection is carried out in a manner that provides for" national security interests. 43 U.S.C. § 1337(p)(4). The plain text of the statute, in addition to its context, indicates that the intended scope of Subsection 1337(p) with respect to national security is broader than including lease terms accounting for times of war or national emergencies, which is the subject of Subsection 1341(c). *See supra* at 12–17. Interpreting Subsection 1341(c) as restricting BOEM's authority under Subsection 1337(p) would interfere with Interior's ability to carry out the later-enacted instruction from Congress to ensure activities authorized under that subsection provide for national security. For example, as evidence of its commitments to national security, Empire points to a term in its lease providing that the Government can temporarily suspend the lease for national security reasons, though such suspensions "will not generally exceed 72 hours." Empire Br. 9 (quoting AR0069). Empire omits that this term is specific to the period in which the lessee is "conducting site characterization

activities in support of plan submittal." AR0067. But in any case, under Empire's reading of the statute, the United States would not be able to use this lease provision outside of wartime or a national emergency.

Empire's argument focuses heavily on the text of Subsection 1334(a)(1) and its interplay with Subsection 1341(c). Empire Br. 16-18. But Subsection 1334(a)(1) is irrelevant here. The regulation on which BOEM relied in issuing the Suspension Order was issued under Subsection 1337(p), which provides an additional suspension authority specific to the activities authorized under Subsection 1337(p)(1). Federal Defendants do not agree with Empire's interpretation of Subsection 1334(a). *See supra* at 19 n.4. But whatever interpretive questions might arise from the omission of a reference to national security in Subsection 1334(a)(1), they are irrelevant to interpreting the text of Subsection 1337(p), which does not have the same sort of textual quirk.

Neither the canon against surplusage nor the general/specific canon gives Empire the better reading of the statute. The surplusage cannon reflects "the idea that 'every word and every provision is to be given effect [and that n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.'" *Nielson v. Preap*, 586 U.S. 392, 414 (2019) (alteration in original) (quoting Scalia & Gardner at 174). When the general/specific canon is applied to statutes "'in which a general authorization and a more limited, specific authorization exist side-by-side . . . the canon avoids not contradiction but the superfluity of a specific provision that is swallowed by the general one.'" *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 356 F. Supp. 3d 109, 142 (D.D.C. 2019) (quoting *RadLAX Gateway Hotel v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)). Thus, because Subsections 1337(p) and 1341(c) do not prohibit something the other section permits, application of general/specific canon here also concerns surplusage.

Giving BOEM's suspension authority under Subsection 1337(p) the full breadth created by that provision's text does not cause Subsection 1341(c) "to have no consequence." *Nielson*, 586 U.S. at 414. Section 1337 imposes a minimum, across-the-board measure to protect national security. A separate statutory provision giving Interior authority to promulgate regulations permitting suspensions of certain leases to protect national security in other circumstances *if necessary* does not make the minimum provision in Subsection 1341(c) superfluous. 43 U.S.C. § 1337(p)(8) ("[T]he Secretary, in consultation with the Secretary of Defense . . . shall issue any *necessary* regulations to carry out this subsection." (emphasis added)).

The D.C. Circuit's interpretation of the Department of Commerce's authority under the Export Control Reform Act of 2018 is illustrative. The statute requires the Secretary of Commerce to "'maintain a list of foreign persons' who have been 'determined to be a threat to national security and foreign policy as set forth in section 4811(2)(A) of this title.'" *Changji*, 40 F.4th at 720 (quoting 50 U.S.C. § 4813(a)(2)). In turn, Section 4811(2)(A) identifies numerous specific national security objectives; human rights is not among them. *Id.* The D.C. Circuit nonetheless found that the Secretary of Commerce could add entities to the so-called "Entity List" mandated by Section 4813(a)(2) due to human rights violations because Section 4813(a)(16) "empowers the Secretary to 'undertake any other action as is necessary to carry out this subchapter[.]" *Id.* at 723 (quoting 50 U.S.C. § 4813(a)(16)). "[S]ection 4813(a)(2) specifically requires the Secretary to list entities to achieve certain specified objectives, whereas section 4813(a)(16) permits the Secretary to consider whether listing entities to achieve other specified objectives is also necessary to carry out the broader statutory scheme." *Id.* at 724. Here too, Interior's use of broad authority to take action as necessary to achieve national security objectives beyond those present in an active wartime or

22

national emergency, in addition to implementing the specific requirements mandated by Congress for emergencies, does not create intolerable surplusage.

