# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EMPIRE LEASEHOLDER LLC, and EMPIRE OFFSHORE WIND LLC, <br><br> Plaintiffs, <br><br>      v. <br><br> DOUGLAS J. BURGUM, et al., <br><br> Defendants. | Case No. 1:26-cv-004-CJN |
| STATE OF NEW YORK, et al., <br><br> Plaintiffs, <br><br>      v. <br><br> DOUGLAS J. BURGUM, et al., <br><br> Defendants. | Case No. 1:26-cv-071-CJN (consolidated) |

## REPLY IN SUPPORT OF FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

ARGUMENT ....................................................................................................................... 1

    I.      The Complaints Are Moot and Should be Dismissed............................................. 1

    II.    Summary Judgment Should be Granted to Federal Defendants on the
          Merits. ................................................................................................................... 6

          A.    BOEM Had Authority to Issue the Suspension Order. ............................... 6

                  1.    Subsection 1337(p) Grants Interior Broad Authority to
                          Suspend Leases Issued Under That Subsection, Including
                          Wind Leases. ................................................................................... 6

                  2.    Subsection 1337(p)(5)'s Grant of Authority Is Distinct from,
                          and in Addition to, the Suspension Authority Granted in
                          Subsection 1334(a). ...................................................................... 11

                  3.    Interior's Authority Under Subsection 1337(p) Is Not
                          Limited by Subsection 1341(c). .................................................... 14

          B.    Plaintiffs Have Not Met Their Burden to Show an APA Violation. ........ 17

          C.    Empire Has Not Established a Violation of the APA's Procedural
              Requirements. ......................................................................................... 20

          D.    Empire Has Not Established a Due Process Violation. ........................... 22

CONCLUSION.................................................................................................................... 24

i

# TABLE OF AUTHORITIES

**PAGE(S)**

**Cases**

*Air N. Am. v. Dep't of Transp.*,
937 F.2d 1427 (9th Cir. 1991) ................................................................................ 21

*Alphabet Workers Union-Commc'n Workers of Am. v. NLRB*,
134 F.4th 1217 (D.C. Cir. 2025) ............................................................................. 4

*Am. Forest Res. Council v. Williams*,
96 F.4th 417 (D.C. Cir. 2024) ............................................................................. 2, 5

*Bittner v. United States*,
598 U.S. 85 (2023) ................................................................................................. 8

*Campbell v. Clinton*,
203 F.3d 19 (D.C. Cir. 2000) ................................................................................. 5

*Chafin v. Chafin*,
568 U.S. 165 (2012) ............................................................................................... 1

*Changji Esquel Textile Co. v. Raimondo*,
40 F.4th 716 (D.C. Cir. 2022) .............................................................................. 16

*China Telecom (Ams.) Corp. v. FCC*,
57 F.4th 256 (D.C. Cir. 2022) ......................................................................... 21, 22

*City of Houston v. Dep't of Hous. & Urban*,
*Develop.*, 24 F.3d 1421 (D.C. Cir. 1994) ............................................................... 2

*Conyers v. Reagan*,
765 F.2d 1124 (D.C. Cir. 1985) ............................................................................. 4

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
143 F.4th 518 (D.C. Cir. 2025) .......................................................................... 2, 3

*Del Monte Fresh Produce Co. v. United States*,
570 F.3d 316 (D.C. Cir. 2009) ............................................................................ 4, 5

*DeNaples v. Office of the Comptroller of the Currency*,
706 F.3d 481 (D.C. Cir. 2013) ............................................................................. 16

*Dep't of Comm. v. New York*,
588 U.S. 752 (2019) ............................................................................................. 20

*Enbridge Energy, LP v. Nessel ex rel. Michigan*,
146 S. Ct. 1074 (2026) ...................................................................................... 8, 13

*Fares v. Smith*,
901 F.3d 315 (D.C. Cir. 2018) ............................................................................. 23

*FBI v. Fikre,*
  601 U.S. 234 (2024)..................................................................................................... 4

*FDA v. Wages & White Lion Inv., LLC,*
  604 U.S. 542 (2025)................................................................................................... 19

*Fed. Trade Comm'n v. Raladam Co.,*
  283 U.S. 643 (1931)..................................................................................................... 9

*Finberg v. Sullivan,*
  634 F.2d 50 (3d Cir. 1980) ......................................................................................... 4

*Ford v. Mabus,*
  629 F.3d 198 (D.C. Cir. 2010)..................................................................................... 7

*Friends of the Earth v. Haaland,*
  583 F. Supp. 3d 113 (D.D.C. 2022).......................................................................... 13

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
  528 U.S. 167 (2000)..................................................................................................... 3

*Fund for Animals, Inc. v. BLM,*
  460 F.3d 13 (D.C. Cir. 2006)....................................................................................... 2

*Harbison v. Bell,*
  556 U.S. 180 (2009)..................................................................................................... 9

*Hecht v. Ludwig,*
  82 F.3d 1085 (D.C. Cir. 1996)................................................................................... 20

*Hornbeck Offshore Servs., LLC v. Salazar,*
  696 F. Supp. 2d 627 (E.D. La. 2010)........................................................................ 13

*Louisiana v. Biden,*
  622 F. Supp. 3d 267 (W.D. La. 2022) ...................................................................... 13

*Mathews v. Eldridge,*
  424 U.S. 319 (1976)................................................................................................... 23

*Morrissey v. Brewer,*
  408 U.S. 471 (1972)................................................................................................... 23

*N.B. v. District of Columbia,*
  244 F. Supp. 3d 176 (D.D.C. 2017).......................................................................... 23

*Nat'l Oilseed Processors Ass'n v. Browner,*
  924 F. Supp. 1193 (D.D.C. 1996).............................................................................. 20

*Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv.,*
  416 F. Supp. 2d 92 (D.D.C. 2006).......................................................................... 7, 8

*National Council of Resistance of Iran v. Department of State,*
  251 F.3d 192 (D.C. Cir. 2001)................................................................................... 18

iii

*PETA v. Gittens*,
    396 F.3d 416 (D.C. Cir. 2025) .................................................................................... 5, 6

*PETA v. U.S. Fish & Wildlife Serv.*,
    59 F. Supp. 3d 91 (D.D.C. 2014) ..................................................................................... 2

*Pharmachemie B.V. v. Barr Lab'ys., Inc.*,
    276 F.3d 627 (D.C. Cir. 2002) ........................................................................................ 5

*Ranch v. Noem*,
    805 F. Supp. 3d 288 (D.D.C. 2025) .............................................................................. 22

*Rason v. Nicholson*,
    562 F. Supp. 2d 153 (D.D.C. 2008) .............................................................................. 23