Subsection 1341(c) also continues to be of consequence in conjunction with Subsection 1334(a). Section 1334 does not require Interior to promulgate regulations providing for suspension of leases, such as oil and gas leases, for national security reasons. Indeed, Empire argues Interior *cannot* do so under the text of Section 1334. Empire Br. 16-18. Federal Defendants disagree with Empire's reading of Subsection 1334(a) and do not believe the Court needs to decide BOEM's authority under that Subsection 1334(a) to decide the statutory interpretation issue in Federal Defendants' favor. Under Federal Defendants' view of BOEM's authority under Subsection 1334(a), Subsection 1341(c) would not be surplusage for the same reasons discussed above in conjunction with Subsection 1337(p). But under Empire's reading of Subsection 1334(a)(1), Subsection 1341(c) would even more plainly not be superfluous. Under that reading, Subsection 1341(c) would provide the only avenue to suspend leases falling outside the scope of Subsection 1337(p) for national security reasons. In that case, even assuming that Subsection 1341(c) lacked consequence for leases issued under (p)(1)—which is not the case for the reasons discussed above—it would clearly still be consequential for leases issued under OCSLA's other provisions. *See Familant*, 910 F. Supp. 2d at 95. *Changji*, 40 F.4th at 724.

Further, "[t]he surplusage cannon is neither inviolable nor insurmountable . . . particularly [] when agency authority is at stake." *Adirondak Med. Ctr.*, 740 F.3d at 699. "The surplusage canon is a tool to effectuate congressional meaning, not to override contrary textual indicia." *Pileggi v. Wash. Newspaper Publ'g Co., LLC*, 146 F.4th 1219, 1236-37 (D.C. Cir. 2025). For all of the reasons discussed above, the text of Subsection 1337(p) indicates Congress intended to grant Interior broad authority to suspend leases for renewable energy activities (and others authorized

23

by Subsection 1337(p)(1)) for national security reasons. Some overlap among the provisions providing suspension authority "is not surprising." *DeNaples v. Off. of the Comptroller of the Currency*, 706 F.3d 481, 487 (D.C. Cir. 2013). In *DeNaples*, the D.C. Circuit found that the Office of the Comptroller of the Currency could use general cease-and-desist powers granted in one provision of the Federal Deposit Insurance Act even though other provisions provided specific enforcement mechanisms. "Congress could reasonably hand [] agencies a palette sufficiently sophisticated to capture the full spectrum of enforcement possibility." *Id.* Similarly, Congress could reasonably give Interior multiple routes under OCSLA to address "the full spectrum" of problems impacting an interest as critical as national security. *Id.*

Resort to legislative history is not appropriate where the text is plain. *Labat-Anderson, Inc. v. United States*, 346 F. Supp. 2d 145, 151 (D.D.C. 2004). In any event, though, the legislative history Empire relies on does not help resolve the interpretive issue at hand. Empire relies on broad statements about legislative purpose. Empire Br. 22-23. But "[n]o legislation pursues it purposes at all costs . . . and it frustrates rather than effectuates legislative intent simplistically to assume that *whatever* furthers the statute's primary objective must be the law." *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 646-47 (1990) (alteration and emphasis in original) (quoting *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987)). Further, as stated by the Chair of the Senate Committee on Energy & Natural Resources when the Environmental Policy Act of 2005 (which added Subsection 1337(p) to OCSLA) was being considered, Congress's goal was, "ultimately, national security and prosperity." 151 Cong. Rec. S6440 (June 14, 2005); *see also, e.g.*, S. Rep. No. 109-78, at 1 (2005) (describing an overarching purpose of the legislation as "enhancing the security of the United States"); H.R. Rep. No. 109-215, at 169 (2005) ("This legislation makes a significant and meaningful contribution toward ensuring America's continued

welfare and security[.]"). Authority to address evolving national security risks therefore serves rather than defeats Congress's purpose in enacting Subsection 1337(p).

Finally, Empire's arguments about the terms of its lease are irrelevant to the question of statutory authority.[5] *See* Empire Br. 15-16. Any claim that BOEM has violated the lease is a breach of contract claim over which the Court lacks jurisdiction. The only applicable waiver of sovereign immunity Empire has identified is the APA. But the APA's waiver does not apply where "any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702; *see also id.* § 704 (APA only available to challenge "final agency action for which there is no other adequate remedy in a court"). The Tucker Act waives sovereign immunity for suits against the United States alleging a breach of contract, placing jurisdiction exclusively in the Court of Federal Claims for any claim more than $10,000. 28 U.S.C. § 1491(a)(1); *see also id.* § 1346(a)(2) . The D.C. Circuit has "interpreted the Tucker Act . . . to impliedly forbid contract claims against the Government from being brought in district court under the waiver in the APA[.]" *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (citation modified) (internal quotations omitted).

In sum, Subsection 1337(p) instructs the Secretary to ensure that activities carried out under that subsection—which include wind energy activities—provide for national security, and gives the Secretary broad authority to suspend leases issued for those activities. Interior's broad authority to suspend leases issued under Subsection 1337(p) is not constrained by any limitations on the more general suspension authority found in Subsection 1334(a)(1). Nor is it constrained by the

---

[5] Further, the lease provision that Empire points to stating that suspensions "will not generally exceed 72 hours" only applies when the lessee is "conducting site characterization activities in support of plan submittal." AR0067-69. Empire is past that stage of development. AR0317 (COP approval letter).

minimum requirement for lease terms set by Subsection 1341(c). Interior's promulgation of 30 C.F.R. § 585.417 and use of that regulation in these circumstances was thus statutorily permissible under OCSLA. Whether application of the regulation in this case was arbitrary or capricious or otherwise unlawful is a separate question from that of statutory authority. Those questions are the subject of Plaintiffs' other claims, which fail for the reasons discussed below.