*Scotts Valley Band of Pomo Indians v. Burgum*,
    808 F. Supp. 3d 1 (D.D.C. 2025) .................................................................................... 3

*Sec. & Exch. Comm'n v. Familant*,
    910 F. Supp. 2d 83 (D.D.C. 2012) ............................................................................... 12

*Spencer v. Kemna*,
    523 U.S. 1 (1998) ............................................................................................................. 4

*United States v. James Daniel Good Real Prop.*,
    510 U.S. 43 (1993) ......................................................................................................... 23

*United States v. Mendoza*,
    464 U.S. 154 (1984) ....................................................................................................... 22

*United States v. Naftalin*,
    441 U.S. 768 (1979) ..................................................................................................... 7, 8

*West Virginia v. EPA*,
    597 U.S. 697 (2022) ....................................................................................................... 11

**Statutes**

22 U.S.C. § 7205(a)(1) ........................................................................................................... 5

43 U.S.C. § 1334(a)(2)(A) .................................................................................................... 13

43 U.S.C. § 1337(a) .............................................................................................................. 11

43 U.S.C. § 1337(b)(5) ........................................................................................................... 8

43 U.S.C. § 1337(p)(5) ....................................................................................................... 5, 7

43 U.S.C. § 1337(p)(8) ......................................................................................................... 15

43 U.S.C. § 1341(c) .............................................................................................................. 15

5 U.S.C. § 558(c) ............................................................................................................ 20, 21

50 U.S.C. § 4811(2)(A) ........................................................................................................ 16

iv

50 U.S.C. § 4813(a)(16).................................................................................................. 15

50 U.S.C. § 4813(a)(2).................................................................................................... 16

**Regulations**

30 C.F.R. § 550.181(d) ................................................................................................. 13

30 C.F.R. § 550.184 ....................................................................................................... 13

30 C.F.R. § 585.417 ..................................................................................................... 5, 9

30 C.F.R. § 585.417(b) .............................................................................................. 1, 6, 11

30 C.F.R. § 585.421(b) .................................................................................................... 5

30 C.F.R. Part 585.......................................................................................................... 7

**Other Authorities**

*Renewable Energy & Alternate Uses of Existing Facilities on the OCS*, 74 Fed. Reg. 19,638
   (Apr. 29, 2009).......................................................................................................... 9

*Renewable Energy Modernization Rule*, 89 Fed. Reg. 42,602 (May 15, 2024) ........................... 10

**INTRODUCTION**

The complaints are moot and should be dismissed. The Suspension Order that Empire and New York have challenged expired on March 22 on its own terms, meaning there is no longer any effectual relief available against the Order. And neither of the exceptions to the mootness doctrine applies. Should the Court reach the merits, summary judgment should be granted in favor of Federal Defendants. Subsection 1337(p) of the Outer Continental Shelf Lands Act (OCSLA) and its implementing regulations provide the Bureau of Ocean Energy Management (BOEM) authority to suspend ongoing lease activities for national security reasons. Empire's arguments to the contrary ignore the plain statutory text and misapply the canons of statutory construction. Neither Empire nor New York has met its burden to show that BOEM acted arbitrarily or capriciously under the Administrative Procedure Act (APA). And Empire has also failed to demonstrate any violation of its rights to process.

**ARGUMENT**

I.      **The Complaints Are Moot and Should be Dismissed.**

The December 22 Suspension Order plainly stated that "[BOEM] is issuing this Director's Order to Empire Leaseholder LLC, pursuant to 30 C.F.R. § 585.417(b), to suspend all ongoing activities related to the Empire Wind 1 Project on the Outer Continental Shelf *for the next 90 days* for reasons of national security." AR0001 (emphasis added). That 90-day period ended on March 22.

Plaintiffs' claims are thus moot. Fed. Defs.' Mem. in Support of Summ. J. (Fed. Defs.' Mem.) 7–12, Dkt. No. 59-1. Vacatur or a permanent injunction against the Order would not provide Plaintiffs any effectual relief because activities are no longer suspended under the Order. *See Chafin v. Chafin*, 568 U.S. 165, 172 (2012). And neither exception to the mootness doctrine

1

applies.  BOEM did not voluntarily withdraw the Order to avoid its review by a court; the Order expired on its own terms.  And while a future order is certainly possible, there is no indication that such an order would avoid judicial review and, regardless, would be a new and separate agency action.

Empire's contrary arguments largely ignore the facts and the law.  *See* Empire's Reply in Supp. of Mot. for Summ J. and Opp'n to Fed. Defs.' Cross-Mot. for Summ. J. (Empire Resp.) 3–11, Dkt. No. 61.

As to the threshold question of mootness, Empire points out that a case is not moot so long as some form of effectual relief remains possible.  Empire Resp. 3 (citing *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 143 F.4th 518, 526 (D.C. Cir. 2025)).  But Empire never explains what that effectual relief would be here.  Instead, Empire posits that "the Suspension Order itself did not expire when the initial 90-day suspension period ended."  Empire Resp. 4.  The Suspension Order, of course, plainly says the opposite.  *See* AR0001.  Despite Empire's protests, it was not necessary for BOEM to "rescind" or "withdraw" the Order for it to become moot.  Empire Resp. 5.  The cases that Empire attempts to distinguish illustrate that, when the plaintiff seeks only prospective relief (as Empire does here), a challenge to sunsetting agency action becomes moot when the action expires on its own terms.  *Am. Forest Res. Council v. Williams*, 96 F.4th 417, 420–21 (D.C. Cir. 2024) (challenge to rules delaying the effective date of a prior rule moot when the "delay rules" expired); *Fund for Animals, Inc. v. BLM*, 460 F.3d 13, 22 (D.C. Cir. 2006) (challenges to specific wild horse gathers moot after the gathers were completed); *City of Houston v. Dep't of Hous. & Urban Develop.*, 24 F.3d 1421, 1426–27 (D.C. Cir. 1994) (challenge to reallocation of grant funds moot after appropriations providing the funds expired and all funds were otherwise disbursed); *PETA v. U.S. Fish & Wildlife Serv.*, 59 F. Supp. 3d 91, 95 (D.D.C.

2

2014) (challenges to export-import permits "clearly moot" when the permits expired); *accord Crowley*, 143 F.4th at 525–32 (finding contract expiration did not moot challenge to contract audits because plaintiff had claims in separate court seeking retrospective monetary relief and because plaintiff also challenged the policy that led to the audits).