### B.    Plaintiffs Have Not Met Their Burden to Show an APA Violation.

Plaintiffs argue that, in issuing the Suspension Order, BOEM acted arbitrarily and capriciously in violation of the APA. Empire Br. 31–45; Statement of P&A in Supp. of the State's Mot. for Summ. J. ("NY Br.") 22–31, Dkt. No. 56. But Plaintiffs' telling largely ignores the nature of the agency action they challenge. In response to new materials from the Department of War, BOEM *temporarily* suspended lease activities so mitigation measures could be explored. BOEM's chosen action was not arbitrary. Should the Court not dismiss the complaints, summary judgment should be granted in favor of Federal Defendants on Plaintiffs' APA claims.

### i.    The Suspension Order Reasonably Explained its Bases.

Empire and New York's first argument is that the Order fails on its face under the APA because it does not adequately explain the bases for the suspension. *See* Empire Br. 31–33, 34–36; NY Br. 24–25. "The APA's arbitrary-and-capricious standard requires that agency action be . . . reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423. All that is necessary is that the agency's path can be reasonably discerned. *Bowman Transp.*, 419 U.S. at 286. The Suspension Order easily meets that standard.

BOEM explained that the Department of War had provided Interior with "an additional assessment regarding the national security implications of offshore wind projects[.]" AR0001. The Suspension Order disclosed that the information concerns "the rapid evolution of relevant

26

adversary technologies and the resulting direct impacts to national security from offshore wind projects." *Id.* And the Suspension Order stated that the Project's "sensitive location on the East coast" heightened the national security risk. *Id.* The Suspension Order provided the legal authority on which BOEM was acting and invited engagement from Empire during the temporary suspension period. *See id.* There is no APA deficiency with the Suspension Order's "reasonable, albeit brief" explanation, particularly given the classified nature of some of the information underlying the Suspension Order. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007); *accord Tourus Records, Inc. v. Drug Enf't Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001) (stating in the context of petition denials that, "[a]lthough nothing more than a 'brief statement' is necessary, the core requirement is that the agency explain 'why it chose to do what it did'" (quoting Henry J. Friendly, *Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders*, 1969 Duke L.J. 199, 222)).

Empire faults BOEM for "merely referencing 'new classified information.'" Empire Br. 43. And New York similarly complains that the Suspension Order relied on "undisclosed national security concerns." NY Br. 24. But what BOEM could say in the Suspension Order was limited by the classified nature of some of the information on which it relied. Reading the APA to "[f]orc[e] the executive branch to disclose information that it has validly classified would 'compel a breach in the security which that branch is charged to protect.'" *Fares v. Smith*, 901 F.3d 315, 324 (D.C. Cir. 2018) (citation omitted).[6] For example, in *Strait Shipbrokers*, the court found that the agency was not required to "do more at the time of [the challenged Specially Designated

---

[6] *Fares* focused on the Due Process Clause, but the plaintiff had brought an APA claim as well. 901 F.3d at 320. The plaintiff argued that the APA's protections were "coextensive with those of the Due Process Clause" such that their "APA claim rises and falls with the due process claim." *Id.*

Nationals] designation than (1) provide the authority for the designations and (2) generally describe the [underlying information] that prompted the designations." *Strait Shipbrokers Pte. Ltd. v. Blinken*, 560 F. Supp. 3d 81, 94 (D.D.C. 2021).

Empire cites *Kirwa* and *RFE/RL*. Empire Br. 36, 38. But *Kirwa* did not discuss the intersection between the APA's reasonable explanation requirement and an agency's reliance on classified information. *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018). *RFE/RL* similarly did not involve classified information. *See RFE/RL, Inc. v. Lake*, 772 F. Supp.3d 79, 83–84 (D.D.C. 2025). The implication of classified materials, however, does not make this a circumstance in which BOEM has simply asked the Court to "trust us." Empire Br. 36–37. The classified information on which BOEM relied is before the Court for review.

Empire points to conclusions from courts addressing preliminary injunction motions relating to other orders and projects. *See* Empire Br. 32–33. In addressing the preliminary injunction motion in this case, however, the Court did not make any claim-specific finding as to a likelihood of success. *See* Tr. 10:23–13:15 (Jan. 15, 2026). Plaintiffs' remaining arguments regarding the basis for the Suspension Order pertain to whether the administrative record before BOEM supported the decision. We address those arguments below. The Suspension Order adequately explained BOEM's decision.

### ii.   BOEM Considered the Relevant Factors.

The APA also requires that agencies do not "entirely fail[ ] to consider an important aspect of the problem" before them. *Ctr. for Biological Diversity*, 146 F.4th at 1160 (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). Empire and New York argue that BOEM violated this requirement by failing to comply with the change-in-position doctrine. *See* Empire Br. 41–43; NY Br. 25–27.