It is certainly true that BOEM continues to review national security concerns associated with the Project. BOEM's ongoing review, however, is not what gave rise to the controversy. The controversy arose from the Order's suspension of activities on the lease. *See* Empire Compl. ¶ 1, Dkt. No. 3 ("This case challenges an action by the United States that unlawfully suspends the development of the Empire Wind Project, . . . ."); NY Compl. ¶ 1, Dkt. No. 1 in 26-cv-71 ("The State brings this action to challenge . . . the December 22, 2025, order . . . to 'suspend all ongoing activities related to [the Empire Wind Project] on the Outer Continental Shelf for the next 90 days for reasons of national security.'"). Indeed, the start of a reconsideration or review process does not even constitute a reviewable final agency action in the first place. *Scotts Valley Band of Pomo Indians v. Burgum*, 808 F. Supp. 3d 1, 13–14 (D.D.C. 2025) (discussing D.C. Circuit case law). Empire itself acknowledges that "[w]hether BOEM chooses to take action under a new suspension order is purely hypothetical." Empire Resp. 4. But hypothetical future action cannot revive a challenge to an expired action.

The only real question is therefore whether one of the two exceptions to the mootness doctrine applies. Neither does.

Starting with voluntary cessation, and as Empire recognizes, the exception is implicated only when the defendant has *unilaterally halted* the challenged conduct *in order to evade review*. Empire Resp. 10 (citing *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190–91 (2000)). BOEM has done neither here. Empire submits that BOEM needs to "prov[e]

3

the challenged conduct *cannot* reasonably be expected to recur." Empire Resp. 10 (citing *FBI v. Fikre*, 601 U.S. 234, 241–42 (2024)). But that burden is triggered only if the party has in fact halted its conduct. *See Fikre*, 601 U.S. at 241 ("[A] defendant's *voluntary cessation of a challenged practice* will moot a case only if the defendant can show that the practice cannot reasonably be expected to recur." (cleaned up and emphasis added)). In any event, "courts have declined to apply the [voluntary cessation] doctrine when the facts do not suggest any 'arguable manipulation of [court] jurisdiction.'" *Alphabet Workers Union-Commc'n Workers of Am. v. NLRB*, 134 F.4th 1217, 1227 (D.C. Cir. 2025). Here, BOEM did not take any action at all to withdraw the Suspension Order, let alone attempt to manipulate the judicial process. The voluntary cessation exception is not applicable.

The same is true of the exception for actions that are capable of repetition but avoid review. That is because any future order—even if it could be considered a repetition of the present one— would not evade review under D.C. Circuit precedent. The plaintiff holds the burden to show the "exceptional circumstance[s]" in which the exception would apply. *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 322 (D.C. Cir. 2009) (quoting *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)). Empire has not done so.

In the D.C. Circuit, the "evading review" aspect of the test is only triggered if the action's short life is "typical of the challenged action." *Del Monte*, 570 F.3d at 322 (citation omitted). "[T]he proper inquiry is whether the challenged activity is by its *very nature short in duration*, so that it could not, or probably would not, be able to be adjudicated while fully live." *Conyers v. Reagan*, 765 F.2d 1124, 1129 (D.C. Cir. 1985) (cleaned up) (citing *Finberg v. Sullivan*, 634 F.2d

4

50, 55 (3d Cir. 1980)).[1]  For example, in *Del Monte*, the time limitation was inherent in the governing regulations.  *See* 570 F.3d at 318–19 (referencing 22 U.S.C. § 7205(a)(1)).[2]

Empire recognizes this standard (Empire Resp. 7–8) but ignores its significance here. Empire puts much weight on the four other suspension orders issued on December 22.  But the time limitation in those orders (like Empire's) derived from the factual circumstances before BOEM, not because of an inherent temporal limitation on such orders.  Empire does not dispute that the governing statute and regulations do not inherently limit the duration of suspension orders such that a court is unlikely to ever review one.  43 U.S.C. § 1337(p)(5); 30 C.F.R. §§ 585.417, 585.421(b) .  That should end the analysis under the exception.  *Am. Forest Res. Council*, 96 F.4th at 421 (finding exception did not apply where plaintiff had "no[t] shown" that agency "rules such as those at issue in this case typically expire within two years").

In any event, as we have explained (Fed. Defs.' Mem. 11), it is the legal questions at issue in the case that must be "capable of repetition" under the exception.  *See PETA v. Gittens*, 396 F.3d 416, 422–23 (D.C. Cir. 2025).  In an APA case, those legal questions necessarily turn on the administrative record before the agency action.  Here, BOEM's factual review of national security

---

[1] Our opening brief cited *Campbell v. Clinton*, 203 F.3d 19, 34 (D.C. Cir. 2000), to describe this standard as requiring that the action must "inherently" avoid review.  Fed. Defs.' Mem. 10. Though we correctly stated the law, the pin cite comes from Judge Randolph's concurring opinion in that case.  *Conyers* is the D.C. Circuit precedent Judge Randolph relied upon, *Campbell*, 203 F.3d at 34, as the Circuit has continued to do.  *See, e.g.*, *Pharmachemie B.V. v. Barr Lab'ys., Inc.*, 276 F.3d 627, 633 (D.C. Cir. 2002).

[2] *Del Monte* began as an unreasonable delay case.  570 F.3d at 320. The mootness issue arose because the government granted the application at issue.  *Id.*  The plaintiff had amended its complaint to challenge the agency action, but still alleged that it had been unreasonably delayed. *Id.*  As to mootness, the operative complaint alleged "the time required to litigate the case was longer than the mandatory deadlines and the time necessary for the government to review the application."  *Id.*  The Circuit concluded that the plaintiff-appellant's "challenge thus meets the evading-review prong of the exception." *Id.* at 322.

issues continues.  And Empire Wind concedes it has submitted additional information to BOEM.

"[A] 'legal controversy so sharply focused on a unique factual context' would rarely" be capable

of repetition.  *PETA*, 396 F.3d at 424 (citation omitted).  The complaints are moot and should be

dismissed.

## II.    Summary Judgment Should be Granted to Federal Defendants on the Merits.

Even if the complaints were not moot, summary judgment should be granted in favor of

Federal Defendants.  OCSLA provides BOEM with authority needed to issue the Suspension

Order, and Empire and New York have not met their burden to demonstrate that BOEM acted

arbitrarily or (in Empire's case) violated Empire's process rights.

### A.    BOEM Had Authority to Issue the Suspension Order.

BOEM acted within its authority under OCSLA in issuing the Suspension Order. As

explained in Federal Defendants' opening brief, Subsection 1337(p) grants Interior broad authority

to suspend leases issued under that subsection for national security reasons.  Empire's reply brief

fails to meaningfully grapple with the text of Subsection 1337(p) or its history. Further, the

arguments in Empire's reply regarding Subsections 1334(a) and 1341(c) misapply canons of

statutory construction and fail to engage with Federal Defendants' key arguments.

### 1.    Subsection 1337(p) Grants Interior Broad Authority to Suspend Leases Issued Under That Subsection, Including Wind Leases.