28

The change-in-position doctrine permits agencies to change existing policies so long as they recognize the change, reasonably explain it, and consider serious reliance interests. *Food & Drug Admin. v. Wages & White Lion Inv., LLC*, 604 U.S. 542, 568 (2025); *see FCC v. Fox Television Stations*, 556 U.S. 502, 514–16 (2009). The doctrine "asks two questions." *Wages & White Lion*, 604 U.S. at 569. The first is whether the agency has in fact changed its position by, for example, acting inconsistently with a prior position or reversing a former view "as to the proper course." *Id.* at 569–70 (citation omitted). If that first question is answered in the affirmative, the second question asks whether the agency recognized it was changing its position and explained the new policy. *Id.* at 570 (citation omitted).

Empire and New York's efforts fail at the doctrine's first question. BOEM has not yet taken any action that could be characterized as changing its position with respect to the approval of the Empire Project. The Suspension Order did not rescind, modify, or permanently suspend Empire's lease or the prior COP approval. Instead, BOEM identified concerns about additional information it had received from the Department of War and suspended activities *temporarily* on the lease so BOEM could further assess the issue and any potential mitigation. *See* AR0001.

BOEM also did not act "inconsistently with an earlier position." *Wages & White Lion*, 604 U.S. at 570–71 (cleaned up). Empire and New York make much of the fact that BOEM had approved Empire's COP after concluding that the Empire Project, with mitigation, did not present any then-known national security risks. Empire Br. 42 (citing AR00642–43, AR2296–2325); NY Br. 25. The problem with Empire and New York's argument is that the Suspension Order was based upon new materials from the Department of War. AR0001. There is no inherent inconsistency between (1) an earlier conclusion that planned mitigation adequately addresses an earlier known risk, and (2) a later initial assessment that the same mitigation may not adequately

address a newly arising risk. In any event, the D.C. Circuit has stated that it is "arguable" whether the reason for an alleged change in position "would have to be disclosed to the appellants . . . given the role of classified materials in review under" the relevant statute. *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 199 (D.C. Cir. 2001).

Nor was BOEM required to consider reliance interests. *See* Empire Br. 43–44; NY Br. 25–27. Any need to consider reliance interests is part of the change-in-position doctrine. *Wages & White Lion*, 604 U.S. at 568 (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016)). As explained above, that doctrine is not implicated here. *See also* Empire Br. 43 (citing AR0034–35 as including information regarding the company's reliance interests). And Empire's reference to BOEM's lifting of an April 2025 stop work order is irrelevant. *See* Empire Br. 43. The April 2025 stop work order did not relate to national security. *See* Ex. A to Mot. & Mem. of Empire Wind to Complete Admin R., Dkt No. 42-1 (noting order was based upon information received about "the environmental analyses for [the] project").

New York, for its part, does not provide any support for the proposition that an agency must consider reliance interests beyond those held by the regulated entity or community that is subject to the agency action. *See* NY Br. 25–27. For example, in *Wages & White Lion*, the Court analyzed reliance interests of the marketers seeking premarket authorization, not of e-cigarette users. *See Wages & White Lion*, 604 U.S. at 585. The Court noted that the premise behind the doctrine is that "an agency should not mislead *regulated entities*." *Id.* at 567 (emphasis added).[7] Further, New York focuses on the circumstances that may arise "if the Project is canceled." NY

---

[7] New York also claims BOEM failed to consider "New York's sovereign interest related to the Project." NY Br. 26. But New York does not provide any statutory or other source of law that required BOEM to consider those interests as part of a temporary lease suspension.

Br. 26. But the Suspension Order only suspended lease activities for 90 days; it did not rescind any project approvals. *See* AR0001. BOEM did not act in violation of the change-in-position doctrine.

### iii.    BOEM Relied Upon New Materials from the Department of War.

Finally, we turn to the question of record support. An agency action is arbitrary and capricious if it "offer[s] an explanation . . . that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Ctr. for Biological Diversity*, 146 F.4th at 1160 (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43). While courts are to determine whether the agency made a rational connection between the facts before the agency and the ultimate decision, *Motor Vehicle Mfrs.*, 463 U.S. at 43, "in an area at the intersection of national security, foreign policy, and administrative law," judicial review "is extremely deferential." *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007). An agency's decision should be upheld "so long as its path may be reasonably discerned," and the Court may consider its "*ex parte* review of the full administrative record [to] confirm[ ] that the agency has not run afoul of that requirement." *Basengezi v. Smith*, No. 23-cv-1249, 2024 WL 1050340, at *6 (D.D.C. Mar. 11, 2024) (internal quotation omitted).