Empire's argument that "nothing in the plain language of Section 1337(p) even suggests . . .

that Congress intended to create free standing suspension authority," Empire Resp. 11, ignores

Subsection 1337(p)'s text and turns a blind eye to that subsection's history and differences from

neighboring subsections.  The text of Subsection 1337(p)(5) provides BOEM with broad authority

to promulgate regulations for the suspension of leases to protect national security, which BOEM

has done through 30 C.F.R. § 585.417(b).  *See* Fed. Defs.' Mem. 12–17.  Indeed, Empire's opening

6

brief did not dispute that Subsection 1337(p)(5) granted BOEM authority to issue the regulations at 30 C.F.R. Part 585, which include Subsection 585.417(b). Statement of P. A. in Supp. of Empire's Mot. for Summ. J. (Empire Mem.) 21–22, Dkt. No 55-1.  Empire's arguments to the contrary now are unavailing.

Empire continues to press a strained reading of Subsection 1337(p) that is unsupported by the text itself.  In Subsection 1337(p)(5), Congress directs that Interior "shall provide for the duration, issuance, transfer, renewal, *suspension*, and cancellation of a lease . . . under this subsection." 43 U.S.C. § 1337(p)(5) (emphasis added).  Congress also directs Interior to "ensure that any activity under this subsection is carried out in a manner that provides for" several enumerated factors, including "protection of national security interests of the United States[,]" and "issue *any* necessary regulations to carry out this subsection." *Id.* § 1337(p)(4), (p)(8) (emphasis added). "'Any' . . . means any." *Ford v. Mabus*, 629 F.3d 198, 206 (D.C. Cir. 2010) (citation omitted).  And Subsection 1337(p)(4) refers directly to activities carried out under the subsection, not lease terms.

To escape Subsection 1337(p)'s clear meaning, Empire attempts to add to the text.  Empire seeks to add the qualifier "in the context of granting authorizations" to Subsection 1337(p)(5)'s instruction to Interior to "provide for the . . . suspension, and cancellation of a lease[.]"  Empire Resp. 13 (citation omitted).  But "Congress did not write the statute that way[,]" *United States v. Naftalin*, 441 U.S. 768, 773 (1979), and the Court cannot "read into [the statute] what is not stated therein," *Nat'l Women, Infants, & Children Grocers Ass'n v. Food & Nutrition Serv.*, 416 F. Supp. 2d 92, 100 (D.D.C. 2006).  A natural reading of the subsection is that Interior was to "provide for" suspension of a lease via the regulations to be promulgated under Subsection 1337(p)(8).  There

7

is simply no reading of Subsections 1337(p)(4) and (5) that limits their application (or the application of regulations promulgated under Subsection 1337(p)(8)) to lease issuance.

Without such a textual limit, Empire presents its policy view that some of the factors in Subsection 1337(p)(4) are best addressed (or can only be addressed) prior to lease issuance. Empire Resp. 14.  As an initial matter, Empire Wind only addresses some of the factors, not all of them.  *See id.*  But in any event, Empire Wind's proposed reading of the Subsection 1337(p)(4) factors is at odds with the statute's logical construction given that the text includes no such limitation.  *See* Fed. Defs.' Mem. 16.  And even if some of the factors in Subsection 1337(p)(4) are more naturally addressed before issuance of a lease or approval of a plan, that is not evidence that Congress intended a pre-lease limitation on Interior's consideration of *all* the Subsection 1337(p)(4) factors.  Indeed, the text and history of the statute supports the opposite conclusion— that Interior's authority is ongoing.

The absence of language limiting the application of Subsection 1337(p) to lease issuance can be directly contrasted with the provisions in Subsection 1337(b) governing oil and gas leases. Empire's response tellingly ignores this argument.  Subsection 1337(b) contains the exact limiting language Empire looks to inject into Subsection 1337(p)—Congress specifically provided that "[t]*erms and provisions* of oil and gas leases" shall "provide for suspension or cancellation of the lease." 43 U.S.C. § 1337(b)(5) (emphasis added). That Congress did not include the same limiting language in Subsection 1337(p) is evidence that Congress intended "a difference in meaning." *Enbridge Energy, LP v. Nessel ex rel. Michigan*, 146 S. Ct. 1074, 1083–84 (2026) (quoiting *Bittner v. United States*, 598 U.S. 85, 94 (2023)).  Thus, not only did "Congress . . . not write" Subsection 1337(p) "th[e] way" Empire argues, the statute itself shows Congress knew how to write it that way and did not.  *Naftalin*, 441 U.S. at 773.

With respect to Subsection 1337(p)'s history, Empire erroneously treats as "speculation" our discussion of the obvious implications of Congress removing language tying Interior's responsibilities under Subsection 1337(p) to lease issuance.  Empire Resp. 23 n.15.  Empire argues that we "offer[] no evidence" of "why the amendments were made." *Id.* at 15.  But "Congress' intent is found in the words it has chosen to use."  *Harbison v. Bell*, 556 U.S. 180, 198 (2009) (Thomas, J., concurring).   Congress's removal of language that would have explicitly tied Interior's authority under Subsection 1337(p) to lease issuance is itself evidence that Congress intended to provide broader authority through the enacted text, which contains no such language. *See* Fed. Defs.' Mem. 15-16; *see also Fed. Trade Comm'n v. Raladam Co.*, 283 U.S. 643, 648 (1931) (discussing amendments to language in original bill in interpreting statute).

Empire next resorts to arguing that "Interior itself previously speculated that the changes may have been 'in response to states' concern over the protection of coastal areas and near-shore waters,' which is directly inconsistent with BOEM's current position that the changes were made to provide it with *more* authority than what was contemplated by earlier versions of the bill." Empire Resp. 15 (quoting M-Opinion 37059 at 7).[3]  Nothing in M-Opinion 37059 is inconsistent with our interpretation of Subsection 1337(p)'s history here.  That M-Opinion did not address whether Subsection 1337(p) grants Interior authority to suspend wind energy leases after those leases are issued.  The regulatory history behind 30 C.F.R. § 585.417, on the other hand, reflects that Interior has interpreted Subsection 1337(p) as providing Interior with authority to promulgate suspension regulations in addition to authority to issue leases.  Renewable Energy & Alternate Uses of Existing Facilities on the OCS, 74 Fed. Reg. 19,638, 19,638 (Apr. 29, 2009) (explaining

---

[3]  M-Opinion 37059 is available at https://www.doi.gov/sites/default/files/m-37059.pdf (last visited August 13, 2026).