### 1.    BOEM's Decision Making.

Here, BOEM based its decision on what it believed to be relevant, new information from the Department of War. Since as early as 2020, the then-Department of Defense recognized that, absent mitigation, the Empire Wind 1 and 2 "may have an adverse impact on military operations conducted in the area, more specifically, to the North American Aerospace Defense Command's (NORAD) homeland defense radar systems." AR5114; *see also* AR4924–29 (executive summary of 2020 BOEM radar interference analysis, referencing ARSR-4 as used to monitor airspace and listing potential operational mitigation for aircraft tracking). Empire agreed. *See* AR4915–16; *see*

31

*also* AR2311, AR2313–14 (EIS Section 3.17, discussing potential impacts on radar systems); AR0417–458 (February 2024 report from Wind Turbine Radar Interference Working Group).

Based upon the then-known risks, BOEM worked to identify COP approval conditions to attempt to mitigate those risks. *See* AR4913 (April 2021 letter from DOD to BOEM); AR0459, AR0545–47 (national security mitigation measures); AR0627, AR0642–43 (discussion of national security interest for purposes of OCSLA analysis). Condition 4.2 relates to the ARSR at Riverhead, New York, and is most relevant here. *See* AR0545–47. The condition requires Empire to: (1) notify NORAD in advance of the last wind turbine generator being commissioned so that Radar Adverse Impact Management can be scheduled; (2) provide $80,000 (or more in some circumstances) to NORAD for management of adverse radar impacts; and (3) enter a mitigation agreement with the Department of Defense for purposes of implementing those other conditions. AR0545–47. As an aviation safety measure, Condition 3.2.1 also requires control mechanisms that "enable [Empire] to immediately initiate a shutdown of any [wind turbine generators] upon emergency order from the Department of [War] or the [U.S. Coast Guard]." AR0543. The mitigation agreement called for in Condition 4.2 is not in the administrative record because Empire and the Department of War have yet to finalize it. *See* Decl. of Elisabeth Treseder ¶ 27 (Jan. 5, 2026), ECF No. 8-3.

Based, in part, on these conditions, BOEM approved the COP in February 2024. AR0317–318; *see also* AR0202–203 (reissuing COP specific to Empire Wind 1); AR0099, AR0129–131 (national security conditions for that reissuance). But during environmental review prior to COP approval, BOEM recognized that, even with the mitigation measure for ARSR, "[s]ome impacts would remain, as the mitigation measures are not able to fully eliminate the potential line-of-sight impacts of the [wind turbine generators] on radar systems." AR2318; *see also* AR2320–2321 (stating the same for NORAD impacts); AR2323–2325 (discussing effectiveness of mitigation).

32

Then, near the end of November 2025, the now-Department of War provided Interior with new materials. AR0001. This included classified information on "the rapid evolution of relevant adversary technologies and the resulting direct impacts to national security from offshore wind projects." AR0001. The classified information on which BOEM relied is before the Court for *ex parte, in camera* review. *See* Decl. of Matthew Giacona ¶ 3 (Feb. 12, 2025) (certifying administrative record), Dkt. No. 4-1; Notice of Providing Classified Information (Jan. 13, 2026), Dkt. No. 30. The administrative record contains an unclassified summary sheet of Interior's concerns. *See* AR0033; *see also* AR0031–32 (project status as of Dec. 8, 2025); AR0036 (regional map showing location of project). After an initial review of the new materials from the Department of War, BOEM suspended all ongoing activities on the lease (with some exceptions) for 90 days in order to coordinate with Empire and the Department of War to "determine whether the national security threats posed by this project can be adequately mitigated." AR0001.

Thus, in sum, BOEM relied on new materials that implicated national security risks and, after an initial review of that information and existing mitigation measures, suspended lease activities temporarily to allow for a more detailed review. "In the national security context, 'conclusions must often be based on informed judgment rather than concrete evidence, and that reality affects what we may reasonably insist on from the Government.'" *China Telecom (Americas) Corp. v. Fed. Commc'ns Comm'n*, 57 F.4th 256, 266 (D.C. Cir. 2022) (quoting *Olivares v. Transp. Sec. Admin.*, 819 F.3d 454, 466 (D.C. Cir. 2016)).

### 2.    Empire and New York Have Not Met Their Burden.

In arguing that BOEM did not act rationally, Empire and New York make three points. First, Empire argues that BOEM acted arbitrarily because BOEM, in approving the COP, had determined the Empire Project could proceed. Empire Br. 33–48. Second, Empire and New York

33

both argue that BOEM acted arbitrarily in suspending all lease activities, rather than any discrete activities that may impact national security. Empire Br. 41; NY Br. 27–28. Third, Empire and New York argue that BOEM's stated reasons were not "genuine"; in other words, that national security was only pretext for some other motive. Empire Br. 39–40; NY Br. 28–31. We address those points in turn.