9

that "in addition to providing the authority to issue leases," the Energy Policy Act of 2005 "included a requirement that any activity permitted under this authority" be carried out in a manner that provides for the interests articulated in Subsection 1337(p)(4)); Renewable Energy Modernization Rule, 89 Fed. Reg. 42,602, 42,663 (May 15, 2024) (stating that the Energy Policy Act of 2005 "authorized [] Interior [] to establish a program for renewable energy activities on the OCS and to promulgate any necessary regulations to carry out that program" in response to comments that BOEM's suspension and cancellation regulations exceeded statutory authority); *see also, e.g.*, Comments of Responsible Offshore Development Alliance on Renewable Energy Modernization Rule 10 (Mar. 31, 2023) (arguing in comment to proposed rule that language in suspension regulation "varies significantly from" the language in Section 1334(a)(1)), *available at* https://www.regulations.gov/comment/BOEM-2023-0005-0113 (last visited Aug. 13, 2026).

Further, States' concerns about lack of control over permitted facilities would, if anything, support a reading of Subsection 1337(p) under which the government retains more extensive, continuing control over permitted activities—not less. States do not have regulatory authority over the OCS that would be displaced by more extensive federal regulatory authority. Thus, to the extent M-Opinion 37059 and the Congressional Record citations therein are useful at all, Empire has only identified additional Congressional history undercutting its own restrictive reading of Subsection 1337(p).

Finally, Federal Defendants do not dispute that wind energy leases are subject to generally applicable OCSLA provisions to the extent Subsection 1337(p) does not grant subsection-specific authority. But it does not follow that Subsection 1337(p)(5) is solely concerned with granting leases, as Empire suggests. Empire Resp. 12–14. For the reasons discussed above and in our opening brief, that conclusion is contradicted by the Subsection's plain text and context. Congress

10

can and has provided ongoing suspension authority for leases issued under Subsection 1337(p)(1) that is in addition to the generally applicable suspension provisions relied on by Empire. As mentioned above, Empire offers no response to Congress's explicit language tied to oil and gas lease issuance in Subsection 1337(b) and the absence of such language in Subsection 1337(p). Empire also relies heavily on Subsection 1337(p)'s interplay with Subsections 1334(a) and 1341(c), neither of which limit Interior's authority under Subsection 1337(p) for reasons discussed more fully below.[4]

To be sure, Congress typically "does not hide 'elephants in mouseholes.'" Empire Resp. 15 (quoting *West Viriginia v. EPA*, 597 U.S. 697, 746 (2022) (Gorsuch, J., concurring)). But that has no bearing here because our reading flows from the plain text. Subsection 1337(p) clearly grants Interior broad authority to issue regulations providing for suspension of leases on national security grounds in addition to authority to issue leases in the first instance. Interior promulgated such a regulation at 30 C.F.R. § 585.417(b). Regardless of whether that regulation was reasonably applied here in compliance with the APA (which, as discussed below, it was), it is authorized by OCSLA.

### 2. Subsection 1337(p)(5)'s Grant of Authority Is Distinct from, and in Addition to, the Suspension Authority Granted in Subsection 1334(a).

The suspension authority in Subsection 1337(p) is not constrained by any limitations in the generally applicable suspension authority found in Subsection 1334(a). Subsection 1334(a) provides generally applicable authority to suspend leases issued under OCSLA, which includes leases authorized by provisions other than Subsection 1337(p)(1), such as oil and gas and sulphur leases. *See* 43 U.S.C. § 1337(a), (i). And nothing in the statute indicates that Congress intended

---

[4] Empire argues that Federal Defendants' interpretation "works at cross purposes with Section 1331 and 1334." Empire Resp. 13–14. Section 1331 is OCSLA's "definitions" section. We assume Empire meant to refer to Sections 1334 and 1341.

for Section 1334 to limit the suspension of leases issued under Subsection 1337(p)(1). Fed. Defs.' Mem. 17–19.

In response, Empire misapplies cannons of construction and, in doing so, fails to engage with Federal Defendants' key arguments. Empire argues that "BOEM's finding of a duplicative Section 1337(p) suspension authority would allow it to suspend leases without following any of the explicit suspension requirements of Section 1334(a), rendering that provision a nullity." Empire Resp. 16. We assume Empire is referring to the surplusage cannon. But just because a statutory provision is unnecessary for Interior to rely on in a specific situation does not mean the provision is surplusage as that term is used in canons of statutory construction. *See Sec. & Exch. Comm'n v. Familant*, 910 F. Supp. 2d 83, 95 (D.D.C. 2012). As we explained, even if the suspension authority in Subsection 1334(a) were more limited than that granted by Subsection 1337(p), there would be "no surplusage problem . . . because any limitations in Section 1334 would still apply to activities falling outside the scope of Subsection 1337(p)." Fed. Defs.' Mem. 19. Empire fails to respond to that argument. Indeed, it is *Empire's* reading of Subsections 1337(p) and 1334(a) that would create surplusage by rendering unnecessary the instructions in Subsection 1337(p)(5) and (8) to provide for lease suspensions and promulgate regulations.

Subsection 1337(b), which concerns oil and gas leases, contains an explicit cross-reference to Subsection 1334(a) that is conspicuously absent from Subsection 1337(p). Fed. Defs.' Mem. 17–18. That difference in language is yet further evidence of a difference in meaning. *Id.* Empire, however, transforms our argument into one that argues that Sections 1348 and 1349 of OCSLA do not apply to wind energy leases. Empire Resp. 20–21. That is not what we argued. The interpretive value of the cross-reference to Section 1334 in Subsection 1337(b) is not in the cross-reference itself, but in the fact that the cross-reference appears in the portions of Section 1337

12

governing oil and gas leases (Subsection 1337(b)) but not the portion governing wind energy and other leases authorized by Subsection 1337(p)(1). In contrast, there is no cross-reference to Section 1348 or 1349 in either Subsection 1337(b) or Subsection 1337(p). Thus, there is not a similar "difference in language" that would convey a "difference in meaning." *Enbridge Energy*, 146 S. Ct. at 1083–1084.

Empire also argues that "[c]ourts have long recognized that leases issued pursuant to Interior's authority under Section 1337 are subject to all other sections of the statute . . . including Section 1334," but neither of the out-of-circuit cases that Empire cites on this point addressed the question at issue here. Empire Resp. 12 & n.12. Both *Louisiana v. Biden*, 622 F. Supp. 3d 267, 277–78 (W.D. La. 2022), and *Hornbeck Offshore Services, LLC v. Salazar*, 696 F. Supp. 2d 627, 633 (E.D. La. 2010), concerned oil and gas activities, not leases for activities authorized by Subsection 1337(p)(1). Neither case so much as references Subsection 1337(p). *See generally Louisiana*, 622 F. Supp. 3d 267; *Hornbeck Offshore Servs.*, 696 F. Supp. 2d 627. Further, this District has recognized distinctions in the regulatory regimes governing oil and gas leases and wind energy leases. *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 136 (D.D.C. 2022) (observing that "[i]n contrast" to the regulations governing wind energy leases, "oil and gas lease cancellations carry the additional requirements that '[a] suspension has been in effect for at least 5 years or' the lessee requests cancellation, and the lessee is entitled to compensation" (quoting 30 C.F.R. § 550.181(d) and also citing 30 C.F.R. § 550.184 and 43 U.S.C. § 1334(a)(2)(A)–(C)), *vacated and remanded as moot*, No. 22-5037, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023).