### a.    The COP Approval Does Not Foreclose New Issues.

The prior COP approval is not dispositive here because, in issuing the Suspension Order, BOEM was relying on newly developing information. OCSLA recognizes that the Secretary's oversight responsibilities are ongoing, including with respect to national security. 43 U.S.C. § 1337(p)(4) ("The Secretary shall ensure that any activity under this subsection is carried out in a manner that provides for . . . ."); 30 C.F.R. § 585.105(h) (requiring lessees to "[c]onduct all activities authorized by the lease or grant in a manner consistent with the provisions of [43 U.S.C. § 1337(p)]"). Certainly, when an agency acts upon classified information, the classified information must provide a rational basis for the agency's conclusion. Empire Br. 34, 36 (quoting *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 123–24 (D.D.C. 2015).[8] And the classified information underlying BOEM's decision is before the Court. While Empire (Br. 35, 37–38) is correct that the Wind Turbine Radar Interference Mitigation Working Group has concluded that offshore wind projects and air defense radar can exist together, the "can" is based upon the need to properly mitigate. *See* AR0419. Empire recognizes as much. *See* Empire Br. 37. And the cited

---

[8] Empire misstates the *FMBE* court's conclusion regarding classified information. *See* Empire Br. 34 (stating in a parenthetical that "*in camera* inspection of classified information showed plaintiff did not pose a threat to national security"). The court found "that the present record, taken as a whole, *supports* [the agency's] exercise of its discretion in reaching its ultimate conclusion under Section 311 that [the plaintiff] is an institution of primary money laundering concern." *FBME*, 125 F. Supp. 3d at 125 (emphasis added).

report notes that "[t]o date, no mitigation technology has been able to fully restore the technical performance of impacted radars." AR0419. The need to mitigate is precisely what drove BOEM's Suspension Order here.

Empire's attempted analogies to *Solonex*, *Moncrief*, and *Planned Parenthood* are inapt. Empire Br. 33–34, 38. *Solonex* and *Moncrief* did not involve new information or national security issues, and the agencies there cancelled the prior agency approvals (leases), rather than temporarily suspending activities. *See Solonex, LLC v. Haaland*, 626 F. Supp. 3d 110, 126 (D.D.C. 2022) (basis for lease cancellation was that prior environmental review as inadequate);[9] *Moncrief v. U.S. Dep't of the Interior*, 339 F. Supp. 3d 1, 5, 10 (D.D.C. 2018) (same). Similarly, *Planned Parenthood* did not involve classified materials or new materials provided to an agency after a prior agency approval. *Planned Parenthood of Greater N.Y. v. Dep't of Health & Human Servs.*, No. 25-cv-2453, 2025 WL 2840318, at *1–4 (D.D.C. Oct. 7, 2025). Empire relies on *Planned Parenthood* to support the proposition that an agency action is arbitrary when there is "'no evidence before the agency to support'" the chosen action. Empire Br. 24 (quoting *Planned Parenthood*, 2025 WL 2840318, at *27). Here, however, BOEM relied upon classified information provided by the Department of War. *See* Giacona Decl. ¶ 3 (certifying administrative record).

Empire also attempts to compare its project with South Fork Wind, an offshore wind project located off the eastern end of Long Island. *See* Empire Br. 35–36 & n.15. In doing so, Empire relies on evidence that it did not include in its motion seeking leave to submit extra-record materials. *See* Empire Mot. to Complete Admin. R., Dkt. No. 42; Order, Dkt. No. 52. Regardless,

---

[9] *Solonex* also involved a drilling permit. *See* 626 F. Supp. 3d at 127. The court at times described the agency's decision regarding the permit as a "withdrawal of an approval." *Id.* But as to the permit, the agency was concluding a long-standing standing reconsideration process after remand from an administrative appeal board. *See id.* at 117–18.

South Fork consists of only twelve turbines, not the fifty-four that would make-up Empire Wind 1. *See Pres. Soc'y of Newport Cnty. v. Burgum*, No. 23-cv-03510, 2026 WL 787910, at *16 (D.D.C. March 20, 2026); AR0031, 34. The prior COP approval does not render the Suspension Order arbitrary.

<div align="center"><b>b.     Arguments About Breadth Are Misplaced.</b></div>

We turn next to Empire's and New York's arguments regarding the Suspension Order's breadth. Both argue that BOEM did not explain why all lease activities needed to be suspended, rather than more discrete, specific activities. *See* Empire Br. 41; NY Br. 27–28. But this again ignores the nature of the agency action. BOEM only suspended activities temporarily in order to further assess the issue of potential mitigation. AR0001. The question of whether the breadth of activities suspended aligned with the classified information before BOEM is just a different spin on the question of whether the administrative record supports the action taken. *See supra* at 31–33.

<div align="center"><b>3.     Empire and New York Have Not Demonstrated Pretext.</b></div>

Finally, Empire and New York do not provide sufficient support for their allegations of pretext. Empire Br. 39–40; NY Br. 28–31. New York relies, in part, on extra-record evidence to support its theory. *See* NY Br. 30–31 (citing New York's prior motion); NY Br. 7–11. The Court held in abeyance Empire's and New York's requests that the Court consider extra-record evidence. *See* Order 5, Dkt. No. 52. Federal Defendants renew their opposition to those requests. *See* Fed. Defs' Opp'n to Pl.'s Mots. to Complete Admin R. 10–14, Dkt. No. 48. As to the allegations themselves, the fact the President and Interior leadership hold strong—and strongly expressed—policy views on offshore wind energy development sheds no light on BOEM's decision to suspend lease activities temporarily in response to the materials from the Department of War. A project can

<div align="center">36</div>

raise national security issues regardless of a policymaker's policy concerns about electricity prices, foreign manufacturing, environmental impacts, and aesthetics.