Presumably because the statutory text and canons of construction do not help its cause, Empire catastrophizes and misconstrues Federal Defendants' arguments regarding the terms of Empire's lease. Empire Resp. 16. Empire argues that Federal Defendants' interpretation of

13

Subsection 1337(p) would "allow[] BOEM to cancel leases for virtually any reason, without following the due process requirements, and without providing the required compensation to lessees." Empire Resp. 16. This argument puts the cart before the horse—any protected property right Empire has that could form the basis for a constitutional claim is shaped by OCSLA and Interior's implementing regulations (which are incorporated into Empire's lease). *Infra* at 22. Then, even if a court finds that a protected property interest exists, determining the due process or just compensation owed would both be separate questions from whether a lease suspension is statutorily authorized. Federal Defendants have also never argued that the Tucker Act bars an APA challenge to the Suspension Order. *See* Empire Resp. 17. Rather, the Tucker Act bars a lease-based breach of contract claim in district court, and the terms of the lease are irrelevant to the merits of Empire's claim (brought pursuant to the APA) that the Suspension Order was contrary to statute. Fed. Defs.' Mem. 25. Further, Empire's argument (Empire Resp. 16) that Federal Defendants' interpretation of Subsection 1337(p) "is also contradicted by its own prior actions" is, for the reasons discussed above, flatly contradicted by the history of BOEM's regulations applicable to wind energy leases. *Supra* at 9–10. Empire's lease expressly acknowledges that the lease is subject to those regulations, which provided BOEM with authority to issue the Suspension Order. AR0043.

### 3.   Interior's Authority Under Subsection 1337(p) Is Not Limited by Subsection 1341(c).

Empire concedes that its argument regarding Subsection 1341(c) turns on resolution of the question of whether Subsection 1337(p)(5) provides BOEM with authority to suspend leases for national security reasons. Empire Resp. 19. Subsection 1341(c) provides that all leases issued under OCSLA "shall contain or be construed to contain a provision whereby authority is vested in the Secretary, upon a recommendation of the Secretary of Defense, during a state of war or national

14

emergency . . . to suspend operations under any lease." 43 U.S.C. § 1341(c). Empire acknowledges it "would be true" that nothing in the text of Subsection 1341(c) bars BOEM from using authority that is granted it by other sections of OCSLA to suspend leases for national security reasons in circumstances not contemplated by 1341(c) "if there were other such authority in OCSLA." Empire Resp. 19. As discussed above, Empire fails to meaningfully respond to Federal Defendants' argument that Subsection 1337(p)(5) plainly provides such authority for leases issued under Subsection 1337(p)(1).

Empire also again misapplies the surplusage canon in arguing that Interior had to rely on Subsection 1341(c). Empire Resp. 21–23. Subsection 1337(p) provides authority to the Secretary to promulgate regulations for the suspension of certain leases to protect national security in other circumstances *if necessary.* 43 U.S.C. § 1337(p)(8) ("[T]he Secretary, in consultation with the Secretary of Defense . . . shall issue any *necessary* regulations to carry out this subsection." (emphasis added)). The statute does not *require* Interior to issue regulations providing for suspension of leases in situations not contemplated by Subsection 1341(c) if not necessary. That Interior did find such a regulation necessary, arguably making Subsection 1341(c) unnecessary for leases authorized by Subsection 1337(p)(1) from a practical standpoint, does not make Section 1341 superfluous *to the statute.*

Nor does Empire seriously engage with the case law that Federal Defendants discussed on this point. While Empire cites the general articulation of the surplusage cannon from *Changji Esquel Textile Co. v. Raimondo*, Empire does not actually address the D.C. Circuit's application of the canon in that case. In turn, Empire does not explain how Subsection 1337(p)'s alleged swallowing of Subsection 1341(c) is any different than the situation in *Changji*, in which the court concluded that 50 U.S.C. § 4813(a)(16)'s authority to "undertake any other action as is necessary

15

to carry out this subchapter" did not swallow the specific instructions in 50 U.S.C. §§ 4813(a)(2) and 4811(2)(A).  *See Changji*, 40 F.4th 716, 722–23 (D.C. Cir. 2022).  Empire also entirely fails to address the D.C. Circuit's decision in *DeNaples v. Office of the Comptroller of the Currency*, 706 F.3d 481, 487 (D.C. Cir. 2013).  In that case, the Circuit found that an agency could use general cease-and-desist powers granted in one provision of the Federal Deposit Insurance Act, even though other provisions provided specific enforcement mechanisms.  *See id.*  Similarly, here, "Congress could reasonably give Interior multiple routes under OCSLA to address 'the full spectrum' of problems impacting an interest as critical as national security."  Fed. Defs.' Mem. 24 (quoting *DeNaples*, 706 F.3d at 487).  Empire has provided no reason to conclude otherwise.

Subsection 1341(c) "also continues to be of consequence in conjunction with Subsection 1334(a)."  *See* Fed. Defs.' Mem. 23.  That would be so particularly under Empire's interpretation of Subsection 1334(a), which, in Empire's view, does not provide authority to suspend leases for reasons of national security.  Empire relegates its response to this argument to a footnote.  Empire Resp. 22 n.14.  Its argument there again relies on the fallacy that the statutory provision Empire thinks governs the present circumstances (*i.e.*, subsection 1341(c)) is rendered a nullity if it does govern the circumstances.  As discussed above, Empire of course ignores that Subsection 1341(c) can apply to other situations.

In sum, it is not Federal Defendants who are engaged in a "tortured attempt to apply the canons of statutory interpretation" to reach their desired outcome.  Empire Resp. 23.  Empire's response brief ignores the Subsection 1337(p)'s plain text and history, misapplies canons of statutory construction, and fails to meaningfully respond to key arguments. Should it reach the merits, the Court should therefore grant Federal Defendants summary judgment on Empire's statutory authority claim.

16

### B.      Plaintiffs Have Not Met Their Burden to Show an APA Violation.

Plaintiffs' arbitrary and capricious claims likewise fail on the merits.  Fed. Defs.' Mem. 26–39.  BOEM reasonably explained the bases for the Suspension Order, considered the relevant factors, and relied on new materials from the Department of War.  We make five points in reply to Empire's response brief.