The Supreme Court has made clear that "a court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Commerce v. New York*, 588 U.S. 752, 781 (2019). Certainly, Interior is in the process of undertaking a review of existing offshore wind leases, as directed by the President. *See* Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects § 1, 90 Fed. Reg. 8363, 8363 (Jan. 29, 2025). But the fact that national security concerns arose as part of, or coincidently with, that review does not demand that the Court assess the Suspension Order any differently than it normally would—by determining whether the administrative record supports BOEM's decision. *See Dep't of Commerce*, 588 U.S. at 780. Nor do other courts' preliminary assessments of orders for other projects (*see* NY Br. 28–29) provide evidence that something else was afoot. Demonstrating pretext requires more than supposition. *See Dep't of Commerce*, 588 U.S. at 782–85 (discussing evidence).

Empire and New York point to three other things as supposed evidence of pretext. None has merit.

First, New York points to the fact that nearly a month passed between the Interior's receipt of the new information from the Department of War and the Suspension Order. NY Br. 29; *see* Empire Br. 35. But an agency's deliberation of an issue over several weeks hardly evidences pretext; indeed, it evidences the contrary. In making this point, New York relies on a post-decisional letter from Empire to BOEM. *See* NY Br. 29 n.16 (citing Ex. 1 to Empire Opp'n to

Defs.' Mot. to Stay, Dkt. No. 45-1). New York's tardy request to put that letter before the Court for purposes of summary judgment fails for the same reasons as New York's other requests. Fed. Defs' Opp'n to Pl.'s Mots. to Complete Admin R. 10–14. But in any event, Empire's views of its interactions with BOEM *since* the Suspension Order shed no light on information before BOEM *at the time of* the Suspension Order. The Court's inquiry, of course, focuses on the latter. *Ctr. for Auto Safety v. Fed. Highway Admin.*, 956 F.2d 309, 314 (D.C. Cir. 1992).

Second, New York references an August 2025 Department of the Interior Secretarial Order governing review of proposed energy projects. NY Br. 8, 30. But Empire is not a proposed energy project. It has received all necessary Interior permits. AR0035. The Secretarial Order is not relevant here.

Third, Empire points to two documents in the administrative record. Empire Br. 39–40 (citing AR0037–40, AR0033). The first, AR0037–40, refers to Interior M-Opinion 37086. *See* AR0037. That M-Opinion directed Interior components to re-evaluate decisions that had been made in reliance on a prior interpretation of an OCSLA provision, 43 U.S.C. § 1337(p)(4). *See* M-37086, Withdrawal of Solicitor's Opinion M-37067 and Reinstatement of M-Opinion 37059, Secretary's Duty to Prevent Interference with Reasonable Uses of Exclusive Economic Zone, the High Seas, and the Territorial Seas in Accordance with Outer Continental Shelf Lands Act Subsection 8(p), Alternate Energy-related Uses on the Outer Continental Shelf (May 1, 2025), available at https://www.doi.gov/solicitor/opinions. Subs

ection 1337(p)(4) also touches on national security. *See* 43 U.S.C. § 1337(p)(4)(F). But the fact that BOEM was also, per an agency directive, re-evaluating its prior conclusion under § 1337(p)(4) as to national security implications known at the time of approval does not undercut

BOEM's reliance on any additional materials from the Department of War. Indeed, AR0037 predates Interior's receipt of the new materials by six months.

Empire calls out the second document, AR0033, as "provid[ing] no legitimate support" for its assertions about national security risks. Empire Br. 40. But as Empire points out, the document post-dates the new Department of War materials (Empire Br. 40) and appears to be an attempt to provide a non-classified summary of potential concerns. *See* AR0033.

Empire and New York have not shown any unlawful pretext for the Suspension Order and have not otherwise met their burden to show arbitrary decision-making. The Suspension Order therefore should be upheld.

### C.    Empire Has Not Established a Violation of the APA's Procedural Requirements.

Empire has not established that the Suspension Order contravenes 5 U.S.C. § 558(c). That section does not allow suspension of a license without certain procedural protections, *except* where "public health, interest, or safety requires otherwise." 5 U.S.C. § 558(c). This exception can apply when national security risks are involved. *China Telecom*, 57 F.4th at 269 (finding plaintiff "d[id] not effectively refute" argument that "the national security imperatives [at issue] could have allowed the Commission to proceed immediately to a decision . . . on the basis that public health, interest, or safety require[d] doing so" (internal quotations omitted)). As BOEM explained here, the suspension resulted from the materials provided by the Department of War "regarding the national security implications of offshore wind projects." AR0001. Empire argues the exception to section 558(c) for "public health, interest, or safety" does not apply given the time between BOEM's receipt of the new materials from the Department of War and issuance of the Suspension order. But was not unreasonable that BOEM took time to review the information and decide necessary next steps. Empire Br. 45. Empire also argues that national security did not warrant

39

action from BOEM; this argument is simply a reframing of their arbitrary and capricious argument. *Id.* That argument fails for the reasons discussed above, and summary judgment should be granted in Defendants' favor.