*First*, BOEM's Suspension Order explained why BOEM was taking the action.  In response, Empire and New York commingle (1) an agency's need to reasonably explain the bases for its decision and (2) the requirement that an agency rationally connect its decision to the facts before it, using the latter to argue a deficiency in the former.  *See* Empire Resp. 27–31; Statement of P. & A. in Opp'n to Agency Defs.' Cross-Mot. for Summ. J. and Reply in Supp. of NY's Mot. for Summ. J. (NY Resp.) 2–4, Dkt. No. 63.  But whether an agency reasonably explained the bases for its decision is judged on the face of the decision.  Here, Empire and New York do not dispute that BOEM's Suspension Order cited the authority under which it was acting and explained that it was suspending lease activities for 90 days so it could make a further assessment of national security implications associated with new classified materials it had received from the Department of War.  AR0001.  That was sufficient.  BOEM reasonably explained the bases for its decision. *See* Fed. Defs.' Mem. 26–28.  And Plaintiffs have not met their burden to show the administrative record did not support that decision.  *See* Fed. Defs.' Mem. 33–39.

*Second*, in attempting to rebut our argument that the change-in-position doctrine is not relevant, Empire and New York still focus on the wrong thing.  We explained that the doctrine is not implicated because BOEM did not alter or revoke any of the existing Project approvals.  Fed. Defs.' Mem. 29.  The argument does not turn on the fact that the Suspension Order was temporary (*contra* Empire Resp. 32; NY Resp. 5).  Nor did BOEM change an existing policy, despite

17

Empire's efforts to cabin it as such. *See* Empire Resp. 33. BOEM reacted to new materials it received from the Department of War in a manner it thought necessary to facilitate further review of national security concerns. *See* AR0001.

New York argues that the change-in-position doctrine is implicated because the Suspension Order, though temporary, "threaten[ed] Empire Wind's entire existence." NY Resp. 5 (quoting Tr. of Prelim. In. Oral Ruling 10:13–14 (Jan. 15, 2026)); *see also* Empire Resp. 32. But that alleged "threat" (if any) would have derived from potential contract issues and business decision-making. The Suspension Order did not purport to cancel the Project. *See* AR0001.

Empire's attempt to distinguish *National Council of Resistance of Iran v. Department of State* only illustrates our point about the doctrine. Empire Resp. 33–34 (citing 251 F.3d 192 (D.C. Cir. 2001)). Empire relies on the court's statement that the agency would be required to "offer us some reason for the change." Empire Resp. 33 (quoting *National Council*, 251 F.3d at 199). But the court made that statement in the context of a *hypothetical* in which the agency would have "taken the [same] record and reached a different conclusion." *National Council*, 251 F.3d at 199. On the *facts* in that case, "[h]owever, the [agency] was not acting on the same record." *Id.* "There [was] no logical reason for concluding that there ha[d] been no change in either the facts or the [agency's] knowledge of the facts between the [prior decision] to designate and the [challenged] designation." *Id.* The court therefore concluded that the "principle" that an agency "must provide a reasoned explanation for" a change in position "does not apply to this case." *Id.* (internal citation omitted). So too here. Any argument that, given existing mitigation, BOEM did not explain why the new materials from the Department of War justified a suspension (*see* Empire Resp. 33) is just an argument that the administrative record does not support BOEM's conclusion. It would not be a violation of the change-in-position doctrine.

18

*Third*—and assuming reliance interests had to be considered at all—New York has not shown that BOEM had to consider New York's reliance interests. BOEM was not acting to rescind an immigration policy implicating large swaths of the population; restrict tax credit availability for an entire industry; or postpone nationwide regulations on education. *See* NY Resp. 6–7 (attempting to analogize cases). BOEM undertook an informal adjudication with respect to a single entity who is currently operating under an agency license issued to that entity. New York (which holds the burden here) does not provide any legal support for the proposition that an agency must in those circumstances consider reliance interests beyond those of the license holder. *See FDA v. Wages & White Lion Inv., LLC*, 604 U.S. 542, 567–68 (2025) (explaining that the intent behind the doctrine is that "an agency should not mislead regulated entities").

*Fourth*, Empire and New York have not shown that BOEM's decision is out of line with the administrative record. Empire and New York do not dispute that the Empire Wind Project could adversely impact military operations and homeland defense absent sufficient mitigation. *See* AR5114; AR4915–16. And Empire and New York do not dispute that existing mitigation measures "are not able to fully eliminate the potential line-of-sight impacts of the [wind turbine generators] on radar systems." AR2318; AR2320–21; AR2323–25. Under those circumstances— and particularly given the national security context—BOEM acted reasonably in suspending lease activities for 90 days in response to new materials from the Department of War so BOEM could further assess the issue.

Empire and New York both attempt (incorrectly) to invoke the doctrine against post-hoc rationalizations. Empire attempts to apply the doctrine to our opening brief's reference to factual differences with the South Fork Wind Project. Empire Resp. 29. But we were only responding to Empire's effort—which it still pursues (Empire Resp. 29 n.18)—to use extra-record evidence

related to South Fork. *See* Fed. Defs.' Mem. 35–36. New York runs even further afield in attempting to posture a document *in the administrative record* as a post-hoc rationalization. NY Resp. 3. A document in the administrative record necessarily precedes the agency decision and therefore cannot be "post-hoc." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1095 (D.C. Cir. 1996) (the administrative record "includes all materials 'compiled' by the agency, that were 'before the agency at the time the decision was made'" (citations omitted)). Further, there is a difference between "a post hoc rationalization, which is a new rationale for an agency action, and a post hoc explanation, which is an agency's discussion of the previously-articulated rationale for the challenged action." *Nat'l Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1204 (D.D.C. 1996), *aff'd in part and remanded sub nom., Troy Corp. v. Browner*, 120 F.3d 277 (D.C. Cir. 1997). "Post hoc rationalizations are precluded; post hoc explanations are not." *Id.*

*Fifth*, New York (but not Empire) rehashes its pretext argument. *See* NY Resp. 9–10. Certainly, should the Court conclude that the administrative record does not support BOEM's decision, the result would be a finding of arbitrary action. But that does not equate to pretext. "[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Dep't of Comm. v. New York*, 588 U.S. 752, 781 (2019). New York cites nothing in the administrative record to support its pretext argument. Should the Court not dismiss the complaints as moot, summary judgment should be granted in favor of Federal Defendants on the claims alleging arbitrary and capricious action.