### D.       Empire Has Not Established a Due Process Violation.

Finally, Empire has not established a due process violation. As an initial matter, property interests protected by the Fifth Amendment "are created and their dimensions are defined by existing rules or understandings that stem from an independent source[.]" *McKinney v. Dist. of Columbia*, 142 F.4th 784, 793 (D.C. Cir. 2025) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)), *rehearing denied en banc*, No. 24-7027, 2025 WL 2551713 (D.C. Cir. Aug. 29, 2025)). Any property interest for Empire arises under Subsection 1337(p), BOEM's regulations, and the resulting lease. *See* 43 U.S.C. § 1337(p)(1). Empire itself describes its expectation regarding its property interest as being "based on the rules in place (*i.e.*, OCSLA, BOEM's implementing regulations, and the terms of its COP Approval) and the terms of [its] lease[.]" Empire Br. 25. Empire's lease acknowledges that the rights conveyed therein are subject to 43 U.S.C. § 1337(p) and the regulations at 30 C.F.R. Part 585. AR0043. Empire's argument that it was deprived of a protected property interest thus relies on its argument that BOEM did not have authority to suspend its lease. As discussed above, the Suspension Order was issued under 30 C.F.R. § 585.417 and a valid exercise of the authority granted by 43 U.S.C. § 1337(p)(4) and (5).

Even if Empire had been deprived of a protected property interest, pre-deprivation process is not always required by the Due Process Clause. BOEM acknowledges it did not provide Empire with process before issuing the Suspension Order. But due process is "flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). Post-deprivation procedural protections may be sufficient "where some valid

governmental interest is at stake[.]" *N.B. et al. v. District of Columbia*, 244 F. Supp. 3d 176, 183 (D.D.C. 2017) (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993)); *see also Gilbert v. Homar*, 520 U.S. 924, 930 (1997). In determining whether post-deprivation procedural safeguards are sufficient, courts balance the private interest affected, the risk of erroneous deprivation, and the government's interest, "including the function involved and the fiscal and administrative burdens" that process would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

"It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Sec'y of State*, 378 U.S. 500, 509 (1964)). "The government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality." *Snepp v. United States*, 444 U.S. 507, 509 n.3 (1980). Empire again points to the "multiple weeks" between BOEM's receipt of materials from the Department of War and BOEM's issuance of the Suspension Order. Empire Br. 29. But again, it was not unreasonable for BOEM to take time to review the materials received from the Department of War and decide necessary next steps. Nor was it unreasonable that BOEM did not immediately share classified national security materials with a private company. *See id.*

The other two *Mathew* factors do not mandate pre-deprivation process. In discussing the private interest at stake, Empire treats the Suspension Order as if it were a permanent cancellation of its lease. Empire Br. 28. But BOEM did not cancel the lease or revoke the Empire Wind COP approval. Rather, BOEM temporarily suspended activities on the lease to allow for consideration of materials received from the Department of War and to explore potential mitigation. AR0001. And Empire's discussion of the risk of erroneous deprivation does not reflect that the point of the

41

suspension period was in part to facilitate discussions with Empire. Empire Br. 28-29. This point is especially relevant given Empire's effort to portray the Suspension Order as a permanent deprivation of its lease (which it was not).

Finally, consideration of Empire's process-based claims emphasizes the mootness of this case. The Suspension Order notified Empire of BOEM's general issue of concern and that BOEM is contemplating action regarding the Project. AR001. And the point of the suspension period was to allow consideration of that information and coordination with Empire. *Id.* Notice- and process-based claims against any further action by BOEM regarding the Empire Project would therefore require a substantially different analysis based on different facts. Any ruling on whether the Suspension Order complied with constitutional and APA procedural requirements would purely be an advisory opinion without consequence for potential future BOEM actions. Empire's Due Process and APA process claims, as well as the rest of Empire and New York's complaints, should therefore be dismissed as moot. *See supra* at 7–12.

## CONCLUSION

The Suspension Order expired on its own terms on March 22, 2026.  As a result, these consolidated cases are now moot and the complaints should be dismissed without prejudice. If the Court reaches the merits, summary judgment should be granted in favor of Federal Defendants.

 June 16, 2026

<div style="margin-left:40%">

STANLEY E. WOODWARD, JR.
Associate Attorney General

JOHN K. ADAMS
Deputy Associate Attorney General

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

</div>

42

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General

 s/ Kristofor R. Swanson 
KRISTOFOR R. SWANSON
(Colo. Bar. No. 39378)
AMANDA K. RUDAT
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 598-1937 (Swanson)
kristofor.swanson@usdoj.gov

*Attorneys for Federal Defendants*

43