### C.   Empire Has Not Established a Violation of the APA's Procedural Requirements.

Empire has not established that the Suspension Order contravenes 5 U.S.C. § 558(c). Subsection 558(c) "does not allow suspension of a license without certain procedural protections,

*except* where 'public health, interest, or safety requires otherwise.'" Fed. Defs.' Mem. 39 (quoting 5 U.S.C. § 558(c)). Empire has not disputed that the exception applies to national security risks. *See China Telecom (Ams.) Corp. v. FCC*, 57 F.4th 256, 269 (D.C. Cir. 2022). And here, the record discusses the potential national security implications of offshore wind projects. *See*, *e.g.*, AR0033, 0037, 0417–58, 4917–5113.

Empire only makes two arguments in reply. Empire Resp. 34–35. *First*, Empire offers little support for its contention that the exceptions in Subsection 558(c) apply only to "unusual, emergency, situations." Empire Resp. 34 (quoting *Air N. Am. v. Dep't of Transp.*, 937 F.2d 1427, 1437 n.8 (9th Cir. 1991)). The statutory language in Subsection 558(c) does not use any of those words. *See* 5 U.S.C. § 558(c). Instead, Empire relies on an out-of-circuit case involving the public interest portion of the exception. *Air N. Am.*, 937 F.2d at 1437 n.8. The Ninth Circuit found an agency conclusion that a revocation was in the public interest to be, standing alone, insufficient to trigger the public interest exception because "at least in theory" "every agency action is taken because the agency believes the action to be in the public interest." *Id.* The court's invocation of the need for an "unusual, emergency, situation[]" was intended as a necessary limitation on the public interest exception so that it would not "swallow" the rule. *Id.* But neither *Air North America* nor any of its cited cases support the proposition that an "emergency" is always a prerequisite for the Subsection 558(c) exceptions. Empire points to statements at the preliminary injunction hearing regarding threats from operations and the fact that the government did not appeal the preliminary injunction ruling as a basis to conclude there is no apparent emergency here. Of course, even assuming an emergency was the governing standard, these post-decisional facts have little relevancy. There are a multitude of reasons why the government—in which appeal authority

21

rests with the Office of the Solicitor General—may not choose to appeal an interlocutory order. *See United States v. Mendoza*, 464 U.S. 154, 160–161 (1984).

*Second*, Empire relies on *China Telecom*. Empire posits that *China Telecom* undercuts BOEM's position here because, in *China Telecom*, the government provided opportunities for the regulated party to respond. Empire Resp. 35 (quoting *China Telecom*, 57 F.4th at 269). But the D.C. Circuit's finding that Subsection 558(c) has "[i]n any event" been satisfied came after its conclusion that the petitioner had "not effectively refute[d]" the government's argument that Subsection 558(c)'s procedural requirement did not apply. *China Telecom*, 57 F.4th at 269. Empire has not shown that the procedural protections in Subsection 558(c) applied here.

### D.  Empire Has Not Established a Due Process Violation.

Empire has also not established a due process violation. Any Empire property interest is necessarily defined by OCSLA, BOEM's implementing regulations, and the terms of the lease, the latter of which expressly makes the conveyance subject to BOEM's suspension authority. *See* Fed. Defs.' Mem. 40. Indeed, Empire conceded the point in its opening brief: "Empire Wind's property interests in the Lease . . . were subject only to the specific suspension and cancellation limitations defined by OCSLA, BOEM's implementing regulations, and the terms of the Lease . . . ." Empire Mem. 25. Our point is that the Suspension Order did not deprive Empire of a stick in its property rights bundle. Rather, the Order was authorized by a defining characteristic of the bundle. The Suspension Order did not revoke the lease or cancel the prior COP approval.

Even assuming deprivation of protected property interest, Empire has failed to demonstrate a procedural due process violation. The Due Process Clause does not categorically require pre-deprivation process; rather, "[d]ue process may be satisfied by either pre-deprivation procedures or 'adequate post-deprivation remedies.'" *Ranch v. Noem*, 805 F. Supp. 3d 288, 304 (D.D.C. 2025)

(quoting *Rason v. Nicholson*, 562 F. Supp. 2d 153, 155 (D.D.C. 2008)), *appeal filed sub. nom. Ranch v. Mullin*, No. 25-5433 (D.C. Cir. Dec. 5, 2025).  Due process is "flexible and calls for such procedural protections as the particular situation demands."  *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).  Post-deprivation procedures are sufficient "where some valid governmental interest is at stake that justifies postponing the hearing until after the event."  *N.B. v. District of Columbia*, 244 F. Supp. 3d 176, 183 (D.D.C. 2017) (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993)).

The post-deprivation process inquiry is governed by the *Mathews* framework, with an emphasis on the governmental interest and whether it "justifies" post-deprivation protections.  *N.B.*, 244 F. Supp. 3d at 183–84.  The parties agree that the government's interest in national security is an important one.  And we maintain that, in light of that interest, the balancing here permitted post-deprivation process, if any was necessary.  *See Mathews v. Eldridge*, 424 U.S. 319, 333–355 (1976).  BOEM received new materials from the Department of War and, to allow for consideration of the issue and conferrals with Empire Wind, temporarily suspended lease activities for 90 days on a Project with a years-long construction schedule.  Empire counters on grounds that, essentially, Empire is not in possession of sufficient explanation of the national security interests.  Empire Resp. 26 (calling the national security interests "unspecified" and "devoid of information").  We have already addressed this point: BOEM could only say so much in the Suspension Order given the classified nature of the information relied upon, and reading the Due Process Clause to "[f]orc[e] the executive branch to disclose information that it has validly classified would 'compel a breach in the security which that branch is charged to protect.'"  *Fares v. Smith*, 901 F.3d 315, 324 (D.C. Cir. 2018) (citation omitted).  The administrative record discusses the national security risks presented by offshore wind projects that do not have sufficient

mitigation to address existing threats.  Fed. Defs.' Mem. 3–6.  Empire has not shown a due process violation.

## CONCLUSION

The Suspension Order that Empire and New York challenge expired on its own terms.  The complaints are therefore moot and should be dismissed.  Should the Court reach the merits, summary judgment should be granted in favor of Federal Defendants.


August 14, 2026

<div style="margin-left:40%">

STANLEY E. WOODWARD, JR.
Associate Attorney General

JOHN K. ADAMS
Deputy Associate Attorney General

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

BRADLEY CRAIGMYLE
Deputy Assistant Attorney General

 _s/ Kristofor R. Swanson__
KRISTOFOR R. SWANSON
(Colo. Bar. No. 39378)
AMANDA K. RUDAT
SHAWN D. REN
Natural Resources Section
Environment & Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 598-1937 (Swanson)
kristofor.swanson@usdoj.gov

*Attorneys for Federal Defendants*

</div>

24